QUARLES & BRADY LLP
Firm State Bar No. 00443100
Renaissance One, Two N. Central
Phoenix, AZ 85004-2391, 602-229-5200
Brian A. Howie (AZ No. 026021)
Brian.Howie@quarles.com
Lauren E. Stine (AZ No. 025086)
Lauren.Stine@quarles.com
*Attorneys for Plaintiffs*

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., NW, Ste. 100
Washington, DC 20006, 201-747-1900
Thomas J. Dillickrath* (DC 483710)
TDillickrath@sheppardmullin.com

Four Embarcadero Center, 17th Floor
San Francisco, CA 94111, 415-434-9100
Amar S. Naik* (CA 307208)
ANaik@sheppardmullin.com
Molly C. Lorenzi* (CA 315147)
MLorenzi@sheppardmullin.com

GIBBS & BRUNS LLP
1100 Louisiana, Ste. 5300
Houston, TX 77002, 713-650-8805
Aundrea K. Gulley* (TX 24034468)
agulley@gibbsbruns.com
Denise Drake* (TX 24092358)
DDrake@gibbsbruns.com
*Attorneys for The Reynolds and Reynolds Co.*

MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
312-782-0600
Britt M. Miller* (IL 6256398)
BMiller@mayerbrown.com
Michael A. Scodro* (IL 6243845)
MScodro@mayerbrown.com
Brett E. Legner* (IL 6256268)
BLegner@mayerbrown.com

1999 K Street, NW
Washington, DC 20006
202-263-3000
Mark W. Ryan* (DC 359098)
mryan@mayerbrown.com
*Attorneys for CDK Global, LLC*

*\*Pro Hac Vice Forthcoming*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br>**(Declaratory Judgment)** |

Plaintiffs CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds"), through their undersigned attorneys, bring this complaint for declaratory and injunctive relief and in support allege as follows.

## INTRODUCTION

1.     This lawsuit challenges Arizona House Bill 2418 (the "DMS Law"), codified at §§ 28-4651 to 28-4655 of the Arizona Revised Statutes. Plaintiffs provide proprietary computer systems to automotive dealers (known as "dealer management systems" or "DMSs"). The DMS Law purports to require Plaintiffs to give third parties unfettered access to and use of Plaintiffs' DMSs, and the sensitive customer data they store, manage, and protect, without Plaintiffs' authorization. The law effectively interferes with Plaintiffs' established contract rights and takes Plaintiffs' intellectual property, ultimately putting highly confidential information pertaining to Arizona consumers at great risk without any justification and in disregard of the laws and Constitution of the United States, and potentially exposing Plaintiffs to substantial criminal penalties.

2.     The DMS Law was falsely described to legislators as a consumer-protecting data privacy measure. In fact, the DMS Law was drafted and pushed through by the Arizona Automobile Dealers Association, the top donor to the law's sponsor in his last election. Far from protecting consumers, the DMS Law necessarily puts consumers' data at extremely high risk by allowing unlicensed third parties—including those seeking to access, collect, and profit from selling consumer data—to access Plaintiffs' DMSs and all of the data on those systems, and forbids Plaintiffs from taking any measures to secure those systems and data.

3.     Rather than protecting consumers, the DMS Law is a blatant attempt by car dealers to change the terms of freely negotiated, arms-length contracts with Plaintiffs and to interfere with Plaintiffs' contracts with other parties, for short-term economic gain and at the expense of the people of Arizona.

QB\58682256.1

4.      In committee debate on the DMS Law, Senator Eddie Farnsworth warned on the record: "I really do think that we're walking on some thin ice here when we start to pass laws that interfere with current contracts. And quite honestly, there's a potential unconstitutionality issue here."

5.      Senator Farnsworth was right: the DMS Law is preempted under the Supremacy Clause of the U.S. Constitution because it conflicts with federal law and policy. It is also void for vagueness and violates several other provisions of the Constitution: it takes private property without just compensation, interferes with contracts, unduly burdens interstate commerce, and impermissibly compels speech.

6.      Beyond its unconstitutionality, if the DMS Law is enforced, millions of Arizonans are likely to see the private information they entrusted to auto dealers — including their driver's license and Social Security numbers, home address, email, phone numbers, and bank or other financial information — exposed to harvesting, aggregation, and syndication by third parties who do not have the same obligations to protect data that dealers have and who often sell such data to the highest bidder.

7.      Additionally, by giving third parties unfettered rights to introduce their computer code into the system, the DMS Law exposes DMS providers to threats caused by introducing a known security risk into a trusted network. Once in the network, a cyber-attacker could hack into other systems and cause direct financial harm to the DMS provider.

## **BACKGROUND**

8.      Plaintiffs CDK and Reynolds are automotive technology companies that have developed complex, advanced proprietary computer systems known as dealer management systems. Car dealerships often license DMSs to help manage accounting, sales, service, finance, payroll, and other business operations. In those contracts, the licensee dealers expressly agree that the license is limited, that they are not authorized to grant further licenses to others, and that they may not access or use the DMSs by means other than those

permitted by the Plaintiffs acting as licensors. Plaintiffs' DMSs process vast amounts of confidential consumer and third-party information, copyrighted or copyrightable material, and trade secrets. Such data include highly sensitive and/or proprietary material from automotive dealerships, their customers, car manufacturers, application software providers, banks, credit bureaus, other financial institutions, and the DMS providers themselves.

9.     DMSs also securely transmit certain data to entities involved in a dealership's business operations (e.g., sending consumer data to a credit bureau for a credit check during the vehicle financing process or receiving updated parts pricing data from a car manufacturer).

10.     CDK's and Reynolds's DMSs are secure because they must be. Numerous federal laws and regulations, as well as industry best practices, limit how data may be handled, stored, or processed on a DMS. Relevant laws include the Gramm-Leach-Bliley Act ("GLBA"), the Fair and Accurate Credit Transactions Act, the FTC's Privacy, Safeguards, and Disposal Rules, the Fair Credit Reporting Act, and the Dodd-Frank Act. Data handled, stored, or processed on a DMS is also governed by contracts with car manufacturers, financial institutions, and other third parties to whom such data is sent or received.

11.     In light of these statutory and contractual obligations, as well as the trust that Plaintiffs' customers and other members of the automotive industry place in their DMSs, Plaintiffs (1) deploy strict authorization and authentication measures to control access to their proprietary systems; (2) require third parties to go through integration testing procedures; and (3) follow strict integration specifications. In these ways, Plaintiffs maintain data integrity and diligently defend their DMSs against cyber-attack, corruption, and breach.

12.     At great expense, Plaintiffs have developed technologically sophisticated security measures to prevent unlicensed and unauthorized access to their DMSs. Plaintiffs

-4-

have also developed their own proprietary processes for securely handling data communications between dealerships, car manufacturers, and other third parties involved in a dealership's business operations. Plaintiffs and other DMS providers compete with each other over the security, functionality, and performance of their system designs, and the ability to provide strong security is a competitive advantage.

13.     The DMS Law takes away Plaintiffs' control over their proprietary systems, however, effectively requiring all DMS providers to use non-secure methods of system access and data transmittal by eliminating the rigorous security and operational measures Plaintiffs have spent millions of dollars and a massive number of human-hours to develop and maintain.

14.     Specifically, the DMS Law forces Plaintiffs to provide unlicensed third parties (whether they be automotive marketing firms, other service providers, or malicious hackers) with free and unfettered access to Plaintiffs' proprietary systems. The *only* restriction placed on this access is that it be at the request of a dealership employee.

15.     In addition to DMSs, many dealers use software applications provided by third parties. In some instances, the dealers would like those third-party application providers to leverage DMS data and processes, which may include accessing data stored on the DMS or writing data back to it. Both Plaintiffs provide robust, monitored means for those legitimate providers to do so. But there are also third parties that attempt to gain unauthorized access to the DMS for several different purposes. Some want to write data back to the system. Some want to extract data from the system. And some of these data extractors are so-called "syndicators," who have historically attempted to access Plaintiffs' DMSs without authorization to hijack consumer and proprietary data and sell it to other parties without Plaintiffs' permission (in many cases, without dealer or consumer knowledge). The DMS Law forbids Plaintiffs from taking any measures to secure their systems or limit the data that a third party can access, extract, or modify on the DMS.

QB\58682256.1

16.     If the DMS Law is enforced, it will place all consumer and proprietary data stored or processed on any DMS at great risk. Consumers will face a significantly increased threat of identity theft every time they buy, lease, or service a vehicle from an Arizona dealer. The same will be true of anyone who has purchased, leased, or serviced a car from an Arizona dealer in recent years.

17.     In short, the DMS Law requires Plaintiffs to tear down their security walls and build a back door to Plaintiffs' DMSs, giving data pirates and cyberthieves free license to jump unimpeded into the pool of data provided by Arizona consumers.

18.     Further, by forcing Plaintiffs to open their secure proprietary systems to unlicensed third parties, the DMS Law eviscerates Plaintiffs' intellectual property rights in their proprietary computer systems, undercutting the economic incentive for them to develop and innovate on the systems capable of helping Arizona dealers manage their businesses while securing Arizona consumers' highly sensitive data.

19.     The DMS Law is problematic in numerous other respects. It requires Plaintiffs and other DMS providers to write new computer code allowing third parties to access and write data back to the DMSs and forbids these providers from charging for that work. It eliminates the many approaches currently used by DMS providers like Reynolds and CDK to enhance system access and security within the automotive software industry and forbids DMS providers from securing their systems. Equally important, the law creates a gaping vulnerability in DMSs that impacts thousands of dealer licensees and tens of millions of consumers within and without Arizona's borders.

20.     The DMS Law conflicts with the federal laws that keep Arizona consumers' (including car buyers') personal information safe. It conflicts with the federal laws that protect Plaintiffs' property interests in, and rights to exclude users from, their DMSs. And it substantially impairs Plaintiffs' existing contracts with dealers; takes Plaintiffs' property for no public use and without compensation; carves out special rules for Arizona car

dealerships that unreasonably burden interstate commerce; and violates Plaintiffs' right to free speech by compelling them to draft and implement computer code and exchange information with third parties.

21.     At the same time, the DMS Law is fatally vague, and exposes DMS providers, including Plaintiffs, to criminal penalties, including fines of up to $16,000 per day. The DMS Law will be added to Title 28 of the Arizona Revised Statutes. Section 28-121(A) states that a person who violates a provision of Title 28 or fails or refuses to do or perform an act or thing required by Title 28 is guilty of a Class 2 misdemeanor. For corporate entities like Plaintiffs, the fine for a Class 2 misdemeanor is up to $10,000 "per offense." In addition, Section 28-121(C) provides that violations of Title 28 are subject to certain statutory surcharges, which are levied on top of the base fine. Together, these statutory provisions mean that a DMS provider, like Plaintiffs, is subject to fines of up to $16,000 per offense.

22.     Because the onerous requirements that the DMS Law places on DMS providers are facially invalid under federal and state law, the Court should declare the law void and enjoin its enforcement against Plaintiffs.

**THE PARTIES**

23.     Plaintiff CDK Global, LLC is a Delaware limited liability company with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail industry.

24.     The automotive data ecosystem that CDK supports is massive, with tens of thousands of installations of approved vendor applications and millions of transactions every day, supporting hundreds of billions of dollars in commerce each year. In light of the size, scope, and importance of its network to the American economy, the Department of Homeland Security has designated CDK's DMS a Critical National Infrastructure "so vital

to the United States that [its] incapacitation would have a debilitating effect on security [and] national economic security."

