QUARLES & BRADY LLP
Firm State Bar No. 00443100
Renaissance One, Two N. Central
Phoenix, AZ 85004-2391, 602-229-5200
Brian A. Howie (AZ No. 026021)
Brian.Howie@quarles.com
Lauren E. Stine (AZ No. 025086)
Lauren.Stine@quarles.com
*Attorneys for Plaintiffs*

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., NW, Ste. 100
Washington, DC 20006, 201-747-1900
Thomas J. Dillickrath* (DC 483710)
TDillickrath@sheppardmullin.com

Four Embarcadero Center, 17th Floor
San Francisco, CA 94111, 415-434-9100
Amar S. Naik* (CA 307208)
ANaik@sheppardmullin.com
Molly C. Lorenzi* (CA 315147)
MLorenzi@sheppardmullin.com

GIBBS & BRUNS LLP
1100 Louisiana, Ste. 5300
Houston, TX 77002, 713-650-8805
Aundrea K. Gulley* (TX 24034468)
agulley@gibbsbruns.com
Denise Drake* (TX 24092358)
DDrake@gibbsbruns.com
*Attorneys for The Reynolds and Reynolds Co.*

MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
312-782-0600
Britt M. Miller** (IL 6256398)
BMiller@mayerbrown.com
Michael A. Scodro** (IL 6243845)
MScodro@mayerbrown.com
Brett E. Legner** (IL 6256268)
BLegner@mayerbrown.com

1999 K Street, NW
Washington, DC 20006
202-263-3000
Mark W. Ryan** (DC 359098)
mryan@mayerbrown.com
*Attorneys for CDK Global, LLC*

*Admitted Pro Hac Vice*
**Pro Hac Vice Forthcoming*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation,<br><br>     Plaintiffs,<br><br> vs.<br><br>Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation,<br><br>     Defendants. | Case No.:<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

1

## <u>TABLE OF CONTENTS</u>

2

INTRODUCTION ......................................................................................................... 1

3

STATEMENT OF FACTS ............................................................................................. 3

    I.     THE DMS ECOSYSTEM ................................................................. 3

4

    II.    UNAUTHORIZED ACCESS ........................................................... 4

5

    III.   THE DMS LAW ............................................................................... 6

6

ARGUMENT .................................................................................................................. 6

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .... 6

7

     A. Multiple Federal Statutes Preempt The DMS Law ....................................... 7

8

        1.     The CFAA Preempts the DMS Law ................................. 7

9

        2.     The Copyright Act Preempts the DMS Law ................... 10

        3.     The DMCA Preempts the DMS Law ............................. 11

10

        4.     The GLBA Preempts the DMS Law ............................... 13

11

     B. The DMS Law Violates Several Constitutional Provisions ....................... 14

        1.     The DMS Law Violates the Contracts Clause ................ 15

12

            a.     The DMS Law Substantially Impairs Contracts with

13

                 Dealers .................................................................. 15

            b.     The DMS Law Does Not Properly Advance a

14

                 Significant and Legitimate Public Purpose ........................... 17

15

        2.     The DMS Law is Unconstitutionally Vague ................... 18

            a.     The DMS Law Is Impermissibly Vague ............... 18

16

            b.     These Vague Provisions Are Not Severable, So the

17

                  Statute Fails ........................................................... 20

        3.     The DMS Law Effects an Unconstitutional Taking of

18

             Plaintiffs' Private Property Without Just Compensation ................. 21

19

        4.     The DMS Law Violates the First Amendment ................ 22

    II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM .......................... 24

20

    III.   THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFFS'

21

        FAVOR ......................................................................................... 25

22

    IV.   THE PUBLIC INTEREST FAVORS GRANTING AN

        INJUNCTION ............................................................................... 26

23

CONCLUSION ............................................................................................................ 26

24

25

26

## **TABLE OF AUTHORITIES**

### **CASES**

Page(s)

*Arce v. Douglas,*
  793 F.3d 968 (9th Cir. 2015) ............................................................. 20

*Ariz. Libertarian Party, Inc. v. Bayless,*
  351 F.3d 1277 (9th Cir. 2003) ........................................................... 20

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*
  447 U.S. 557 (1980) .......................................................................... 23

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) ............................................................................ 19

*Cotter v. Desert Palace, Inc.,*
  880 F.2d 1142 (9th Cir. 1989) ........................................................... 24

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ..................................................................... 7, 12

*Cycle Barn, Inc. v. Arctic Cat Sales, Inc.,*
  701 F. Supp. 2d 1197 (W.D. Wash. 2010) .......................................... 18

*Dep't of Treasury v. Fabe,*
  508 U.S. 491 (1993) .......................................................................... 20

*Desertrain v. City of Los Angeles,*
  754 F.3d 1147 (9th Cir. 2014) ........................................................... 19

*Elrod v. Burns,*
  427 U.S. 347 (1976) .......................................................................... 25

*Energy Reserves Grp. v. Kan. Power & Light Co.,*
  459 U.S. 400 (1983) .................................................................... 15, 17

*Facebook, Inc. v. Power Ventures, Inc.,*
  844 F.3d 1058 (9th Cir. 2016) ......................................................... 8, 9

*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995) ....................................................................................... 7

*Gen. Motors Corp. v. Romein*,
  503 U.S. 181 (1992) ..................................................................................... 15

*Goldie's Bookstore, Inc. v. Super. Ct.*,
  739 F.2d 466 (9th Cir. 1984) ...................................................................... 24

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................................................ 18

*Horne v. Dep't of Ag.*,
  135 S. Ct. 2419 (2015) ................................................................................ 21

*Hunt v. City of Los Angeles*,
  638 F.3d 703 (9th Cir. 2011)........................................................................ 18

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 558 (N.D. Ill. 2019) ...................................................... 8, 12

*Junger v. Daley*,
  209 F.3d 481 (6th Cir. 2000)........................................................................ 22

*Kelo v. City of New London*,
  545 U.S. 469 (2005) ..................................................................................... 22

*Lee v. Walters*,
  433 F.3d 672 (9th Cir. 2005)........................................................................ 20

*LL Liquor, Inc. v. Montana*,
  912 F.3d 533 (9th Cir. 2018)........................................................................ 15

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ..................................................................................... 21

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009)........................................................................ 8

*MAI Sys. Corp. v Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir. 1993)........................................................................ 10

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007) ................................................................................ 11, 12

*Nat'l Wildlife Fed'n v. Coston*,
   773 F.2d 1513 (9th Cir. 1985) ........................................................................ 7

*Penn Central Transportation v. New York City*,
   438 U.S. 104 (1978) ................................................................................ 21, 22

*Pure Wafer Inc. v. City of Prescott*,
   845 F.3d 943 (9th Cir. 2017) ....................................................................... 15

*Republic of the Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988) .................................................................... 6, 7

*Retail Digital Network, LLC v. Prieto*,
   861 F.3d 839 (9th Cir. 2017) ....................................................................... 23

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988) ..................................................................................... 22

*Ross v. City of Berkeley*,
   655 F. Supp. 820 (N.D. Cal. 1987) .............................................................. 18

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984) ..................................................................................... 21

*Seltzer v. Cochrane*,
   104 F.3d 234 (9th Cir. 1996) ....................................................................... 18