25.    CDK has made substantial investments to build out and support its network of product and Software as a Service (SaaS) offerings. Over the last four years alone, CDK has spent more than $100 million researching, developing, and deploying new and enhanced products for its customers.

26.    Plaintiff The Reynolds and Reynolds Company is a privately held Ohio corporation with its corporate headquarters at One Reynolds Way, Kettering, Ohio 45430.

27.    Reynolds developed, maintains, owns, and operates a proprietary enterprise computer system that car dealerships license to manage their businesses. The system has hundreds of millions of lines of natively developed source code deployed in Reynolds's software programs.

28.    Reynolds's ongoing development of its DMS has produced a single system capable of supporting data communications between and among licensed dealerships, new car manufacturers, financial institutions, and automotive application software.

29.    Defendant Mark Brnovich is the Attorney General of Arizona and in that position is the chief law enforcement officer of the State and has responsibility for enforcing the DMS Law. Specifically, pursuant to A.R.S. § 28-333, Attorney General Brnovich "shall prosecute and defend in the name of this state all actions necessary to carry out" Title 28 of the Arizona Revised Statutes (to which the DMS Law will be added). Attorney General Brnovich is sued in his official capacity only.

30.    Defendant John S. Halikowski is the Director of the Arizona Department of Transportation and in that position has the authority to supervise and regulate dealers, manufacturers, distributors, and other entities. Defendant Halikowski is sued in his official capacity only. Defendant Brnovich and Defendant Halikowski are referred to collectively as "Defendants."

-8-

**JURISDICTION AND VENUE**

31.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, and 2201(a). There is federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs allege violations of the federal Constitution. Plaintiffs seek a declaration of their rights pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, over which there is an actual controversy after the enactment of the DMS Law.

32.     This Court has personal jurisdiction over Defendants because (a) they are located in the District in which this action was filed; and (b) many of the actions giving rise to these claims occurred in and/or were directed from this District.

33.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

**FACTUAL ALLEGATIONS**

34.     DMSs are proprietary systems licensed to end users (i.e., car dealerships) based on contract terms such as a limited license, with fees based on features, functionality, and number of users. DMSs run hundreds of millions of lines of computer code and incorporate valuable patents, copyrights, trade secrets, and other intellectual property. They also store and process sensitive consumer, financial, and proprietary data. Many companies, including CDK and Reynolds, develop, own, operate, and license DMSs.

35.     DMSs are distributed computer systems that operate in interstate commerce across state lines. For example, an Arizona dealership licensing a Reynolds DMS could have a DMS server that resides on-site at its dealership and connects with Reynolds data centers in Texas and/or Ohio, automakers in Michigan, and software application vendors in Georgia, Florida, and/or California. In addition, many dealership groups have multi-state, regional, or national operations and enter into a single set of contracts with a DMS provider to license the DMS across some or all of their operations.

36.     CDK and Reynolds, like many other DMS providers, deploy strict access controls on their systems to comply with both federal and state data security and privacy

laws and their contracts with dealers, and to manage the security, privacy, and performance of their proprietary enterprise computer systems. Typically, only dealership employees may use DMS login credentials to access the DMS. In accordance with the DMS contract and their own obligations under federal law, these dealership employees cannot share these credentials with any non-dealership employee or use the DMS for purposes other than the dealership's business. Additionally, the DMS contracts prevent automated access to the DMS unless authorized by the DMS provider.

37.     Although CDK's DMS is different than Reynolds's, the DMS Law affects both companies' DMSs in a similar manner. Both companies' DMSs provide licensees with the option to allow automakers (also known as Original Equipment Manufacturers or "OEMs"), lenders, credit bureaus, application providers, and other third parties to interoperate with their respective DMSs through system interfaces that securely manage the flow of data. Each of those interfaces is also established and governed by its own licensing agreements.

A.     **CDK's DMS**

38.     CDK's DMS offering to car dealers consists primarily of two products that provide dealers with proprietary software tools and resources used to manage core aspects of their businesses. CDK currently licenses its DMS to more than 30,000 dealerships around the world and approximately 8,000 new car dealerships in North America. CDK annually processes 2.5% of the U.S. gross domestic product (approximately $500 billion) through its software solutions.

39.     CDK has invested hundreds of millions of dollars to develop the hardware and software components of its DMS over decades. CDK's DMS contains, and consists of, valuable intellectual property including patented technologies, proprietary software elements and programs created by CDK (including software programs eligible for protection by the copyright laws), and proprietary data collections, which are accessible

through the DMS. Dealers that license DMS services from CDK receive a personal, non-transferable software license to use CDK's DMS in accordance with the terms and conditions of their agreements.

40.     CDK's terminal program, which runs on dealer computers, is an original and independent work created and licensed by CDK. It consists of original and distinct elements, including its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; dynamic user experience; and secure connectivity between dealer endpoints and CDK's networks.

41.     In addition to its core functionalities, the CDK DMS processes and/or stores voluminous amounts of highly sensitive data, including financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, vehicle information, customer personal identifiable information, proprietary intellectual property, and proprietary data belonging to CDK and third parties, including the data described below.

42.     Such data belongs to several types of entities. Some data, such as prices and part numbers for replacement parts, labor rates, and rebate, incentive, and warranty information is proprietary to OEMs such as General Motors, Ford, and Subaru. Other data in or processed by CDK's DMS is proprietary to third-party service providers, such as credit reporting bureaus like Equifax, Experian and TransUnion. Still other data in the DMS is CDK's own proprietary, copyrightable data, including forms, accounting rules, tax tables, service pricing guides, and proprietary tools and data compilations. And while some data "belongs" to the dealers, in the sense that dealers enter the data into the system, that use CDK's DMS, much of that is consumer data. Access to third-party and CDK proprietary information in the DMS is permitted for licensed DMS customers, but CDK is prohibited by contract from sharing much of this information with any other third parties.

QB\58682256.1

## B.    Reynolds's DMS

43.    Reynolds introduced its first computerized DMS, called "ERA," in the late 1980s. In 2006, Reynolds merged operations with Dealer Computer Services, Inc., which had developed a separate DMS product in the 1980s now known as POWER. Reynolds continues to offer both POWER and ERA (collectively, the "Reynolds DMS").

44.    The Reynolds DMS is an integrated system of hardware and software components distributed to over 5,000 franchised new car dealerships in North America, including: dealer-side or hosted servers; operating systems, segregated databases, and application layers on the servers; secured interfaces between the servers and the dealer's computers; end-user application software on the dealer's computers; secure data connections from the servers to the data centers and centralized processing facilities; security measures including encryption, access monitoring, and password complexity requirements; and network and system components including Virtual Local Area Networks, Wide Area Networks, print servers, and software.

45.    These components allow retail automotive dealers to manage their inventories, bookkeeping and accounting, customer contacts, financial and insurance information, transactional details, government reporting and compliance requirements, human resources files, and many other materials involved in managing an auto dealership. Each Reynolds DMS is custom built to provide the hardware and software components that an individual dealership needs to maximize performance.

46.    Reynolds's customers depend upon the DMS to process highly sensitive and/or proprietary data, including consumer data; dealer operational and business data; OEM data; credit and financial data; Reynolds's proprietary data; and data licensed from third parties. These categories of information are protected by federal data security and privacy laws, as well as contracts governing data access.

47.     Over the course of two decades, Reynolds invested well over half a billion dollars and millions of human-hours in building, securing, and maintaining the proprietary design and interaction of the components of its DMS platform in the face of ever-evolving technology. Reynolds continues to invest in its DMS platform.

48.     The Reynolds DMS software program that runs on dealer computers is an original copyrighted work. Among the many significant original elements of the program are its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience. Every time a user opens the Reynolds DMS software program, it displays a notice stating that the program is Reynolds's copyrighted, confidential, and proprietary property:



49.     It is impossible for a user to access or use the Reynolds DMS without running (and thereby copying) Reynolds's copyrighted DMS software programs. Reynolds does not allow any dealer, application provider, or other third party to access the Reynolds DMS without a valid license or express authorization.

QB\58682256.1

50.     Reynolds's DMS is a custom product and is offered pursuant to highly negotiated license agreements with dealers. Though the products, services, and terms differ widely among dealers, all dealers that license a Reynolds DMS agree that only dealership employees may access Reynolds's proprietary DMS. Dealers further agree not to connect any third-party software to their Reynolds DMS. Reynolds's prohibition on third-party access to its DMS has been widely known in the automotive industry for at least a decade.

### C.     Security Features to Control Access to DMSs

51.     Plaintiffs employ a number of technologically advanced security features to protect the data and functionality of their DMSs and guard against unauthorized access. As detailed below, these features include password protections, login prompts, and contractual security provisions. The following are some examples. Plaintiffs are continuously introducing new security measures to combat new methods of attempted unauthorized access, and Plaintiffs cannot disclose all of their security measures to the public.

### 1.     CDK Security Controls

52.     For example, among CDK's many security measures, its DMS is password protected. To gain access, each dealership employee must use that employee's individual login credentials.

53.     Typically, at least one employee at each dealership using CDK's DMS has "system administrator"-level access privileges. A dealership employee has compared having system administrator-level access to possessing "the keys to the kingdom." Users with system administrator-level privileges may create new accounts (and corresponding login credentials) for other dealership employees. These users also have the ability to define the data and functions each employee may access within CDK's DMS by creating and assigning the employees different "roles." In other words, each user has access to the DMS commensurate with the access privileges assigned to his or her login credentials.

54.     Data maintained in CDK's DMS is used in four primary application areas: Accounting, Finance & Insurance Sales, Parts, and Service. The login credentials that dealerships create for their employees can be configured to allow access to all four functions or only specific ones. Login credentials also may be configured to run reports, search data, and modify data as appropriate. Upon information and belief, car dealerships have in the past provided login credentials to third parties, that thereby gained unauthorized, automated access to CDK's DMS, and those credentials often allowed general access to most or all application areas. This access has allowed unauthorized third parties to install programs on the system, creating technological issues during system upgrades and causing additional security concerns.

55.     CDK has implemented security features in addition to password protection. In early 2016, CDK created a login prompt, depicted below, requiring users to certify that they were an "authorized dealer employee" before they could access CDK's DMS.

```
login:▮▮▮▮▮
Password:
Last login: Thu Mar 24 09:10:10 from 139.126.150.113
A RAID EVENT has been reported in the raid event directory.
It is important to notify your CRR of this RAID EVENT as soon as possible.
The CDK Global DMS is for authorized Dealer personnel only.
Use or access by unauthorized third parties is prohibited.
Those using this system without authorization will be denied
access and may have their services revoked.
Enter "YES" to confirm you are an authorized dealer employee
in order to continue,  enter "NO" to exit this program.
yes
```

56.     Further, in November 2017, CDK began introducing a "CAPTCHA" control for particular login credentials that CDK suspected third parties of using to facilitate unauthorized access to its DMS. CAPTCHA (an acronym for "completely automated public Turing test to tell computers and humans apart") controls are simple tests designed to tell whether a request for access is coming from a human or a machine impersonating a human. These controls are designed specifically to prevent access to computers through automated means.