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ................................................................................ 22, 23

*State v. Pandeli*,
   161 P.3d 557 (2007) ................................................................................ 20, 21

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ....................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*Sveen v. Melin*,
   138 S. Ct. 1815 (2018) ........................................................................... 15, 17

*Tucson Woman's Clinic v. Eden*,
   379 F.3d 531 (9th Cir. 2004) ....................................................................... 19

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) ........................................................................ 8

*United States v. Trotter*,
   478 F.3d 918 (8th Cir. 2007) .......................................................................... 8

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) .................................................................... 11, 22

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013) ....................................................................... 23

*West Indian Co. v. Virgin Islands*,
   643 F. Supp. 869 (D.V.I. 1986) .................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................................... 6

*Wooley v. Maynard*,
   430 U.S. 705 (1977) .................................................................................... 22

*World Wide Rush, LLC v. City of L.A.*,
   606 F.3d 676 (9th Cir. 2010) ....................................................................... 23

## STATUTES AND CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ....................................................................................... 21

U.S. Const. art. I, § 10, cl. 1 ........................................................................... 15

U.S. Const. art. VI, cl. 2 ................................................................................... 7

15 U.S.C. § 6801 ......................................................................................... 7, 13

15 U.S.C. § 6807 ....................................................................................... 13, 14

17 U.S.C. § 101 .................................................................................................. 7

17 U.S.C. § 102(a) ........................................................................................... 10

17 U.S.C. § 106 ......................................................................................... 10, 11

17 U.S.C. § 301(a) ................................................................................... 10, 11

17 U.S.C. § 1201 ............................................................................... 7, 11, 12

17 U.S.C. § 1202 ............................................................................................. 7

17 U.S.C. § 1203 ...................................................................................... 7, 11

17 U.S.C. § 1204 ...................................................................................... 7, 11

17 U.S.C. § 1205 ............................................................................................. 7

18 U.S.C. § 1030 .................................................................................. 7, 8, 9

A.R.S. § 13-803 ........................................................................................... 18

A.R.S. §§ 28-4653 *et seq.* ................................................................... passim

## RULES AND REGULATIONS

Federal Rule of Civil Procedure 65 ................................................................. 1

12 C.F.R. § 1016.3(l)(3)(ii)(C), (E) ............................................................ 13

16 C.F.R. Parts 313, 314 ........................................................ 13, 14, 16, 17

## OTHER AUTHORITIES

139 Cong. Rec. S16422 ................................................................................. 9

Arizona HB 2418 ................................................................................... passim

H.R. Rep. 105-551 ...................................................................................... 11

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") move for the entry of a preliminary injunction to enjoin Defendants Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation (collectively, "Defendants"), and all those in active concert or participation with them, from enforcing Arizona HB 2418, which adds Article 10 to Title 28, Chapter 10 of the Arizona Revised Statutes and is effective as of August 27, 2019 (hereinafter, the "DMS Law"), pending completion of judicial review of the constitutionality of the statute. This Motion is supported by the following Memorandum of Points and Authorities, the Exhibits hereto, Plaintiffs' Motion for Leave to File Certain Documents Under Seal filed concurrently herewith, and the entire record in this action.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This case involves Arizona HB 2418 (the "DMS Law"). The DMS Law, which was backed by automotive dealers as a way to reduce their costs, radically changes the long-established contractual relationship between these dealers and the owners of computer systems known as dealer management systems ("DMSs"). In the process, the new DMS Law puts millions of Arizonans' most sensitive personal data at risk. Consistent with federal law and cybersecurity best practices, Plaintiffs prohibit dealers from giving a third party access to Plaintiffs' DMSs except under carefully controlled and secure conditions. The DMS Law strips Plaintiffs of their right to control access to their systems and gives dealers unfettered control over access. Vague and incoherent, the DMS Law conflicts with federal statutes protecting Plaintiffs' proprietary interests in their DMSs and violates several constitutional guarantees, all while exposing Plaintiffs to potential criminal penalties for complying with federal law, honoring their contractual agreements, and safeguarding the security of their systems. There is no countervailing public benefit; to the contrary, the DMS

Law's potential effects on the public would be devastating, allowing Social Security numbers, drivers' license numbers, and sensitive financial data to be hijacked from these systems and sold on the open market.

The constitutional problems with the DMS Law are legion:

- The DMS Law is preempted by at least five federal statutes related to data privacy and security as well as copyright protection, thereby conflicting with the Supremacy Clause of the Constitution;

- The DMS Law is so vague as to be incoherent, as Plaintiffs cannot determine what conduct violates it;

- The DMS Law interferes with and impairs Plaintiffs' contractual obligations to protect the security and integrity of the DMSs and their contractual rights to control third-party access to their systems, violating the Contracts Clause of the Constitution;

- The DMS Law results in a taking of Plaintiffs' property by requiring them to provide unlicensed third parties with access to their DMSs and allowing those parties to write data into the system—absent any discernable public benefit—without just compensation; and

- The DMS Law violates the First Amendment by requiring Plaintiffs to engage in compelled speech, and the Dormant Commerce Clause by placing an undue burden on interstate commerce without any legitimate public purpose.

In addition to these fatal constitutional flaws, the statute needlessly places sensitive consumer and proprietary data at extraordinary risk of breach. In fact, enforcing this law would be antithetical to the public good, ensuring only that Arizonans would be at a severely heightened—and very real—risk of having their most sensitive data exposed to unwanted third parties. Given the law's legion constitutional infirmities and the irreparable harm that will result if it is enforced, that enforcement should be enjoined.

# STATEMENT OF FACTS

## I.   THE DMS ECOSYSTEM

Plaintiffs CDK Global, LLC ("CDK") and The Reynolds & Reynolds Company ("Reynolds") develop, own, and operate proprietary DMSs. Plaintiffs have invested millions of dollars and countless hours into developing and maintaining their systems, which incorporate copyrighted works and other proprietary data and processes. (Declaration of Dean W. Crutchfield ("Crutchfield Decl.") ¶ 5 (attached as "Exhibit A"); Declaration of Kelly Hall ("Hall Decl.") ¶ 12 (attached as "Exhibit B").) Automotive dealerships license the DMSs to help manage their business operations, and the DMSs enable dealers to handle vast amounts of confidential consumer and proprietary data, process millions of transactions daily, and manage data communications between dealers, customers, car manufacturers, credit bureaus, car manufacturers, and other third parties.

DMSs[1] are complex proprietary computer systems consisting of millions of lines of code, thousands of software programs, and various hardware components, processing vast amounts of data sourced from many parties. (Crutchfield Decl. ¶¶ 5, 9; Hall Decl. ¶ 2.) Much of this data—*e.g.*, Social Security numbers, driver's license numbers, and proprietary pricing data—is commercially sensitive and valuable. (Crutchfield Decl. ¶ 9; Hall Decl. ¶¶ 8-9.)