57. The CAPTCHA used by CDK states that "[o]nly dealer personnel are authorized to use the CDK Global DMS. Use or access by unauthorized third parties is strictly prohibited and violates the contractual terms on which CDK licenses its software and services. Machine/automated access . . . or issuing of user names and passwords for third party use is considered non-authorized access." The CAPTCHA then requires the user to identify a word or series of letters and numbers to "confirm you are an authorized dealer employee" before allowing the user to log into the CDK DMS.

58. As another example of its security innovations, CDK has virtualized the entire DMS environment. This virtualized environment enables CDK to manage the system more easily.

59. CDK's contracts also impose contractual security. For example, partner vendors agree not to access or retrieve data from or write it to a CDK system using unapproved methods. Partner vendors also represent and warrant that they will maintain appropriate security measures regarding sensitive information.

**2.   Reynolds Security Controls**

60. Protecting the integrity and security of the Reynolds platform and the sensitive data it contains is a paramount concern for both Reynolds and its customers. Reynolds's DMS includes multiple protections designed to exclude hackers, prevent automated scripts from encumbering system resources, and ensure that only properly licensed dealership employees can access and use the system.

61. Reynolds strictly controls and manages system access to and interoperability with its DMS through a series of technological security measures that manage the array of sensitive consumer, financial, and proprietary data flowing through the Reynolds network.

62. First, the Reynolds DMS can only be accessed by dealership employees through Reynolds's proprietary terminal software. These software programs are known as

QB\58682256.1

ERA-Ignite (the current program) and ERAccess (the legacy program). Both are copyrighted. Both also contain extensive security features.

63.     Dealership employees accessing the DMS through these programs must first answer a login prompt requiring the user to enter a valid username and password to access the system. Reynolds links each set of authorized login credentials to a dealership employee. Each set of credentials also has individualized access permissions within the DMS, based on the employee's role at the dealership. For example, a salesperson will generally have access to different DMS functionality than a service advisor or dealership manager. These controls prevent unauthorized access and mitigate the risk of errors by limiting the employee's access to the DMS to that required by the scope of the employee's duties.

64.     Reynolds deploys CAPTCHA controls to protect the Reynolds DMS from unauthorized automated software programs attempting to access data. After logging in, a dealership employee must pass through a CAPTCHA control to access the Reynolds DMS data-exporting functions. It is impossible for a dealer-user to access these and other portions of the Reynolds DMS platform without first passing the CAPTCHA control. Reynolds also deploys CAPTCHA control prompts when Reynolds security measures determine that a set of login credentials is being used in a manner inconsistent with authorized access.

65.     Reynolds's software also monitors all user credentials to look for suspicious patterns and potential security threats. Specifically, Reynolds's Suspicious User ID heuristic software monitors a variety of factors that differentiate automated scripts and bots from bona fide human users, including keystroke speed, keystroke pattern, source of keystroke signals (physical keyboard versus virtual keyboard), and the volume and timing of data requests. If the monitoring software determines that, based on a number of these factors, users are suspicious, then the system deactivation protocols are triggered.

66.     Reynolds has also built extensive security features into how it interoperates with third parties. The Reynolds Integration Hub is specifically designed to provide bespoke

-17-

system integration to facilitate data communications between the Reynolds DMS and OEMs, application providers, and financial institutions. Reynolds continually monitors the various data flows through the Hub for errors and other alerts. The Reynolds Integration Hub includes a "journaling" function that protects against corruption risk from automated "write-backs" by third-party vendor software into DMS databases. Such automated data pushes involve the creation of more entries and transactions than an actual individual human user could possibly produce and can push thousands of erroneous entries into the DMS within minutes. The erroneous data entries resulting from these automated data pushes occurring in one part of the DMS can propagate across other DMS functionalities, effectively paralyzing one or even multiple systems. Reynolds's proprietary journaling technology allows Reynolds to audit and trace the effects of malfunctioning vendor software.

67.     Reynolds's license and interface agreements impose contractual security obligations on its third-party providers and vendors through the Reynolds Certified Interface program. Those application providers are prohibited from using unapproved methods to access the Reynolds DMS; are required to notify Reynolds promptly in the event of a security breach; and must warrant to Reynolds that they have dealer permission and will comply with data security and privacy laws. Reynolds requires vendors to include terms in their End User License Agreements with dealers detailing appropriate safeguards designed to protect sensitive customer information. Reynolds reserves the right to—and does—audit these vendor-partners to ensure compliance.

### 3.     These Security Controls Are an Important Part of the DMSs

68.     The development and implementation of security controls such as CAPTCHA screens and contractual obligations are vital to keep private data, including the enormous amount of private personal data stored in the DMSs, out of the hands of hackers and other unauthorized parties. But the DMS Law greatly restricts, if not entirely prevents, the

effective use of such controls by broadly prohibiting DMS providers such as Plaintiffs from employing any "technical means" to restrict access by third parties (including malicious hackers).

**D.   Federal Law Protecting DMS Providers' Property**

69.     The Copyright Act states that "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author." 17 U.S.C. § 501(a). The Act enables any "legal or beneficial owner of an exclusive right under a copyright . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).

70.     The Digital Millennium Copyright Act ("DMCA") provides that no "person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). It also provides that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that . . . is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title." *Id.* § 1201(a)(2)(A). The DMCA further states that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof." *Id.* § 1201(b)(1)(A). To enforce these prohibitions, the DMCA not only provides for criminal sanctions, *see id.* § 1204, but also gives copyright owners a private right of action against those who unlawfully access their copyrighted works, *see id.* § 1203 ("Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.").

71.     Software developed and licensed by DMS providers is subject to copyright protections. For example, Reynolds has registered copyrights for multiple versions of its DMS terminal software program. (Registration Nos. TX 7-586-896; TX 7-586-863; TX 8-538-825; and TX 8-538-541). Any unlicensed use of that DMS software (or use exceeding the terms of the license between a DMS provider and an end user such as a car dealership) infringes upon those copyrights.

72.     Attempts by any third party to bypass, avoid, disable, deactivate, or impair DMS access-control measures by misappropriating login credentials, providing access to unlicensed third parties, or circumventing security tools such as CAPTCHA, violate § 1201(a)(1)(A)'s prohibition on circumvention of a technological measure that effectively controls access to a work protected by the Copyright Act and DMCA.

73.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, protects owners of trade secrets from misappropriation by third parties. Under the DTSA, owners of trade secrets have a federally guaranteed right to exclude others from their trade secrets. Under this law, permission to use or access a trade secret must come from the owner of that intellectual property.

74.     The Computer Fraud and Abuse Act ("CFAA") provides that "[w]hoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," is subject to both criminal and civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.* § 1030(g) (civil damages and injunctive relief). This statute also provides a private cause of action for "compensatory damages and injunctive relief or other equitable relief" to anyone who suffers at least $5,000 in damage or loss in any one-year period "by reason of a violation" of its terms. *Id.* § 1030(g); *see id.* § 1030(c)(4)(A)(i)(I).

75.     A DMS is a "computer" within the meaning of the CFAA, which defines that term to include not only computing devices but also "any data storage facility or

-20-

communications facility directly related to or operating in conjunction with such device." *Id.* § 1030(e)(1). A DMS also is a "protected computer" within the statute's meaning because it is used in and affects interstate and foreign commerce and communications. *See id.* § 1030(e)(2)(B).

76.     Pursuant to the CFAA, the authorization required for lawful access to a computer system such as a DMS must come from the system's owners, not from its users. Any access to a computer system without or exceeding the computer system owner's authorization violates the statute.

**E.     Federal Law Governing How Dealers and DMS Providers Must Secure Consumer Data**

77.     The Gramm-Leach-Bliley Act ("GLBA") requires "that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

78.     In furtherance of this policy, the law requires federal agencies to: "establish appropriate standards for the financial institutions subject to their jurisdiction relating to administrative, technical, and physical safeguards—(1) to insure the security and confidentiality of customer records and information; (2) to protect against any anticipated threats or hazards to the security or integrity of such records; and (3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer." *Id.* § 6801(b).

79.     The GLBA defines financial institutions as "any institution the business of which is engaging in financial activities . . . ." *Id.* § 6809(3)(A); *see also id.* 12 U.S.C. § 1843(k) (defining "financial activities"); *id.* § 1843(k)(4) (describing "activities that are financial in nature").

-21

80.    The GLBA defines the term "nonpublic personal information" as "personally identifiable financial information—(i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A).

81.    The Federal Trade Commission circulated the Safeguards Rule, which implements 15 U.S.C. § 6801(b), in May 2002. The Rule became effective on May 23, 2003. *See* 16 CFR Part 314. It requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing, implementing, and maintaining a comprehensive information security program that contains administrative, technical, and physical safeguards that are appropriate to the financial institution's size and complexity, the nature and scope of its activities, and the sensitivity of the customer information at issue. *Id.* § 314.3. The Rule requires financial institutions to have reasonable policies and procedures to ensure the security and confidentiality of customer information and to detect, prevent, and respond to attacks, intrusions, or other system failures. *Id.* § 314.4(b). In addition to developing their own safeguards, companies covered by the Rule are responsible for taking steps to ensure that their affiliates and service providers safeguard customer information in their care. *Id.* § 314.4(d).

82.    Federal agencies have recognized that automobile dealerships are financial institutions under the GLBA. As such, dealers and DMS providers must implement the privacy and security mandates of the GLBA.

83.    The GLBA further provides that state law may not be inconsistent with the GLBA. *See* 15 U.S.C. § 6807.

**F.    The Contracts Between Plaintiffs and Dealers**

84.    Plaintiffs enter into contracts licensing their DMSs to automotive dealerships throughout the country. Those contracts are freely negotiated, arms-length transactions. The

-22-

contracts contain detailed provisions setting forth Plaintiffs' exclusive rights to control third-party access to their proprietary DMS systems.

### 1.    CDK's Master Service Agreements

85.    CDK has entered into Master Service Agreements with approximately 200 new car dealerships in Arizona. These Agreements expressly prohibit the dealerships from allowing third parties to access CDK's DMS without CDK's authorization: "Client shall not allow access to [the CDK DMS] by any third parties except as otherwise permitted by this Agreement." MSA § 4(D).

86.    In addition, each CDK dealer agrees, among other things, that it will only use CDK's software "for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any of the Products or Services, or any portion thereof, to any third party," *id.* § 4(B), and that it will "treat as confidential and will not disclose or otherwise make available any of the [CDK] Products and Services (including, without limitation, screen displays or user documentation) or any trade secrets, processes, proprietary data, information, or documentation related thereto . . . in any form, to any person other than employees of [the dealer] with a need to know," *id.* § 4(D). Each dealer also acknowledges that notwithstanding its license to use the CDK DMS, the DMS remains at all times "the exclusive and confidential property of [CDK]." *Id.* § 4(A).

87.    Additionally, CDK's Master Service Agreement independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE [CDK] PRODUCTS AND SERVICES EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT." *Id.* § 4(B). This language has remained substantially unchanged in every version of the Master Service Agreement since approximately 2010.

88.    In fact, every version of CDK's standard Master Service Agreement since at least 1994 has expressly prohibited dealers from permitting unauthorized third parties to access the dealers' licensed DMS.

89.     In return, CDK agrees that, "to the extent it is a Service Provider to [the dealer] under the [Graham-Leach-Bliley Act's] Safeguards Rule," CDK will "implement and maintain appropriate safeguards as CDK may determine to be reasonably necessary to protect the confidentiality of Customer Information provided [by the dealer] to CDK pursuant to the terms of this Agreement and in CDK's possession and control." *Id.* § 5(F).