A DMS benefits car dealerships by allowing them to manage their day-to-day business operations, from human resources, to bookkeeping and tax computations, to all of the service and sales operations in which the auto industry engages. (Crutchfield Decl. ¶ 6.) DMSs create and license numerous processes and data points that allow them to serve dealers. (*Id.* ¶ 8.) Dealers may leverage the power of the DMS to, for example, send data to credit bureaus and receive parts data from manufacturers. DMS providers manage this data

---

[1] DMSs refers to Plaintiffs' DMSs unless otherwise indicated.

flow by developing interfaces capable of securely receiving data from and transmitting it to the DMS. (*Id.* ¶¶ 19-20; Hall Decl. ¶ 21.) Integration partners—including software vendors, who sell computer applications to dealers and populate those applications with data housed on the DMSs—use these interfaces, paying fees based on the functionality and complexity of the interface. (Crutchfield Decl. ¶ 30.) Plaintiffs have also developed reporting tools included in their DMSs that enable dealers to export their operational data securely to application vendors and other third parties of the dealers' choice. (*Id.* ¶ 15; Hall Decl. ¶ 19.)

Plaintiffs employ multiple technological measures—such as secure login credentials, CAPTCHA prompts, and comprehensive cybersecurity infrastructure, hardware, and software—to safeguard Plaintiffs' systems from unauthorized access or breach. (Crutchfield Decl. ¶¶ 12, 16; Hall Decl. ¶¶ 29-34.) Plaintiffs also prohibit dealers from granting third parties access to their DMSs without Plaintiffs' authorization. (Crutchfield Decl. ¶ 14; Hall Decl. ¶ 15.)

## II.   UNAUTHORIZED ACCESS

Outside third parties have used unauthorized, unlicensed, and illegal means to access DMSs. These third parties break into the systems and steal sensitive data or write data into the system without incurring the significant expenditures and taking the necessary precautions required to develop, operate, and maintain the DMSs.[2] Some gain access by using dealer employee login credentials. Once in the system, they launch automated programs to run processes and extract or modify data. (Crutchfield Decl. ¶ 34; Hall Decl.

---

[2] For example, in October 2016, hackers accessed the personal information of more than 12.5 million dealership customers at 130 stores through a vulnerability in the DMS provided by DealerBuilt. DealerBuilt has entered into a consent order with the Federal Trade Commission ("FTC") requiring enhanced security measures. Agreement Containing Consent Order, *In the Matter of Lightyear Dealer Technologies, LLC*, File No. 172 3051 (F.T.C.), https://www.ftc.gov/system/files/documents/cases/172_3051_dealerbuilt_final_consent_agreement_6-12-19.pdf.

¶¶ 42-44.) These methods are used by hackers and cyber-thieves as well as automotive "third parties." (Crutchfield Decl. ¶¶ 32-34.) Plaintiffs' cybersecurity measures prophylactically protect the systems from unauthorized access, whether from hostile third parties hired by marketing firms, criminal cyber-gangs, or nefarious entities working for nation-states.

Beyond misappropriating Plaintiffs' intellectual property every time they access the DMS and run automated programs on these systems, unauthorized third parties pose unacceptable security and operational risks. Some use lax security practices such as sharing both usernames and passwords via unencrypted email and disregarding industry best practices like data minimization. (*Id.* ¶ 34; Hall Decl. ¶ 41.) Likewise, many access the system functionality to reach data from consumers, car manufacturers, credit bureaus, and DMS providers—much of it subject to nondisclosure agreements and data security and privacy laws. (Hall Decl. ¶¶ 9, 46.)

The automated programs used by these third parties degrade the speed and reliability of the DMS, often disrupting other dealership functions that a DMS is intended to support. (Crutchfield Decl. ¶ 34; Hall Decl. ¶¶ 42-44.) And when programs attempt to write back data, they can corrupt data and propagate errors throughout the system, which DMS providers must attempt to fix at great expense. (Hall Decl. ¶¶ 26-27.) Preventing unauthorized access requires constant vigilance. In an average month, CDK prevents numerous attacks on its system and frequently is required to conduct cybersecurity incident investigations. (Crutchfield Decl. ¶ 33.) To manage these security risks, Plaintiffs use contractual and technological means to prevent unauthorized third-party access—which can include those with nefarious intent like a gang of cyber-criminals or a data extractor working for an automotive marketing firm—to their DMSs. The cybersecurity measures implemented by Plaintiffs are designed to prevent unauthorized access. (*See supra* at 3.)

### III.   THE DMS LAW

The DMS Law requires DMS providers to allow unfettered access[3] to their proprietary computer systems to third parties that a dealer "authorizes." It places almost no restriction on dealers' ability to authorize access to Plaintiffs' proprietary systems and the sensitive consumer data Plaintiffs process, and prohibits Plaintiffs from charging a "fee" for this access. The statute forbids Plaintiffs from "tak[ing] any action ... to prohibit or limit a dealer's ability to protect, store, copy, share, or use protected dealer data," a term expansively defined to include virtually all data stored or processed on a DMS. A.R.S. § 28-4653.A.3. The law also bars DMS providers from "imposing any fee [vaguely defined to exclude only "direct costs incurred" in providing access] or other restriction ... for accessing or sharing protected dealer data or for writing data to a [DMS]." *Id.* § 28-4653.A.3(a). And it prevents providers from "prohibiting a third party that … the dealer has identified as one of its authorized integrators from integrating into the dealer's [DMS]," specifically forbidding DMS providers to impose restrictions "on the scope or nature of the data that is shared" with dealer-designated third parties or "on the ability of" dealer-designated third parties "to write data to a [DMS]." *Id.* § 28-4653.A.3(b).

### ARGUMENT

Plaintiffs are entitled to a preliminary injunction because: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) an injunction "is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

To satisfy the first element, Plaintiffs need only show a "'fair chance of success'" on their claims. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)

---

[3] Such unfettered access includes automated access, unlimited bulk extractions, and system-altering write-back access.

(en banc) (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)). Plaintiffs easily meet that burden, for the DMS Law is preempted by the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201-05, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§ 6801 *et seq*. The DMS Law also violates the Contracts and Takings Clauses and the First and Fourteenth Amendments to the Constitution.

### A.     Multiple Federal Statutes Preempt the DMS Law.

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. art. VI, cl. 2). Congress may do so expressly, in the text of a federal statute, or "implicitly," "either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citations omitted). Conflict preemption exists "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotations omitted).

The DMS Law is impliedly preempted by the CFAA, the DMCA, and the GLBA because it "stands as an obstacle" to their respective purposes.  Also, the Copyright Act expressly preempts the DMS Law because that law forces DMS providers to open their computer systems to nearly any third party a dealer chooses. Congress gave the owners of protected computers and copyrighted works the *exclusive* right to determine who may access their property and on what terms. Because the DMS Law strips DMS providers of that federally conferred right, it conflicts with federal law and is thus impliedly preempted.

### 1.     The CFAA Preempts the DMS Law.

"The CFAA prohibits acts of computer trespass by those who are not authorized

7

users or who exceed authorized use." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016); *accord In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 570 (N.D. Ill. 2019) ("the 'authorization' required for lawful access under the CFAA must come from the owner of the computer system, not from anyone who happens to use the system"). The Act prohibits anyone from "intentionally access[ing] a computer without authorization ... and thereby obtain[ing] ... information from any protected computer," 18 U.S.C. § 1030(a)(2), where "protected computer" is defined to include any computer "used in or affecting interstate ... commerce," *id.* § 1030(e)(2)(B), as well as any "data storage facility or communications facility directly related to or operating in conjunction with such a" computer, *id.* § 1030(e)(1). In effect, the CFAA prohibits any unauthorized access to any private computer connected to the Internet. *See United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007). Plaintiffs' DMSs and the computing devices by which they operate are "protected computers" under the CFAA.