### 2.     Reynolds's Dealer Agreements

90.     Reynolds licenses its DMS to its 85 car dealerships in Arizona under a set of terms and conditions designed to protect its system's functional integrity and security, safeguard Reynolds's valuable intellectual property rights, and meet Reynolds's contractual obligations to third parties. As a condition of the Reynolds Master Agreement, each Reynolds dealer agrees not to share login credentials with third parties or connect other software to the DMS. Only dealership employees are licensed to access the system. Specifically, Reynolds dealers expressly agree:

> Reynolds (or Other Providers) retains all proprietary rights in the Licensed Matter and the Site, Including copyrights, patents and trade secrets. You acknowledge that Licensed Matter [e.g., the DMS] contains Confidential Information belonging to Reynolds or Other Providers and that Licensed Matter may be subject to end user license agreements of Other Providers. You agree: (a) not to copy (other than making regular back-up copies, if permitted by us), modify, disassemble or decompile any Licensed Matter or the Site, or re-license, sublicense, rent, lease, timeshare or act as a service bureau; (b) to maintain the Licensed Matter in complete confidence; (c) *not to disclose or provide access to any Licensed Matter or non-public portions of the Site to any third party, except your employees who have a need for access to operate your business and who agree to comply with your obligations under this Section 1;* (d) to notify Reynolds immediately of any unauthorized Use or disclosure of Licensed Matter or your PIN or Logins (if applicable); (e) to cooperate with us to protect Reynolds and Other Providers' proprietary rights in Licensed Matter and the Site, and (f) to comply with any end user license agreement of an Other Provider.

Reynolds Master Agreement, § 1 (emphasis added).

91.     The Reynolds Customer Guide—which is incorporated by reference into the Master Agreement and is a part of the license agreement between Reynolds and the dealership—likewise states that the dealer "may not install Other Matter on the Equipment

-24-

or connect Other Matter to Licensed Matter, either directly or remotely, without [Reynolds's] prior written consent. This restriction is necessary to protect the integrity and continued functioning of the Licensed Data, Licensed Software, and the Equipment." Customer Guide at 20. The Customer Guide defines "Other Matter" as "any software product, database, or other materials provided to you by a third party, which is capable of functioning on or with Equipment."

92.     The Reynolds Customer Guide further provides:

> You expressly acknowledge that the Licensed Matter constitutes valuable proprietary property, includes confidential information and constitutes trade secrets that embody substantial creative efforts and that is valuable to Reynolds. You agree to keep confidential the Licensed Matter (including all licensed copies and documentation) covered under the Documents and shall not copy, reproduce, distribute, or in any way disseminate or allow access to or by third parties.

> You expressly agree that you shall observe complete confidentiality with respect to the Licensed Matter. This agreement and requirement mean that *you shall not disclose or otherwise permit any person, firm or entity access to or use of the Licensed Matter.* The sole exception to this restriction is that you may disclose or grant access to the Licensed Matter to your employees whose employment require such access, provided that such employee is advised that the Licensed Matter contains proprietary property, confidential information and trade secrets and that each employee agrees to preserve the confidentiality of the Licensed Matter.

Reynolds Customer Guide at 21 (emphasis added).

93.     The Reynolds Customer Guide also states that "[i]n addition to the use restrictions described in the Master Agreement and this Customer Guide, certain Licensed Data is subject to use restrictions from the Other Providers of such Licensed Data. Such Licensed Data may only be used in connection with the Reynolds System for which its use is licensed to you by us." *Id.* at 22–23.

94.     Reynolds's contracts with dealers also call for it to act at all times in accordance with the strictures of the GLBA. For example, the Reynolds Customer Guide states that where Reynolds is a "Service Provider" under the GLBA Safeguards Rule,

"Reynolds will implement and maintain safeguards appropriate to protect the security, confidentiality, and integrity of your Customer Information." Customer Guide at 10.

### 3. These Contractual Provisions Are an Important Part of the Bargain Between DMS Providers and Dealers

95.      Dealers know and agree to these restrictions when they choose to license a DMS. Both Plaintiffs and their customer dealers negotiate the resulting licensing fees subject to those restrictions and based on the expectation that the license's scope extends solely to dealership employees. The DMS Law abrogates these freely negotiated contractual provisions between DMS providers and dealers.

### G. Available Methods of Secure, Authorized Integration

96.      DMS providers understand that dealers sometimes seek to leverage DMS functionality for use by third-party application providers. Because unauthorized automated access poses serious risks to both the privacy, confidentiality, integrity, and availability of sensitive data, including private consumer information, and the functionality of the DMS, Plaintiffs have each developed and implemented technological methods to permit secure means of interoperating with authorized third parties.

### 1. CDK's Partner Program

97.      Introduced in 2000, CDK's third-party access program ("Partner Program," formerly known as 3PA) is an interface that currently provides secure managed, bi-directional integration between software applications and CDK's DMS. Integration management includes the use of credential and access logs, which record who accessed the information, when it was accessed, and any changes made to the information. For example, the third-party marketing website TrueCar generates sales leads for dealerships. TrueCar integrates with CDK's DMS through the Partner Program to access sales transaction data, which it uses to validate vehicle sales based on TrueCar leads. There are hundreds of other

third-party applications that make similar use of the integration services provided through CDK's Partner Program.

98.     Each software application vendor participating in the Partner Program enters into a written agreement with CDK granting the vendor a limited, non-transferable license to use the CDK Interface System to access, send, and/or receive certain data stored on the DMS solely to provide specific application services to CDK dealers.

99.     CDK charges third-party participants in the Partner Program fees for the integration services it provides. These fees allow CDK to recoup its substantial investment in the Partner Program and compensate CDK for the value of its services and the intellectual property that makes secure data integration with CDK's DMS possible.

100.    While many dealers and software vendors exchange data through the Partner Program, it is not the only way to exchange data residing on CDK's DMS. CDK's flagship DMS product, Drive, includes several reporting tools that dealers may use to compile and export their operational data, which they then can use or distribute to certain third parties. Additional reporting tools also are available to Drive users on an add-on basis.

101.    CDK dealers can and do use these reporting tools to share data with third-party vendors instead of having those vendors access CDK's DMS through the Partner Program. The main distinction between this dealer-driven data sharing and the data integration provided by the Partner Program is the level of automation. Dealer sharing requires human intervention, while the Partner Program, once set up, is automatic. The automation and direct machine access facilitated by the Partner Program requires the extra safeguards put in place by CDK.

102.    Plaintiffs believe that other DMS providers may permit third-party access to their systems outside of a certification program and/or without requiring those third parties to pay integration fees. CDK believes that it has a richer, more secure, product offering, but some dealers prefer a different system and are free to switch DMS providers. Many dealers

-27

have left CDK in recent years and gone to another DMS provider, and many others have opted to stay or switched *to* CDK since it began taking steps, such as those described above, to manage and prevent unauthorized third-party access to its DMS.

### 2. Reynolds's Certified Interface Program

103.    Reynolds secures interoperability with its DMS by jointly developing bespoke computer software interfaces with OEMs, application providers, credit bureaus, and other third-party partners, allowing third parties to receive data from and push data into the Reynolds DMS via dedicated, individually customized interfaces built with layers of security and data integrity safeguards. Because all interfaces run through the centralized Reynolds Integration Hub, Reynolds can secure, monitor, and support each interface with appropriate computing resources.

104.    Reynolds tailors each partner's interface package in accordance with that partner's needs to provide service to the dealer, including communication protocols, business rules, data elements, frequency, and bi-directional capabilities. Some partners purchase multiple interface packages with different functionalities and data elements to offer different levels of service to dealers.

105.    To handle the development of interfaces with automotive application software providers, Reynolds created the Reynolds Certified Interface Program ("RCI Program"). Certified providers sign a Reynolds Interface Agreement, which requires them to describe their data use and adhere to a data use policy:

> [Third party vendor] must describe in Exhibit A all data sets and uses of the data, which shall be subject to Reynolds' acceptance, including: the purposes of the data sets; the identities or categories of any other parties to whom [vendor] may transfer the data; and [vendor's] or any other party's uses of the data. Other than as specified in Exhibit A, [vendor] is prohibited from transferring the data to another party; or reselling the data.

Standard Reynolds Interface Agreement, § 6.10.

-28

106.    Reynolds and its partners in the RCI Program agree to adhere to federal data security laws and regulations: "[E]ach party agrees to comply with all legal obligations relating to the privacy and security of such 'non-public personal information' under the GLBA [and] the FTC regulations promulgated pursuant thereto . . . ." *Id.*, § 6.11. They also agree to take appropriate measures to prevent unauthorized access to customer data stored or processed on a DMS. *See id.*

107.    Regardless of whether an application provider is in the RCI Program, Reynolds dealership customers can use dealer-driven data export tools to send their operational and inventory data to application providers or other third parties, as the dealer deems appropriate—including non-RCI participants. Once dealer data has been exported from the system via these standard tools, it is up to the dealer to determine whether and where to send its data. These tools, such as Dynamic Reporting (a feature that builds customized reports) or AVID (a program that configures automated vehicle inventory data reports) allow dealership employees to push data to third parties and can be scheduled to run at any time automatically.

### 3.    Plaintiffs' Methods Ensure Data is Protected

108.    Both CDK and Reynolds have developed programs that enable third-party data vendors to access the DMSs in a managed, secure, and reliable way. These programs safeguard the data stored in the DMSs and ensure that third-party access will not harm the functioning of those systems. The DMS Law eviscerates these safeguards because it prohibits DMS providers from imposing fees or using technical or contractual means to restrict access to their respective systems, instead requiring them to provide unlimited access to "integrators" and any other third party authorized by dealers.

### H.    Hostile Access to DMSs

109.    Without Plaintiffs' authorization, without paying any compensation to Plaintiffs, and in violation of several federal laws, third parties have repeatedly tried to

-29

access Plaintiffs' DMSs with dealer-provided login credentials using automated machine access on interfaces designed for human use, and then writing data, extracting data, and sometimes re-selling extracted data to third-party application vendors. The DMS Law converts these unauthorized or "hostile" third parties from unauthorized data writers or extractors into "authorized integrators" and gives them the purported "right" to engage in data extraction from Plaintiffs' DMSs without Plaintiffs' permission. The DMS Law does not stop there. It also requires Plaintiffs to permit hostile third parties to create, update, and delete data on Plaintiffs' DMSs on a bulk, automated basis. The actions of these third parties—which the DMS Law demands that DMS providers allow—are the same actions that malicious criminal hackers attempt against Plaintiffs' systems every day. But the DMS Law condones this otherwise unlawful behavior, and in fact subjects Plaintiffs to liability for taking measures to protect the confidentiality, integrity, and availability of their systems from hostile attack. In addition, the DMS Law fails to contemplate potentially different forms of unauthorized access, recognizing no distinction between a hostile integrator and malicious bandits or hackers: all unauthorized access is apparently treated the same.

110.    In the past, hostile third parties have been able to install unauthorized software directly within the DMS's core operating system by exploiting the system design (e.g., computer hacking) or by abusing legitimate access provided to the dealer. This third-party software had not passed Plaintiffs' secure development practices and was architecturally opaque. Such activity hinders Plaintiffs' ability to respond in the event of a security incident within the DMS because such access is not monitored or logged. It also creates problems during system upgrades due to conflicts with installed software libraries and unknown code. Further, it substantially increases the impact and likelihood of corruption of files and programs within Plaintiffs' computer system. The DMS Law prevents Plaintiffs from prohibiting this practice.