Congress enacted the CFAA to give the owners of computer systems the power to control who may access their computer systems. The statute imposes liability if a defendant's access was "without authorization" or in excess of authorization, 18 U.S.C. § 1030(a)(2), and grants computer owners "exclusive discretion" to determine who is authorized to access their computer and for what purposes. *United States v. Nosal*, 844 F.3d 1024, 1036 (9th Cir. 2016). Thus, the statute empowers a computer owner to limit the purpose and duration of system access by restricting it to certain purposes or by revoking authorization that the owner had previously given. *See id.* at 1038; *Facebook*, 844 F.3d at 1068; *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009).

The CFAA underscores Congress's intent to vest computer owners with the exclusive right to determine who may access their systems. It is not only enforceable through criminal penalties, but also authorizes any private person "who suffers damage or loss by reason of a violation" to "maintain a civil action against the violator to obtain

compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g); *see also* 139 Cong. Rec. S16422 (daily ed. Nov. 19, 1993) (remarks of Sen. Leahy) (private right of action "allows aggrieved individuals to obtain relief" for unauthorized intrusions into their computer systems).

The DMS Law would frustrate Congress's purpose of allowing computer owners to protect themselves against unauthorized access. Under the DMS Law, a DMS provider may not "prohibit[] a third party that the dealer has identified as one of its authorized integrators from integrating into that dealer's dealer data system." A.R.S. § 28-4653.A.3(b). That is, the DMS Law bars DMS providers from placing any "unreasonable" restrictions "on the scope or nature of the data that is shared with an authorized integrator," or on "the ability of the authorized integrator to write data to a dealer data system." *Id.* § 28-4653.A.3(b)(i), (ii). The DMS Law is in square conflict with the CFAA because it empowers the dealers who license the DMS—not the DMS owners—to determine who may access the DMS, and even to determine who may alter data or processes on those computers.

The Ninth Circuit's decision in *Facebook* confirms that the CFAA prohibits what the DMS Law purports to authorize. The defendant website created a link on its home page that, when clicked, caused electronic messages to be sent through its users' Facebook accounts. 844 F.3d at 1063. After the defendant ignored a cease-and-desist letter, Facebook sued under the CFAA and won. *Id.* The Ninth Circuit rejected the defendant's argument that it was authorized to access Facebook's computers within the meaning of the CFAA because the individual users had allowed it to access their accounts, holding that "[t]he consent that [defendant] had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computers after Facebook's express revocation of permission." *Id.* at 1068. In short, the CFAA prohibited authorized Facebook users from granting a third party access to Facebook's computers without Facebook's consent.

But that prohibited result is what the DMS Law purports to allow: dealers, authorized

to access Plaintiffs' DMSs for limited purposes under their licensing agreements, could grant any third party unfettered access to Plaintiffs' computers, even where Plaintiffs object to such third-party automated system access requests. The DMS Law thus conflicts with, and is impliedly preempted by, the CFAA.

### 2.	The Copyright Act Preempts the DMS Law.

Plaintiffs' DMSs are protected under the Copyright Act because they include original and creative elements: source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and the dynamic user experience. (Hall Decl. ¶ 13); 17 U.S.C. § 102(a). The Copyright Act grants a copyright owner the "exclusive right[]" to "reproduce," "distribute copies" of, and "prepare derivative works based upon" the owner's "copyrighted work." 17 U.S.C. § 106(1)–(3). "Anyone who violates any of the exclusive rights of the copyright owner" is "an infringer of the copyright," *id.* § 501(a), subject to criminal prosecution as well as suit by the copyright owner for injunctive and monetary relief, *id.* §§ 501–06. The statute expressly preempts any right "under the common law or statutes of any State" that is "equivalent to any of the exclusive rights" the Act grants copyright owners. *Id.* § 301(a). Thus, no one may assert a state-law right to copy or prepare a derivative work based on a copyrighted work.

Yet those are precisely the rights the DMS Law purports to confer on dealers and designated integrators. The DMS Law allows dealers and their designees a state-law right to "copy" and "share" data contained in Plaintiffs' DMSs. A.R.S. § 28-4653.A.3. It also permits integrators to "access" Plaintiffs' DMSs "without" Plaintiffs' "prior express written consent." *Id.* § 28-4653.A.3(b)(vi). But each time an integrator accesses Plaintiffs' copyrighted software programs without Plaintiffs' consent, an unauthorized copy of the software is loaded into the memory of the integrator's computer. (Hall Decl. ¶ 14.) That "creates a copy under the Copyright Act." *MAI Sys. Corp. v Peak Computer, Inc.*, 991 F.2d 511, 519 (9th Cir. 1993). In sum, the DMS Law purports to give dealers and integrators a

state-law right to copy and distribute copies of Plaintiffs' copyrighted works. Because the right to do any of those things is, under federal law, an "exclusive" right of the copyright owner, the Copyright Act preempts the DMS Law. 17 U.S.C. §§ 106, 301(a).

### 3.    The DMCA Preempts the DMS Law.

The DMS Law also directly interferes with the purpose of—and is therefore impliedly preempted by—the DMCA, which prohibits both the "circumvention" of "technological measure[s] that effectively control[] access to a [copyrighted] work" and the manufacture or sale of technologies and services that are "primarily designed or produced for the purpose of circumventing" such measures. 17 U.S.C. §§ 1201(a)(1)(A), (a)(2)(A).

Congress enacted the DMCA to "address[] the ease with which pirates could copy and distribute a copyrightable work in digital form." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 458 (2007) (internal quotations omitted). Congress believed that digital piracy was "overwhelming the capacity of conventional copyright enforcement to find and enjoin unlawfully copied material" and "sought to combat copyright piracy in its earlier stages, before the work was even copied." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001). It did so by "back[ing] with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections." *Microsoft Corp.*, 550 U.S. at 458 (internal quotations omitted).

Congress's intent was to deter digital copyright infringement by amplifying "the copyright owner's right to control access to his or her copyrighted work." H.R. Rep. 105-551, pt. 2, at 38 (1998). The DMCA thus imposes criminal sanctions and gives copyright owners a private right of action against those who unlawfully access their copyrighted works. *See* 17 U.S.C. §§ 1203, 1204.

The DMCA gives DMS providers the right to use technological measures to control access to their proprietary systems and to enforce that right against parties who circumvent those measures. The software programs used in a DMS are valuable copyrighted or

copyrightable works containing numerous original, expressive elements. (Hall Decl. 13.) DMS providers use a variety of technological measures to control access to these works and prevent their unauthorized copying, including requiring passwords; deploying "CAPTCHA" controls to distinguish between automated access by computers and access by humans; sending text prompts to certify that a login attempt is by an authorized user; and disabling dealer credentials used by unauthorized third parties. (Crutchfield Decl. ¶¶ 16, 34; Hall Decl. ¶¶ 29-34.)