QB\58682256.1

111.    Moreover, DMSs house both "protected dealer data" as defined by the DMS Law and other proprietary data, including Plaintiffs' intellectual property and data licensed to Plaintiffs by OEMs and other parties. By prohibiting Plaintiffs from "tak[ing] any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use protected dealer data," the DMS Law grants third parties access to that other proprietary data as well.

112.    And, every time a hostile third party accesses a Plaintiff DMS using dealer-provided login credentials, that third party uses valuable CDK or Reynolds intellectual property, including patented and copyrighted technologies and original software elements and programs, without Plaintiffs' consent and in violation of the express terms of Plaintiffs' licensing agreements and system access policies.

113.    Further, when third-party data extractors access the DMSs, they create a copy of portions of the DMS program code—as well as copies of the original and distinctive page layouts, graphical content, text, arrangement, organization, display of information, and dynamic user experience—in the Random Access Memory of the extractor's computer. Even when third-party data extractors do not access proprietary data directly, they often access and copy data created using CDK or Reynolds and third-party proprietary forms and functions within the DMS.

114.    Hostile third parties' use of unauthorized, automated methods for creating, reading, updating, and deleting data places considerable strain on Plaintiffs' DMSs, degrading system availability and consuming valuable computing resources. These parties also create serious information confidentiality and integrity concerns.

115.    The DMS Law also defines DMSs to include "firmware," typically low-level software used to operate wireless routers and other hardware devices. As written, the DMS Law prohibits Plaintiffs from restricting third parties from "writing data to a" DMS, which includes its firmware, and defines "protected dealer data" broadly to include material

potentially housed on such hardware devices. In the ordinary course, Plaintiffs do not allow *any* third parties to make changes to their DMS firmware—including dealers themselves—for numerous security and functionality reasons. Indeed, some firmware is designed to never be altered or alterable. Routers and other hardware are vulnerable attack points for any network, and the DMS Law exposes these points to a host of third parties without Plaintiffs' approval.

**1.      Hostile Access Degrades DMS Performance**

116.    Plaintiffs can accommodate legitimate, authorized, and managed demands for system interoperability through interfaces that facilitate the automated flow of data between a dealer and application providers, OEMs, and other third parties. These interfaces can be scaled and optimized to a given third party's legitimate needs to provide its service. By contrast, unauthorized third parties generally gain access to the Plaintiffs' DMSs by pretending to be dealer employees, using systems that were designed for human users. Allowing human access while blocking machine access to computer systems reflects basic computer system design and optimizes the performance, availability, confidentiality, and integrity of the system for both dealership employees and authorized third parties.

117.    CDK's analyses have shown that hostile data extraction repeatedly and unnecessarily queries the same dealership DMS's human-user interface tens of thousands of times a day, querying *all* data in multiple files beyond what appears necessary and/or without limiting its queries to new or updated data. These human-user interfaces are not designed for the demands of automated extraction methods. Reynolds has similarly experienced automated querying at a rate of hundreds or even thousands of computing requests per day from a single data extractor. Plaintiffs' internal analyses show that these operations have taken more data than necessary to provide the service requested of the third-party extractor by the dealer.

118.    The burdens on Plaintiffs' DMSs resulting from unauthorized third-party access and querying are real and measurable. For example, in some instances, third-party data extractors access more than 10 times the number of records that a vendor would access (and would need to access) to obtain a comparable dataset using CDK's managed Partner Program API. The data extractors' inefficient and poorly constructed queries can take many times longer to complete than comparable queries executed through the Partner Program interface. Similarly, since the early 2000s, third-party actions have impaired the functionality of the Reynolds DMS on many occasions. The speed and volume of automated scripts in particular taxes the computational and network resources of the Reynolds DMS, degrading services for dealers and increasing Reynolds's operational costs.

119.    In addition to extracting data from Plaintiffs' DMSs, some unauthorized third parties also attempt to write altered data back onto the DMS. Such unauthorized, automated activity creates a high risk of introducing data errors and undermining the integrity of the DMSs. A series of errors by automated systems can rapidly propagate across an entire dataset, causing major disruption or even service denials. And because these hostile third parties do not use Plaintiffs' approved methods of DMS access, and the DMS Law prohibits Plaintiffs from placing any "technical or contractual" bounds on the access, Plaintiffs are limited in their ability to trace and correct DMS data that a vendor erroneously writes to the system. If the DMS Law goes into effect, Plaintiffs will also be subject to criminal penalties if they stop unauthorized activity.

### 2.    Hostile Access Creates Security Threats

120.    Unauthorized third-party access to Plaintiffs' DMSs through a human-user interface is significantly less secure than the managed interfaces that Plaintiffs require third-party vendors to use.

121.    Participants in CDK's Partner Program access a CDK DMS through pre-defined integration points, which act as intermediaries between the participants'

-33-

applications and the actual DMS. Before allowing any data to be transferred in or out of the DMS, the application must satisfy rigorous authentication protocols. And the authentication token that each application uses is transmitted through a secured communication channel. By contrast, most third-party data syndicators use dealer-issued login credentials that the syndicators often obtain through unsecured channels, including unencrypted, plain-text email. This exposes the credentials—and by extension, data on CDK's DMS—to interception or compromise and violates widely accepted cybersecurity practices.

122.    Reynolds launched its RCI program in the early 2000s and has invested heavily in it ever since. The RCI program facilitates customized interfaces allowing third parties to leverage the benefits of the DMS, while imposing constructed layers of security protections between the vendors and the DMS itself. The RCI program provides application vendors with the ability to both receive and, if appropriate, securely push data into the DMS via an interface that ensures the vendor receives and pushes only what is necessary for the dealer's business needs for that vendor.

123.    The RCI program's innovative design has enabled Reynolds to scale its DMS systems to handle the intense amount of interoperability between Reynolds, OEMs, application providers, credit bureaus, and other third parties in a secure manner. Reynolds's interface protocols ensure that third parties do not directly access the DMS and do not interfere with other critical dealer processes. Reynolds regularly implements security updates to combat any and all attempts by any unlicensed third party to access its systems—protecting the system from malicious cyber criminals and "hostile" third parties alike.

124.    Hostile access also violates the fundamental security tenet known as data minimization or least privilege access, which—consistent with the GLBA—holds that each user of a secured system should receive no greater access or privileges than necessary. Plaintiffs' certified third-party access programs ensure that each participant accesses only the specific categories of data needed for that party's approved purposes. By contrast, third-

party data extractors access and extract data from all primary directories in the Plaintiffs' DMSs.

125.   Finally, hostile access impedes Plaintiffs' ability to audit and remain accountable to dealers and other third parties from whom they license data for the movement of data. Hostile third parties extract huge amounts of data from the DMS and sell or syndicate that data to third parties, who may resell or re-syndicate it further. Plaintiffs have no way of knowing where this data is going or how it will be used. By contrast, when third parties use Plaintiffs' certified third-party access programs to interoperate with the DMS, those third parties agree to use the data only for approved purposes.

**I.      The DMS Law**

126.   In introducing the bill for discussion before the Arizona Senate Transportation and Public Safety Committee, bill sponsor Arizona State Representative Noel Campbell incorrectly described it as a cybersecurity measure to protect consumers, explaining that in purchasing a car from a dealer, "you're going to give up information about yourself that I'm sure that the consumer does not want released out in the ether." But by requiring Plaintiffs to allow unrestricted access to their DMSs, that is precisely what the DMS Law will do.

**1.      The DMS Law's Basic Features Harm Plaintiffs and Customers**

127.   Although Arizona has not previously regulated the relationship between dealers and DMS providers, the DMS law effectively rewrites key provisions of contracts between Plaintiffs and Arizona car dealerships.

128.   Section 28-4651 of the DMS Law defines a "dealer data vendor" to include "a dealer management system provider [or] consumer relationship management system provider." CDK and Reynolds each meet this definition of a "dealer data vendor." The definition of "dealer data vendor," however, also includes any vendor providing a system "that permissibly stores protected dealer data pursuant to a contract with a dealer." This

-35-

would include vendors that license customer relationship management, digital marketing, electronic vehicle registration and titling, and other software to facilitate dealership business operations, including, for example, any cloud storage company.

129.   "Protected dealer data" is defined very broadly by the DMS Law to include nonpublic personal information about consumers and any "other data that relates to a dealer's business operations in the dealer's dealer data system." It is not limited to data properly owned by the dealership.

130.   The DMS Law defines a covered "dealer data system" to mean *any* "software, hardware, or firmware system that is owned, leased or licensed by a dealer" and that "stores or provides access to protected dealer data." As discussed, this sweeps very broadly to include even the software used to run routers and other hardware devices. Thus, the DMS Law applies to much more than DMS providers. Because it covers *any* software, hardware, or firmware provided by a vendor that stores *any* protected dealer data, the law also applies *a fortiori* to the word processing system the dealer uses, the dealer's CRM software, the dealer's tax software, and the diagnostic equipment in the dealer's service bays, among countless other examples.

131.   Section 28-4653 of the DMS Law prohibits a DMS provider from "tak[ing] *any action* by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use protected dealer data." (Emphasis added.) This includes "imposing *any* fee or other restriction on the dealer or an authorized integrator for accessing or sharing protected dealer data or for writing data to a dealer data system." (Emphasis added.) But that section also prohibits a third party from placing "*unreasonable* restriction[s] on integration." (Emphasis added.) Dealer data vendors are thus left with an irreconcilable ambiguity over how to comply with a law that prohibits "any" restrictions but at the same time prohibits only "unreasonable" restrictions.

132.   The DMS Law forbids a DMS provider from placing any restriction—including a fee—on access by "authorized integrators." An "authorized integrator" is any third party "with whom a *dealer* enters into a contractual relationship to perform a specific function for the dealer that allows the third party to access protected dealer data or to write data to a dealer data system, or both, to carry out the specified function." In other words, under the DMS Law, a hostile and unauthorized third-party data extractor or writer becomes an "authorized integrator" at the sole discretion of a dealer—with no input from, control by, or protection for Plaintiffs. Plaintiffs may not prohibit any third party that the dealer has identified as one of its authorized integrators from accessing and using that dealer's dealer data system, so long as the third party complies with standards deemed acceptable by the dealer.

133.   The DMS Law further bars Plaintiffs from placing certain restrictions "on the scope or nature of the data that is shared with an authorized integrator" or "on the ability of the authorized integrator to write data to a dealer data system." Nor may Plaintiffs place certain "limitation[s] or condition[s] on a third party that accesses or shares protect[ed] dealer data or that writes data to a dealer data system."

134.   Section 28-4653 of the DMS Law states that it "does not prevent a dealer, manufacturer or third party from discharging its obligations as a service provider or otherwise under federal, state or local law to protect and secure protected dealer data," but it would be impossible for Plaintiffs to comply with the DMS Law *without* violating several such obligations.