The DMS Law deprives DMS providers of their rights under the DMCA. It prevents providers from excluding *any* third party from accessing their DMSs so long as a dealer "authorizes" that access, thereby stripping DMS providers of their power "to protect their works from piracy behind digital walls such as encryption codes or password protections." *Microsoft Corp.*, 550 U.S. at 458. Indeed, the DMS Law not only forces DMS providers to give third parties access to their copyrighted software, but it also requires that such access be given without the imposition of a "fee." *See* A.R.S. § 28-4653.A.3(a).

The DMS Law thus impermissibly replaces the federal statutory regime—under which copyright owners enjoy plenary control over access to their copyrighted digital works so they can reap financial returns from their copyrights—with a conflicting state-law regime that compels DMS providers to abandon the "technological measure[s] that effectively control[] access to [their copyrighted] work," 17 U.S.C. § 1201(a)(1)(A), and to grant access to any dealer-designated third parties. It is hard to imagine a more significant "obstacle to the accomplishment of Congress's full objectives." *Crosby*, 530 U.S. at 373. The DMS Law is therefore impliedly preempted by the DMCA.[4]

---

[4] One court has already held that DMS providers could state a DMCA claim against third parties that allegedly circumvented such technological measures. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. at 570 .

### 4.      The GLBA Preempts the DMS Law.

The GLBA imposes on "each financial institution" an "affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). The GLBA codifies implied-preemption principles, providing that state law yields to the dictates of federal law insofar as state law is "inconsistent with [the GLBA's] provisions." 15 U.S.C. § 6807(a). Here, the DMS Law is inconsistent with, and thus preempted by, the GLBA.

The GLBA requires certain agencies—including the FTC, which exercises jurisdiction over car dealers—to "establish appropriate standards" for "administrative, technical, and physical safeguards" to "insure the security and confidentiality of customer records and information" and "to protect against unauthorized access to or use of such records or information." 15 U.S.C. § 6801(b). As required by this directive, the FTC adopted a rule requiring financial institutions to "implement information safeguards to control" any "reasonably foreseeable … risks to the security, confidentiality, and integrity of customer information." 16 C.F.R. § 314.4.[5]

In a recent complaint and consent order involving a DMS provider, the FTC alleged that a DMS provider is a "financial institution" within the meaning of the GLBA. Complaint ¶ 23, *In re Lightyear Dealer Techs. LLC*, File No. 172 3051 (F.T.C.), https://www.ftc.gov/system/files/documents/cases/172_3051_dealerbuilt_final_complaint_6-12-19.pdf.[6]      In

---

[5] "Customer information" is defined as "nonpublic personal information," which in turn is defined as "[p]ersonally identifiable financial information" and "[a]ny list, description, or other grouping of consumers … that is derived using" such information "that is not publicly available." 16 C.F.R. §§ 313.3(n)(1), 314.2(b).

[6] Car dealers are "financial institutions" because they provide loans, financing, and other financial products and services to their customers. 12 C.F.R. § 1016.3(l)(3)(ii)(C), (E); *see also* FTC, *FTC's Privacy Rule and Auto Dealers: FAQs*, https://www.ftc.gov/tips-advice/business-center/guidance/ftcs-privacy-rule-auto-dealers-faqs; Decision and Order 3, *In the*

short, the federal agency charged with implementing the GLBA has now articulated the position that DMS providers must "implement information safeguards" to protect "the security, confidentiality, and integrity" of that information.[7] 16 C.F.R. § 314.4.

But the DMS Law prohibits DMS providers from "tak[ing] ***any action*** by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use protected dealer data." A.R.S. § 28-4653.A.3 (emphasis added). The statute defines "protected dealer data" to include "personal, financial or other data relating to a consumer that a consumer provides to a dealer or that a dealer otherwise obtains and that is stored in the dealer's [DMS]." *Id.* at § 28-4651.7. In other words, the DMS Law affirmatively prevents DMS providers from taking actions that they believe necessary to control "risks to the security, confidentiality, and integrity of customer information." 16 C.F.R. § 314.4. Thus, the DMS Law is "inconsistent with," and therefore preempted by, the GLBA. 15 U.S.C. § 6807.[8]

### B.     The DMS Law Violates Several Constitutional Provisions.

The DMS Law also violates the Contracts and Takings Clauses as well as the First and Fourteenth Amendments to the United States Constitution.

---

*Matter of Franklin's Budget Car Sales, Inc.*, File No. 102-3094, Dkt. No. C-4371 (F.T.C. Oct. 26, 2012), https://www.ftc.gov/sites/default/files/documents/cases/2012/10/121026 franklinautomalldo.pdf (enjoining dealership from "violat[ing] any provision of" 16 C.F.R. Parts 313 and 314).

[7] Plaintiffs reserve the right to challenge the FTC's allegation in this and any other litigation.

[8] Section 28-4653.C, which states that the DMS Law does not prevent third parties, including Plaintiffs, *see* § 28-4651(10), from "discharging" their "federal, state, or local" legal obligations to secure protected dealer data, does not save the statute from GLBA preemption. The DMS Law does not state which federal obligations are subsumed within this carve-out, and Plaintiffs cannot comply with their obligations under federal law and the DMS Law at the same time.

### 1.   The DMS Law Violates the Contracts Clause.

A state may not pass any "[l]aw impairing the [o]bligation of [c]ontracts." U.S. Const. art. I, § 10, cl. 1. At bottom, "[t]he Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). Specifically, the Clause subjects state laws changing the enforceability of contract provisions to a two-part test. *Pure Wafer Inc. v. City of Prescott*, 845 F.3d 943, 952 (9th Cir. 2017). First, the Court examines "whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Sveen*, 138 S. Ct. at 1821–22. Second, if there is substantial impairment, the Court determines "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id*. at 1822 (quoting *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-412 (1983)). "[T]he level of scrutiny to which the legislation will be subjected" under the second part "increase[s]" as "[t]he severity of the impairment" does. *Energy Reserves Grp.*, 459 U.S. at 411. The DMS Law fails both parts of this test.

### a.   The DMS Law Substantially Impairs Contracts with Dealers.

The test for substantial impairment examines "'whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.'" *LL Liquor, Inc. v. Montana*, 912 F.3d 533, 537 (9th Cir. 2018) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)). Plaintiffs unquestionably have a contractual relationship with dealers that the DMS Law impairs. Further, that impairment is substantial. In evaluating this third factor, the Court "consider[s] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. The DMS Law does all of these things.

Plaintiffs' contracts expressly limit access to their DMSs and provide that a dealer must obtain approval before allowing a third party to access, use, or modify the system. For

instance, CDK's Master Service Agreement ("MSA") provides that a dealer obtain written permission from CDK. (Crutchfield Decl., exh. 1 thereto (CDK MSA) § 4(B); *see also id.* § 4(D).) Each dealer who signs the Reynolds Master Agreement makes a similar promise. (Hall Decl. ¶ 15 & exh. 1 thereto (Reynolds Master Agreement), § 1.) The Customer Guide accompanying the Master Agreement further restricts a dealer's ability to provide third-party access. (*Id.* exh. 2 thereto at 22.) Thus, a central feature of the bargain between Plaintiffs and dealers is Plaintiffs' ability to control access to their DMSs. Dealers who give third parties access without Plaintiffs' permission violate their licensing agreements. (Crutchfield Decl. ¶ 14; Hall Decl. ¶ 16.)