135.   The DMS law works at cross purposes with federal and state data privacy laws. In late 2016, a hacker broke into a DMS called DealerBuilt because of poor security practices that created an unsecured access point into a backup database storing sensitive consumer data, including names, addresses, telephone numbers, Social Security numbers, driver's license numbers, dates of birth, credit card information, and other data. For at least

-37-

ten days, the hacker had access to the records of 12.5 million consumers stored on this backup database and downloaded the personal information of nearly 70,000 consumers from the backup directories of just five dealerships.

136.   By Consent Order with the Federal Trade Commission, DealerBuilt now must implement a detailed information security program, including implementing technical measures to monitor unauthorized attempts to extract data from its networks, data access controls for all databases storing personal information, and encrypting all Social Security numbers and financial account information. To comply with the Order, DealerBuilt must, at a minimum, restrict inbound connections to IP addresses, require authentication to access the databases, and limit employee access to what is needed to perform that employee's job function.

137.   Additionally, pursuant to a separate consent decree with one state, the DealerBuilt DMS is required by court order to "maintain and implement reasonable access control Policies that clearly define which users have authorization to access its Computer Network, and [to] maintain reasonable enforcement mechanisms to approve or disapprove access requests based on those Policies."

138.   By contrast, the DMS Law *prevents* DMS providers (including DealerBuilt) from taking any measures to prevent access to their systems. DMS providers cannot comply with both the security mandates imposed by federal and state law, on the one hand, and the DMS Law on the other.

139.   Section 28-4654 of the DMS Law requires Plaintiffs to "make any agreement regarding access to, sharing or selling of, copying, using or transmitting protected dealer data terminable on ninety days' notice from the dealer."

140.   Section 28-4654 further requires Plaintiffs to "[a]dopt and make available a standardized framework for the exchange, integration and sharing of data from dealer data systems with authorized integrators and the retrieval of data by authorized integrators."

-38-

Section 28-4654 requires Plaintiffs to "[p]rovide access to open application programming interfaces" or "a similar open access integration method" to authorized integrators, and requires Plaintiffs to provide "unrestricted access to all protected dealer data and all other data stored in the dealer data system" upon a dealer's notice of intent to terminate an agreement with a dealer data vendor.

141.    Section 28-4654 also requires Plaintiffs to provide "access to or an electronic copy of all protected dealer data and all other data stored in the dealer data system in a commercially reasonable time and format that a successor dealer data vendor or authorized integrator can access and use" upon notice of the dealer's intent to terminate its contract. And the same section requires Plaintiffs to "allow a dealer to audit the dealer data vendor or authorized integrator's access to and use of any protected dealer data."

142.    In effectively requiring Plaintiffs to grant access to their DMSs, routers, and other hardware devices to any third party at the dealers' sole discretion, Sections 28-4653 and 28-4654 compel Plaintiffs to exchange data, intellectual property, and other information with third parties. The DMS Law mandates open access to the sensitive categories of information that flow through Plaintiffs' systems while simultaneously prohibiting Plaintiffs from taking measures to protect that information as required by federal and state data protection and privacy laws. Moreover, complying with these sections, if possible at all, would require Plaintiffs to draft computer code to change the basic functionality of parts of their DMSs, and would thereby compel Plaintiffs to engage in protected speech.

143.    These provisions retroactively rewrite Plaintiffs' negotiated contracts and undercut Plaintiffs' extensive efforts to protect the confidentiality, integrity, and availability of their DMSs by limiting access to authorized users and barring or detecting unauthorized intrusions. These provisions encroach on Plaintiffs' property rights by preventing Plaintiffs from excluding others from their systems; moreover, they do so for the benefit of private parties rather than for public purposes. And, in so doing, these provisions even require

-39-

Plaintiffs to permit third parties to write data to Plaintiffs' systems and hardware, notwithstanding the serious risks associated with that practice.

144.    These provisions permit third parties to use, copy, and distribute Plaintiffs' original copyrighted material without compensation, while simultaneously barring Plaintiffs from implementing contractual and/or technical measures to protect their exclusive rights as copyright owners.

### 2.    The DMS Law is Hopelessly Vague

145.    Numerous provisions of the DMS Law are so vague that they fail to place Plaintiffs on notice of what conduct is permitted and what conduct might subject them to criminal penalties under the law, including the provisions discussed below.

146.    Section 28-4652 prohibits Plaintiffs (as "third parties") from "requiring" a dealer to grant Plaintiffs or their agents direct or indirect access to the dealer's data system. But Plaintiffs do not "require" dealers to do anything; they enter into voluntary contracts with dealers desiring access to their services. And by virtue of owning and operating their DMSs, Plaintiffs necessarily have employees or agents that have access to the computer systems to develop, monitor, and operate these systems. This provision fails to inform Plaintiffs whether conditions in those voluntary agreements constitute unlawful "requirements" and whether the fact that Plaintiffs' employees or agents have access to their own proprietary systems violates the law.

147.    Section 28-4653.A.2 prohibits Plaintiffs (as "third parties") from engaging in any act of "cyber ransom," which means "to encrypt, restrict or prohibit or threaten or attempt to encrypt, restrict or prohibit a dealer's or a dealer's authorized integrator's access to protected dealer data for monetary gain." As with Section 28-4652, this provision does not inform Plaintiffs whether it is a violation to *agree with* dealers to host and encrypt their data for a fee. If this is not a violation, then this provision also fails to inform Plaintiffs

-40-

whether it is "cyber ransom" for them to restrict access to paying dealers' data by non-paying dealers or third parties.

148.    Section 28-4653.A.3 prohibits Plaintiffs (as "third parties") from taking "any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use protected dealer data." This provision does not make clear whether it is limited to *that dealer's* protected dealer data or *all* protected dealer data. That is, it does not place Plaintiffs on notice of whether it is a criminal violation for them to limit one dealer's ability to copy or use protected dealer data belonging to another dealer.

149.    Section 28-4653.A.3(a) prohibits Plaintiffs (as "third parties") from imposing any "fee" on a dealer or authorized integrator for access to protected dealer data. "Fee" is defined as a charge "beyond any direct costs incurred" by Plaintiffs (as "dealer data vendors") in providing such access "to an authorized integrator or allowing an authorized integrator to write data to a dealer data system." *Id.* § 28-4651.5. This is impermissibly vague on two levels.

150.    First, "fee" is defined with reference to Plaintiffs' costs to provide access to authorized integrators, with no reference to their costs to provide access to dealers. But Section 28-4653.A.3(a) prohibits charging fees for access by dealers. This may mean Plaintiffs cannot charge *anything* to dealers (because, by definition, this would be a charge beyond any direct costs incurred by Plaintiffs in providing access to authorized integrators), or it may mean that only charges to authorized integrators can be classified as impermissible fees. The law fails to inform Plaintiffs which of these two constructions is correct, and thus which charges will trigger a violation.

151.    Second, "direct" costs are not defined. Considering all of the costs required for Plaintiffs merely to maintain systems capable of interfacing with authorized integrators, there is no way for Plaintiffs to know where to draw the line between "direct" costs (which may be charged) and any higher charge (which constitutes a criminal fee). When accused

of drawing the line in the wrong place, Plaintiffs will be at the mercy of a judge's or jury's subjective interpretation of how direct is "direct."

152.    Section 28-4653.A.3(b) prohibits Plaintiffs (as "third parties") from placing certain "unreasonable restrictions" on dealer data system access by authorized integrators. "Unreasonable" is not defined except by a non-exhaustive list of five examples, four of which incorporate the undefined term "unreasonable." Without more, Plaintiffs cannot begin to determine which restrictions are prohibited, especially considering that Section 28-4653.A.3 prohibits "*any* action" to limit a dealer's ability to share or use protected dealer data.

153.    Another example of the vague language permeating the DMS Law is Section 28-4655, which provides that the DMS Law does not "govern, restrict or apply to data that exists outside of a dealer data system, including data that is generated by a motor vehicle." A key component of "protected dealer data," however, is "motor vehicle diagnostic data that is stored in a dealer data system." *See* § 28-4651.7(b). This is vague in at least three respects.

154.    First, once external motor vehicle data is transmitted to a dealer data system, it is unclear whether it (a) becomes protected dealer data, taking it outside the exclusion of Section 28-4655 and making it subject to the DMS Law, or (b) remains subject to the exclusion (and thus *not* subject to the DMS Law) as long as it still exists outside the dealer data system. That is, it is unclear whether "exists outside of a dealer data system" means "exists *solely* outside of a dealer system," or "*also* exists outside of whatever dealer data system it may be in."

155.    Second, if the latter is the correct interpretation, then it is also unclear whether Section 28-4655 applies to (i.e., exempts) that data wherever it is stored (including within a dealer data system), or only whatever copies of the data exist outside the dealer data system.

156.   Third, regardless of which of these interpretations is correct, there is no way for Plaintiffs—regulated parties subject to criminal penalties for non-compliance—to know whether data entered into their DMS also exists outside of it.

157.   Even setting aside all of these deficiencies, the application of the *entire DMS Law* to Plaintiffs' conduct is vague due to Section 28-4653.C, which provides that the law does not prevent third parties (including Plaintiffs) from discharging their obligations, as service providers or otherwise, under federal, state or local law to protect and secure protected dealer data. But the entire purpose of the DMS Law is to prohibit Plaintiffs from implementing the technological and operational measures that Plaintiffs have developed based on their understanding of their legal obligations to protect and secure protected dealer data.

158.   It is therefore impossible for Plaintiffs to comply with these obligations and the conflicting provisions of the DMS Law. But the DMS Law itself provides no clear guidance as to which of these will control. That is, it is ultimately unclear whether the DMS Law applies to Plaintiffs *at all*.

### J.     The Current Controversy

159.   On April 9, 2019, Governor Ducey signed House Bill 2418 into law. The DMS Law will become effective 90 days after the close of the regular session of the Fifty-Fourth Legislature, or on August 26, 2019.

160.   Because the DMS Law will become effective in just a few weeks, Plaintiffs face imminent enforcement of the DMS Law against them by Defendants.

161.   Additionally, the new statutory obligations imposed upon Plaintiffs regarding third-party access to their DMSs pose a real and immediate threat to Plaintiffs' property and contract rights and to the security of the DMSs.

-43-

# FIRST CLAIM FOR RELIEF

## Declaratory Judgment

### (Conflict Preemption, Digital Millennium Copyright Act)

162.   Paragraphs 1–161 above are incorporated herein by reference.

163.   This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it is preempted by the federal Digital Millennium Copyright Act.

164.   The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, provides that "the laws of the United States . . . shall be the supreme law of the land."

165.   State laws that conflict with federal law are preempted by operation of the Supremacy Clause.

166.   Preemption may arise in a variety of contexts, including when the state law conflicts with, or poses an obstacle to, the purposes sought to be achieved by the federal law.

167.   Congress enacted the DMCA, 17 U.S.C. § 1201, to reinforce copyright owners' rights to use technological defenses to control access to and prevent the copying of copyrighted material. The DMCA establishes penalties for those who circumvent copyright owners' technological defenses and prohibits commerce in products or services designed to facilitate circumvention of copyright owners' technological defenses. Section 1201(a)(1)(A) of the DMCA provides that no "person shall circumvent a technological measure that effectively controls access to a work protected under this title." Section 1201(a)(2) reinforces that prohibition by banning commerce in products and services intended to facilitate circumvention of access controls.

168.   The DMCA is not only enforceable criminally, *id.* § 1204, but also offers copyright owners a private right of action against those who unlawfully access an owner's work, *id.* § 1203.