The DMS Law eviscerates this contractual bargain. It bars Plaintiffs from prohibiting a dealer-designated third party from "integrating" into Plaintiffs' DMSs. A.R.S. § 28-4653.A.3(b). And it nullifies Plaintiffs' contractual right to control, and charge proper fees for, access to their DMSs, *id.* § 28-4653.A.3(a), or from placing an undefined, "unreasonable restriction on the ability ... to write data" to the system (thereby forcing Plaintiffs to allow outside companies to *alter* their DMSs without compensation). *Id.* § 28-4653.A.3(b)(ii).

The DMS Law also impairs Plaintiffs' ability to comply with their contractual data-security obligations. The FTC's Safeguards Rule requires financial institutions, such as car dealers, to enter into contractual arrangements with "service providers," such as Plaintiffs, requiring the service providers to "implement and maintain" "appropriate safeguards for the customer information" the dealers provide to Plaintiffs. 16 C.F.R. §§ 314.4(d)(1), (2). Recognizing this requirement, Plaintiffs' contracts include language stating that they will implement such safeguards. For instance, CDK's MSA provides that "to the extent it is a Service Provider" to the dealer under the Safeguards Rule, it will "implement and maintain appropriate safeguards as CDK may determine to be reasonably necessary to protect the confidentiality" of the nonpublic information in its possession and control that was provided by the dealer. (Crutchfield Decl., exh. 1 thereto, § 5F.) Reynolds' Customer Guide contains

similar language. (Hall Decl., exh. 2 thereto at 10.) The open access required by the DMS Law, however, prevents Plaintiffs from fulfilling these obligations. (Crutchfield Decl. ¶ 38; Hall Decl. ¶ 39.) This is a substantial impairment because these contractual provisions are an essential part of the parties' bargain—indeed, dealers may not engage service providers without these provisions. 16 C.F.R. § 314.4(d)(2).

The DMS Law also interferes with Plaintiffs' "reasonable expectations," which are defined by "whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Grp.*, 459 U.S. at 411. There is no history of states regulating the relationship between DMS providers and dealers or the third-party access dealers may grant to DMSs. Finally, the DMS Law prevents Plaintiffs from "safeguarding or reinstating their rights." *Sveen*, 138 S. Ct. at 1822. It bars Plaintiffs from enforcing important contract provisions, and it offers no way to make those provisions enforceable. *Cf. id.* at 1823, 1830.

In short, every factor weighs in favor of finding a "substantial impairment" of Plaintiffs' contract rights. *Id.* at 1821.

### b. The DMS Law Does Not Properly Advance a Significant and Legitimate Public Purpose.

"The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Grp.*, 459 U.S. at 705. The DMS Law identifies no reason why DMS providers must lose their contractual rights, or why dealers and third parties should escape their contractual duties. Rather, the statute simply confers valuable benefits on dealers and their designees—no-"fee," unfettered access to DMSs for dealer-designated third-parties—at the expense of DMS providers.[9] This "bald preference for one class of contracting citizens over another ... suggest[s] the kind of favored treatment that clearly exceeds the state's police

---

[9] The Arizona Automobile Dealers Association is the top donor to the law's sponsor. *See* https://votesmart.org/candidate/campaign-finance/67434/noel-campbell#.XWBYR5NKiu4

power." *Ross v. City of Berkeley*, 655 F. Supp. 820, 833 (N.D. Cal. 1987). "Affect[ing] only [a] narrow class" of economic actors, the DMS Law serves no "legitimate public purpose." *Cycle Barn, Inc. v. Arctic Cat Sales, Inc.*, 701 F. Supp. 2d 1197, 1203–04 (W.D. Wash. 2010).

But the DMS Law would not survive Contracts Clause scrutiny even with a legitimate public purpose, for the impairment must also be "both reasonable and necessary to fulfill" that purpose. *Seltzer v. Cochrane*, 104 F.3d 234, 236 (9th Cir. 1996). Whatever purported public purpose might be ascribed to the DMS Law, it unreasonably compels DMS providers to give third parties no-fee, unfettered access to their systems—without regard to intellectual property rights or the sensitivity of the data on the DMSs, and despite the history of data corruption and performance degradation caused by unauthorized third-party access.

### 2.      The DMS Law is Unconstitutionally Vague.

"[A] law is void for vagueness" under the Due Process Clause "if its prohibitions are not clearly defined"—that is, if it (1) "fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited," or (2) "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (quotation marks omitted). Laws like the DMS Law that impose criminal sanctions or implicate the First Amendment require even greater precision. *Id.* (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).[10] Because its unconstitutionally vague provisions cannot be severed, the entire DMS Law fails.

### a.      The DMS Law Is Impermissibly Vague.

Laws that leave the public guessing as to what they do or do not prohibit are

---

[10] The First Amendment implications are discussed in Section I.B.4, *infra*. The DMS Law is part of Title 28 of the Arizona Revised Statutes. A violation of Title 28 is punishable by a fine of up to $10,000 per violation. A.R.S. § 13-803. Additional surcharges could augment the fine to $16,800 per violation. *See id.* §§ 12-116.01-02, 28-121(C).

unconstitutionally vague. *See, e.g.*, *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014) (striking down municipal ordinance prohibiting use of vehicle "as living quarters either overnight, day-by-day, or otherwise," because it failed to define "living quarters" or "otherwise"); *City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999) (striking down gang loitering ordinance defining "loitering" as "remain[ing] in any one place with no apparent purpose," because it was "difficult to imagine how any citizen ... standing in a public place with a group of people would know if he or she had an 'apparent purpose'"); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004) (striking down provision of Arizona statute requiring licensed abortion providers to ensure that patients were "treated with consideration, respect, and full recognition of the patient's dignity and individuality," because these undefined terms were ambiguous and subjected physicians to sanctions based on subjective viewpoints of others).

The DMS Law is replete with such vague language. For example:

Section 28-4653.A.2 prohibits Plaintiffs from engaging in any act of "cyber ransom," defined as "to encrypt, restrict or prohibit or threaten or attempt to encrypt, restrict or prohibit a dealer's or a dealer's authorized integrator's access to protected dealer data for monetary gain." Setting aside the danger to Arizonans of a default rule that *criminalizes* encryption of sensitive data, is it a violation for Plaintiffs to contractually *agree with* dealers to host and encrypt their data for a fee? If not, is it "cyber ransom" for Plaintiffs to restrict access to that data by non-paying dealers and other outsiders?

Section 28-4653.A.3 prohibits Plaintiffs from taking "any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use protected dealer data." Is this limited to *that dealer's* protected dealer data or *all* protected dealer data? Is it a criminal violation to limit one dealer's ability to copy or use protected dealer data from another dealer?