169.   CDK's DMS software is an original creative work protected under Title 17. Among its original and creative elements are its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

170.   The Reynolds DMS PC software program is an original creative work protected under Title 17. Among the many significant original elements of the program are its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience. Reynolds has registered copyrights on multiple versions of the Reynolds DMS software program. (Registration Nos. TX 7-586-896; TX 7-586-863; TX 8-538-825; and TX 8-538-541). The application software on the dealer PC and on the DMS server that is accessed by the DMS PC software program is also original creative work protected under Title 17. Among the many significant original elements of these programs are their source and object code; distinctive page layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

171.   CDK uses several technological measures to control access to and prevent copying of the CDK DMS software program. These technological measures include: requiring CDK dealer employees to log on with passwords; text prompts asking a user to certify that the user is an authorized dealer employee; CAPTCHA controls; and disabling dealer credentials that CDK finds have been used for automated access by third parties. These measures effectively control access to the DMS software program because the program, or portions of it, cannot be run, and its original, expressive elements cannot be displayed or copied, unless these measures have been navigated.

172.   Reynolds deploys numerous technological measures that effectively control access to and copying of the Reynolds DMS software or portions thereof. These technological access-control measures include login prompts that require a user to enter a

valid username and password to access the system; CAPTCHA controls that require a user to successfully solve a CAPTCHA to access certain portions of the Reynolds DMS software (including the Reynolds DMS data exporting functions); and Reynolds's Suspicious User ID monitoring software (which identifies login credentials that use automated scripts and bots and flags those credentials for deactivation). In the ordinary course of their operation, these technological measures require application of information, or a process or treatment, with Reynolds's authority as the owner of the DMS, to gain access to the Reynolds DMS software. These measures effectively control access to the DMS software program because the program, or portions of it, cannot be run, and its original, expressive elements cannot be accessed, displayed, or copied, unless these measures have been navigated.

173.    The DMCA prohibits hostile third parties from circumventing these technological measures without CDK's or Reynolds's authorization, and gives CDK and Reynolds an enforceable right against such circumvention. Moreover, the statute prohibits hostile third parties from offering services that facilitate circumvention of the above-described technological measures. CDK and Reynolds, in turn, have an enforceable right to erect technological measures against hostile third parties' unauthorized access to and copying of their respective copyrighted DMS software.

174.    The DMS Law stands as an obstacle to the purposes behind, and is preempted by, the DMCA because it effectively compels CDK and Reynolds to abandon the technological measures that they have adopted to control access to their copyrighted works and that Congress has authorized them to employ. Contrary to the DMCA, copyright owners must jettison these technological measures and grant access to any third party designated by a dealer without a license or authorization from the DMS provider.

175.    Thus, the DMS Law conflicts with the DMCA and is preempted.

-46-

**SECOND CLAIM FOR RELIEF**

**Declaratory Judgment**

**(Conflict Preemption, Copyright Act)**

176.    Paragraphs 1–175 above are incorporated herein by reference.

177.    This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it is preempted by the federal Copyright Act.

178.    The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, provides that "the laws of the United States . . . shall be the supreme law of the land."

179.    State laws that conflict with federal law are preempted by operation of the Supremacy Clause.

180.    Preemption may arise in a variety of contexts, including when the state law conflicts with, or poses an obstacle to, the purposes sought to be achieved by the federal law.

181.    The Copyright Act, 17 U.S.C. § 101, *et seq*., offers protection to creators of copyrightable material, including the right to exclude others from copying, distribution, preparation of derivative works based on, and displaying copyrighted works.

182.    As explained, Plaintiffs' DMSs contain and are comprised of copyrighted and copyrightable material.

183.    The DMS Law conflicts with, and is preempted by, the federal Copyright Act because it eliminates the copyright owner's right to exclude others from copying, distributing, creating derivative works based on, or displaying the copyrighted or copyrightable material by requiring the owner to allow third parties with no license agreement with Plaintiffs to access and use Plaintiffs' copyrighted DMS software. Such access and use necessarily entails the display, distribution, and creation of copies and derivative works of the copyrighted DMS software. As explained above, each time a user

runs the DMS software, that process creates a new fixed copy of the original computer program code in the computer's random access memory; new fixed copies of the program's original graphical content, text, screen layouts, and dynamic user experience; and displays those original copyrighted features on the computer screen. Moreover, allowing third parties to remotely access the DMS entails distribution of new copies of the software.

184.    Thus, the DMS Law conflicts with the Copyright Act and is preempted.

### THIRD CLAIM FOR RELIEF

### Declaratory Judgment

### (Conflict Preemption, Defend Trade Secrets Act)

185.    Paragraphs 1–184 above are incorporated herein by reference.

186.    This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it is preempted by the federal Defend Trade Secrets Act ("DTSA").

187.    The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, provides that "the laws of the United States . . . shall be the supreme law of the land."

188.    State laws that conflict with federal law are preempted by operation of the Supremacy Clause.

189.    Preemption may arise in a variety of contexts, including when the state law conflicts with, or poses an obstacle to, the purposes sought to be achieved by the federal law.

190.    The DTSA, 18 U.S.C. § 1836, *et seq.*, protects owners of trade secrets from misappropriation by third parties. Meant by Congress as a powerful tool for the protection of trade secrets, the Act not only establishes criminal penalties, but also gives the owner of a trade secret that is misappropriated a private right of action against anyone who discloses or uses that secret without the owner's consent despite knowing or having reason to know

-48

that knowledge of the trade secret was derived from or through someone who had a duty to maintain the owner's secret.

191.   CDK's DMS contains numerous CDK-proprietary trade secrets, including CDK-related forms, accounting rules, tax tables, and proprietary tools and data compilations. These trade secrets relate to CDK's DMS services, which are licensed and/or sold in interstate and foreign commerce. As described in greater detail above, CDK has taken reasonable measures to keep its trade secrets secret.

192.   Reynolds's DMS contains numerous Reynolds-proprietary trade secrets, including Reynolds-related forms, accounting rules, tax tables, and proprietary tools and data compilations. These trade secrets relate to Reynolds's DMS services, which are licensed and/or sold in interstate and foreign commerce. As described in greater detail above, Reynolds has taken reasonable measures to keep its trade secrets secret. State laws that conflict with federal law are preempted by operation of the Supremacy Clause.

193.   The DMS Law conflicts with, and is preempted by, the Defend Trade Secrets Act because it deprives Plaintiffs of their federally protected rights to exclude others from their trade secrets by requiring CDK and Reynolds to provide access to third parties authorized by the dealers, not by CDK or Reynolds.

194.   Thus, the DMS Law conflicts with the DTSA and is preempted.

## FOURTH CLAIM FOR RELIEF

## Declaratory Judgment

## (Conflict Preemption, Computer Fraud and Abuse Act)

195.   Paragraphs 1–194 above are incorporated herein by reference.

196.   This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it is preempted by the federal Computer Fraud and Abuse Act.

-49

197.    The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, provides that "the laws of the United States . . . shall be the supreme law of the land."

198.    State laws that conflict with federal law are preempted by operation of the Supremacy Clause.

199.    Preemption may arise in a variety of contexts, including when the state law conflicts with, or poses an obstacle to, the purposes sought to be achieved by the federal law.

200.    The CFAA provides that "[w]hoever … intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," is subject to criminal and civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.* § 1030(g) (civil damages and injunctive relief).

201.    In enacting the CFAA, Congress intended to empower businesses and individuals to control who may access their computer systems by prohibiting hackers and others from accessing computers without the owners' authorization. Under the statute, computer owners have exclusive discretion to decide who is authorized to access their computer and for what purposes.

202.    To effectuate these aims, the CFAA is not only enforceable criminally, but also permits any private person "who suffers damages or loss by reason of a violation of" the statute to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief," *id.* § 1030(g).

203.    A DMS is a "computer" within the meaning of the CFAA, which defines that term to include "any data storage facility or communications facility directly related to or operating in conjunction with [a computing] device." *Id.* § 1030(e)(1). Plaintiffs' DMSs also rely on the operation of one or more computing devices in their operations. The DMSs themselves, and the computing devices by which they operate, are "protected computers"

within the statute's meaning because they are connected to the internet and thus are used in and affect interstate and foreign commerce and communications. *See id.* § 1030(e)(2)(B).

204.    Contrary to Congress's purpose in enacting the CFAA, Arizona's DMS Law removes Plaintiffs' rights to determine who is an authorized user of their DMSs, or for what purpose third parties may use their DMSs, by requiring CDK and Reynolds to allow access to their systems by any user authorized by a *dealer*, even if not authorized by CDK or Reynolds.

205.    Thus, the DMS Law conflicts with the CFAA and is preempted.

## FIFTH CLAIM FOR RELIEF

## Declaratory Judgment

## (Conflict Preemption, Gramm-Leach-Bliley Act)

206.    Paragraphs 1–205 above are incorporated herein by reference.

207.    This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it is preempted by the GLBA.

208.    The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, provides that "the laws of the United States . . . shall be the supreme law of the land."

209.    State laws that conflict with federal law are preempted by operation of the Supremacy Clause.

210.    Preemption may arise in a variety of contexts, including when the state law conflicts with, or poses an obstacle to, the purposes sought to be achieved by the federal law.

211.    The GLBA provides "that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). In furtherance of this law, the Federal Trade Commission's Safeguards Rule requires

financial institutions such as automobile dealerships to employ administrative, technical, and physical safeguards to protect sensitive customer information at issue. *See* 16 CFR Part 314.3.

212.    In addition to implementing their own safeguards, financial institutions such as dealerships must take steps to ensure that their service providers—such as Plaintiffs and other DMS providers—similarly safeguard customer information in their care. *Id.* § 314.4(d).

213.    The DMS Law forbids Plaintiffs from taking any measures to secure their systems or limit the data that a third party can access, extract, or modify on the DMS.

214.    The DMS Law further bars Plaintiffs from placing certain restrictions "on the scope or nature of the data that is shared with an authorized integrator" or "on the ability of the authorized integrator to write data to a dealer data system." Nor may Plaintiffs place certain "limitation[s] or condition[s] on a third party that accesses or shares protect[ed] dealer data or that writes data to a dealer data system."

215.    Contrary to Congress' intent, the DMS Law requires DMS providers to create a gaping vulnerability in DMSs that impacts thousands of dealer licensees and hundreds of millions of consumers within and without Arizona's borders.

216.    Such provisions directly conflict with, and are preempted by, the GLBA's requirements that financial institutions and their service providers use technical measures to secure and protect consumer data. The DMS Law also poses an obstacle to the purposes sought to be achieved by the federal law and undermines federal policy as embodied in the GLBA and related regulations.

217.    Thus, the DMS Law conflicts with the GLBA and is preempted.

**SIXTH CLAIM FOR RELIEF**

**Declaratory Judgment**

**(Void for Vagueness, United States Constitution)**

218.   Paragraphs 1–217 above are incorporated herein by reference.

219.   This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it is void for vagueness under the U.S. Constitution.

220.   The Constitution provides that no State shall deprive any person of property without due process of law. U.S. Const. amend. XIV.

221.   It is a basic principle of due process that a law is void for vagueness if its prohibitions are not clearly defined—that is, if it fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited.

222.   Laws imposing criminal sanctions, as the DMS Law does, are subject to a more demanding standard of scrutiny when challenged for vagueness.