Section 28-4653.A.3(a) prohibits Plaintiffs from imposing any "fee" on a dealer or

"authorized integrator" for access to protected dealer data. "Fee" is defined as a charge "beyond any direct costs incurred" by Plaintiffs in providing such access "to an authorized integrator or allowing an authorized integrator to write data to a dealer data system." A.R.S. § 28-4651.5. There are multiple problems here. *First*, the section defines "fee" solely in terms of Plaintiffs' costs to provide access to so-called "authorized integrators", with no reference to costs incurred in providing access to dealers. Does that mean Plaintiffs cannot charge dealers anything, or does it mean that only charges to "authorized integrators" can qualify as impermissible? Which construction triggers a violation? *Second*, "direct" costs are not defined. Plaintiffs incur many costs to maintain systems capable of interfacing with "authorized integrators", and there is no way to know where to draw the line between recoverable, "direct" costs and the higher charges that may trigger criminal sanctions.

Section 28-4653.A.3(b) prohibits Plaintiffs from placing "unreasonable restrictions" on "authorized integrators'" DMS access. But "unreasonable" is defined only by an expressly non-exhaustive list of five examples, four of which use the undefined term "unreasonable."

### b.     These Vague Provisions Are Not Severable, So the Statute Fails.

When a statutory provision is unconstitutionally vague, courts consider whether the provision may be severed to preserve the remainder of the law. *Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1283 (9th Cir. 2003). Severability is a question of state law. *Lee v. Walters*, 433 F.3d 672, 676 (9th Cir. 2005) (citing *Dep't of Treasury v. Fabe*, 508 U.S. 491, 509–10 (1993)). And under Arizona law, the question is "whether the legislature would have enacted the statute without the unconstitutional provision, if it knew of the invalidity." *Arce v. Douglas*, 793 F.3d 968, 989 (9th Cir. 2015) (citing *State v. Pandeli*, 161 P.3d 557, 573 (2007)). Where the valid and invalid parts are "so intimately connected as to raise the presumption that the legislature would not have enacted the one without the other," the

1    statute as a whole falls. *Id.*

2          The DMS Law is riddled with ambiguities that are central to the statue as a whole.

3    The only reasonable presumption is that, without these provisions, the legislature would not

4    have enacted the remainder. Therefore, the DMS Law as a whole fails to pass muster.

5                    **3.**     **The DMS Law Effects an Unconstitutional Taking of Plaintiffs'**
                            **Private Property Without Just Compensation.**

6          The Takings Clause provides: "[N]or shall private property be taken for public use,

7    without just compensation." U.S. Const. amend. V. When the government physically takes

8    private property, it effects a *per se* taking. *Loretto v. Teleprompter Manhattan CATV Corp.*,

9    458 U.S. 419, 426 (1982). The *per se* takings analysis applies equally to personal property

10   as to real property, *Horne v. Dep't of Ag.*, 135 S. Ct. 2419, 2428 (2015), and the Clause

11   likewise protects intangible property from government intrusion, *Ruckelshaus v. Monsanto*

12   *Co.*, 467 U.S. 986, 1003 (1984) (intangible property protected).

13         The DMS Law is a *per se* taking by the government of Plaintiffs' private property.

14   The statute permits any dealer-authorized third party to enter the DMSs, use Plaintiffs'

15   intellectual property, extract data configured according to Plaintiffs' proprietary methods,

16   and write data to Plaintiffs' systems. A.R.S. § 28-4653.A.3(a), (b). Despite taking these

17   property rights from Plaintiffs, and permitting third parties to physically occupy the DMSs

18   with their data and code, the DMS Law forbids Plaintiffs from "imposing any fee [defined

19   to exclude any profit] ... on the dealer or an authorized integrator" in return. *Id*. § 28-

20   4653.A.3(a). Barring Plaintiffs from receiving just compensation for the appropriation of

21   their property, the statute violates the Takings Clause.

22         The same is true under the regulatory taking framework of *Penn Central*

23   *Transportation v. New York City*, 438 U.S. 104, 124 (1978). Under that test, the court may

24   examine several factors to determine whether a regulation that deprives an owner of its

25   property rights is a taking. *Id*. These factors include the owner's legitimate investment-

26

backed expectations and the public good served by the regulation. *Id.* Here, Plaintiffs have spent millions of dollars developing and maintaining their systems without any comparable state intrusions on their property rights. And as discussed above, *see supra* Section I.B.1.b, the DMS Law does not serve the common good, but instead improperly benefits a single, favored group—motor vehicle dealers. *See Kelo v. City of New London*, 545 U.S. 469, 477, 478 (2005) (government may not take private property "for the purpose of conferring a private benefit on a particular private entity," nor "under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit"). Moreover, as discussed below, *see infra* Section IV, this narrow benefit to dealers comes at great risk to the public.

Accordingly, the DMS Law is an unconstitutional taking of Plaintiffs' property.

## 4.    The DMS Law Violates the First Amendment.

The First Amendment protects both the right to speak and the right not to speak. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,* 487 U.S. 781, 797 (1988). Yet the DMS Law compels DMS providers to speak against their will in two ways. First, by requiring them to allow any third party to access the data on their systems, the DMS Law forces Plaintiffs to involuntarily share information. Second, by prohibiting use of "technical means" to "limit a dealer's ability to … share" data, A.R.S. § 28-4653.A.3, the DMS Law requires Plaintiffs to speak by writing computer code to override the security features that currently prevent unauthorized access to and modification of their DMSs.[11] (*See* Crutchfield Decl. ¶ 42; Hall Decl. ¶¶ 17-28, 37.)

A law "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and is "a content-based regulation of speech" subject to strict constitutional scrutiny. *Riley*, 487 U.S. at 795. The fact that Plaintiffs' speech is arguably "commercial" does not affect the analysis. *Sorrell v. IMS Health Inc.*, 564 U.S.

---

[11] Computer code is protected speech. *See, e.g.*, *Universal City Studios*, 273 F.3d at 449; *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

552, 571 (2011). Indeed, the DMS Law fails even under the more lenient, now disfavored test applied to commercial speech in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). *See Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 841 (9th Cir. 2017). Under that test, the protected speech here "merits First Amendment scrutiny as a threshold matter" because it "is neither misleading nor related to unlawful activity." *World Wide Rush, LLC v. City of L.A.*, 606 F.3d 676, 684 (9th Cir. 2010). To "withstand such scrutiny," the State must "assert a substantial interest to be achieved by [its] restriction[] on commercial speech"; show that "the restriction ... directly advance[s] the state interest involved"; and show that the restriction is "not ... more extensive than is necessary to serve that interest." *Id.* The State cannot carry that burden here. The DMS Law does not achieve, much less directly advance, a substantial purpose. *See supra* Section I.B.1.b. To the contrary, it puts Arizonans' private data at risk.

Additionally, inasmuch as the statute applies only to DMSs licensed to automotive dealers and not to similar proprietary systems used in other industries, it is "underinclusive" when measured against any conceivably legitimate interest that Arizona might advance. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 824 (9th Cir. 2013). Such "underinclusivity is relevant to *Central Hudson*'s direct advancement prong because it may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* (internal citations and quotations omitted). When a statute has "exceptions that undermine and counteract the interest the government claims it adopted the law to further," the law "cannot directly and materially advance its aim, and is, therefore, unconstitutionally underinclusive." *World Wide Rush*, 606 F.3d at 685 (internal quotations omitted). Whatever Arizona's purported interest in compelling DMS providers to engage in involuntary speech, it has offered no rationale for targeting only automotive DMSs and not similar proprietary systems used in other industries.