223.   As the foregoing, non-exhaustive list demonstrates (*infra* ¶ 224(a)-(g)), numerous aspects of the DMS Law would deprive Plaintiffs of property without a reasonable opportunity to know what is prohibited or required.

224.   Indeed, the DMS Law is riddled with ambiguities going to the heart of nearly every operative provision affecting Plaintiffs, who cannot know:

(a)   Whether contractually agreed dealer access restrictions violate the law;

(b)   Whether hosting encrypted data for a fee is prohibited cyber-ransom;

(c)   Whether they are required to facilitate or prevent one dealer from accessing another dealer's data;

(d)   Whether any or all of their dealer charges are prohibited fees;

(e)   Which of their restrictions on access by authorized integrators are "unreasonable";

-53-

(f)     What subset of dealer data is actually subject to the law; or even

(g)     Whether, in light of conflicting federal obligations, the law applies to Plaintiffs or their core conduct *at all*.

225.    In light of these fundamental ambiguities, which are not severable from the DMS Law as a whole, the Act is unconstitutionally vague on its face and as applied to Plaintiffs—particularly under the heightened scrutiny triggered by criminal liability.

**SEVENTH CLAIM FOR RELIEF**

**Declaratory Judgment**

**(Unconstitutional Taking, United States Constitution)**

226.    Paragraphs 1–225 above are incorporated herein by reference.

227.    This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it works an unconstitutional taking under the U.S. Constitution.

228.    The Constitution provides that private property may not be taken for public use without just compensation. U.S. Const. amend. V.

229.    The DMS Law takes Plaintiffs' private property by requiring CDK and Reynolds to allow third parties to access their proprietary DMSs and to remove data and write data to that system. The DMS Law takes Plaintiffs' control over their proprietary systems and gives it to third parties. And it allows third parties to physically occupy and take part of the proprietary DMSs by allowing them to write data into that system.

230.    The DMS Law takes private property for no public purpose but rather for the sole economic benefit of a small number of private parties—including car dealers located in Arizona and third-party data syndicators.

231.    CDK and Reynolds spent years and millions of dollars developing their DMSs, including security measures to control access to the system, and during that time the government did not regulate the right of dealers to grant third parties access to DMSs.

-54-

232.    The DMS Law provides no compensation for the physical and regulatory taking of Plaintiffs' property. To the contrary, the DMS Law prohibits CDK and Reynolds from imposing a fee for access to their systems and the valuable data contained therein.

233.    The DMS Law reduces the economic value of the DMSs to CDK and Reynolds.

**EIGHTH CLAIM FOR RELIEF**

**Declaratory Judgment**

**(Violation of Federal Contracts Clause)**

234.    Paragraphs 1–233 above are incorporated herein by reference.

235.    This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it violates the Contracts Clause of the U.S. Constitution.

236.    The Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1.

237.    The DMS Law substantially impairs Plaintiffs' existing contractual relationships with dealers. As explained, those contracts prohibit dealers from granting third parties access to Plaintiffs' DMSs. Those contracts explicitly preserve the rights of CDK and Reynolds to determine who is authorized to access the DMSs.

238.    The DMS Law further impairs Plaintiffs' existing contracts with dealers by requiring that any agreement regarding access to, sharing or selling of, copying, using or transmitting dealer data is terminable upon 90 days' notice from the dealer.

239.    The DMS Law further impairs Plaintiffs' existing contracts with dealers by eliminating Plaintiffs' ability to implement and maintain appropriate safeguards to protect the confidentiality of customer information on the DMSs.

240.    There is no legitimate public purpose supporting this significant imposition on Plaintiffs' contract rights. The DMS Law is not drawn in an appropriate and reasonable

way to advance a significant and legitimate public purpose. In fact, the law advances no public purpose but rather alters existing contractual relationships for the benefit of a small class of private parties.

**NINTH CLAIM FOR RELIEF**

**Declaratory Judgment**

**(Violation of Dormant Commerce Clause)**

241.    Paragraphs 1–240 above are incorporated herein by reference.

242.    This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it violates the dormant Commerce Clause of the U.S. Constitution.

243.    The dormant Commerce Clause provides that any state law affecting interstate commerce may not impose an undue burden on that commerce. *See* U.S. Const. art. I, § 8, cl. 3.

244.    The DMS Law affects interstate commerce because it regulates the relationship between DMS providers and car dealers, which conduct business across state lines in interstate commerce.

245.    The DMS Law imposes an undue and substantial burden on interstate commerce because it creates special rules for the relationship between DMS providers and dealers. DMSs are sold nationwide, and indeed some dealers have operations in more than one State, but Plaintiffs must change their products specifically for the Arizona market as a result of the DMS Law.

246.    Further, the DMS Law places a great quantity of private consumer information and proprietary OEM data at risk in states outside Arizona by permitting access to DMSs by users who have not been properly screened and trained by DMS providers and by dismantling the carefully designed safeguards currently in place to prevent the deleterious effects of unfettered DMS access.

-56

247.   There is no legitimate public purpose justifying the DMS Law's burden on interstate commerce because the law inures to the sole benefit of a small class of private parties.

**TENTH CLAIM FOR RELIEF**

**Declaratory Judgment**

**(Unconstitutional Abridgement of the Freedom of Speech, United States Constitution)**

248.   Paragraphs 1–247 above are incorporated herein by reference.

249.   This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority, and seeks a declaration that the DMS Law is unenforceable because it compels speech in violation of the First Amendment to the U.S. Constitution.

250.   The First Amendment prohibits state actors from abridging the freedom of speech. U.S. Const. amend. I. The rights protected by the First Amendment include the freedom from compelled speech and extend to corporate persons. *See id.*

251.   The DMS Law abridges the freedom of speech by compelling Plaintiffs to engage in an exchange of information with third parties.

252.   The DMS Law also abridges the freedom of speech by compelling Plaintiffs to draft computer code to allow third parties to circumvent the security measures that currently control access to Plaintiffs' DMSs and otherwise rewrite the functionality of the DMSs to allow and enable such access.

253.   The DMS Law's abridgments of Plaintiffs' freedom of speech are not supported by or sufficiently tailored to a substantial, compelling, or otherwise valid government interest, do not directly advance that government interest, and are more extensive than necessary to serve that government interest.

QB\58682256.1

254.   The disclosure requirements imposed by the DMS Law are unjustified and unduly burdensome because they would require Plaintiffs to engage in protected speech by (i) drafting computer code to allow third parties to circumvent the security measures that currently control access to Plaintiffs' DMSs and otherwise rewrite the functionality of the DMSs; and (ii) forcing the exchange of information with third parties, all at substantial cost and in violation of Plaintiffs' rights.

### ELEVENTH CLAIM FOR RELIEF

### Preliminary and Permanent Injunction

255.   Paragraphs 1–254 above are incorporated herein by reference.

256.   This claim is brought under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's inherent equitable authority.

257.   Plaintiffs have a substantial likelihood of success on the merits of their claims.

258.   Plaintiffs would suffer irreparable harm in the absence of an interlocutory and permanent injunction because the access to the DMSs required by the DMS Law may compromise the integrity of those systems, damaging their continued operation and placing protected consumer, OEM, third-party, and Plaintiff data at risk, while permanently and immeasurably damaging DMS providers' reputations as sources of secure systems. The DMS Law requires Plaintiffs to allow parties authorized by dealers to write data onto the system, regardless of whether that party has been vetted by Plaintiffs. This poses the real possibility of data corruption or adding malware to the system. Additionally, Plaintiffs have taken strong measures to prevent hackers from accessing their DMSs, but the methods they have employed are undone by the DMS Law, which strips Plaintiffs of the ability to prevent access that they have not authorized. All the while, confidential information, including a vast amount of consumer information, is needlessly placed at risk by the law.

-58

259.    For these reasons, there is no adequate remedy at law to compensate for the irreparable harm Plaintiffs face if the DMS Law is not enjoined during the pendency of this action.

260.    The balance of the equities weighs in favor of granting an injunction. Dealers and third parties will not be harmed by the injunction, which would preserve the existing contractual relationships between the parties. At the same time, Plaintiffs face irreparable harm to their DMSs and professional reputations, OEMs face exposure of their proprietary data, and consumers risk having their private data exposed and altered through the third-party access to the DMS required by the DMS Law.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

A.      Declaring that the DMS Law is unenforceable because it is preempted by the Digital Millennium Copyright Act;

B.      Declaring that the DMS Law is unenforceable because it is preempted by the Copyright Act;

C.      Declaring that the DMS Law is unenforceable because it is preempted by the Defend Trade Secrets Act;

D.      Declaring that the DMS Law is unenforceable because it is preempted by the Computer Fraud and Abuse Act;

E.      Declaring that the DMS Law is unenforceable because it is preempted by the Gramm-Leach-Bliley Act;

F.      Declaring that the DMS Law is unenforceable because it is void for vagueness in violation of the Due Process Clause of the United States Constitution;

G.      Declaring that the DMS Law is unenforceable because it violates the Takings Clause of the United States Constitution;

1       H.     Declaring that the DMS Law is unenforceable because it violates the

2  Contracts Clause of the United States Constitution;

3       I.     Declaring that the DMS Law is unenforceable because it violates the

4  Dormant Commerce Clause of the United States Constitution;

5       J.     Declaring that the DMS Law is unenforceable because it violates the First

6  Amendment of the United States Constitution;

7       K.     Temporarily and permanently enjoining the enforcement of the DMS Law;

8       L.     Awarding Plaintiffs their costs and litigation expenses, including attorney's

9  fees and costs; and

10      M.     Awarding Plaintiffs such other and further relief that this Court deems just,

11  proper, and equitable.

12      RESPECTFULLY SUBMITTED this 29th day of July, 2019.

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391

By */s/ Brian A. Howie*
    Brian A. Howie
    Lauren Elliott Stine

    *Attorneys for Plaintiffs*

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., NW, Ste. 100
Washington, DC 20006, 201-747-1900
Thomas J. Dillickrath* (DC 483710)
TDillickrath@sheppardmullin.com

Four Embarcadero Center, 17th Floor
San Francisco, CA 94111, 415-434-9100
Amar S. Naik* (CA 307208)
ANaik@sheppardmullin.com
Molly C. Lorenzi* (CA 315147)
MLorenzi@sheppardmullin.com

-60

1

2                                  GIBBS & BRUNS LLP

3                                  1100 Louisiana, Ste. 5300
Houston, TX 77002, 713-650-8805

4                                  Aundrea K. Gulley* (TX 24034468)
agulley@gibbsbruns.com

5                                  Denise Drake* (TX 24092358)
DDrake@gibbsbruns.com

6                                  *Attorneys for The Reynolds and Reynolds*
*Company*

7

8                                  MAYER BROWN LLP
71 S. Wacker Drive

9                                  Chicago, IL 60606
312-782-0600

10                                 Britt M. Miller* (IL 6256398)
BMiller@mayerbrown.com

11                                Michael A. Scodro* (IL 6243845)
MScodro@mayerbrown.com

12                               Brett E. Legner* (IL 6256268)
BLegner@mayerbrown.com

13                               1999 K Street, NW
Washington, DC 20006

14                               202-263-3000

15                               Mark W. Ryan* (DC 359098)
mryan@mayerbrown.com

16                               *Attorneys for CDK Global, LLC*

17                               *\*Pro Hac Vice Forthcoming*

18

19

20

21

22

23

24

25

26

QB\58682256.1