1   **II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM.**

2          Unless a preliminary injunction issues, the DMS Law will inflict several immediate

3   and irreparable injuries on Plaintiffs that money damages cannot remedy. *Cf. Cotter v.*

4   *Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989).

5          *First*, the DMS Law's requirement that Plaintiffs allow any dealer-designated third

6   party to "write back" data into the DMSs requires system modification and threatens to

7   corrupt the data stored or processed on these systems. (Hall Decl. 45.) History shows that

8   writeback by unauthorized third parties can cause serious data integrity issues. Plaintiffs

9   might not be able to fix such problems, especially because the DMS Law simultaneously

10  forces Plaintiffs to allow writebacks to bypass technological measures intended to monitor

11  and control them. (*Id.* ¶¶ 26-27.)

12         *Second*, the DMS Law threatens Plaintiffs' reputations as providers of secure and

13  reliable DMSs. (*Id.* ¶ 47; *see also* Declaration of Peter N. Golder ("Golder Decl.") ¶¶ 10,

14  19-21 (attached as "Exhibit C").) If a third party designated by a dealer steals data from or

15  impairs the functionality of the DMS, the automotive industry will associate those harms

16  with the DMS provider, causing reputational injuries for which money damages are

17  insufficient. *See, e.g.*, *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841

18  (9th Cir. 2001) (loss of goodwill supports finding of irreparable harm); (*see also* Golder

19  Decl. ¶¶ 22-31.) The threat of data theft is a real possibility, as demonstrated by the

20  previously discussed DealerBuilt Consent Order requiring DealerBuilt to implement a

21  detailed information security program after its less rigorous data access policies enabled

22  hackers to steal and publish sensitive consumer data. The DMS Law *prevents* DMS

23  providers from implementing the very technological measures that the FTC ordered

24  DealerBuilt to install, increasing the likelihood of similar data breaches. *See supra* n.2.

25         *Third*, the Ninth Circuit, like other courts nationwide, has long recognized that "[a]n

26  alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's*

1   *Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). For example, "[t]he loss of

2   First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

3   irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Similarly, "interference with

4   ... contractual rights in violation of the Contract Clause, standing alone, is sufficient

5   irreparable harm to support" a preliminary injunction. *West Indian Co. v. Virgin Islands*,

6   643 F. Supp. 869, 882 (D.V.I. 1986), *aff'd*, 812 F.2d 834 (3d Cir. 1987). Because the DMS

7   Law violates these same constitutional rights, the Court may presume that Plaintiffs will

8   suffer irreparable injury if the law is not preliminarily enjoined.

9   **III.    THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFFS' FAVOR.**

10          Plaintiffs will suffer significant hardship if the DMS Law takes effect. By contrast,

11  neither the State nor dealers will be harmed if the DMS Law is preliminarily enjoined, as

12  dealers' relationships with Plaintiffs and other DMS providers will continue to be governed

13  by contract. The DMS Law hands dealers the power to allow third parties to access

14  Plaintiffs' DMSs and extract all manner of data from or write-back data to the DMS for no

15  fee, meanwhile *criminalizing* the very cybersecurity measures that federal law *requires*. But

16  DMS providers *already* provide manual reporting tools built into the DMSs for dealers who

17  wish to export dealer-owned data to third parties for free. (Crutchfield Decl. ¶ 15; Hall Decl.

18  ¶ 19.) These tools enable dealers to run appropriate reports and export resulting data

19  securely to third parties whenever they want, and they avoid the many risks posed by

20  unauthorized access. Even without the DMS Law, therefore, dealers can securely transfer

21  their data to third parties of their choice without paying a fee to Plaintiffs.

22          The technological, reputational, and economic injuries that Plaintiffs will suffer if

23  subjected to the DMS Law's directives far outweigh any benefits that the DMS Law affords

24  dealers, particularly where the core benefit is already available without the harms that

25  follow from unauthorized access.

26

## IV.   THE PUBLIC INTEREST FAVORS GRANTING AN INJUNCTION.

Unrestricted access to Plaintiffs' DMSs will jeopardize the security of millions of consumer records, including sensitive information such as Social Security numbers, driver's license numbers, and financial information. (Crutchfield Decl. ¶¶ 9, 38.) By forcing Plaintiffs to grant free and unfettered access to their DMSs, the DMS Law prevents DMS providers from securely maintaining this sensitive data on their systems. (*Id.* ¶¶ 36-38.) Compulsory access to the DMS by even a limited number of third parties creates more points of entry, expanding the "attack surface" available to hackers and cyber-thieves. (Hall Decl. ¶¶ 39-40.) The risk of an irreversible breach of consumer data, whether negligent or intentional, warrants enjoining enforcement of the DMS Law. This risk to the public is the issue that the FTC addressed when it ordered DealerBuilt to improve access controls and security measures on its DMS, but the DMS Law *prohibits* those very safeguards.

## CONCLUSION

The DMS Law is hopelessly vague, preempted by at least four separate federal statutes, interferes with Plaintiffs' contractual relations and takes their private property without just compensation, and implicates Plaintiffs' fundamental First Amendment rights, all without any public purpose, instead benefitting only a small group of private actors. In light of the serious constitutional infirmities dooming the DMS Law and the serious risks to the data security of Arizona residents, Plaintiffs respectfully request entry of a preliminary injunction prohibiting Defendants from enforcing the DMS Law pending completion of judicial review.

RESPECTFULLY SUBMITTED this 23rd day of August, 2019.

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391

26

1

By */s/ Brian A. Howie*

2
    Brian A. Howie
    Lauren Elliott Stine

3
    *Attorneys for Plaintiffs*

4

5
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP

6
2099 Pennsylvania Ave., NW, Ste. 100
Washington, DC 20006, 201-747-1900

7
Thomas J. Dillickrath* (DC 483710)
TDillickrath@sheppardmullin.com

8
Four Embarcadero Center, 17th Floor

9
San Francisco, CA 94111, 415-434-9100
Amar S. Naik* (CA 307208)

10
ANaik@sheppardmullin.com
Molly C. Lorenzi* (CA 315147)

11
MLorenzi@sheppardmullin.com

12
GIBBS & BRUNS LLP
1100 Louisiana, Ste. 5300

13
Houston, TX 77002, 713-650-8805
Aundrea K. Gulley* (TX 24034468)

14
agulley@gibbsbruns.com
Denise Drake* (TX 24092358)

15
DDrake@gibbsbruns.com

16
*Attorneys for The Reynolds and Reynolds
Company*

17

18
MAYER BROWN LLP
71 S. Wacker Drive

19
Chicago, IL 60606
312-782-0600

20
Britt M. Miller** (IL 6256398)
BMiller@mayerbrown.com

21
Michael A. Scodro** (IL 6243845)
MScodro@mayerbrown.com

22
Brett E. Legner** (IL 6256268)
BLegner@mayerbrown.com

23

24
1999 K Street, NW
Washington, DC 20006

25
202-263-3000
Mark W. Ryan** (DC 359098)

26
mryan@mayerbrown.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*Attorneys for CDK Global, LLC*

*\*Admitted Pro Hac Vice*
*\*\*Pro Hac Vice Forthcoming*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel identified on the Court-Generated Notice of Electronic Filing.

*/s/ Maria Marotta*

QB\170667.00001\59172881.1

1