# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation,<br><br>Defendants. | Case No. 2:19-cv-04849-GMS |

### Declaration of Dean W. Crutchfield
### Pursuant to 28 U.S.C. § 1746

1. I am currently employed by CDK Global, LLC ("CDK"), the U.S. operating company for, and a wholly owned subsidiary of, CDK Global, Inc. (CDK Global, Inc. is a publicly traded company listed on the NASDAQ Global Select Market under the symbol "CDK"). I have been employed by CDK for three years. I currently serve as Vice President and executive officer of CDK Global, Inc., holding the title Executive Vice President and Chief Information Officer. In that position, I am generally responsible for the worldwide technological direction of CDK Global, Inc. and have P&L responsibility for its IT infrastructure, including all IT-related projects. I directly oversee the CDK Global, Inc. Global Security office ("GSO"), Global Hosting, and Global Information Technology operations which, in turn, have responsibility for CDK Global Inc.'s

1

cybersecurity, data security, all of its global data centers and infrastructure, and all its internal and commercial software and services. This declaration is based on my personal knowledge.

## I. CDK's business

2.  CDK is a Delaware limited liability company with its corporate headquarters and principal place of business in Hoffman Estates, Illinois. CDK Global, Inc. is a leading global provider of technology solutions to the automotive industry. Through CDK and its other operating subsidiaries, CDK Global, Inc. provides integrated technology solutions to approximately 30,000 auto, truck, motorcycle, marine, recreational vehicle, and heavy equipment dealers around the world, including approximately 9,000 new car dealerships in North America. CDK Global Inc. provides technology solutions to approximately 200 new car dealerships in Arizona through CDK.

3.  CDK is a "dealer data vendor" as that term is defined in Ariz. Rev. Stat. § 28-4651(4), although CDK does not believe that terminology is accurate.

## II. CDK's dealer management system and the automotive retail ecosystem

4.  CDK has developed a dealer management system ("DMS") that it licenses to automotive dealerships. The DMS is a "dealer data system" as defined by Ariz. Rev. Stat. § 28-4651(3)(a), although CDK disputes the accuracy of that terminology.

5.  The DMS is a complex piece of technology, consisting of millions of lines of computer code and thousands of software programs hosted by CDK in a dealer integrated network environment. The DMS contains copyrightable material and other intellectual property belonging to CDK.

6.  The DMS enables automotive dealerships to compile, store, and use data effectively and perform other operations in their day-to-day business. A DMS benefits car dealerships by allowing

them to manage their daily operations, from human resources, to bookkeeping and tax computations, to all of the service and sales operations on which the auto industry relies.

7.  CDK enters into Master Services Agreements with its dealer customers, including its dealer customers in Arizona. *See* Master Services Agreement attached hereto as Ex. 1. The majority of CDK's dealer customers access the DMS through a cloud-based IT environment hosted by CDK.

8.  To meet the dealers' daily operational needs, the DMS consists of four primary application areas: (1) Accounting, which covers standard accounting procedures including general ledger receivables, balance sheets, and purchase orders; (2) Service Management, which enables dealers to process orders and invoices for services and repairs; (3) Parts Management, which manages parts and inventory; and (4) Sales and Financed and Insurance Management, which is used to process automobile sales and financing.

9.  The DMS houses vast amounts of data belonging to participants in the automotive retail ecosystem, including dealers, their customers, application software providers, banks, credit reporting bureaus, other financial institutions, car manufacturers, and the DMS provider itself. Much of this data is private and extremely sensitive. For instance, the DMS houses Social Security numbers, driver license numbers, consumer credit applications and credit scores, consumer home addresses and phone numbers, bank and other financial information, proprietary pricing information, and warranty information. Particularly sensitive data types are encrypted in the DMS and expunged as appropriate. The DMS also stores and processes data from the various parties associated with our dealer customers.

10.  CDK has specific contractual obligations to protect the data supplied by its customers and other entities. And, as a licensor of software technology to automotive dealers, CDK has

3

obligations mandated by industry best practice standards to protect the physical infrastructure, system integrity, and data (including consumer data) against unauthorized access into the DMS's features and functions.

11.  CDK annually processes approximately $500 billion, or 2.5% of the U.S. gross domestic product, through its software solutions.

### III.    CDK's cyber security measures

12.  Providing a secure DMS environment, protecting the sensitive data housed in the DMS, and ensuring the proper and reliable functioning of the DMS is essential to CDK's business. There are close to one million authorized users on the CDK system. CDK must track and authenticate these users to ensure that they are using the system in an authorized manner. CDK has invested, and continues to invest, significantly in cyber security controls, including spending tens of millions of dollars on cyber security and related initiatives over the last several years. CDK's cyber security control efforts include data center infrastructure, network infrastructure, cyber security hardware and software, employees dedicated to security matters, and security event and information management technology and processes. These controls are defined, implemented, and maintained to protect the participants in, and the proper functioning of, the automotive retail environment.

### A.    Dealer customers are required to access the DMS securely

13. CDK's dealer customers (and their employees) access their licensed DMS using secure login credentials. These credentials provide access to functions and data within the DMS according to the user's job responsibilities.

14.  CDK's agreements with its dealer customers prohibit dealers from providing third parties with access to the DMS without CDK's written approval. *See, e.g.*, Ex. 1 at §§ 4(B), (D).

733294703.1 17-Aug-19 12:42
QB\59166223.1

15.   Dealers have the ability to extract and transmit data that is housed on the DMS, including to certain third-party software application providers, for no cost. They may do so through utilizing "manual reporting." Under that process, a dealership employee runs a report and exports the resulting data into a file, such as a plain-text file or an Excel spreadsheet, which the dealer may then send to a vendor.

16.   CDK employs many other security control methods, such as network firewalls, and is continually developing additional security safeguards. One method of security that CDK uses is a CAPTCHA prompt and challenge that is used to make sure that a party attempting to access the system is not a robot or a hacker.

### B.    The Partner Program

17. In addition to dealer customers, third parties may seek access to the DMS. Such third parties include certain third-party vendors who provide software applications or other services that integrate with the DMS to provide a number of value-added services to dealers. Examples of such third-party services include license-plate and vehicle registration, customer relationship management, marketing, and website management.

18.   Many third-party service providers read (or extract) data from the DMS, and some write data back into the DMS to update various fields. This latter process is often called "writeback." Examples of writeback include service appointments, customer relationship management information, and financing and insurance information.

19. To facilitate the safe and secure exchange of data between dealers and third parties, CDK has a third-party access program called the CDK Global Partner Program ("Partner Program"). The Partner Program provides certified third parties with data access, including, for some, bidirectional real-time read and writeback access.

5

20.   The Partner Program is a system of uniquely designed custom interfaces that allow CDK to manage how third-party vendors interface and integrate with the DMS, how data is extracted from and written into the DMS, and how the Partners' applications interact with the DMS.

21.   All non-CDK vendor clients in the Partner Program enter into a written agreement with CDK, known as a Third Party Access Agreement, which defines the terms and conditions of the vendor's participation in the Partner Program. *See* Third Party Access Agreement attached hereto as Ex. 2. In addition, Partners are required to complete a formal four-step certification process for each of their applications.

22.   As part of this process, the parties exchange technical information pursuant to a non-disclosure agreement. Partners in the Partner Program agree that they will access, send, receive, or otherwise use data maintained on the DMS solely in connection with providing the software applications to dealers that are identified in their enrollment agreement with CDK. Partners also agree not to copy, license, sell or otherwise transfer data obtained from the DMS to another third party (a process which is sometimes referred to as data syndication). This provides CDK with transparency and the ability to ensure that data is being used in a secure and appropriate manner.

23.   Also in this process, the Partner works with an integration analyst at CDK to develop functionality around its application. Specifically, CDK creates an interface for each Partner that provides access to a set of predefined integration points according to the specific data requirements of each of the Partner's applications ensuring that only authorized dealer data is transferred to the Partner.

733294703.1 17-Aug-19 12:42
QB\59166223.1

24.   Next, the application is tested to verify that the interface programming is working as designed and properly installed on dealers' instances of the DMS. This testing helps to verify that the Partner's integration into the DMS is not causing data corruption or overburdening the DMS.

25.   In the final stage of the process, individual dealer customers authorize CDK to install the Partner's application integration through a secure web interface. CDK requires the Partner to obtain a written agreement from the dealer granting access to the specific data elements that its applications require.

26.   Vendors in the Partner Program agree not to receive data maintained on the CDK DMS from any non-authorized source. Without this restriction, CDK would be unable to certify that the vendor has obtained data from the DMS in a secure, authorized, and appropriate manner that meets the Partner Program's standards.

27.   The Partner Program logs a detailed record of all transactions between a vendor's application and the DMS. This logging function allows CDK to monitor and audit how each third-party application uses its integration points, what data fields are being accessed, and what data is being written back into the DMS.

28.   Permitting parties to access the DMS that have not gone through the requirements of the Partner Program is inconsistent with the Program's purposes of maintaining data confidentiality, integrity, and availability, ensuring accountability across all data movement from the DMS, and providing a framework in which data is used only as intended.

29. CDK does not permit unauthorized third-party access to its DMS due to data security concerns, the need to preserve the DMS's operational integrity, and the necessity of protecting CDK's and third parties' intellectual property.

733294703.1 17-Aug-19 12:42
QB\59166223.1

30.  Some certified Partners access the DMS only to read or extract data from the system, while others access the DMS to both read and extract data and write data back into the system. Some use a large number of data fields, while others just a few. Partners in the Partner Program pay fees based on the functionality and complexity of the integration interface. Through the above-described certification process, CDK collaborates with third-party application vendors to ensure that the read-and-write access to the DMS is engineered and tested to carefully designed specifications. Those specifications prevent damaging the performance of CDK's system and ensure that those Partners do not disrupt or introduce risk to the overall system health of the automotive retail environment.

31.  CDK's Partner Program and other security measures guard against data corruption, and ensure system availability and data transport confidentiality, by ensuring that approved vendors' applications are writing the correct information to the correct fields in the DMS in the correct format. When data corruption errors are introduced into the system, CDK is responsible for fixing the issues.

### C.    Cyber security attacks on CDK's system are a constant danger

32.  Attempted cyber security attacks on CDK and other networks in the automotive retail environment are aggressive and continuous. Nefarious actors continuously probe the CDK system looking for ways to penetrate the system in an attempt to illegally and fraudulently gain access for their own gain.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

8

████████████████████████████████████████████████

██████████████████████████

34.  A number of unauthorized third parties attempt to gain access to the DMS by using dealer login credentials. These parties often use lax security measures, such as sharing user logins and passwords via unencrypted, plain text email. And these parties may extract large amounts of data from the system to sell (or, syndicate) to other vendors or parties. They also make so many queries on the DMS or use such poorly constructed queries that they can noticeably decrease the speed and availability of the DMS throughout the network. Even if an unauthorized third party did use secure methods and well-constructed queries, CDK is unable to exercise oversight of the changes to, access to, and removal of, data by those unauthorized users. To prevent harm to the system's functionality and to protect the integrity of the data in the system, CDK has measures in place to detect and stop this type of access and it has taken steps to prevent the sharing of login credentials.

## IV.    Effect of the DMS Law on security and system functionality

35. The DMS Law weakens the cyber security of the DMS, jeopardizes system functionality, and otherwise harms CDK in a number of ways. The DMS Law: (1) requires CDK to permit third parties to write data into the system without the certification and collaborative engineering that is part of the Partner Program and that is necessary to guard against data corruption; (2) prevents CDK from monitoring system access to determine if a party is accessing the DMS in an improper or dangerous manner; (3) undermines CDK's engineering and risks degrading the DMS's performance; (4) will trigger costs associated with increased cyber security incidents; and (5) necessitates that CDK write new computer code to accommodate the expanded third-party access.

9

36.   The DMS Law weakens the security of the DMS ecosystem by mandating that CDK allow participants to read and write data back to CDK's system. Ariz. Rev. Stat. § 28-4653.A.3(a). Reading data and writing data back to the system is a complex process that is capable of introducing data corruption errors and is potentially disruptive to the confidentiality, integrity, and availability of the DMS. To protect against these problems, CDK created its Partner Program, which includes the previously described certification process. As I understand the DMS Law, however, it prevents CDK from placing such restrictions on third parties authorized by a dealer to access or write data to the DMS.

37.   Because the DMS Law mandates open, unauthorized access, CDK, as a practical matter, will not be able to monitor the behavior pattern algorithms that it uses to identify unauthorized and potentially dangerous access. These algorithms are a common form of cyber security incident prevention, and one CDK uses to great effect. Under the DMS Law, CDK may not even be permitted to employ its CAPTCHA challenge to determine if the party accessing the system is a robot or a hacker.

38.   The system access required by the DMS Law thus makes it significantly more difficult to prevent, detect, and investigate whether there has been a data breach and stop the breach. This, in turn, places the private and extremely sensitive consumer data housed in the DMS at risk.

39.   For the reasons described, the DMS Law puts CDK's DMS's performance at risk. CDK's system, like any other large-scale system, is designed to perform very specific, engineered functions and obtain results in a matter of milliseconds. This response time is necessary to conduct retail automotive commerce in ways that dealers and consumers expect. This threat to system performance posed by third-party access under the DMS Law will be borne by all of CDK's dealers

733294703.1 17-Aug-19 12:42
QB\59166223.1

nationwide, if not worldwide, as well as the individual consumers nationwide, if not worldwide, who buy or service their cars at dealerships.

40.  The open access required by the DMS Law will dramatically increase the risk of cyber-security or secure-processing incidents that would require CDK, and potentially other participants in the automotive retail environment, to investigate. Public disclosure of these incidents could have negative impacts on CDK's brand, stock valuation, and sales potential.

41.  The DMS Law also makes it significantly more difficult for CDK to discover, investigate, or report a cyber-security or secure-processing incident. Inside the automotive retail environment, it is not unusual for other parties to be engaged to determine the scope of an incident and assess what actions may be appropriate based on forensic discovery. CDK also may have state-law obligations to report potential data breaches to state law enforcement officials, such as a particular State's Attorney General. By preventing CDK from effectively monitoring or controlling how its DMS is accessed by third parties, the DMS Law would make it significantly more difficult for CDK to perform these types of investigations or determine whether it has a duty to report a potential incident.

42.  Compliance with the DMS Law to accommodate the third-party access required by the statute would require CDK to reconfigure its computer system. This would be a potentially massive undertaking, and would include writing new computer code to accommodate third-party access on the terms required by the DMS Law.

### V.       Certain parts of this declaration should be filed under seal.

43.  Exhibit 1 to my declaration is the CDK Master Services Agreement. That document forms the contractual relationship between CDK and the dealer and sets out their respective rights and obligations. CDK considers the Master Services Agreement to be highly confidential and

11

proprietary. It contains information that has economic value to CDK's competitors in the DMS space as well as other third parties, including new car manufacturers and application providers. If CDK's competitors were to obtain this document, they could use knowledge of the terms and conditions of CDK's contractual relationship with its dealers to harm CDK's competitive standing by offering more favorable terms and conditions to CDK's dealer customers. This information is not generally known by others, and CDK consistently has treated the Master Services Agreement as confidential and proprietary. The document is not publicly available on CDK's website. In other pending litigation involving CDK and its DMS, CDK has designated prior versions of this document as confidential under stipulated protective orders.

44. Exhibit 2 to my declaration is the CDK Third Party Access Agreement. That document forms the contractual relationship between CDK and third-party vendor partners and sets out their respective rights and obligations. This document contains information that CDK considers to be highly confidential and proprietary. It contains information that has economic value to CDK's competitors in the DMS space as well as other third parties, including new car manufacturers and application providers. If CDK's competitors or other third parties were to obtain this document, they could use knowledge of the terms and conditions of CDKs contractual relationship with its vendor partners to harm CDK's competitive standing by offering more favorable terms and conditions to CDK's dealer customers and/or third party partners. This information is not generally known by others, CDK has consistently treated the Third Party Access Agreement as confidential and proprietary, and the Third Party Access Agreement itself (at ¶ 10) provides that its terms shall be considered confidential and not subject to disclosure. The document is not publicly available on CDK's website.

12

45. The data in paragraph 33 above describes the persistent and aggressive cyber security attacks that take place against CDK and other networks in the auto retail environment.  That information is competitively sensitive and confidential, and CDK could suffer harm if the information were publicly disclosed.  The information relates to the methods by which CDK detects cyber attacks and maintains the cyber security of its systems.  The information could be used by hackers to attack CDK's system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: August 23, 2019

_____

Dean W. Crutchfield

13

# EXHIBIT 1

# TO BE FILED UNDER SEAL

# EXHIBIT 1

# EXHIBIT 2

## TO BE FILED UNDER SEAL

# EXHIBIT 2



## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
| --- | --- |
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation, | Case No. 2:19-cv-04849-GMS |
| Plaintiff, |  |
| v. |  |
| Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation, |  |
| Defendants. |  |

## DECLARATION OF KELLY HALL
### Pursuant to 28 U.S.C. § 1746

1.      I am the Senior Vice President of Software Development for The Reynolds & Reynolds Company ("Reynolds"), where I have been employed since 1985.[1] In this role, I oversee the company's software development programs and teams.  I am also responsible for ensuring the security of the computer systems and software that Reynolds licenses to automotive dealerships across North America.  I handle day-to-day security issues that arise during normal

---

[1] From 1985-2006, my employer was Universal Computer Systems ("UCS"), which merged with The Reynolds & Reynolds Company by acquisition in 2006.

business operations (such as potential unauthorized access to a Reynolds system) and develop and implement security initiatives to improve Reynolds' product offerings.  Through my 34 years of employment with Reynolds and UCS and as a computer programmer, I am familiar with the security risks facing computer systems, particularly those facing the types of systems licensed by Reynolds to automotive dealerships.

## I.   The Reynolds Dealer Management System

2.      Reynolds is an automotive technology company that develops, maintains, owns, and operates proprietary enterprise computer systems known as Dealer Management Systems ("DMS") that it licenses to franchised new car dealerships.  A DMS allows dealers to manage core operations of their business, including accounting, payroll, parts, service, sales, and finance & insurance functions.  A DMS also supports data communications between dealers, new car manufacturers (known as original equipment manufacturers or "OEMs"), lenders, credit bureaus, application providers, and other third parties.

3.      Reynolds currently licenses two DMSs: ERA and POWER (the "Reynolds DMS").  Reynolds first introduced ERA in the 1980s, and UCS originally developed and designed POWER in the 1990s prior to its merger with Reynolds.  ERA and POWER's software programs are comprised of hundreds of millions of lines of natively developed source code. Reynolds currently licenses ERA and POWER to approximately 4600 franchised new car dealerships (by rooftop) in the United States.

4.      ERA and POWER compete against DMS offerings from CDK Global, Cox Automotive, Auto/Mate, AutoSoft, DealerBuilt, and other automotive technology companies. These companies design their systems in different ways, regarding both the architecture of their computer systems and the scope of their DMS functionalities.  DMS providers compete on these

differences in system design and functionality, along with price, contract length, performance, security, and other characteristics.

5. On a technical level, every Reynolds DMS includes some combination of the following interconnected hardware and software components: dealer-side or hosted servers; operating systems, segregated databases, and application layers on the servers; secured interfaces between the servers and the dealer's PCs; end-user application software on the dealer's PCs; secure data connections from the servers to other data centers and centralized processing facilities; security measures including encryption, access monitoring, password complexity requirements; and network and system components including Local Area Networks, Wide Area Networks, print servers, and software; and other components.

6. The Reynolds DMS operates across a distributed computer network spread across several states.  For example, an Arizona dealership licensing a Reynolds DMS could have a DMS server that resides on-site at its dealership and connects with Reynolds data centers in Texas and/or Ohio, OEMs based in Michigan, and software application vendors in Georgia, Florida, and/or California.  In addition, many multi-state dealerships will enter into a single contract with a DMS provider to license its DMS across some or all their national operations.

7. Because dealerships vary with respect to the OEM franchise(s) that they sell or service, size, scope of operations, business processes, and other characteristics, every Reynolds DMS is a custom-built system configured to provide the best performance for each licensee. For example, some dealers scale up DMS performance and capacity by licensing additional server cores and software seats.  Other dealers license optional software applications designed for particular business needs (e.g., licensing a used vehicle inventory management application).

8.      The Reynolds DMS stores and processes highly sensitive and/or proprietary data, including: consumer data; dealer operational and business data; OEM data; credit and financial data from banks, credit bureaus, and other financial institutions; Reynolds' proprietary data such as Service Price Guides; and data licensed from third parties.  The Reynolds DMS also stores other Reynolds intellectual property used to operate the system.

9.      Specifically, these highly sensitive and/or proprietary data include:

a.      Information from consumers and dealership employees, including names, social security numbers, driver's license numbers, dates of birth, addresses, financial information, credit information, contact information, and other extremely sensitive data.  It is my understanding that such information is subject to regulation under federal and state data privacy laws, including, for example, the Gramm-Leach-Bliley Act ("GLBA").

b.      Proprietary and competitively sensitive information licensed from OEMs for use by their franchise dealers, such as codes and prices for parts and labor, rebate and incentive information, rates and residuals values used in the vehicle leasing and financing process, and warranty information. Agreements with OEMs govern how Reynolds and franchise dealers can use any such licensed OEM data.

c.      Information belonging to other third parties, such as credit check information generated by credit reporting bureaus.

d.      Reynolds proprietary information, including forms, accounting rules, tax tables, and proprietary analytics.

e.   Reynolds intellectual property, including copyrighted software elements and programs, such as the ERAccess.exe terminal emulation program that dealership employees use to access the DMS server, patented processes, and proprietary data embedded in products such as Service Price Guides.

10.   It is my understanding that Reynolds must comply with federal data security and privacy laws (such as the GLBA) as well as comport with industry best practices to prevent unauthorized access to or misuse of data.  In addition, Reynolds must comply with the terms of contracts governing data access.

11.   In addition to securing data stored or processed on its DMS, Reynolds provides secure data communications between its DMS and OEMs, financial institutions such as banks and credit bureaus, application software providers, and other third parties.  These entities have their own demands on system functionality (e.g., requesting real-time transmissions of certain data elements) and hundreds of idiosyncratic demands (e.g., mandating the use of certain data encryption methods).

## II.  Proprietary Interests in the Reynolds DMS

12.   Over the last two decades, Reynolds has invested hundreds of millions (if not billions) of dollars and millions of man-hours on product planning, program definition, programming, quality assurance testing, and documentation for the Reynolds DMS.

13.   The Reynolds DMS contains Reynolds intellectual property such as copyrighted software elements and programs.  Reynolds has registered copyrights for multiple versions of its DMS PC software program (Registration Nos. TX 7-586-896; TX 7-586-863; TX 8-538-825; and TX 8-538-541).

14.     Reynolds' registered copyrights extend to the terminal emulation program that dealership employees use to access the DMS server.  Every time a user opens this Reynolds DMS software program, the program displays a notice stating that the program is Reynolds' copyrighted, confidential, and proprietary property:



A user cannot run the Reynolds DMS without accessing Reynolds' copyrighted technologies.

15.     Reynolds licenses its DMS to its dealership customers under a set of terms and conditions designed to protect its system's functional integrity and security, protect Reynolds' valuable intellectual property rights, and meet Reynolds' contractual obligations to third parties. Every Reynolds dealership customer signs the Reynolds Master Agreement and agrees to the Customer Guide when they license the Reynolds DMS.  As a condition of the Reynolds Master Agreement, each Reynolds dealer agrees that it will not share login credentials with third parties or connect other software to the DMS.  (*See* Exhibit 1, Reynolds Master Agreement, § 1).  Only dealership employees are licensed to access the system.  (*Id.*).  The Customer Guide further

states that dealership customers "shall not copy, reproduce, distribute, or in any way disseminate or allow access to or by third parties." (*See* Exhibit 2, Reynolds Customer Guide, pp. 22).

16.     Third parties accessing or attempting to access the Reynolds DMS without Reynolds' permission are using or attempting to use its intellectual property without a license. Likewise, dealers providing third parties with such access to the Reynolds DMS are violating the terms of their licensing agreements with Reynolds.

**III. The Reynolds Integration Hub**

17.     To manage the array of sensitive consumer, financial, and proprietary data flowing through its computer network and the intense demands of dealers, OEMs, and other third parties, Reynolds strictly controls and manages system access to and interoperability with its DMS.

18.     Dealership employees access the DMS through login credentials that allow them to interact with data and application programs stored and processed on the DMS.  An employee uses a login prompt requiring him/her to enter his/her specific login credentials and then a separate prompt for his/her specific masked password.  Each login credential is tied to a dealership employee, and the DMS functionality available to each employee depends on the employee's role at the dealership.  For example, a salesperson may have access to different DMS functionality compared to a service advisor or dealership manager.  Not only do these controls on user credentials minimize the risk of unauthorized access, but they also mitigate the risk of errors (e.g., service advisor cannot modify a financing package, lower-level employees cannot access or modify managerial reports).

19.     Reynolds also provides its dealership licensees with secure reporting tools built into the DMS such as Dynamic Reporting that allow dealership employees to build, schedule,

and export reports of a dealer's operational or business data, either for the dealer's internal use or for transmittal to any third party.

20.     Although these built-in tools are sufficient for many purposes, Reynolds has faced increasing demand for more automated, frequent, larger, and complex data communications between the Reynolds DMS and OEMs, application providers, financial institutions, and other third parties.

21.     In response to this demand for improved functionality, Reynolds built the Reynolds Integration Hub (the "Hub") to manage data flow between the DMS and OEMs, application providers, and other third parties.  The Hub is a technological innovation that enables the Reynolds DMS to reliably and securely handle this data flow through dedicated, customized interface packages based on a party's requested data, functionality (e.g., read-only, read-and-write), frequency, scheduling, and volume of data transfers, as well as other features.  Reynolds specifically manages the development of interfaces between the Reynolds DMS and application providers through the RCI Program.  All application providers that join the RCI Program sign a license agreement requiring them to describe their data use, adhere to Reynolds' data use policy, and agree to adhere to federal data security laws and regulations.  (*See* Exhibit 3, Reynolds Interface Agreement, § 6.10).  Reynolds works with each vendor to design, build, and test the interfaces they need.  (*Id.* §§ 2.3, 3).

22.     The Hub enables OEMs, application providers, and other third parties to improve the services that they offer their dealer customers.  For example, the Hub enables real-time interoperability between the DMS and third parties (e.g., changes made to a customer's service appointment by a dealership employee on the DMS instantly update a third-party application so that it has the most current data).  The Hub also manages write-back functionality, allowing third

parties to automatically enter or update new data into a Reynolds DMS (e.g., changes made to a customer's address by a dealership employee on a third-party CRM application will be reflected on the DMS).

23.     The Hub's design and features provide Reynolds DMS dealer licensees with performance and security benefits.  By separating how dealership employees and OEMs, application providers, and other third parties interact with the system, Reynolds can minimize performance issues, data corruption risks, and security compromises on the DMS for its dealers. For example, the movement of data by outside vendors through secure interfaces centralized at a single gateway avoids having dealership employees or third parties constantly query the system to extract or modify data.  The use of centrally controlled "business rules" minimizes data errors and allows different third parties to interact seamlessly with one another.

24.     Reynolds also implements specific security features and best practices at the Hub. By design, the Hub ensures that third parties never directly access the DMS and only receive the data requested to perform their contracted work for dealer customers.  This best practice, sometimes referred to as "data minimization," reduces the volume of data exchanged in order to maximize system performance and minimize the exposure of data to breach.  The Hub's interfaces are also encrypted, ensuring secure transmission to the receiving party, with additional field-level encryption used for sensitive data like social security numbers.

25.     The Hub further allows Reynolds to diagnose and isolate any potential performance or security-related incidents (e.g., shutting down one application's interface in the event of a faulty software update rather than shutting down the entire system).

26.     The Hub also manages all automated "write-backs" of data fields by third parties. Automatic data pushes by OEMs, application providers, and other third parties involve the

creation of more entries and transactions than an actual individual human user could possibly produce at one time and can push thousands of entries into the DMS within minutes.  Any erroneous data entries resulting from automatic data pushes by a single third party can propagate across the DMS and impact other interfaced third parties, effectively paralyzing a dealer's system and operations.

27.     To mitigate these risks, the Hub logs, tracks, and creates an audit trail for every single "write-back" transaction.  This proprietary "journaling" process allows Reynolds to minimize the risk or impact of erroneous data write-backs by enabling Reynolds' system to revert data to a prior state.  No other DMS provider offers similar functionality.

28.     Today, the Hub handles about 13,000 transactions per minute during peak hours, an average of 8.7 million transactions per day, and an average of 260 million transactions per month.  The complexity of these transactions continues to grow.

IV. **Security Features that Control Access to the Reynolds DMS**

29.     The Reynolds DMS includes multiple technological security measures designed to prevent unauthorized access to its system, prevent automated scripts from overloading system resources, and ensure that only properly licensed users can access and use the system.  Because the security threats facing computer systems are constantly evolving, Reynolds must continue building, testing, and releasing security-related software improvement for the Reynolds DMS.

30.     Reynolds takes steps to ensure that the only persons accessing its DMS through dealership login credentials are dealership employees themselves, such as linking a login credential to a dealership employee.  Reynolds also provides dealership managers with the ability to restrict the types of data that its dealership employees may access (e.g., a sales representative

may not have access to service-related data).  The Reynolds DMS also requires users to change their passwords regularly.

31.     In addition, Reynolds deploys CAPTCHA control prompts to guard against unauthorized access to the Reynolds DMS.  CAPTCHA is a tool commonly used in the computer software industry to protect computer systems and websites against abusive automated software programs.  Such automated programs are commonly used by hackers and other unauthorized entities to extract or modify data on secured computer systems.

32.     Reynolds primarily deploys CAPTCHA control prompts when a dealership employee wants to use one of the reporting tools built into the Reynolds DMS (e.g., Dynamic Reporting) and download the data from the DMS to an external device.  During the process of using these built-in reporting tools, the employee may encounter a CAPTCHA control prompt displaying a series of letters and/or numbers designed to distinguish human usage from machine input.

33.     Reynolds also deploys CAPTCHA control prompts in other situations, such as when other security measures determine that a dealership employee's login credential might be exhibiting characteristics consistent with unauthorized access.

34.     Additionally, the Reynolds DMS includes a suite of "invisible" access controls that help prevent unauthorized access to the Reynolds DMS.  Reynolds' Suspicious User ID monitoring software analyzes keystroke speed, keystroke pattern, and the volume and timing of data requests to differentiate unauthorized automated scripts and bots from authorized use by human users.  When the software identifies a suspicious user based on these factors, it automatically flags the user ID for deactivation.

### V. HB 2418 Would Require Reynolds to Remove Security Features and Allow Any Unlicensed Third Party to Have Free and Unfettered Access to the Reynolds DMS

35.     It is my understanding that HB 2418 requires DMS providers to permit any third party "authorized" by a dealer to access, extract, and modify data stored or processed on a DMS. It is my understanding that such third parties can include third-party "data extractors," companies that have historically sought unlicensed access to the Reynolds DMS through employee login credentials and use automated programs that call upon the software functionality of the DMS without any regard to system security or performance to access, extract, or modify data stored or processed on a DMS.

36.     It is also my understanding that HB 2418 mandates that DMS providers like Reynolds are not permitted to use contractual, technical, or other means to restrict third parties "authorized" by dealers from accessing the Reynolds DMS.  I further understand that HB 2418 allows dealers to provide any third party with access to the Reynolds DMS at the dealer's sole discretion.

37.     Compliance with HB 2418 would require Reynolds to reconfigure the entire Reynolds DMS to allow for unfettered access to the system.  To do this, Reynolds employees would need to review millions of lines of code that currently operate the Reynolds DMS and remove or rewrite code that implements the many layers of security protocols that prevent or mitigate the risks of unauthorized access to the Reynolds DMS through DMS login credentials. For example, the Suspicious User ID monitoring software is written into the DMS and operates automatically to flag automated user IDs.  Removing this tool would require Reynolds to expend resources to rewrite its DMS software to comply with HB 2418.

## VI. HB 2418 Would Create Gaping Security Vulnerabilities to the Reynolds DMS, Reduce DMS Performance, and Harm Reynolds' Ability to Provide a Secure DMS to Arizona Customers

38.     Every time a third party accesses a Reynolds DMS using a dealership employee's login credentials, it uses valuable Reynolds intellectual property, including copyrighted technologies and original software elements and programs, without Reynolds' consent or a legitimate license to do so.

39.     Because HB 2418 would give "data extractors" the ability to access the Reynolds DMS freely and extract, modify, or transmit any data without interruption, every single data element stored or processed on the Reynolds DMS — including sensitive consumer data, licensed OEM data, and Reynolds' own proprietary data — would be at greater risk of breach.

40.     By design, the Reynolds DMS minimizes the "attack surface" available to hackers, cyberthieves, and other unauthorized third parties.  Enabling access to even a limited number of third parties creates more points of entry to the DMS, and thus expands the "attack surface."  It is well known that simply sharing login credentials with outside third parties increases the potential for a security breach.  That risk is compounded here by the fact that HB 2418 would further require Reynolds to strip out the security protections on those very credentials being shared.

41.     The practices of many third parties, particularly those by data extractors, demonstrate that these security risks are substantial.  For example, data extractors have been known to request and receive DMS usernames and credentials to access the Reynolds DMS through unencrypted, plain text email.  Data extractors also disregard industry best practices such as data minimization and attempt to access data beyond the scope of their business relationship with the dealer to resell to other third parties or develop their own competing products.

Reynolds has also observed multiple third parties utilizing the same set of credentials, as well as sharing credentials with ordinary dealer employees. In the event of a data breach, these practices make it difficult, if not impossible, to trace and remedy the breach's source.

42.     Additionally, the automated software programs used by third parties like data extractors can wreak havoc on a system. Data extractors use automated software programs to call upon the software functionality of the DMS to access, extract, or modify data stored or processed on the DMS. But because Reynolds designed its DMSs for human use rather than machine use (and only licenses the system for use by human dealer employees), the queries and scripts used by these automated programs can lock-up other system processes and often grind DMSs to a halt (even if the queries or scripts only call for a small amount of data). For example, prior to rolling out effective security measures that detected and minimized the unauthorized access by data extractors on the Reynolds DMS, automated programs used by data extractors at times took more than 70%+ of CPU time on a DMS and disrupted the ability of legitimate human users to use other DMS functionality, sometimes to the point of locking-up or crashing a dealership's entire system. In some cases, data extractors queried the systems hundreds or thousands of times in a single day.

43.     The automated programs used by data extractors to access, extract, or modify data are commonly used by hackers, cyberthieves, and others to breach secure systems and extract large amounts of data for private gain. Because HB 2418 forbids Reynolds from taking any countermeasures against any third parties' use of automated programs on the Reynolds DMS, it also prevents Reynolds from securing its system against common forms of attack.

44.     To maintain their access to the systems, some data extractors have also been known to use automated programs to stay logged into the Reynolds DMS so they can run their

automated programs during non-business hours.  Such conduct expands the surface area of attack that hackers, cyberthieves, or others can exploit when trying to breach the Reynolds DMS.

45.     Because HB 2418 allows writeback by any third party through login credentials, none of the Hub's security and performance features — such as the use of strict business rules and journaling — would be available to guard against invalid data entry.  When such errors occur on an automated basis, they can disrupt all dealer operations and any interfaced third parties using that data within a matter of minutes.

46.     Further, Reynolds' contracts with OEMs and certain other third parties, such as credit reporting bureaus, restrict Reynolds from sharing or providing unauthorized access to categories of sensitive data with any parties beyond specific, authorized dealerships and third parties.  Compliance with HB 2418 could put Reynolds in breach of its agreements with OEMs and certain third parties.

47.     Reynolds has staked its brand and reputation on providing a secure DMS platform.  Any data breach that results from hostile access to the Reynolds DMS will cause substantial harm to Reynolds' reputation, and could cost Reynolds millions of dollars in response and investigation costs, lost business, lost goodwill, and legal fees.

48.     Exhibits 1 and 2 to my declaration are, respectively, the Reynolds Master Agreement and the Reynolds Customer Guide.  These two documents, along with certain other documents identified in the Master Agreement, form the contractual relationship between Reynolds and its dealer customers.  Reynolds considers these two documents to be highly confidential and proprietary.  These documents contain information that has economic value to Reynolds' competitors in the DMS space as well as other third parties, including new car manufacturers and application providers.  If Reynolds' competitors were to obtain these

documents, they could use knowledge of the terms and conditions of Reynolds' contractual relationship with its dealers to harm Reynolds' competitive standing by offering more favorable terms and conditions to Reynolds' dealer customers.

49.     The information in these documents is not generally known by third parties outside Reynolds and is not readily ascertainable by proper means.  Within and without the company, Reynolds consistently has treated the Master Agreement and the Customer Guide as confidential and proprietary.  These documents are not publicly available on Reynolds' website, and they each contain legends (on every page) indicating that the documents are "Confidential and Proprietary Information of" Reynolds.  The cover page of the Customer Guide states that it and its contents "may not be reproduced in any form or disclosed in any manner to anyone" other than the dealer and the dealer's employees without the express permission of Reynolds.  Finally, Reynolds' dealer customers have agreed to maintain the confidentiality of these documents.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _Aug_ , _22_, 2019

Kelly Hall

SMRH:4831-2013-8914.1

QB\59154448.1

# EXHIBIT 1

# TO BE FILED UNDER SEAL

# EXHIBIT 1

# EXHIBIT 2

## TO BE FILED

## UNDER SEAL

# EXHIBIT 2

# EXHIBIT 3

## REYNOLDS INTERFACE AGREEMENT

This Reynolds Interface Agreement ("Agreement") is entered into as of this ___ day of
_____, 2013 ("Effective Date") by and between THE REYNOLDS AND REYNOLDS
COMPANY, and its affiliates ("Reynolds"), an Ohio corporation, having its principal place of business
at One Reynolds Way, Kettering, Ohio 45430 and XXXXXXXXXX or referenced herein as
XXXXXXXX corporation/limited liability company, having its principal place of business at
XXXXXXXXXX. The parties for good and valuable consideration agree as follows:

## 1. DEFINITIONS

1.1.    Certification – Upon completion of Reynolds testing and the Joint Pilot the Interfaced
Product will be declared ready for GCA by Reynolds, and Reynolds shall provide written
notification to XXXXXXXXXX that XXXXXXXXXX's Interfaced Product has been
certified under the Reynolds' Certified Interface Program.

1.2.    Confidential Information. A party's trade secrets under applicable law and the proprietary
and confidential information which is disclosed to the other party pursuant to this Agreement.

1.3.    Disclosing Party. The party who discloses Confidential Information to the other party.

1.4.    GCA – General Customer Availability. The date which Reynolds declares the Interfaced
Product certified and ready for implementation.

1.5.    Interface – Processes developed by Reynolds, which include, but are not limited to, software,
hardware, specifications, data formats, security codes and other intellectual property, that
allow for the transfer of data from one or more Reynolds Systems and/or the ability to input
data from XXXXXXXXXX's Product into one or more Reynolds Systems.

1.6.    Interfaced Product – XXXXXXXXXX's Product(s) as identified in Exhibit A and described
in Exhibit B, which is licensed by XXXXXXXXXX to a Qualified End User(s) and complies
with the Interface specifications, or incorporates the software provided by Reynolds (all such
specifications, security codes, information and software are part of the Interface) so that
XXXXXXXXXX's Product will function as described in Exhibit B, including, but not
limited to, displaying and/or integrating the Reynolds System Output and/or Reynolds
System Input accurately and not causing any errors or conflicts with the Reynolds System.

1.7.    Interface Test – Testing the Interfaced Product to determine if it properly displays the
Reynolds System Output and/or properly delivers the Reynolds System Input, complies with
the Interface and does not conflict with the operation of the Reynolds System.

1.8.    Joint Pilot – One (1) or more Qualified End Users provided by XXXXXXXXXX, to pilot test
the Interface and the Interfaced Product in collaboration with XXXXXXXXXX. Pilot
selection and number of pilots will be at the sole discretion of Reynolds.

CONFIDENTIAL

**Defs. Ex. 98**
REYCID0003646

1.9.  Non-Approved Access – Any direct or indirect use or access of the Reynolds System by XXXXXXXXXXX or an agent acting on behalf of XXXXXXXXXXX.

1.10.  Non-Approved Use – XXXXXXXXXXX utilization of the Interface(s), Reynolds System Input, and/or Reynolds System Output with any product or service other than the Interfaced Product(s).

1.11.  Qualified End User – A single dealership store and application area (or branch) combination (and its associated employees), as defined in the Reynolds System, which has obtained the appropriate license rights to receive XXXXXXXXXXX's Interfaced Product.

1.12.  Receiving Party.  The party receiving such Confidential Information of the Disclosing Party.

1.13.  Reynolds System(s) – Any Reynolds product, service or application sold and marketed by Reynolds and its affiliates.

1.14.  Reynolds System Input – The data intended to be transferred into the Reynolds System from XXXXXXXXXXX's Interfaced Product for purposes other than logging or requesting data.

1.15.  Reynolds System Output – The data intended for transfer from the Reynolds System to XXXXXXXXXXX's Interfaced Product for purposes other than logging or requesting data.

1.16.  XXXXXXXXXXX's Product – XXXXXXXXXXX hardware, software and/or services sold and marketed by XXXXXXXXXXX as listed in Exhibit A and fully described in Exhibit B, which may be provided directly to Qualified End Users.

## 2.  **DUTIES**

2.1.  REYNOLDS' SERVICES.  Reynolds will provide to XXXXXXXXXXX the appropriate Interface(s) defined in Exhibit A necessary to certify the Interfaced Product(s).  Reynolds will provide to XXXXXXXXXXX development assistance up to the maximum assistance identified in Exhibit E in order to enable XXXXXXXXXXX to incorporate the Reynolds System Output and/or Reynolds System Input into the Interfaced Product.  Reynolds will notify XXXXXXXXXXX if it appears that the maximum assistance may be exceeded.  In the event that the maximum assistance is exceeded, Reynolds may charge XXXXXXXXXXX on a time and materials basis for additional assistance based on the rates in Exhibit E.

2.2.  OWNERSHIP.  All Reynolds intellectual property provided to XXXXXXXXXXX hereunder shall be considered for all purposes of this Agreement to be part of the Interface.  Any license granted herein is not a sale of the original Interface(s) or any copies thereof.  Reynolds retains the ownership of the Interface(s) and all copies thereof, including all rights and interests in contributions and additions communicated by XXXXXXXXXXX to Reynolds related to the Interface(s), or the Reynolds System(s) software.  Reynolds claims patent, copyright, trade secret and confidential information protection in the Interface, including all moral rights, as well as the way in which the Reynolds System(s) software, database and the

CONFIDENTIAL

Interface organize and store data. XXXXXXXXXX releases any rights or interests it may have in the Interface or the organization, format and structure of the Reynolds System Output and/or Reynolds System Input that might result from XXXXXXXXXX's contribution and additions. XXXXXXXXXX's Product and the Interfaced Product(s) including any software are, and will at all times remain, the sole and exclusive property of XXXXXXXXXX.

2.3.  XXXXXXXXXX'S DEVELOPMENT. XXXXXXXXXX represents and warrants the following requirements related to its development process:

    2.3.1.  XXXXXXXXXX's Product(s) operates with all of the functionality cited in Exhibit B and in accordance with any applicable operating manuals or other documentation included by reference.

    2.3.2.  XXXXXXXXXX will provide competent XXXXXXXXXXnical resources to properly develop the Interfaced Product.

    2.3.3.  XXXXXXXXXX Product(s) will properly integrate with the Interface(s) and that it will be generally available to begin the Interface Test(s) within thirty (30) days of the date that the Interface(s) described in Exhibit A is made available to XXXXXXXXXX or at a later date as determined by Reynolds.

    2.3.4.  XXXXXXXXXX Product(s) will complete the Interface Test(s), the Joint Pilot(s), and achieve Certification within _____ days from the beginning of the Interface Test(s) or at a later date as determined by Reynolds.

Through no fault of Reynolds, if XXXXXXXXXX fails to meet any of the provisions set forth in Sections 2.3.1-2.3.4, Reynolds may terminate this Agreement as set forth in Section 5.5.

2.4.  PAYMENT BY XXXXXXXXXX. XXXXXXXXXX will pay all fees set forth in Exhibit E of this Agreement.

    2.4.1.  The submission of any invoices by Reynolds to XXXXXXXXXX and any payment by XXXXXXXXXX to Reynolds for services or any other costs, charges, and/or expenses shall be governed by the terms set forth in Exhibit E to this Agreement. XXXXXXXXXX shall pay all amounts due to Reynolds within thirty (30) days of receipt of invoice.

    2.4.2.  All pricing detailed in Exhibit E to this Agreement may be increased upon thirty (30) days written notice to XXXXXXXXXX.

    2.4.3.  XXXXXXXXXX shall pay Reynolds for all amounts due Reynolds pursuant to Exhibit E to this Agreement in accordance with the time provisions set forth in the Agreement or Exhibit E.  In the event that XXXXXXXXXX does not timely pay an amount due under Exhibit E to this Agreement, XXXXXXXXXX will be referred to Reynolds' Customer Account Services department in accordance with Reynolds' normal collection process.  Further, Reynolds may charge XXXXXXXXXX a late charge, calculated at the rate of 1½% per month or the maximum rate currently permitted by law, whichever is less.  Amounts that remain unpaid may result in

CONFIDENTIAL

REYCID0003648

discontinuation of services by Reynolds, will require additional fees for services to be reinstated, and will be deemed a material breach as described in Section 5.6 of this Agreement.

2.4.4.   XXXXXXXXXX agrees to pay all taxes (whether billed at the time of invoicing or determined to be due by a taxing authority at a later time) other than those taxes based on Reynolds' income, or provide appropriate exemptions.  Taxes shall include, but are not limited, to personal property tax, sales tax, use tax or excise tax, which may be imposed by any taxing authority as a result of Reynolds' provision of services to XXXXXXXXXX under this Agreement.

## 2.5.   XXXXXXXXXX'S OBLIGATIONS.

2.5.1.   NONDISCLOSURE.  Except as expressly permitted herein, XXXXXXXXXX will not disclose or publish the Reynolds System Output and/or the Reynolds System Input provided by the Interface in any way except as set forth in Exhibit A.

2.5.2.   USE OF REYNOLDS SYSTEM OUTPUT.  XXXXXXXXXX will not permit the Reynolds System Output provided by the Interface(s) to be used for any purpose other than the limited purpose described in Exhibit A.  The Qualified End User, on whose behalf XXXXXXXXXX has paid the applicable fees set forth in Exhibit E, may use the Interfaced Product and the Reynolds System Output.  XXXXXXXXXX will not permit any other uses of the Reynolds System Output or allow any access to the data by XXXXXXXXXX or other parties unless the transfer of the data has been authorized in writing by Reynolds and the Qualified End User that originally collected the data.

2.5.3.   COMPLIANCE WITH CERTIFICATION.  Unless otherwise identified in Exhibit A, upon Certification and for as long as this Agreement is in effect, any Non-Approved Access and/or Non-Approved Use is strictly prohibited and is considered a violation of this Agreement and any other data movement agreements between XXXXXXXXXX and Reynolds.  Such violation(s) will be subject to any or all of the following:

2.5.3.1.  Reynolds has the right to immediately disable and/or uninstall all current and future Interface(s) and/or instances of Non-Approved Access.

2.5.3.2.  Reynolds has the right to assess the Monthly Interface Fee(s) (as defined in Exhibit E) for the number of single dealership store and application area (or branch) combinations that utilized Non-Approved Access or Non-Approved Use during the period of the violation.

2.5.3.3.  Reynolds has the right to assess a deactivation fee for the removal of the Interface(s) described in Exhibit A which is equal to the Installation Fee(s) (as defined in Exhibit E) for the number of Qualified End Users at the time of the violation.

CONFIDENTIAL

2.5.4.   NOTIFICATION OF SECURITY BREACH.  Subject to requirements of law, or actions of any regulatory or law enforcement authority that prohibits, restricts, or delays them from doing so, XXXXXXXXXX or any third party acting on behalf of XXXXXXXXXX having access to data collected from a Qualified End User provided under the terms of this Agreement, shall provide prompt written notice to Reynolds of any security breach of data collected from a Qualified End User obtained through such access, which at the time of the breach was in the possession or custody of XXXXXXXXXX or such third party.  The disclosure notification shall be made within 24 hours by XXXXXXXXXX or third party following discovery of such breach.  The disclosure notification shall describe at a minimum the scope of the data breach and measures taken to restore the integrity, security, and confidentiality of such data.  Such measures and corrective actions shall be implemented as soon as practicable by XXXXXXXXXX. Notification shall be by email to the security email address (datasecurity@reyrey.com).

2.5.5.   CANCELLATION OF INTERFACED PRODUCT.  XXXXXXXXXX will notify Reynolds within one (1) business day of a Qualified End User cancelling any Interfaced Product(s) currently provided by XXXXXXXXXX by submitting a termination request to Reynolds for the corresponding Interface(s).  Should a Qualified End User contact Reynolds and request the Interface(s) being provided to XXXXXXXXXX's Interfaced Product be stopped immediately, Reynolds reserves the right to comply with this request and will notify XXXXXXXXXX within one (1) business day of the Qualified End User request and Reynolds' compliance.  Should XXXXXXXXXX contact the Qualified End User and reach agreement to reinstate the Interfaced Product within three (3) business days of receiving such notice from Reynolds, Reynolds will re-install / turn on the corresponding Interface(s) for no additional Installation Fee(s).  Reynolds will use commercially reasonable efforts to terminate billing for the month subsequent to the submission of a termination request. Reynolds does not prorate the Monthly Fee(s).

2.6.   NO REVERSE ENGINEERING.  XXXXXXXXXX will not reverse engineer or decompile the Interface or any other Reynolds software.  Reynolds will not reverse engineer or decompile XXXXXXXXXX's Product, provided that Reynolds may take whatever action is necessary to discontinue or remove any Interface in accordance with the terms of this Agreement.  XXXXXXXXXX will not otherwise attempt to determine how the Interface works or how the data is structured or organized within the database created and stored by any Reynolds System or software.

2.7.   CONFIDENTIALITY.  Neither party will disclose any information relating to the Interface, the implementation of the Interface, XXXXXXXXXX's Product, the Interfaced Product, the Reynolds System or any other Confidential Information of the other party to anyone, for any purpose, except employees and consultants that have executed agreements obligating them to comply with the provisions of this Agreement. The parties acknowledge and agree that the disclosure of any trade secrets or Confidential Information to the other party does not confer upon a party any license, interest or rights of any kind in or to the trade secrets or Confidential Information, except as provided in this Agreement. Except as permitted by this

CONFIDENTIAL

Agreement, neither party will disclose, disseminate, use or otherwise make available the Confidential Information of the other. Each party will use reasonable efforts, but in no event less than the security precautions such party undertakes to protect its own proprietary and confidential information of like nature, to prevent any Confidential Information of the other party from being disclosed to third parties.

This Agreement, including all terms and conditions are considered Confidential Information. The existence of this Agreement may be publicized by XXXXXXXXXX and/or Reynolds in order to promote the Interface and XXXXXXXXXX's Products. XXXXXXXXXX, including its officers, directors, and employees, agrees not to tortiously interfere with Reynolds' relationship with current or prospective suppliers or customers. XXXXXXXXXX, including its officers, directors and employees, also agrees to refrain from communicating, in writing, any disparaging or libelous statements to any third party regarding Reynolds, or Reynolds' officers, directors, employees, products, services, or programs (including but not limited to the Reynolds Certified Interface program). Failure to comply with any of the terms of non-disparagement shall amount to a material breach of this Agreement.

The parties agree written confidentiality agreements substantially similar to the terms contained herein will be obtained for any employees or contractors permitted access to Confidential Information. Prior to the time an employee or contractor of Receiving Party receives any Confidential Information of the Disclosing Party, the Receiving Party will instruct that employee or contractor about the obligations of the Receiving Party hereunder and instruct that employee or contractor not to disclose or use any Confidential Information, except as specifically provided herein. The Receiving Party will be liable for any damages caused to the Disclosing Party by an employee or contractor violating this Agreement.

At the Disclosing Party's request or upon completion of the Receiving Party's use of Confidential Information, the Receiving Party will return all copies of Confidential Information to the Disclosing Party or, at the Disclosing Party's request, will destroy Confidential Information and certify such destruction to the Disclosing Party. The Receiving Party may retain a copy of Confidential Information, for archival purposes or to the extent required by law, subject to the Receiving Party's continuing obligations under this Section 2.7. The Receiving Party recognizes that its unauthorized use or disclosure of Confidential Information may give rise to irreparable injury, and acknowledges that remedies other than injunctive relief may not be adequate. Accordingly, the Disclosing Party has the right to seek equitable and injunctive relief to prevent the Receiving Party's unauthorized use or disclosure of any Confidential Information, as well as such damages or other relief as is occasioned by such unauthorized use or disclosure. The provisions of this Section 2.7 pertaining to Confidential Information shall survive termination or expiration of this Agreement.

In the event the Receiving Party is required to disclose Confidential Information in connection with any judicial proceeding or government investigation, then the Receiving Party shall promptly notify the Disclosing Party and allow a reasonable time for the Disclosing Party to seek a protective order from the appropriate court or government agency.

CONFIDENTIAL

REYCID0003651

Thereafter, the Receiving Party may disclose Confidential Information to the extent required by law, subject to any applicable protective order.

The restrictions of this Section 2.7 on the Receiving Party's use and disclosure of Confidential Information shall not apply to any information that: (a) was publicly known at the time of the Disclosing Party's communication thereof to the Receiving Party; (b) becomes publicly known, through no fault of Receiving Party, subsequent to the time of the Disclosing Party's communication thereof to the Receiving Party; (c) the Receiving Party can demonstrate with documentary evidence that the Confidential Information was in the Receiving Party's possession free of any obligation of confidence at the time of the Disclosing Party's communication thereof to the Receiving Party; (d) the Receiving Party can demonstrate with documentary evidence that the Confidential Information is/was developed by Receiving Party independently of and without reference to any other Confidential Information; (e) is rightfully obtained by Receiving Party from a third party without restriction; (f) is identified by the Disclosing Party as no longer proprietary or confidential; or (g) is disclosed in circumstances in which it is subject to a protective order or other similar legal protection that will prevent the public disclosure of the Confidential Information and will prevent disclosure to any party that may be considered a competitor of either Party. The confidentiality provisions of this agreement supersede and replace any and all prior agreements entered into by the parties related to this Agreement.

2.8.   USE OF TRADEMARKS.  Neither XXXXXXXXXXX nor Reynolds will use the name of the other party or any of the other party's trademarks, service marks, trade names or logos, except with the express prior written consent of the other party for the specific use or as set forth in Section 4.5 of this Agreement.  Notwithstanding the foregoing, XXXXXXXXXXX grants a limited use license to Reynolds to use its trademarks, service marks, trade names, or logos for the Initial Term (and any applicable Renewal Term) of this Agreement to brand, display and advertise XXXXXXXXXXX as an authorized vendor.

2.9.   QUALIFIED END USER REQUEST FOR INFORMATION.  Should a Qualified End User contact Reynolds directly to request information on XXXXXXXXXXX Interfaced Product, including the specific data fields included in the Reynolds System Input and / or Reynolds System Output used for the Interfaced Product, Reynolds may comply with the Qualified End Users' request and provide such information.  This action by Reynolds will not be considered a breach of any of the confidentiality provisions of this Agreement.

## 3.   <u>CERTIFICATION PROCESS</u>

3.1.   INTERFACE TESTING.  Prior to Certification, XXXXXXXXXXX must provide access to the Interfaced Product(s) to Reynolds for the Interface Test(s).  The parties will mutually agree upon the date for the Interface Test(s). No later than fifteen (15) days prior to the date of the Interface Test(s), XXXXXXXXXXX will submit all test scripts to Reynolds for review prior to executing the Interface Test.  If Reynolds requests modifications to the test scripts, Reynolds will notify XXXXXXXXXXX of such modifications in writing within seven (7) days of receipt of the test scripts.  If modifications are requested, XXXXXXXXXXX may

CONFIDENTIAL

REYCID0003652

make modifications and re-submit test scripts to Reynolds for approval in accordance with the process set forth herein. All Interface Tests are conducted in a test environment designated by Reynolds. Reynolds will notify XXXXXXXXXX upon successful completion of the Interface Test(s).

3.2.    INTERFACE TESTING RESOURCES. Reynolds will supply XXXXXXXXXX with access to an applicable test environment for the Interface Test and ongoing testing of the Interfaced Product and the Interface for XXXXXXXXXX's employees and consultants that have executed agreements obligating them to comply with the provisions of this Agreement.

3.3.    JOINT PILOT. After the Interface Test is complete, if Reynolds and XXXXXXXXXX mutually determine that the Interfaced Product satisfies the Interface Test, then Reynolds and XXXXXXXXXX will mutually agree upon the scope and length of the Joint Pilot. XXXXXXXXXX will suggest potential Qualified End User(s) to participate in the Joint Pilot. Reynolds will not provide a list of Qualified End Users to XXXXXXXXXX for preliminary pilot selection.

3.4.    CERTIFICATION. After the Joint Pilot is successfully completed and the Interfaced Product is ready for GCA then Reynolds will provide XXXXXXXXXX with written notice of Certification. Declaration of Certification will be in Reynolds sole discretion.

3.5.    RE-CERTIFICATION.

3.5.1. Initial Certification of an Interfaced Product will be valid until one of the following events occurs, at which time XXXXXXXXXX will be required to re-certify the Interfaced Product:

3.5.1.1.  XXXXXXXXXX requests additional Interface(s), thereby changing the level of integration with Reynolds System.
3.5.1.2.  A new release of the Interfaced Product by XXXXXXXXXX that interacts with the Interface in a different manner than when the Interfaced Product was originally certified.
3.5.1.3.  XXXXXXXXXX elects to utilize an enhanced Interface made available by Reynolds.
3.5.1.4.  Twenty-four (24) months have expired since the Certification or Re-Certification of the Interfaced Product.

Except as specified in 3.5.1.4 above, Re-Certification may require an amendment to this Agreement, or a separate Reynolds Interface Agreement and additional fees.

3.5.2. Distribution of Interfaces not defined in Exhibit A, or the distribution of the Interface with an Interfaced Product not defined in Exhibit A, will require amendment of this Agreement, or a separate Reynolds Interface Agreement. The occurrence of either of these events may require additional fees.

CONFIDENTIAL

3.5.3. New releases of the Interfaced Product in which XXXXXXXXXX's changes do not materially modify the Interfaced Product or which do not impact the Interface will not require re-certification, but will require XXXXXXXXXX to notify Reynolds in advance of such changes. XXXXXXXXXX will provide test scripts or other documentation to Reynolds to certify that the changes have been successfully tested by XXXXXXXXXX.

3.6. SUSPENSION/TERMINATION OF CERTIFICATION. After Certification, Reynolds may suspend and/or subsequently terminate Certification if one of the following has occurred through no fault of Reynolds:

3.6.1. an Interfaced Product(s) does not accurately and/or completely display or integrate the Reynolds System Output and/or the Reynolds System Input;

3.6.2. an Interfaced Product(s) does not comply with any Interface specifications provided to XXXXXXXXXX by Reynolds and included by reference in Exhibit A;

3.6.3. an Interfaced Product(s) materially degrades or otherwise adversely affects the operation of the applicable Reynolds System;

3.6.4. XXXXXXXXXX has failed to maintain reasonable distribution and support channels for the Interfaced Product;

3.6.5. XXXXXXXXXX is in violation of this Agreement;

3.6.6. an Interfaced Product(s) utilizes the Interface(s) in a way that places a Qualified End User at operational or security risk; or

3.6.7. an Interfaced Product(s) utilizes the Interface(s) in a way that places Reynolds at operational or security risk.

Reynolds will provide XXXXXXXXXX with written notice and explanation of such suspension, and XXXXXXXXXX must make all corrections within thirty (30) days to become re-certified. XXXXXXXXXX will be required to pay the standard Re-Certification Fee described in Exhibit E. During any suspension of Certification XXXXXXXXXX must not distribute, use or access the Interface. If XXXXXXXXXX fails to become re-certified in accordance with this Section 3.6 within thirty (30) days, Reynolds may terminate Certification and this Agreement. In the event of termination XXXXXXXXXX will be responsible for payment of the Certification Process Fee(s) and any other fees that have been agreed between the parties up to the date of termination.

3.7. END USER LICENSE FORM. The Interfaced Product must be licensed only to and for use by Qualified End Users that: (i) agree to a license agreement containing terms that are substantially similar to those in the attached Exhibit C; (ii) are separately licensed by Reynolds to use the Reynolds System and such application software as required for use with the Interface; and/or (iii) have authorized Reynolds to access and transfer data to

CONFIDENTIAL

XXXXXXXXXX.  XXXXXXXXXX will attach a copy of the proposed end user license agreement for the Interfaced Product and/or data authorization form as Exhibit D to this Agreement, which is required to be signed or acknowledged by all Qualified End Users. XXXXXXXXXX agrees to obtain the approval of Reynolds before executing any end user license agreement which substantially modifies the terms set forth in Exhibit C.

4. **LICENSE RIGHTS AND OBLIGATIONS**

4.1.   LICENSE GRANT.  After XXXXXXXXXX receives notice of Certification and pays all sums then due and payable to Reynolds, Reynolds grants to XXXXXXXXXX a non-exclusive, revocable license in the Territory (as defined in Exhibit A) to (i) utilize the Interface(s) provided to XXXXXXXXXX; (ii) use the Interface(s) solely with XXXXXXXXXX's Interfaced Product; (iii) publicly display the "Reynolds Certified Interface" logo on all marketing material and website(s) describing the Interfaced Product in accordance with the provisions set forth in Section 4.5 of this Agreement; (iv) demonstrate, sublicense, and distribute the Interface(s), only as incorporated into the Interfaced Product, to Qualified End Users during the Initial Term (and any applicable Renewal Term).

4.2.   REYNOLDS SUPPORT.  For the fees set forth in Exhibit E, Reynolds will provide the services necessary to implement the Interface, first line support to XXXXXXXXXX regarding the use of the Interface, and any other services set forth in this Agreement during the Initial Term (and any applicable Renewal Term).

4.3.   REYNOLDS UPDATES.  During the Initial Term (and any applicable Renewal Term), Reynolds will provide to XXXXXXXXXX specifications for Interface enhancements and revisions necessary to maintain and/or improve the functionality of the Interfaced Product since the time of GCA of the Interfaced Product.  XXXXXXXXXX will promptly comply with any enhancements or revisions provided by Reynolds and test the revised Interfaced Product with Reynolds within thirty (30) days of when the revised Interface is made available to XXXXXXXXXX.   Reynolds will make available to XXXXXXXXXX a test environment and/or data for testing of these revisions.

4.4.   REYNOLDS ASSISTANCE.  During the Initial Term (and any applicable Renewal Term), Reynolds will provide XXXXXXXXXX with reasonable XXXXXXXXXXnical assistance, up to the maximum assistance defined in Exhibit E, in the development of the Interfaced Product.

4.5.   REYNOLDS LOGO AND COMMUNICATION.  Upon XXXXXXXXXX's receipt of Certification, Reynolds will provide XXXXXXXXXX with a program logo, the standards for use of the logo, and an information kit that includes policies regarding communication. Policies provided to XXXXXXXXXX by Reynolds related to the program logo or communication are subject to change at Reynolds sole discretion and any violation of these policies will also be considered a violation of this Agreement.  In addition, Reynolds will place XXXXXXXXXX's information as described in Exhibit A on the Reynolds' website as

CONFIDENTIAL

REYCID0003655

a Reynolds' Certified Interfaced Product. XXXXXXXXXX shall have the right to display the program logo on marketing materials or websites for the Interfaced Product only. XXXXXXXXXX agrees to provide to Reynolds copies of marketing materials for the Interfaced Product for review prior to publication. Reynolds must review and approve all references to Reynolds or the Reynolds Certified Interface Program contained in press releases by XXXXXXXXXX, or any third parties acting on behalf of XXXXXXXXXX, before such information is published. Prior to Certification, XXXXXXXXXX is prohibited from claiming integration with the Reynolds System(s).

4.6.   XXXXXXXXXX ASSISTANCE. XXXXXXXXXX will provide appropriate support, maintenance and error correction services for the Interfaced Product as reasonably requested by Reynolds or as required in the end user agreement between XXXXXXXXXX and the Qualified End Users.

4.7.   DISTRIBUTOR(S) OF INTERFACED PRODUCT(S). During the Initial Term (and any applicable Renewal Term), XXXXXXXXXX may distribute the Interfaced Product through distributors. XXXXXXXXXX warrants that any distributor of the Interfaced Product on behalf of XXXXXXXXXX has entered into a written agreement with XXXXXXXXXX which binds the distributor to the same obligations as XXXXXXXXXX under this Agreement.

4.8.   ENDORSEMENT. Reynolds does not endorse, warrant, support, or certify any functionality, capabilities or any other aspects of the Interfaced Product.


5.  **TERM/TERMINATION**

5.1.   TERM. This Agreement and any license granted herein shall be for three (3) years after the Effective Date of this Agreement ("Initial Term"). This Agreement will renew automatically for additional one (1) year terms (each, a "Renewal Term") unless either party gives a notice of its intent not to renew at least sixty (60) days prior to the end of the Initial Term or the then applicable Renewal Term.

5.2.   TERMINATION FOR BREACH. If either party breaches any of the material provisions of this Agreement then the nondefaulting party may terminate this Agreement by written notice, unless the defaulting party will remedy such breach or begin a good faith effort to remedy the breach upon a mutually agreed upon time, within the period of fifteen (15) days after the said notice is delivered to the defaulting party.

5.3.   IMMEDIATE TERMINATION. Reynolds may, immediately upon written notice to XXXXXXXXXX, terminate this Agreement if XXXXXXXXXX (i) becomes insolvent, (ii) files or has filed against it and not dismissed within sixty (60) days, a proceeding under any federal or state insolvency, bankruptcy or other law for the relief of creditors, (iii) ceases or admits in writing its intention to cease the operation of its business in the ordinary course.

CONFIDENTIAL

5.4.   TERMINATION FOR INCOMPLETE INTERFACE(S).  XXXXXXXXXX may terminate this Agreement upon thirty (30) days prior written notice, without any further obligation, if Reynolds, after using commercially reasonable efforts, is unable to make the Interface(s) function in accordance with the documentation and agreed upon specifications. XXXXXXXXXX is responsible for payment of the Certification Process Fee(s) and any other fees that have been agreed between the parties up to the date of termination.

5.5.   TERMINATION FOR PARTIAL DEVELOPMENT.  Reynolds may, immediately upon written notice to XXXXXXXXXX, terminate this Agreement if XXXXXXXXXX fails to comply with the provisions set forth in Sections 2.3.1-2.3.4.  In the event of termination under this Section 5.5, XXXXXXXXXX is responsible for payment of the Certification Process Fee(s) and any other fees that have been agreed between the parties up to the date of termination.

5.6.   TERMINATION FOR FAILURE TO PAY.  Reynolds may, immediately upon written notice to XXXXXXXXXX, terminate this Agreement for failure of XXXXXXXXXX to pay any fees defined in Exhibit E, or any amounts invoiced for fees following notice and XXXXXXXXXX opportunity to cure in accordance with Section 2.4.3.

5.7.   MUTUAL TERMINATION.  Either party may terminate this Agreement at anytime with or without cause by giving the other party one hundred-eighty (180) days written notice of intent to terminate.

5.8.   WIND-DOWN.  If XXXXXXXXXX's Product has achieved Certification then upon termination of this Agreement, at Reynolds option, a wind-down period of not less than one month and not greater than one year may be invoked.  During the wind-down period the parties shall continue to perform under the terms of this Agreement, in effect at the time of termination, except for new installations.  New installations during the wind-down period must be mutually agreed to by both parties. At the conclusion of the wind-down period or immediately upon termination if Reynolds does not invoke the wind-down, XXXXXXXXXX must cease all use, distribution, and sublicensing of the Interface. XXXXXXXXXX is also responsible for payment to Reynolds of any positive difference between the Minimum Fees, prorated on a monthly basis to the end of the Initial Term (and any applicable Renewal Term), or if invoked, the end of the wind-down period, and the sum of Installation Fee(s) and Monthly Interface Fee(s) (or transaction fees, where applicable).

6.   **GENERAL**

6.1.   NOTICES.  With the exception of a notification of security breach as described in Section 2.5.4, all notices, requests and approvals required by this Agreement shall be (i) in writing, (ii) addressed to the parties as indicated below unless otherwise notified in writing of a change, and (iii) deemed to have been delivered either when personally delivered, sent by overnight courier, or, if sent by mail, in which event it shall be sent postage prepaid, certified, return receipt requested, thereof three (3) business days after mailing. The

CONFIDENTIAL

REYCID0003657

addresses of the parties are as follows:

| To XXXXXXXXXX: | To Reynolds: |
|---|---|
| | The Reynolds and Reynolds Company |
| _____ | One Reynolds Way |
| _____ | Kettering, OH 45430 |
| _____ | |
| Title: _____ | Title: VP, Data Services |
| | Copy to: Legal Department |

6.2.    AUDIT.  Reynolds will be entitled to request an audit of XXXXXXXXXX records that relate to the Interface or to the Interfaced Product(s) no more frequently than once per calendar year during the Initial Term (and any applicable Renewal Term) of this Agreement if in Reynolds' sole judgment reasonable cause exists.  Audits shall be conducted by an independent, third party auditor at any time upon fifteen (15) days written notice to XXXXXXXXXX.  Audits shall be conducted during normal business hours in the offices of XXXXXXXXXX.  XXXXXXXXXX shall have the right to approve the third party auditor; however, such approval shall not be unreasonably withheld.  XXXXXXXXXX shall retain all records associated with this Agreement for three (3) years following termination of this Agreement and conclusion of wind-down period, if any.  In the event that an audit reveals any issue that amounts to a material breach of the Agreement, or an under payment by XXXXXXXXXX to Reynolds of five percent (5%) or more within any twelve month period, XXXXXXXXXX shall immediately pay (i) the amount due for the audit period, (ii) a service charge equal to one and one-half percent (1.5%) per month on the outstanding balance compounded monthly since the date of each monthly under payment and (iii) the actual cost of the audit including auditor and reasonable expenses.  Notwithstanding the foregoing, XXXXXXXXXX shall not be liable for amounts specified in clauses (ii) and (iii) above if an under-payment by XXXXXXXXXX was due to Reynolds failing to properly invoice XXXXXXXXXX.  The third party auditor shall sign a confidentiality agreement prior to commencing the audit, agreeing to keep confidential any information obtained by such examination, provided however that the auditor can disclose the details to Reynolds of any non-compliance with this Agreement.

6.3.    NON-EXCLUSIVE.  This Agreement is non-exclusive and does not limit Reynolds' right to otherwise license, develop, market or distribute the Interface(s).

6.4.    ASSIGNMENT.  This Agreement may be assigned by XXXXXXXXXX to XXXXXXXXXX's parent, or wholly owned subsidiary or affiliate.  In addition, XXXXXXXXXX may assign its rights hereunder upon providing written notice to Reynolds if a person or entity (or group of persons or entities as defined for purposes of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder) acquires a controlling interest in XXXXXXXXXX after the Effective Date of this Agreement; provided,

CONFIDENTIAL

REYCID0003658

however, that in such event Reynolds shall have the right to immediately terminate this Agreement upon providing written notice within thirty (30) days of Reynolds receipt of notice of the assignment to the successor entity. Any other assignment by XXXXXXXXXXX must be consented to by Reynolds. Reynolds may assign or sublicense its rights without restriction.

6.5.    INDEMNITY. Each party shall be responsible for and shall hold the other party harmless from all expenses, including legal fees and expenses, which arise from its performance hereunder and which are for actual or alleged damage to any property, except to the extent that such expenses are attributable to the other party's negligence or willful misconduct.

XXXXXXXXXX shall defend, indemnify and hold harmless Reynolds, its officers, directors, and employees from and against any and all damages and costs (including penalties, interest, and reasonable attorneys' fees and expenses), arising from (i) XXXXXXXXXX's failure of the Interfaced Product to perform as warranted to any Qualified End User; (ii) any violation by XXXXXXXXXX of this Agreement; (iii) any violation or infringement by XXXXXXXXXX of any party's rights or interests; (iv) violation by XXXXXXXXXX of any privacy statute or regulation; (v) the failure of XXXXXXXXXX to obtain the necessary data rights and consents to offer the Interfaced Product and Interface, including all required notices to Qualified End Users and individual retail customers and all required consents from customers and consumers, and that XXXXXXXXXX has all right and authority required to collect, disclose and use such information; and/or (vi) failure to pay taxes or contributions deemed appropriate by a taxing authority.

Reynolds shall defend, indemnify and hold harmless XXXXXXXXXX, its officers, directors, and employees from and against any and all damages and costs (including penalties, interest, reasonable attorneys' fees and expenses) which it may incur with respect to (i) any infringement of any patent, trademark, copyright or any other proprietary right of a third party, based upon any use of the Reynolds' Interface; (ii) any action by a Qualified End User arising out of such Qualified End User's use solely of the Reynolds' Interface, and any damage caused to any Reynolds System (including any damage caused to any software or database) by a Qualified End User's use solely of the Interface; and (iii) any action arising out of Reynolds' performance or failure to perform under this Agreement.

In any case arising under this Section 6.5: (i) the Indemnified Party (Reynolds or XXXXXXXXXX, as applicable) shall provide the Indemnifying Party (Reynolds or XXXXXXXXXX, as applicable) with prompt written notice of any action, claim or threat of suit; (ii) the Indemnified Party shall permit the Indemnifying Party the opportunity to take over, settle or defend such action, claim or suit with counsel chosen by the Indemnifying Party (who will be reasonably acceptable to the Indemnified Party), provided, however, that the Indemnifying Party shall not enter into any settlement or compromise of any such claim without the Indemnified Party's prior written consent, which consent will not be unreasonably withheld; (iii) the Indemnified Party shall cooperate fully with Indemnifying Party in connection with such action, claim or suit at Indemnifying Party's expense. The terms of this Section 6.5 shall survive termination of this Agreement.

CONFIDENTIAL

6.6.  WARRANTIES. XXXXXXXXXX warrants to Reynolds that: (i) the Interfaced Product and subsequent new releases of the Interfaced Product will be free of material defects, changes, revisions or errors that prevent the Interfaced Product from operating with the Reynolds System; (ii) XXXXXXXXXX has the right and power to enter into this Agreement and to grant to Qualified End Users all of the rights and licenses in the Interfaced Product as set forth in this Agreement; (iii) XXXXXXXXXX has obtained or shall obtain all necessary permission and licenses regarding data to offer the Interfaced Product; (iv) XXXXXXXXXX and the Interfaced Product comply with all applicable laws, including all laws regarding data privacy and security; (v) XXXXXXXXXX shall provide all required notices to Qualified End Users and consumers and shall obtain all required consents from Qualified End Users and consumers, (vi) XXXXXXXXXX has all right and authority required to collect, disclose and use such information as described in Exhibit A; (vii) the Reynolds System Output of a Qualified End User will only be accessed by or transferred to XXXXXXXXXX or a third party in accordance with the express written consent of the Qualified End User and in accordance with the terms of this Agreement; and (viii) the Interfaced Product will operate in a manner consistent with the requirements of Interface and other Reynolds System software and databases and will not interfere with, damage or delay the operation of the Interface or other Reynolds System software or databases.

Reynolds warrants to XXXXXXXXXX that: (i) the Interface will operate in a manner consistent with the written specifications provided to XXXXXXXXXX; (ii) Reynolds has the right and power to enter into this Agreement and to grant to XXXXXXXXXX all of the rights and licenses in the Interface as set forth in this Agreement; (iii) Reynolds has obtained or shall obtain all necessary permission and licenses regarding data to offer the Interface; (iv) Reynolds and the Interface complies with all applicable laws, including all laws regarding data privacy and security.

NO OTHER WARRANTIES. EXCEPT AS SPECIFIED HEREIN, REYNOLDS MAKES NO WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, REGARDING THE INTERFACE, THE REYNOLDS SYSTEM OR ANYTHING ELSE AND HEREBY EXPRESSLY DISCLAIMS ALL OTHER EXPRESS AND IMPLIED WARRANTIES AND CONDITIONS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. REYNOLDS DOES NOT WARRANT THE OPERATION OF THE INTERFACE WILL BE UNINTERRUPTED OR ERROR FREE.

6.7.  DAMAGES.

6.7.1. NO CONSEQUENTIAL DAMAGES. EXCEPT FOR BREACH OF CONFIDENTIALITY AND/OR INTELLECTUAL PROPERTY INDEMNIFICATION, NO PARTY TO THIS AGREEMENT WILL HAVE LIABILITY TO THE OTHER PARTY OR ANY THIRD PARTY FOR SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, AND CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, GOODWILL OR SAVINGS, DOWNTIME, DAMAGE TO OR REPLACEMENT OF INTERFACE AND DATA) ARISING FROM CLAIMS BASED IN WARRANTY, CONTRACT,

CONFIDENTIAL

REYCID0003660

TORT (INCLUDING NEGLIGENCE), STRICT TORT, OR OTHERWISE, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH CLAIM OR DAMAGE.

6.7.2. LIQUIDATED DAMAGES.  THE PARTIES AGREE THAT, EXCEPT FOR BREACHES OF CONFIDENTIALITY, PERSONAL INJURY, OR REAL PROPERTY DAMAGES, AND XXXXXXXXXX'S INDEMNIFICATION OBLIGATIONS PURSUANT TO THIS AGREEMENT, IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ASCERTAIN THE AMOUNT OF ACTUAL DAMAGES CAUSED BY A MATERIAL BREACH OF THIS AGREEMENT BY XXXXXXXXXX.  THEREFORE, THE PARTIES AGREE THAT IN THE EVENT OF A MATERIAL BREACH OF THIS AGREEMENT BY XXXXXXXXXX, THAT XXXXXXXXXX SHALL PAY TO REYNOLDS, AS LIQUIDATED DAMAGES, THE SUM OF ONE HUNDRED THOUSAND DOLLARS ($100,000.00) FOR EACH MATERIAL BREACH OF THIS AGREEMENT.  FOR THE AVOIDANCE OF DOUBT, FOR PURPOSES OF CALCULATING SUCH LIQUIDATED DAMAGES, A MATERIAL BREACH SHALL MEAN A SINGLE OCCURENCE OR SERIES OF RELATED OCCURENCES (FOR EXAMPLE, LETTERS SENT TO MULTIPLE DEALERS IN VIOLATION OF SECTION 2.8 OF THIS AGREEMENT WOULD BE A SINGLE MATERIAL BREACH FOR PURPOSES OF CALCULATING LIQUIDATED DAMAGES, AS OPPOSED TO MULTIPLE MATERIAL BREACHES). EXCLUDING THE EXCEPTIONS SET FORTH ABOVE, THE LIQUIDATED DAMAGES ABOVE SHALL BE REYNOLDS SOLE AND EXCLUSIVE MONETARY REMEDY FOR MATERIAL BREACHES OF THIS AGREEMENT; PROVIDED THAT NOTHING IN THIS SECTION LIMITS REYNOLDS' RIGHT TO OBTAIN INJUNCTIVE AND OTHER EQUITABLE RELIEF AS MAY BE APPROPRIATE.

6.7.3. DIRECT DAMAGES.  WITH THE EXCEPTION OF BREACH OF CONFIDENTIALITY, INTELLECTUAL PROPERTY INDEMNIFICATION, PERSONAL INJURY OR REAL PROPERTY DAMAGES, EACH OF WHICH HAS NO LIMITATION, REYNOLDS' LIABILITY FOR DIRECT DAMAGES TO XXXXXXXXXX WILL NOT EXCEED THE ACTUAL AMOUNT PAID BY XXXXXXXXXX TO REYNOLDS UNDER THIS AGREEMENT.

6.8. EXCUSE FOR NONPERFORMANCE.  Reynolds shall not be held responsible for any delay or failure to perform hereunder where such delay or failure is due to any cause beyond Reynolds' direct control including, but not limited to, Acts of God, fire, explosion, flood, strikes or other labor dispute, riot, communications or power supply failure, delay in delivery, failure or malfunction of equipment, lack of or inability to obtain data, or any other causes, contingencies or circumstances beyond Reynolds' control which prevent or hinder performance hereunder or make such performance hereunder impracticable.  Should Reynolds be delayed or unable to perform hereunder where such delay or inability to perform is due to any cause described in this Section 6.8, Reynolds will notify XXXXXXXXXX and

CONFIDENTIAL

make reasonable efforts to perform hereunder.

6.9.   XXXXXXXXXX ACKNOWLEDGEMENT.  XXXXXXXXXX acknowledges that Reynolds may now or in the future provide products and services that may be similar or the same as the Interfaced Product.

6.10.   USE OF DATA.  XXXXXXXXXX must describe in Exhibit A all data sets and uses of the data, which shall be subject to Reynolds' acceptance, including: the purposes of the data sets; the identities or categories of any other parties to whom XXXXXXXXXX may transfer the data; and XXXXXXXXXX's or any other party's uses of the data.  Other than as specified in Exhibit A, XXXXXXXXXX is prohibited from transferring the data to another party; or re-selling the data.  XXXXXXXXXX understands and agrees that Reynolds' acceptance of XXXXXXXXXX's activities described in Exhibit A shall not constitute Reynolds' endorsement or warranty of or acceptance of legal consequences for XXXXXXXXXX's services, and XXXXXXXXXX shall not make representations to the contrary.

6.11.   DATA PRIVACY.  To the extent that any data from or about an individual retail customer of a Qualified End User delivered by Reynolds to XXXXXXXXXX under this Agreement contains "non-public personal information," as such term is defined in Title V of the Gramm-Leach-Bliley Act and its implementing regulations (the "GLBA"), or the Personal Information Protection and Electronic Documents Act of Canada ("PIPEDA"),  each party agrees to comply with all legal obligations relating to the privacy and security of such "non-public personal information" under the GLBA, the FTC regulations promulgated pursuant thereto, any state statutes adopted to comply therewith and any state regulations promulgated under such state statutes or in compliance with the GLBA, and the PIPEDA and laws of any province of Canada in compliance with PIPEDA.

XXXXXXXXXX acknowledges and agrees that it will comply with all of its obligations with respect to the privacy, security and integrity of data collected from a Qualified End User under the agreement between XXXXXXXXXX and such Qualified End User.

Reynolds shall implement and maintain appropriate administrative, XXXXXXXXXXnical and physical safeguards reasonably designed to protect against unauthorized access to, use of or disclosure of the data delivered by Reynolds pursuant to this Agreement, including data from or about an individual retail customer of a Qualified End User; provided that Reynolds' obligations with respect to data collected from a Qualified End User shall cease once Reynolds has transmitted such data to XXXXXXXXXX and received confirmation from XXXXXXXXXX that such data was received by XXXXXXXXXX.

Each party agrees to keep data from or about an individual retail customer of a Qualified End User confidential pursuant to the terms of this Agreement.

6.12.   DISPUTE RESOLUTION PROCEDURES.  In the event of any dispute, claim, question or disagreement arising from or relating to this Agreement or the alleged breach thereof, the parties shall use their best efforts to consensually settle such dispute, claim, question or disagreement.  To this effect, they shall consult and negotiate with each other in good faith,

CONFIDENTIAL

REYCID0003662

and, recognizing their mutual interests, attempt to reach a just and equitable resolution satisfactory to both parties.  If they do not reach such a resolution within a period of sixty (60) days, then, upon notice by either party to the other, all such disputes, claims, questions or disagreements shall be finally settled by binding arbitration, before a single arbitrator, administered by the American Arbitration Association (the "AAA") in accordance with the provisions of its Commercial Arbitration Rules.  The location where the arbitration will be held, the individual who will serve as the arbitrator, and the rules under which the arbitration will be conducted will be determined by mutual agreement of the parties.  If the parties are unable to agree on any such matters, then those matters upon which the parties are unable to agree will be determined by the AAA in its sole and absolute discretion.  The final decision of the arbitrator may be reduced to, and entered as, a judgment in any court of competent jurisdiction.  Notwithstanding, however, anything to the contrary contained in this Section 6.12 or elsewhere in this Agreement, any claim for equitable relief only may be brought at any time in any court of competent jurisdiction.

6.13.  **RESPECT FOR EMPLOYEES.**  Reynolds and XXXXXXXXXX acknowledge and agree that the other party's personnel have been acquired and trained by said party at considerable expense. Throughout the Initial Term (and any applicable Renewal Term) and for a period of one (1) year following the expiration or termination of this Agreement, neither Reynolds nor XXXXXXXXXX shall knowingly solicit for employment or employ any employee of the other party that has been directly involved in the negotiation or performance of this Agreement until the expiration of one (1) year following such employee's termination of employment with the other party.  If either party fails to abide by the restrictions contained in this section, then the non-abiding party agrees to pay to the other party a placement fee of one hundred percent (100%) of the former employee's total gross earnings during the employee's last twelve (12) months of employment by the former employer.

6.14.  **GOVERNING LAW.**  This Agreement will be governed by the substantive laws of the State of Ohio, regardless of conflict of laws principles.  The parties submit to the jurisdiction of the state and federal courts in the State of Ohio.  The section headings are for convenience only and will not be used in interpretation of this Agreement.

6.15.  **ENTIRE AGREEMENT.**  This Agreement, together with the Exhibits identified herein, incorporated by reference and listed below, constitutes the entire agreement between the parties.  Any modification to this Agreement must be by written amendment signed by authorized representatives of each party.
6.15.1.  Exhibit A – XXXXXXXXXX Product(s) Submitted for Certification
6.15.2.  Exhibit B – XXXXXXXXXX Product Description(s)
6.15.3.  Exhibit C – Qualified End User License Agreement Required Provisions
6.15.4.  Exhibit D – Form of XXXXXXXXXX Qualified End User License Agreement and/or Data Authorization Form.
6.15.5.  Exhibit E – Fees

6.16.  **SEVERABILITY.**  If any of the provisions or portions of this Agreement are determined to be invalid or unenforceable, such invalid provisions or invalid portions shall be severed from

CONFIDENTIAL

this Agreement, and all other provisions hereof shall remain in full force and effect.

6.17. RELATIONSHIP OF THE PARTIES. This Agreement will not be deemed or construed to create any partnership, joint venture, fiduciary, employment or agency relationship between the parties. Nothing in this Agreement will be construed to constitute or appoint either party as the agent or representative of the other party for any purpose whatsoever, or to grant to either party any right or authority to assume or create any obligation or responsibility, express or implied, for or on behalf of or in the name of the other, or to bind the other in any way or manner whatsoever.

An authorized representative of each party has executed this Agreement as of the date first written above.


**XXXXXXXXXX**                                    **The Reynolds and Reynolds Company**

By: _____       By: _____

_____              Robert G. Schaefer, Vice President, Data Services
           Printed Name and Title                                        Printed Name and Title

Date: _____      Date: _____

CONFIDENTIAL

REYCID0003664

## EXHIBIT A

## XXXXXXXXXX PRODUCT(S) SUBMITTED FOR CERTIFICATION

**Name of Product(s):** _____

**Description of Product(s):** _____

_____

Please list all Products with a brief description and prepare a complete description of the Product(s) to be included in Exhibit B.

**Current release version and release date for Product(s):**

_____

| Reynolds System(s): | Territory: |
|---|---|
| ERA_____ | ☒ U.S.    ☐ Canada |
| POWER_____ | ☒ U.S. |

**Interface(s) to be provided by Reynolds:**

| Name | Frequency | Reynolds Input / Output: | |
|---|---|---|---|
| Insert/Update Customer | On-Demand | ☒ Input | ☐ Output |
| Search Customer | On-Demand | ☐ Input | ☒ Output |
| Publish Vehicle Inventory | Event Triggered | ☐ Input | ☒ Output |
| Publish F&I Deal History with Aftermarket | Event Triggered | ☐ Input | ☒ Output |
| Publish F&I Lender | Event Triggered | ☐ Input | ☒ Output |
| Insert F&I Deal – Start | On-Demand | ☒ Input | ☐ Output |
| Publish Repair Order | Event Triggered | ☐ Input | ☒ Output |
| Publish Vehicle Sales | Event Triggered | ☐ Input | ☒ Output |

CONFIDENTIAL

REYCID0003665

State the purpose and operating environment of the Interface(s): _____

_____

_____

Below is a description of XXXXXXXXXX's existing uncertified interfaces with Reynolds Systems. Continued use of these interfaces by XXXXXXXXXX will not constitute a violation of Section 2.5.3, pending delivery of a similar Interface(s) by Reynolds to XXXXXXXXXX for implementation as provided for in this Agreement. Upon receipt of Certification, XXXXXXXXXX will follow the terms of this Agreement and cease use of the uncertified interface(s) within sixty (60) days.

_____

_____

_____

CONFIDENTIAL

XXXXXXXXXX information to be used to brand, display, and advertise XXXXXXXXXX as a vendor in the RCI Program:
(To be provided prior to Certification)

☐ LOGO –

☐ Website URL –

☐ Trade Name –

☐ Trade Mark –

☐ Service Mark –

☐ Testimonial Quote –

If marked by an "X" above, Reynolds reserves the right to use any or all of this information at Reynolds sole discretion.

Interface Specifications:  (List specifications including version and date of document)

CONFIDENTIAL

REYCID0003667

# EXHIBIT B

## XXXXXXXXXX PRODUCT DESCRIPTION(S)

Insert extensive product description here

CONFIDENTIAL

REYCID0003668

**EXHIBIT C**

**QUALIFIED END USER LICENSE AGREEMENT REQUIRED PROVISIONS**

The Interface may be made available by XXXXXXXXXX to Qualified End User(s) only pursuant to an End User License Agreement that, at a minimum, contains provisions that:

C.1.    Authorize the operation of the Interface only with the Interfaced Product and only for each license fee that is paid.

C.2.    Prohibit copying, disassembly, decompilation, and/or reverse engineering of the Interfaced Product and the Interface;

C.3.    Reserve to XXXXXXXXXX and Reynolds all rights, title and interest in and to Interfaced Product and the Interface;

C.4.    Prohibit transfer of the Interfaced Product and the Interface to third parties and prohibit lending, leasing, sublicensing or pledging of the Interfaced Product and the Interface by Qualified End User and prohibit service bureau or outsourcing uses of the Interfaced Product and Interface;

C.5.    Include a statement substantially similar to the following:  "Product(s) provided under this Agreement contain portions of program code owned by third party licensors and such licensors will be entitled to enforce this License as an intended third party beneficiary and the obligations of the licensee cannot be modified or terminated without the written consent of such third party licensors.  Licensee shall not disclose any passwords or other security information that are related to the Interface or other software licensed by this License.  ALL LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING (WITHOUT LIMITATION) ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  In no event will any licensor be liable for indirect, incidental, consequential or exemplary damages arising from use, or inability to use Interface(s), even if they knew of the possibility of such damages.

C.6.    The End User license agreement and all rights to use or maintain possession of the Interfaced Product and the Interface will terminate immediately upon the Qualified End User's breach of any material provision of such agreement.

C.7.    The End User license agreement must prohibit the Qualified End User from using the Interfaced Product and Interface outside the definitions and process defined in Exhibit A.

C.8.    Include provisions substantially similar to the following:

Each party will comply with all applicable legal obligations relating to privacy, security, integrity, and confidentiality of data collected from a Qualified End User, except for aggregated data that does not enable identification of the Qualified End User's individual retail customers and any other extracted data ("Customer Information"), which obligations may

CONFIDENTIAL

REYCID0003669

include the Gramm-Leach-Bliley Act and its implementing regulations ("GLBA"), the Personal Information Protection and Electronic Documents Act of Canada ("PIPEDA"), the laws of any state of the United States, and the laws of any province of Canada.

Each party will, at a minimum, implement and maintain appropriate administrative, XXXXXXXXXXnical, and physical safeguards reasonably designed to:  (a) ensure against any anticipated threats or hazards to the security or integrity of the Customer Information; and (b) protect against unauthorized access to or use of the Customer Information that could result in substantial harm or inconvenience to the Qualified End User or the individual who is the subject of Customer Information.

Each party may disclose Customer Information, when required, pursuant to any federal or state law or regulation or rules or regulations of any governmental agency.  These provisions shall apply during the term and after the termination of the End User License Agreement.

C.9.   Include a statement substantially similar to the following:

By signing this Agreement, you are providing your dealer management system ("DMS") provider with your written consent to permit us to access data on your DMS system.  Such access is in order for us to provide the services contracted for hereunder, and we will not use your data for any other purposes.  NOTICE TO NORTH CAROLINA DEALERS:  THIS END USER LICENSE AGREEMENT RELATES TO THE TRANSFER AND ACCESSING OF CONFIDENTIAL INFORMATION AND CONSUMER RELATED DATA.

CONFIDENTIAL

REYCID0003670

**EXHIBIT D**

**FORM OF XXXXXXXXXX QUALIFIED END USER LICENSE AGREEMENT AND/OR DATA AUTHORIZATION FORM**



CONFIDENTIAL

**EXHIBIT E**

**FEES**

**Certification Process Fee:** $ _____ (USD)
This fee will be due upon invoice from Reynolds.

**(Per Qualified End User) Installation Fee(s):**
      Existing Qualified End Users as of the Effective Date $\_\_\_\_\_ (USD) & $ \_\_\_\_\_ (CAD)
      New Qualified End Users as of the Effective Date $\_\_\_\_\_ (USD) & $\_\_\_\_\_ (CAD)

This one-time setup fee is payable within the first month after submission of an order for each
Qualified End User to whom XXXXXXXXXX's Interfaced Product is sold, beginning on the Effective
Date of this Agreement.  XXXXXXXXXX will pay this fee directly on behalf of Qualified End Users.

Within seven (7) days of the Effective Date of this Agreement, XXXXXXXXXX will provide
Reynolds a comprehensive list of the existing Qualified End Users with whom XXXXXXXXXX is
already providing services and were installed prior to the Effective Date of this Agreement.  This list
will include, at a minimum, the name, address, phone number, and installation date of each Qualified
End User.  After Certification, any integration requests by XXXXXXXXXX for Qualified End Users
matching names on this list will be installed at the Installation Fee for Existing Dealers listed above.
Any integration requests by XXXXXXXXXX for Qualified End Users not listed will be invoiced for
the Installation Fee for New Qualified End Users listed above.

Fees for pre-load files delivered at initial installation are included in the (Per Qualified End User)
Installation Fees for New Qualified End Users.  Requests for Reynolds to send replacement pre-load
files for a previously completed RCI order will be assessed a fee of $125.00 (USD) for each
replacement pre-load file.

**(Per Qualified End User) Monthly Interface Fee(s):** $\_\_\_\_\_ (USD) & $\_\_\_\_\_ (CAD)
This recurring monthly fee is payable beginning the first month after submission of an order for each
Qualified End User to whom XXXXXXXXXX's Interfaced Product is sold, beginning on the Effective
Date of this Agreement.  XXXXXXXXXX will pay this fee directly on behalf of Qualified End Users.

**Minimum Fees:**  For each twelve (12) month period following Certification of the Interfaced Product,
XXXXXXXXXX's total (Per Qualified End User) Installation Fee and (Per Qualified End User)
Monthly Interface Fee paid to Reynolds will be no less than $_____ (USD) or $_____ (CAD) (the
"Minimum Fees").  The first twelve (12) month period begins upon Certification of the Interfaced
Product.  If XXXXXXXXXX's total (Per Qualified End User) Installation and (Per Qualified End
User) Monthly Interface Fee(s) paid to Reynolds do not meet the Minimum Fees at the end of each
given twelve (12) month period thereafter, then XXXXXXXXXX will pay Reynolds the difference

CONFIDENTIAL

REYCID0003672

between the Minimum Fees and the sum of (Per Qualified End User) Installation and (Per Qualified End User) Monthly Interface Fee(s) paid to Reynolds.

**Maximum Assistance:**  Reynolds will provide XXXXXXXXXX a maximum of <u>40</u> hours of support during the initial implementation and certification process for the Interfaced Product(s) defined in this Agreement. If Reynolds exceeds these hours during the implementation and certification process, Reynolds will notify XXXXXXXXXX in writing. If XXXXXXXXXX would like Reynolds to exceed the Maximum Assistance, XXXXXXXXXX will request in writing support for said services. In Reynolds sole discretion Reynolds may decline and/or accept the request and will charge XXXXXXXXXX per hour at an hourly rate of <u>$250</u> per hour (USD).

**Non-Refundable Re-Certification Fee:**      $_____ (USD)
As described in Sections 3.5.1.1 – 3.5.1.4, this Re-Certification Fee is payable when XXXXXXXXXX releases a major release of their already-Certified Interfaced Product and/or if twenty-four (24) months have expired since the last Certification or Re-Certification of the Interfaced Product has occurred.

CONFIDENTIAL

REYCID0003673

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation,<br><br>      Plaintiff,<br><br>  v.<br><br>Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation,<br><br>      Defendants. | Case No. 2:19-cv-04849-GMS |

**DECLARATION OF PROFESSOR PETER N. GOLDER, PH.D.**
**AUGUST 22, 2019**

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................... 1

    A.   Qualifications ................................................................................................. 1

    B.   Assignment and Background ......................................................................... 2

    C.   Materials Relied Upon and Compensation ................................................... 4

II.  Summary of Opinions ............................................................................................ 5

III. CDK's and Reynolds's Corporate Reputations and Brand Equities are Important Intangible Assets, Which Take Considerable Time, Effort, and Investment to Develop ....................................................................................... 6

    A.   Strong Corporate Reputation and Brand Equity Can Provide a Competitive Advantage and Generate Economic Benefits ............................ 6

    B.   Developing CDK's and Reynolds's Corporate Reputations and Brand Equities Required Significant Investment and Commitment throughout the Companies ................................................................................................ 7

IV.  CDK's and Reynolds's Corporate Reputations and Brand Equities Would Be Irreparably Harmed by a Material Public Data Breach, and the Harm Would Be Extremely Difficult, If Not Impossible, to Reliably Measure and to Repair ............................................................................................. 11

    A.   A Material Public Data Breach Would Harm CDK's and Reynolds's Corporate Reputations and Brand Equities ............................................... 12

    B.   A Material Public Data Breach Would Cause CDK and Reynolds to Lose Existing and Potential Customers ...................................................... 14

    C.   Reputational Harm Resulting from a Material Public Data Breach is Extremely Difficult, If Not Impossible, to Reliably Measure or Repair ................... 16

# I.    INTRODUCTION

## A.    Qualifications

1. My name is Peter Golder. I am a professor of marketing at the Tuck School of Business at Dartmouth College in Hanover, New Hampshire. In 2014, I was appointed by Dartmouth's president to be one of seven founding faculty members in Dartmouth's Society of Fellows. From 2015 to 2018, I served as area coordinator of the Tuck School's marketing faculty group. In 2015, I became co-editor-in-chief of the academic journal *Marketing Letters*. In 2017, I became faculty director of the Tuck School's First-Year Project course, and, in 2018, I became faculty director of the Tuck School's global and experiential courses. I am a former professor of marketing and coordinator of the marketing department doctoral program at the Stern School of Business at New York University in New York, New York.

2. I hold a Ph.D. in Business Administration (Marketing) from the University of Southern California and a B.S. in Mechanical Engineering from the University of Pennsylvania.

3. My research experience and interests include branding, product features and customer perceptions associated with quality, innovation, market entry strategies, new product development and marketing, historical analysis of the sources of market leadership, and global marketing. I have employed a variety of research methods in addressing these topics, including case studies, historical method, and econometric analysis.

4. I teach or have taught classes for MBA candidates including marketing, new product marketing, creativity and design, and global marketing, and I regularly present to academic and professional audiences on these and other related topics. I have written more than thirty publications appearing in academic journals, as book chapters, and in the media, including publications in leading marketing and business journals such as *Journal of Marketing*, *Journal of Marketing Research*, *Marketing Science*, and *Harvard Business*

*Review*. I currently serve on the editorial boards of *Journal of Marketing*, *International Journal of Research in Marketing*, and *Marketing Science* and serve as a peer reviewer of articles submitted to these journals and other academic journals. My research and contributions to the field of marketing have been recognized with many best paper and best book awards, and my research has been featured in the media, including *The Wall Street Journal*, *The Economist*, and *Advertising Age*. I have also consulted on several marketing-related topics for litigation, including irreparable harm, trademark and trade dress issues, advertising, warning labels, and transfer pricing.

5. A copy of my curriculum vitae, which provides additional detail on my education, qualifications, and professional affiliations, as well as a list of the publications I have authored, is attached to this report as **Appendix A**. A list of the cases in which I have provided expert testimony during the past four years is attached as **Appendix B**.

### B.   Assignment and Background

#### i.   Assignment

6. I have been asked by Counsel for CDK Global, LLC ("CDK") and Counsel for the Reynolds and Reynolds Company ("Reynolds") to offer my expert opinions regarding the impact on Plaintiffs' corporate reputations and brand equities that may result from a material public data security breach, which Plaintiffs assert they are at an increased risk of suffering following the passage of Arizona House Bill 2418 ("the DMS Law").[1] While I understand that there may be other potential harms resulting from the DMS Law, I have been asked to focus specifically on their reputational harm in the event of a material

---

[1]   Complaint, *CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation v. Mark Brnovich, Attorney General of the State of Arizona and John S. Halikowski, Director of the Arizona Department of Transportation*, Case No. 2:19-cv-04849-GMS, July 29, 2019 ("Complaint"), ¶ 8; Declaration of Kelly Hall, *CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation v. Mark Brnovich, Attorney General of the State of Arizona and John S. Halikowski, Director of the Arizona Department of Transportation*, Case No. 2:19-cv-04849-GMS, August 22, 2019 ("Hall Declaration"), ¶¶ 39-40.

public data breach (i.e., a data breach with a noticeable impact — for example, one affecting a large number of records or affecting particularly sensitive data — that is publicly disclosed to customers.) Other harms are outside the scope of my assignment.

ii.   *Background*

7.   Plaintiffs CDK and Reynolds are computer software and information technology companies serving the automotive industry by selling and servicing software known as Dealer Management Systems ("DMSs").[2] These systems are licensed to automotive dealers to help manage a variety of business operations, such as "accounting, sales, service, finance, [and] payroll."[3] As part of the processes needed to perform their core functions, DMSs house a variety of "highly sensitive and/or proprietary material from automotive dealerships, their customers, car manufacturers, application software providers, banks, credit bureaus, other financial institutions, and the DMS providers themselves."[4] Both CDK and Reynolds currently provide "monitored means" for third-party application providers to integrate with their DMSs,[5] but Plaintiffs contend that the DMS Law would require CDK, Reynolds, and other DMS providers to allow third parties authorized solely by automotive dealers — so-called "authorized integrator" companies

---

[2]   Complaint, ¶ 8.

[3]   Complaint, ¶ 8.

[4]   Complaint, ¶ 8. Such data can include, for example, automotive dealership information such as "financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, [and] vehicle information"; consumer information such as "driver's license and Social Security numbers, home address, email, phone numbers, and bank or other financial information"; car manufacturer information such as "prices and part numbers for replacement parts, labor rates, and rebate, incentive, and warranty information"; financial institution information such as data for conducting credit checks; and the DMS provider's own data such as "forms, accounting rules, tax tables, [and] service pricing guides." Complaint, ¶¶ 41, 6, 42. According to the DMS Law, the data includes "protected dealer data," which is defined as any "personal, financial or other data relating to a consumer [...], motor vehicle diagnostic data [...], [and] other data that relates to a dealer's business operators," as well as "required manufacturer data," which means "data that is required to be obtained by the manufacturer under federal or state law or to complete or verify a transaction between the dealer and the manufacturer." House Bill 2418, 54th Legislature, 1st Reg. Sess. (Ariz. 2019), ("The DMS Law"), pp. 1:42-45, 2:1-11.

[5]   Complaint, ¶ 15.

— access to the DMS providers' respective DMSs.[6] Plaintiffs assert that the inability of CDK, Reynolds, and other DMS providers to authorize potential users and evaluate and minimize risk on a case-by-case basis or otherwise provide oversight of data security measures increases the risk of a data breach.[7] I understand from Plaintiffs' complaint that if the DMS Law were enforced, the data stored or processed on any DMS will be placed "at great risk."[8]

### C.    Materials Relied Upon and Compensation

8.   In the course of my work, I drew on my expertise and experience in marketing developed over the past several decades. I reviewed the publicly-filed complaint, certain academic publications and textbooks, press articles, and other publicly available materials, as well as certain corporate records created and maintained by Plaintiffs in the ordinary course of business. A complete list of the materials I have relied upon for this assignment is included in **Appendix C**. I reserve the right to review any additional documents that may be produced in this matter.

9.   I am being compensated for my work in this case at my standard rate of $850 per hour. I have been assisted in this matter by staff of Analysis Group, Inc. ("Analysis Group"), who worked under my direction and supervision. I also receive compensation based on the fees charged by Analysis Group. My compensation is not contingent on the nature of my findings or on the outcome of this litigation.

---

[6]   The DMS Law, p. 5:17-29. According to the DMS Law, "authorized integrator" means a third-party with whom a dealer enters into a contractual relationship to perform a specific function for a dealer that allows the third-party to access protected dealer data or to write data to a dealer data system, or both, to carry out the specified function. The DMS Law, 1:7-11. Currently, for example, CDK itself has a Partner Program which allows certain third-parties such as TrueCar, a "third-party marketing website [that] generates sales leads for dealerships" to securely integrate with CDK's DMS to "access sales transaction data." Complaint, ¶ 97. Under the DMS Law, the DMS providers will be required to allow access to any third parties "that the dealer wishes to be an authorized integrator." The DMS Law, pp. 3:1-45, 4:1-7.

[7]   Hall Declaration, ¶¶ 39-40.

[8]   Complaint, ¶ 16.

4

## II.    SUMMARY OF OPINIONS

10. Based on my review and consideration of the information available to me in this matter, and drawing upon my experience and expertise in the field of marketing, including branding, I have reached the following opinions:

   a.  CDK's and Reynolds's corporate reputations and brand equities are important intangible assets, which take considerable time, effort, and expense to develop. To that end, CDK and Reynolds have developed their respective corporate reputations and brand equities with significant investment and commitment throughout their companies. Both companies have specifically invested in developing reputations for strong and reliable data security. Reynolds has focused on building its reputation for data security for two decades with regular software and policy updates for data security.[9] CDK — both as a former division of Automatic Data Processing, Inc. ("ADP")[10] and as a stand-alone company — has undertaken an effort to emphasize data security in marketing its capabilities to automotive dealers.

   b.  If a material public data breach were to occur, CDK's and Reynolds's corporate reputations and brand equities associated with data security would be irreparably harmed. Not only would a material public data breach harm CDK's and Reynolds's corporate reputations and brand equities directly, but it likely would also cause them to lose existing and potential customers (i.e., automotive dealerships). The reputational harm that would result from a material public data breach would be extremely difficult, if not impossible, to reliably measure and to repair.

---

[9]   Reynolds has been building this reputation since at least 1999 with regular software and policy updates for data security, such as providing encryption in online applications in 1999; implementing a system to allow dealers to see third-party access to their systems via modems in 2006; removing unauthorized third-party application files in 2008; and implementing security monitoring in 2016. "ERA Data Management Milestones," *Reynolds & Reynolds*, 2016.

[10]   "ADP Completes Spinoff of CDK Global," *ADP*, October 1, 2014, available at http://mediacenter.adp.com/news-releases/news-release-details/adp-completes-spinoff-cdk-global.

III. **CDK'S AND REYNOLDS'S CORPORATE REPUTATIONS AND BRAND EQUITIES ARE IMPORTANT INTANGIBLE ASSETS, WHICH TAKE CONSIDERABLE TIME, EFFORT, AND INVESTMENT TO DEVELOP**

A. **Strong Corporate Reputation and Brand Equity Can Provide a Competitive Advantage and Generate Economic Benefits**

11. For many companies, building a positive corporate reputation and strong brand equity is an important objective, as these are crucial intangible assets.[11] Strong corporate reputation and brand equity provide a competitive advantage and generate economic benefits. Therefore, to build a strong brand and resulting reputation, companies invest in various stages of brand development to bolster these crucial intangible assets, as shown in Figure 1 below:

**Figure 1.[12]**
**Brand Resonance Pyramid**



---

[11] For example, when surveying "843 senior-level individuals with deep expertise and knowledge about their organization's brand and reputation management objectives," the Ponemon Institute found that 74 percent of respondents said their organization's reputation is one of their most valuable assets. However, only 49 percent said they felt their organization's reputation could withstand negative events. "Reputation Impact of a Data Breach," *Ponemon Institute*, November 2011, available at https://www.experian.com/assets/data-breach/white-papers/reputation-study.pdf, pp. 1, 3.

[12] Kotler, Philip and Kevin Lane Keller, *Marketing Management*, 15th Edition, Pearson, 2016 ("Kotler and Keller (2016)"), p. 330.

12. Strong brand equity "occurs when the consumer has a high level of awareness and familiarity with the brand and holds some strong, favorable, and unique brand associations in memory" — while favorable associations build strong brand equity, unfavorable associations hurt brands.[13] A strong brand in turn drives a company's *reputation*, understood as the perception of the company by stakeholders (as opposed to just customers).[14] As such, a company's reputation is a crucial intangible asset. A strong reputation can increase revenue, attract potential investors and employees, lower marketing costs, and generate word-of-mouth endorsements.[15] Conversely, a weak reputation drives away customers, repulses investors, and negatively affects overall firm performance.[16] This principle applies in both business-to-consumer as well as business-to-business markets, and, specifically with business customers, "[c]reating such goodwill […] is thought to lead to greater selling opportunities and more profitable relationships" and "can provide a strong competitive advantage."[17]

**B.    Developing CDK's and Reynolds's Corporate Reputations and Brand Equities Required Significant Investment and Commitment throughout the Companies**

13. Developing a corporate reputation for customer service, high-performance, data security, and/or other characteristics typically requires significant investment and commitment

---

[13] Keller, Kevin Lane, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, 4th Edition, Pearson, 2013 ("Keller (2013)"), p. 549.

[14] "The Most Reputable US Consumer Companies," *Reputation Institute*, October 2018, available at https://ri.reputationinstitute.com/hubfs/_PDF/Research/Consumer%20Report_v2%20(003).pdf.

[15] Fombrun, Charles J. and Naomi Gardberg, "Who's Tops in Corporate Reputation?" *Corporate Reputation Review*, Vol. 3, No. 1, January 2000, p. 17.

[16] Fombrun, Charles J. and Jonathan Low, "The Real Value of Reputation," *Communication World*, November–December 2011, available at https://www.iabc.com/wp-content/uploads/2014/10/The-Real-Value-of-Reputation.pdf, p. 22.

[17] Keller (2013), pp. 37-38.

throughout a company. To build a strong business reputation and brand, all parts of a company must be committed,[18] and strategic choices and trade-offs often have to be made over a long period of time. For example, if a company strives to provide the highest quality of service, it will likely have to trade off cost and therefore compete at a higher price point.

14. Further, developing a well-known reputation for strong and reliable data security is critical for information technology companies, as "the amount and sensitivity of personal data that is entrusted to technology companies today is unprecedented."[19] When customers purchase a product or service, they expect that in exchange for their trust and loyalty, the company "will behave in certain ways and provide them utility through consistent product performance."[20] In the case of information technology systems such as DMSs, the manner in which DMSs market their products indicates that automotive dealerships expect that their data will be securely stored.[21] For example, a dealer-facing publication providing guidance on how to select a DMS provider listed "system security" among the three technological components to consider.[22] Additionally, memos from the

---

[18] For example, "companies cannot [build their brand and reputation] by simply hiring bright people or paying them a lot of money. They must create an environment in which people can work well together and where they are engaged with the mission of the firm." Prahalad, Deepa, "Why Trust Matters More Than Ever for Brands," *Harvard Business Review*, December 8, 2011, available at https://hbr.org/2011/12/why-trust-matters-more-than-ev.

[19] Prahalad, Deepa, "Why Trust Matters More Than Ever for Brands," *Harvard Business Review*, December 8, 2011, available at https://hbr.org/2011/12/why-trust-matters-more-than-ev.

[20] Keller (2013), p. 34.

[21] "Plaintiffs and other DMS providers compete with each other over the security, functionality, and performance of their system designs, and the ability to provide strong security is a competitive advantage." Complaint, ¶ 12. For example, in CDK's presentation to its North American Megadealer User Group (a group of customers with multiple stores and locations), CDK stressed the importance of data security. "CDK-0032184.pdf," CDK-0032184.

[22] "System Security: You have to make sure your provider takes great care to protect your data." Kitzman, Sharon, "How to Find the Right DMS," *Auto Dealer Today*, May 5, 2014, available at https://www.autodealertodaymagazine.com/310463/how-to-find-the-right-dms.

National Automobile Dealers Association (NADA) to its members emphasized to dealers the need to assess the security of their data and their DMSs.[23]

15. Reynolds has demonstrated a commitment to and investment in building secure systems and then tying data security associations to its corporate reputation through numerous parts of its business practices. Reynolds has been building this reputation since at least 1999 with regular software and policy updates for data security, such as providing encryption in online applications in 1999; implementing a system to allow dealers to see third-party access to their systems via modems in 2006; removing unauthorized third-party application files in 2008; and implementing security monitoring in 2016.[24] As part of the cultivation of this reputation over the last two decades, Reynolds stresses the importance of their Reynolds Certified Interface Program ("RCI Program") to monitor third-party integration, which was launched in 2000 and reached 140 participants in 2016.[25] Further, in a 2016 interview, Reynolds's then-president Ron Lamb stated that the company uses its own products and systems for "chores such as accounting, payroll, inventory management and phone calls" rather than purchasing off-the-shelf software from third parties,[26] which demonstrates the commitment to and belief in the security of

---

[23]   "Dealer Data Guidance – Sample Service Provider Contract Language," *National Automobile Dealers Association*, August 28, 2013, available at https://d3dkdvqff0zqx.cloudfront.net/groups/ilada/attachments/dealerdataguidance.pdf; "10 Steps Dealers Need to Take to Protect 'Dealer Data,'" *National Automobile Dealers Association*, 2014, available at https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474839172; "Service Provider Dealer Data Access Addendum," *National Automobile Dealers Association*, available at https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474839174.

[24]   "ERA Data Management Milestones," *Reynolds & Reynolds*, 2016.

[25]   The RCI Program was originally launched in 2000 as Performance Path and was rebranded as the RCI Program in 2003. "ERA Data Management Milestones," *Reynolds & Reynolds*, 2016. For example, a client testimonial on the RCI program stated: "With the type of personal information we deal with, data security is our top priority and the Reynolds Certified Interface helps us facilitate this. It's safe and secure, the support is awesome, and it's totally worth the cost. I would rather spend the extra money to know we are protected and not ever have to worry." "Certified Dealer's Process Reynolds Certified Interface Testimonial," *Reynolds & Reynolds*, available at https://www.reyrey.com/media/certified-dealers-process-reynolds-certified-interface-testimonial.

[26]   "Reynolds Sells a Revolution," *Automotive News*, November 14, 2016, available at https://www.autonews.com/article/20161114/RETAIL/311149988/reynolds-sells-a-revolution.

their software. Additionally, a document describing Reynolds's "10 Principles of Reynolds Data Management" emphasizes "Confidentiality of Dealer, Consumer, OEM and Reynolds's data and Reynolds's proprietary software" and "Integrity of the system and data."[27]

16. CDK has committed to building a reputation for data security as well. In 2014, shortly after completing its spinoff from ADP, CDK conducted industry-wide research, including surveys of dealership General Managers and Principals, as well as "consult[ing] with the CDK Global data security team."[28] Among the "Dealer Challenges" found by CDK were "[i]ncreasing legal & business pressure to manage data usage," "[g]rowing concerns around external/hostile access to the DMS," and "[a]ssurance of industry partner data security practices."[29] CDK announced development of the Dealer Data Exchange ("DDX"), a free software tool provided to DMS customers that offered "visibility and control of ALL integration points" in the DMS (emphasis in original).[30] In 2015, CDK announced "SecurityFirst," a component of a multipart strategy that involved industry education and marketing efforts to increase dealers' awareness of data security issues, ongoing security initiatives, ensuring secure and reliable access to DMS data by authorized third parties through CDK's "3PA" program, and the development of new security and monitoring tools.[31] CDK's dealer materials state that "SecurityFirst is our declaration that a comprehensive approach to security is the best way to protect your

---

[27]   "Reynolds - 10 Principles of Reynolds Data Management," *Reynolds & Reynolds*, 2014.

[28]   Defs. Ex. 28, Preliminary Injunction Hrg., *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-CV-318-JDP (W.D. Wisc. June 26-28, 2017) ("*Authenticom* P.I. Hrg."), CDK-0001009 at 12.

[29]   Defs. Ex. 28, *Authenticom* P.I. Hrg., CDK-0001009 at 14.

[30]   Defs. Ex. 28, *Authenticom* P.I. Hrg., CDK-0001009 at 23.

[31]   "CDK Global Launches Security-Focused Program for Automotive Retail," MarketWatch, available at https://www.marketwatch.com/press-release/cdk-global-launches-security-focused-program-for-automotive-retail-2015-06-22; "CDK Security First," *CDK Global*, available at https://www.cdkglobal.com/en-ca/cdk-security-first; "CDK-0111950.pdf," CDK-0111950 at 53-54; "CDK-0887504.pdf," CDK-0887504 at 06-16.

brand, our brand and the automotive industry as a whole."[32] Aligning with those statements, CDK has communicated regularly with dealers, reminding them about the importance of data security and the risks associated with unauthorized third-party access.[33]

17. Reynolds's and CDK's strategic positioning to build a reputation for data security can also be seen in how they each market themselves on their customer-facing websites. The Reynolds website features an entire section on their data management practices and principles, emphasizing data security: "Data is a valuable asset in any business today, and customers expect their information is protected. Your dealership runs on data, but if security is compromised, the success of your business is in danger."[34] CDK's website has similarly strong messaging about data security on multiple pages, positioning itself as "the only company in the industry to use Tier IV data centers to back our systems, maintained under the most stringent security standards."[35]

## IV.  CDK'S AND REYNOLDS'S CORPORATE REPUTATIONS AND BRAND EQUITIES WOULD BE IRREPARABLY HARMED BY A MATERIAL PUBLIC DATA BREACH, AND THE HARM WOULD BE EXTREMELY DIFFICULT, IF NOT IMPOSSIBLE, TO RELIABLY MEASURE AND TO REPAIR

18. Harms that arise from material public data breaches generate direct and indirect costs. Generally speaking, direct costs can be substantial and can include costs to mitigate

---

[32]  "CDK-0111950.pdf," CDK-0111950 at 52.

[33]  *See* "CDK-2670251.pdf," CDK-2670251, at 11; "CDK-1176494.pdf," CDK-1176494; "CDK-1176497.pdf," CDK-1176497; Defs. Ex. 38, *Authenticom* P.I. Hrg., CDK-0001113; "CDK-0214705.pdf," CDK-0214705; Defs. Ex. 39, *Authenticom* P.I. Hrg., CDK-0001115; Defs. Ex. 40, *Authenticom* P.I. Hrg., CDK-0001117.

[34]  "Reynolds Data Management," *Reynolds & Reynolds*, available at https://www.reyrey.com/company/reynolds-data-management. *See also* "Data Security," *Reynolds & Reynolds*, available at https://www.reyrey.com/company/reynolds-data-management/data-security.

[35]  "The Power of a Strong DMS," *CDK Global*, available at https://www.cdkglobal.com/us/automotive/dms. *See also* "Data Management," *CDK Global*, available at https://www.cdkglobal.com/us/automotive/dealership-operations/data-management; "CDK Security First," *CDK Global*, available at https://www.cdkglobal.com/en-ca/cdk-security-first.

damage caused by the data breach and to assist victims. Indirect costs, on the other hand, represent potential financial fallouts of the data breach including, most importantly, the loss of corporate reputation, brand damage, and loss of customers. These indirect costs are difficult to predict, difficult to measure, and often difficult or impossible to repair.[36]

### A.    A Material Public Data Breach Would Harm CDK's and Reynolds's Corporate Reputations and Brand Equities

19. For data breaches in general, a *Forbes Insights* report suggested that 46 percent of organizations suffered harm to their reputations and brand value as a result of a data security breach, and 19 percent of organizations suffered reputational and brand harm due to a "[t]third-party security breach or IT system failure."[37] Further, a 2014 study found that data breaches are in the top three incidents that affect reputation, right after poor customer service and environmental incidents.[38]

20. A proxy for whether a brand's reputation has been harmed due to a publicized data breach is whether the company's stock price (if a public company) has fallen. Investors, in addition to customers, form opinions about company reputations, and those opinions in turn affect the price of the company's stock. For example, a study using 72 data breaches from 2004 to 2011 found that following the notification of a breach a company's stock value would steadily decrease, with "persistence up to 5 days after the incident" showing "delayed market reaction to the news announced,"[39] indicating the difficulty in

---

[36] As previously mentioned, my declaration focuses on the indirect costs related to corporate reputation and brand equity.

[37] "Fallout: The Reputational Impact of IT Risk," *Forbes Insights*, 2014, available at https://images.forbes.com/forbesinsights/StudyPDFs/IBM_Reputational_IT_Risk_REPORT.pdf, p. 6.

[38] "The Aftermath of a Data Breach: Consumer Sentiment," *Ponemon Institute*, April 2014, available at https://www.ponemon.org/local/upload/file/Consumer%20Study%20on%20Aftermath%20of%20a%20Breach%20FINAL%202.pdf, p. 10

[39] Of the 72 data breaches used in the study, 56 of them took place in the United States. Sinanaj, Griselda, Jan Muntermann, "Assessing Corporate Reputational Damage of Data Breaches: An Empirical Analysis," *Association for Information Systems - BLED Proceedings,* 2013, p. 10.

ascertaining the financial impact of a data breach. A 2017 Ponemon Institute study of 113 publicly traded companies that suffered a data breach found that "[s]tock [p]rices [d]rop an [a]verage of 5 [p]ercent when the [d]ata [b]reach is [d]isclosed."[40] Another study on the effect of security breaches notes that "[s]ecurity breaches can have a significant impact on the financial performance of firms. […] [S]ecurity breaches of personal private information of clients can cause damage to the firms' reputation and also lead to legislative sanctions."[41] The same study goes on to state that while "[t]he evidence on the impact of security breaches is clear," it is "typically difficult to estimate," as such estimates typically rely on "subjective judgment of the analysts" to assess the "value of each asset and the probability of it being damaged."[42] The stock price drop as a proxy for reputational harm can be clearly seen in recent public data breaches. For example, after the September 2017 data breach of Equifax, its stock "[p]lunged 18.4% [s]ince [i]t [r]evealed [a] [m]assive [b]reach."[43] Similarly, in November 2018, Marriott International's stock "sank 5.6% […] after the hotel operator disclosed a 'data security incident.'"[44]

21. While for public companies, drops in stock price can *signal* reputational harm, the *amount* and *impact* of reputational damage due to a material public data breach can be far more extensive and difficult, if not impossible, to capture. To the extent that a company

---

[40]  "The Impact of Data Breaches on Reputation & Share Value," *Ponemon Institute,* May 2017, available at https://www.centrify.com/media/4737054/ponemon_data_breach_impact_study.pdf, p. 2.

[41]  Goel, Sanjay, Christopher Brown, and Hany Shawky, "Measuring the Impact of Security Breaches on Stock Valuations of Firms," *In Proceedings of the 6th Annual Security Conference*, April 2007, available at https://pdfs.semanticscholar.org/cf4b/00606775d37ec4766fc2a89fd176eac8bdcb.pdf, p. 32-1.

[42]  Goel, Sanjay, Christopher Brown, and Hany Shawky, "Measuring the Impact of Security Breaches on Stock Valuations of Firms," *In Proceedings of the 6th Annual Security Conference*, April 2007, available at https://pdfs.semanticscholar.org/cf4b/00606775d37ec4766fc2a89fd176eac8bdcb.pdf, pp. 32-1-2.

[43]  Nusca, Andrew, "Equifax Stock Has Plunged 18.4% Since It Revealed Massive Breach," *Fortune*, September 11, 2017, available at https://fortune.com/2017/09/11/equifax-stock-cybersecurity-breach/.

[44]  Kilgore, Tomi, "Marriott's Stock Sinks After Disclosing Data Breach Affecting Up to 500 Million Guests," *MarketWatch,* November 30, 2018, available at https://www.marketwatch.com/story/marriotts-stock-sinks-after-disclosing-data-breach-affecting-up-to-500-million-guests-2018-11-30.

has developed and invested in a reputation for data security, a single data breach could irreparably harm the company by undermining the very nature of its brand identity. Even if a company has a long-standing reputation for high quality data security, that reputation may not be resilient enough to withstand even a single material public data breach. As discussed in Section III above, given the focus of CDK and Reynolds on data security, the expectation of data security from customers, and CDK's and Reynolds's dedication to building a reputation for strong data security, a material public data breach would irreparably harm CDK's and Reynolds's corporate reputations and brand equities.[45]

**B.    A Material Public Data Breach Would Cause CDK and Reynolds to Lose Existing and Potential Customers**

22. The effects of a material public data breach would reverberate through CDK's and Reynolds's customer relationships. To better understand how a data breach would affect the decision-making of existing and potential customers of Reynolds and CDK (i.e., automotive dealerships), it is important to consider the process surrounding a customer's purchase decision. The customer buying process shown in Figure 2 below is a widely accepted concept in the marketing literature, describing the process through which customers make purchases based on a series of activities that result in purchase and post-purchase consumption:

---

[45]   *See* ¶ 28 below for a discussion of the variation and subjectivity in brand valuation estimates.

**Figure 2.[46]**
Five-Stage Model of the Customer Buying Process



23. While customers may not always proceed through every stage extensively or in that exact order, novel or salient information — such as news of a data breach — is likely to cause customers to reconsider some or all stages of their buying process and increase customers' focus on data security when making decisions. During that reconsideration, customers (in this case, automotive dealerships) would potentially be lost at any of these buying process stages.

24. For example, an existing customer of CDK or Reynolds would be in the "post-purchase" stage while using the DMS. If a material public data breach were to occur, that customer's perception of the CDK or Reynolds reputation for data security would be negatively affected, providing an external shock that causes the customer to return to the problem recognition, information search, and/or evaluation of alternatives stages. In those

---

46   Kotler and Keller (2016), p. 195.

stages, the automotive dealership may decide that a company with a material public data breach can no longer be a trusted provider of secure services and subsequently switch away to another provider, causing loss of existing customers.

25. On the other hand, an automotive dealership searching for a new DMS provider — a potential customer — may eliminate CDK or Reynolds from any consideration in the "evaluation of alternatives" stage if CDK's or Reynolds's reputation for data security was harmed by a material public data breach. A simple rule frequently applied in purchase decisions is the "elimination-by-aspects" heuristic, where a potential purchaser determines an important attribute and applies a cut-off value that has to be met: for example, not associated with a material public data breach.[47] News of a material data breach would therefore negatively affect CDK's or Reynolds's reputation in automotive dealerships' information processing as they proceed through their buying process, thereby causing the affected company to lose potential customers on top of the loss of existing customers.[48]

### C.   Reputational Harm Resulting from a Material Public Data Breach is Extremely Difficult, If Not Impossible, to Reliably Measure or Repair

26. Once reputational harm resulting from a material public data breach has been sustained, it is extremely difficult — if not impossible — to reliably measure or repair that damage. The indirect costs of a material public data breach could be overwhelming for any

---

[47]   *See* a description of lexicographic decision-making in Payne, John W., James R. Bettman, and Eric J. Johnson, *The Adaptive Decision Maker*, Cambridge University Press, 1993, pp. 26-27.

[48]   Additionally, if the data breach is publicized as affecting certain dealerships, customers of the dealerships (i.e., car buyers and prospective buyers) may make decisions that negatively affect the dealerships themselves. Dealerships may then, in order to maintain their own customer base and reputation, switch to another DMS provider as a way to demonstrate a change that would increase data security. In fact, according to industry publication *Automotive News*, a 2016 survey of 200 dealerships across five states suggested that "nearly 84 percent of consumers would not buy another car from a dealership after their data had been compromised by a breach at the dealership." Bond Jr., Vince, "Dealers Vulnerable to Hackers, Survey Warns," *Automotive News*, June 20, 2016, available at https://www.autonews.com/article/20160620/OEM06/306209973/dealers-vulnerable-to-hackers-survey-warns.

company facing them, and these costs are exacerbated and muddied by the DMS

provider's lack of control over who is accessing the data under the proposed DMS Law

and therefore a lack of control over the magnitude and impact of a data breach.

27. For a DMS provider such as CDK or Reynolds, given the numerous points at which

corporate reputation, brand equity, and customers can be affected, it is impossible to

identify and reliably measure the damage in each and all of those aspects. With the DMS

Law, it would become even more difficult to predict the frequency and severity of

potential data breaches, before or after they have occurred, further undermining any

attempt to quantify the resulting harm. For example, the reputation can be harmed at any

of the portions of the Brand Resonance Pyramid (Figure 1) through which CDK and

Reynolds have built a reputation for data security. For both automotive dealerships that

are existing customers and those that are potential customers, additional reputational

damage can negatively affect how the parties think about CDK or Reynolds as they

proceed through the five stages of their buying process (*see* Figure 2). Considering all

these factors, identifying and reliably measuring the reputational damage would be

extremely difficult, if not impossible.

28. Further exacerbating the challenge of reliably measuring reputational harm is the inherent

complexity of valuing intangible assets such as corporate reputation and brand equity.

Though stock market valuation can provide a starting point for measuring a firm's value,

"traditional financial valuation approaches have difficulty in valuing businesses with

significant intangible assets [...] such as brand assets."[49] Additionally, the effect of

intangible assets such as brand on company valuation differs across sectors.[50] The lack of

consistency in valuing brands can also be seen when comparing the annual brand

---

[49]   Mizik, Natalie and Robert Jacobson, "Valuing Branded Businesses," *Journal of Marketing*, Vol. 73, No. 6, November 2009 ("Mizik and Jacobson 2009"), p. 137.

[50]   Mizik and Jacobson 2009, p. 151.

rankings of three main brand consultancies: Interbrand's "Best Global Brands," Millward
Brown's "Top 100 Lists," and Brand Finance's "The World's 500 Most Valuable
Brands."[51] For the same companies in the same year, these three rankings provide
"[h]ighly [d]ivergent [e]stimates of [b]rand [v]alue" and do not even agree on the
direction of change in brand value for many brands.[52] Considering both variation in brand
valuation and the numerous aspects through which reputational harm could be sustained,
reliable quantification of reputational harm would be extremely difficult, if not
impossible.

29. Even if harm to corporate reputation and brand equity were possible to reliably quantify,
the data security reputation of an information technology firm like CDK or Reynolds is
unlikely to be fully repaired.[53] After sustaining reputational harm, it will be unlikely for a
company to fully recover its prior reputation, as there will always be a permanent stain on
its record that competitors can continually point to during their own sales efforts. For an
information technology company that has built a reputation on data security, the effect of
the reputational harm caused by a material public data breach would be even more
extensive and irreparable than for a company with a reputation built on other
characteristics. For example, a company's damaged reputation for customer service might
recover (or partially recover) through ongoing and consistent positive customer service
interactions. In contrast, a customer may have few touchpoints with data security and
primarily associate security with the *absence* of a negative event. As such, in the event of

---

[51] Mizik, Natalie, "Value of Marketing," *Marketing Accountability Standards Board — Board Meeting*, March 2010, available at https://themasb.org/wp-content/uploads/2010/03/J.-Methods-of-Marketing.Stock-Price-MizikF-3.10.pdf ("Mizik 2010"), pp. 22-23.

[52] Mizik 2010, pp. 23-25.

[53] Many companies that experience a cyberattack subsequently go out of business. For example, according to the National Cyber Security Alliance, 60 percent of "hacked small and midsize businesses [...] go out of business after six months." "Cyberthreats and Solutions for Small and Midsize Businesses," *Vistage*, 2018, available at https://www.vistage.com/wp-content/uploads/2018/04/Cybersecurity-Research-Note.pdf, p. 2.

even one negative data security incident, customers are more likely to recall that occurrence when evaluating the probability of risk and place a disproportionate weight on that one negative event.[54]

30. When companies suffer reputational harm, swift and serious action is often required to attempt to remedy the situation. For example, when companies "make[] a mistake," customers want companies to attempt to rebuild trust by "[c]ommunicating real-time updates including how the issue is being resolved and expected timing […] [and m]aking improvements to their systems to avoid future breaches."[55] Other suggestions for addressing reputational harm involve "taking responsibility";[56] "mak[ing] changes to address the problem at the source";[57] "implement[ing] a swift fix for the problem"; and "demonstrat[ing] ownership."[58] However, in the case of a material public data breach due to the DMS Law, CDK or Reynolds would find it difficult or impossible to take any of those actions in an attempt to remedy their reputational harm, as the cause of such a data breach would be due to access decisions that are mandated by the DMS Law, and therefore outside of CDK's or Reynolds's control.[59] They would not be able to avoid

---

[54]   Literature on information processing suggests that customers are more likely to recall dramatic and/or salient events when conducting a memory search to evaluate the risk of events. These events, such as a data breach, are likely to be weighted disproportionately heavily by customers relative to other available information, and as the corrective action is the absence of a negative event, that perception cannot be fully corrected. *See*, Tversky, Amos and Daniel Kahneman, "Availability: A Heuristic for Judging Frequency and Probability," *Cognitive Psychology,* Vol. 5, 1973; Slovic, Paul, Baruch Fischhoff, and Sarah Lichtenstein, "Rating the Risks," *Environment*, Vol. 21, No. 3, April 1979.

[55]   Lieberman, Matthew, "Mind the Trust Gap: How Companies Can Retain Customers After a Security Breach," *Forbes*, December 8, 2017, available at https://www.forbes.com/sites/forbestechcouncil/2017/12/08/mind-the-trust-gap-how-companies-can-retain-customers-after-a-security-breach/#7b5b7d2f6c95.

[56]   Shadbolt, Peter, "How Can a Company Repair a Damaged Reputation?" *BBC*, October 13, 2016, available at https://www.bbc.com/news/business-37630983.

[57]   "What is Reputational Damage Coverage?" *Insurance Technologies Corporation*, available at https://www.getitc.com/syndicate/2017/12/28/what-is-reputation-damage-coverage.

[58]   Smith-Bingham, Richard, "Reputation Risk," *Oliver Wyman*, available at https://www.oliverwyman.com/content/dam/oliver-wyman/global/en/2014/may/ReputationRisk_Final_web.pdf, p. 13.

[59]   I understand that, for example, because the DMS Law "forbids Reynolds from taking any countermeasures against any third parties' use of automated programs on the Reynolds DMS, it also prevents Reynolds from securing its system against common forms of attack." Hall Declaration, ¶ 43.

future breaches by making internal changes or even making a quick fix, as even if their own systems were secure, dealers would be able to provide access to "authorized integrators" outside of the DMS providers' control.

31. Even if CDK or Reynolds were able to retain some of their customers after a material public data breach due to the DMS Law, their corporate reputations and brand equities would be irreparably harmed in a way that is not reliably measurable or ultimately recoverable.


Professor Peter N. Golder, Ph.D.
August 22, 2019

20

# APPENDIX A
# CURRICULUM VITAE

# Peter N. Golder

Tuck School of Business
Dartmouth College
100 Tuck Hall
Hanover, NH 03755-9000
(603) 646-0598
peter.n.golder@tuck.dartmouth.edu

## ACADEMIC EXPERIENCE

Dartmouth College, Tuck School of Business
 Professor of Marketing, 2009-present
 Faculty Director, TuckGO, 2018-present
 Faculty Director, First-Year Project, 2017-present
 Co-Editor-in-Chief, *Marketing Letters*, 2015-present
 Academic Trustee, Marketing Science Institute, 2016-present
 Marketing Faculty Area Coordinator, 2015-2018
 Senior Fellow, Dartmouth College Society of Fellows, 2014-2017

New York University, Stern School of Business
 Professor of Marketing, 2008-2009
 Coordinator, Marketing Department Doctoral Program, 2008-2009
 George and Edythe Heyman Faculty Fellow, 2004-2009
 Associate Professor of Marketing, 1999-2008 (tenured in 2002)
 Assistant Professor of Marketing, 1995-1999

Peking University, Guanghua School of Management
 Visiting Professor of Marketing, 2006-2007

University of California, Los Angeles (UCLA)
 Visiting Assistant Professor of Marketing, 1994-1995

University of Southern California
 Research and Teaching Assistant, 1990-1994

## EDUCATION

Ph.D. in Business Administration (Marketing), 1994
 University of Southern California, Los Angeles, CA

B.S. in Mechanical Engineering, 1984
 University of Pennsylvania, Philadelphia, PA

## HONORS

Citation of Excellence Award from Emerald Group Publishing for paper with high citations, novelty, interdisciplinary interest, and relevance in today's world (2015).
AMA Doctoral Consortium Faculty Member (2015, 2005, 2004, 2002, 1999)

Maynard Award for *Journal of Marketing* paper making the most significant contribution to marketing theory and thought (2013)

Elsevier Distinguished Scholar Award from Society for Marketing Advances—career achievement award for "brilliant work and nurturing of the historical method in research in marketing" (2012)

INFORMS Society for Marketing Science Long Term Impact Award—chosen from all papers published in *Marketing Science* during preceding 10 years (2012)

Excellence in Global Marketing Research Award, American Marketing Assoc. (2011)

Executive MBA Great Professor Teaching Award (2008)

Buzzell Award for best paper published by Marketing Science Institute (2007, 1994)

Finalist, Little Award for Best Paper in *Marketing Science* (2007)

Finalist, Bass Award for Best Dissertation-based paper in *Marketing Science* (2007)

Best Paper Award, American Marketing Assoc. Technology and Innovation Group (2005)

Berry Book Prize (Best Book in Marketing), American Marketing Association (2003)

Early Career Award for First 10 Years of Contributions to Marketing Strategy Research, American Marketing Association (2003)

Editor's Award for Reviewing, *Journal of Marketing* (2003)

Finalist, INFORMS Society for Marketing Science Practice Prize (2003)

Top Ten Business Book of the Year, *Harvard Business Review* (2002)

Marketing Science Institute Young Scholars Program Faculty Member (2006, 2001)

O'Dell Award for *Journal of Marketing Research* paper making the most significant long-term contribution (1998)

Bass Award for best paper in *Marketing Science* or *Management Science* based on a marketing doctoral dissertation (1998)

Faculty Advisor Award for Field Study Achievement (UCLA - 1995)

Beta Gamma Sigma (1994)

Richard D. Irwin Dissertation Award Winner (1993)

AMA Doctoral Consortium Fellow, University of Illinois (1993)

Graduate of Conoco's Management Development Program (1985)

Second Prize, Senior Design Project, University of Pennsylvania (1984)

Pi Tau Sigma, National Honorary Mechanical Engineering Fraternity (1984)

## JOURNAL PUBLICATIONS

Golder, Peter N., Debanjan Mitra, and Christine Moorman (2018), "Incorporating Quality Considerations in Merger Analysis: Why, What, When, and How?" *The Antitrust Bulletin*, 63 (June), 222-236.

Golder, Peter N., Dmitri. G. Markovitch, and Jonathan P. O'Brien (2018), "When do Investors reward Acquisitions and Divestitures? The Contrasting Implications of Normative and Behavioral Economic Theories," *Managerial and Decision Economics*, 39 (March), 226-239.

Golder, Peter N., Sandy Jap, and Joel H. Steckel (2017), "The Future of *Marketing Letters*: Vison, Review Process, and a New Type of Paper—Idea Corners," *Marketing Letters*, 28 (September), 335-339.

Golder, Peter N., Debanjan Mitra, and Christine Moorman (2012), "What is Quality? An Integrative Framework of Processes and States," *Journal of Marketing*, 76 (July), 1-23.

- Harold H. Maynard Award for *Journal of Marketing* paper making the most significant contribution to marketing theory and thought (2013)
- Citation of Excellence Award from Emerald Group Publishing for paper with high citations, novelty, interdisciplinary interest, and relevance in today's world (2015).

Golder, Peter N., Rachel Shacham, and Debanjan Mitra (2009), "Innovations' Origins: When, By Whom, and How are Radical Innovations Developed?" *Marketing Science*, 28 (January), 166-179.

Mitra, Debanjan and Peter N. Golder (2008), "Does Academic Research Help or Hurt MBA Programs?" *Journal of Marketing*, 72 (September), 31-49.

- Selected by *JM* Editor as single article from issue to feature on *JM* Blog
- Basis of our article in *Financial Times* (see Other Publications)
- Basis of our article in *BusinessWeek* online (see Other Publications)
- Featured on The Chronicle of Higher Education *News Blog*

Markovitch, Dmitri and Peter N. Golder (2008), "Using Stock Prices to Predict Market Events: Evidence on Sales Takeoff and Long-Term Firm Survival," *Marketing Science*, 27 (July-August), 699-716.

Mitra, Debanjan and Peter N. Golder (2007), "Quality is in the Eye of the Beholder," *Harvard Business Review*, 85 (April), 26-28.

Mitra, Debanjan and Peter N. Golder (2006), "How Does Objective Quality Affect Perceived Quality? Short-Term Effects, Long-Term Effects, and Asymmetries," *Marketing Science*, 25 (3), 230-247.

- Robert D. Buzzell Best Paper Award from Marketing Science Institute (2007)
- Finalist, John D. C. Little Award for Best Paper in *Marketing Science* (2007)
- Finalist, Frank M. Bass Award for Best Dissertation-based paper in *Marketing Science* (2007)
- Featured in Handelsblatt, a top German economics and business periodical
- Featured in *Insights from MSI* (Marketing Science Institute)
- Reprinted in ICFAI's *Journal of Brand Management*

Golder, Peter N. and Gerard J. Tellis (2004), "Growing, Growing, Gone: Cascades, Diffusion, and Turning Points in the Product Life Cycle," *Marketing Science*, 2, 207-218.

- INFORMS Society for Marketing Science Long Term Impact Award (2012)

- Best Paper Award, American Marketing Association Technology and Innovation Group (2005)
- Also published in the Marketing Science Institute working paper series and featured in their periodical, *Insights from MSI*

Foster, Joseph A., Peter N. Golder, and Gerard J. Tellis (2004), "Predicting Sales Takeoff for Whirlpool's New Personal Valet," *Marketing Science*, 2, 182-185.

- INFORMS Society on Marketing Science Inaugural Practice Prize (finalist)

Bohlmann, Jonathan D., Peter N. Golder, and Debanjan Mitra (2002), "Deconstructing the Pioneer's Advantage: Examining Vintage Effects and Consumer Valuations of Quality and Variety, *Management Science*, 48 (September), 1175-1195.

Mitra, Debanjan and Peter N. Golder (2002), "Whose Culture Matters? Near-Market Knowledge and Its Impact on Foreign Market Entry Timing," *Journal of Marketing Research*, 39 (August), 350-365.

- Excellence in Global Marketing Research Award, American Marketing Association (2011)

Golder, Peter N. (2000), "Insights from Senior Executives about Innovation in International Markets," *Journal of Product Innovation Management*, 17 (September), 326-340, lead article.

Golder, Peter N. (2000), "Historical Method in Marketing Research with New Evidence on Long-Term Market Share Stability," *Journal of Marketing Research*, 37 (May), 156-172.

- Featured in *The Wall Street Journal* (front page) and *Advertising Age*

Golder, Peter N. and Gerard J. Tellis (1998), "Beyond Diffusion: An Affordability Model of the Growth of New Consumer Durables," *Journal of Forecasting*, 17 (June-July), 259-280.

Golder, Peter N. and Gerard J. Tellis (1997), "Will It Ever Fly? Modeling the Takeoff of Really New Consumer Durables," *Marketing Science*, 3, 256-270.

- Frank M. Bass Award (1998) for best paper in *Marketing Science* or *Management Science* based on a marketing doctoral dissertation
- Featured in *The Wall Street Journal* (front page)
- Published in the Marketing Science Institute working paper series

Tellis, Gerard J. and Peter N. Golder (1996), "First to Market, First to Fail? Real Causes of Enduring Market Leadership," *Sloan Management Review*, (Winter), 65-75.

- Featured in *The Wall Street Journal, The Economist, The Los Angeles Times, WirtschaftsWoche* (German business magazine) and *Harvard Management Update*
- Reprinted in *Harvard Business Manager*
- Invited keynote presentation at the Conference Board's 1996 Marketing Conference

Golder, Peter N. and Gerard J. Tellis (1993), "Pioneer Advantage: Marketing Logic or Marketing Legend?" *Journal of Marketing Research*, (May), 158-170.

- William F. O'Dell Award (1998) for long-term contribution to the marketing discipline
- Findings referenced in *Wall Street Journal* op-ed article

## BOOKS AND OTHER PUBLICATIONS

Golder, Peter N. and Debanjan Mitra, editors (2018), *Handbook of Research on New Product Development*, Edward Elgar.

Golder, Peter N. and Debanjan Mitra (2018), "New Product Development Research: Consolidating the Present and Guiding the Future," in *Handbook of Research on New Product Development*, Peter N. Golder and Debanjan Mitra, editors, Edward Elgar.

Fan, Tingting, Peter N. Golder, and Donald R. Lehmann (2017), "Innovation and New Products Research: A State-of-the-Art Review, Models for Managerial Decision Making, and Future Research Directions," in *Handbook of Marketing Decision Models*, Berend Wierenga and Ralf van der Lans, editors, Springer.

Golder, Peter N., Debanjan Mitra, and Christine Moorman (2015), "A Comprehensive View of Quality and Its Implications for Managers," The AMA Journal Reader, American Marketing Association (online publication).

Fan, Tingting, Peter N. Golder, and Eitan Muller (2014), "Dynamics of Multi-Feature Product Usage: Carryover, Spillover, and Social Effects," Marketing Science Institute Report No. 14-118.

Lehmann, Donald R. and Peter N. Golder (2014), "New Products Research," in *The History of Marketing Science*, Russell S. Winer and Scott A. Neslin, editors, World Scientifc – Now publishers.

Golder, Peter N., Julie R. Irwin, and Debanjan Mitra (2013), "Long-Term Market Leadership Persistence: Baselines, Economic Conditions, and Category Types," Marketing Science Institute Report No. 13-110.

Golder, Peter (2010), "First-mover (pioneer) advantage," in *Wiley International Encyclopedia of Marketing*, Jagdeth Sheth and Naresh Malhotra, editors, in Volume 1, Marketing Strategy, Robert Peterson and Roger Kerin, editors, John Wiley & Sons Limited.

Golder, Peter (2010), "Later mover (nonpioneer) advantage," in *Wiley International Encyclopedia of Marketing*, Jagdeth Sheth and Naresh Malhotra, editors, in Volume 1, Marketing Strategy, Robert Peterson and Roger Kerin, editors, John Wiley & Sons Limited.

Golder, Peter and Gerard Tellis (2010), "Product Life Cycle," in *Wiley International Encyclopedia of Marketing*, Jagdeth Sheth and Naresh Malhotra, editors, in Volume 5, New Product Development, Barry Bayus, editor, John Wiley & Sons Limited.

Mitra, Debanjan and Peter N. Golder (2009), "Objective and Perceived Quality," in *Empirical Generalizations about Marketing Impact*, Dominique M. Hanssens, editor, Marketing Science Institute, 18.

Golder, Peter N. (2009), "Market Leadership," in *Empirical Generalizations about Marketing Impact*, Dominique M. Hanssens, editor, Marketing Science Institute, 21.

Golder, Peter N. and Gerard J. Tellis (2009), "First-mover Advantage," in *Empirical Generalizations about Marketing Impact*, Dominique M. Hanssens, editor, Marketing Science Institute, 34.

Golder, Peter N. and Gerard J. Tellis (2009), "Sales Takeoff," in *Empirical Generalizations about Marketing Impact*, Dominique M. Hanssens, editor, Marketing Science Institute, 39.

Golder, Peter N., Rachel Shacham, and Debanjan Mitra (2009), "Radical Innovations," in *Empirical Generalizations about Marketing Impact*, Dominique M. Hanssens, editor, Marketing Science Institute, 42.

Golder, Peter N. and Debanjan Mitra (2008), "MBA Recruiters Value Academic Research," *BusinessWeek* online, October 16.

Golder, Peter and Debanjan Mitra (2008), "Academic research is good for MBA students," *Financial Times*, September 22.

Chandy, Rajesh K., Peter N. Golder, and Gerard J. Tellis (2004), "Historical Research in Marketing Strategy: Method, Myths, and Promise," in *Assessing Marketing Strategy Performance*, Christine Moorman and Donald R. Lehmann, eds., Boston, MA: Marketing Science Institute.

Tellis, Gerard J. and Peter N. Golder (2002), *Will and Vision: How Latecomers Grow to Dominate Markets*, New York: McGraw-Hill.

- Winner of the Berry-AMA Book Prize for the best book in marketing (2003)
- Selected by *Harvard Business Review* as one of the top ten business books of 2001
- Reviewed in *Harvard Business Review* (September 2001)

Golder, Peter N. and Gerard J. Tellis (2001), "Competition is the Best Way to Regulate Microsoft," *Los Angeles Times*, December 26.

Golder, Peter N. and Gerard J. Tellis (1992), "Do Pioneers Really Have Long-Term Advantages? A Historical Analysis," Marketing Science Institute Report Number 92-124, Boston, MA: Marketing Science Institute.

- Winner of Marketing Science Institute Best Paper of the Year Award

## PRESENTATIONS

Chang, Sue Ryung, Peter N. Golder, and Joel H. Steckel (2017), "Measuring and Managing International Market Share Volatility: Insights from a Country, Category, and Brand Hierarchy Framework," Tuck Marketing Research Camp.

Golder, Peter N., Julie R. Irwin, and Debanjan Mitra (2016), "Will You Still Try Me, Will You Still Buy Me, When I'm 64? Long-Term Market Leadership Persistence and the Impact of Economic Conditions and Category Types," invited presentation, Kelley School of Business, Indiana University.

Golder, Peter N. (2016), "Design Thinking: Learn to Think Like a Disruptor," invited workshop, Marketing Science Institute, Cambridge, MA.

Golder, Peter N. (2016), "The Fragility of Market Leadership," AEMARK: XXVIII Congreso de Marketing at Universidad de Leon, Leon, Spain.

Golder, Peter N. (2016), "The Fragility of Market Leadership," L2/NYU Stern Digital Leadership Academy, New York, NY.

Golder, Peter N. (2016), "What is Quality?" American Antitrust Institute Invitational Symposium on Non-Price Effects of Mergers, Washington D.C.

Golder, Peter N. and Hans-Willi Schroiff (2016), "Closing the Gap between Innovation Management Theory and Practice," American Marketing Association Winter Educators' Conference, Las Vegas, NV.

Chang, Sue Ryung, Peter N. Golder, and Joel H. Steckel (2015), "Measuring and Managing International Market Share Volatility: Insights from a Country, Category, and Brand Hierarchy Framework," invited presentation, Corporate Competitiveness in International Perspective, Keizai Koho Center, Tokyo, Japan.

Golder, Peter N. (2015), "Strategy Research: Interesting Questions + Illuminating Data □ Publication," AMA-Sheth Foundation Doctoral Consortium, London Business School.

Fan, Tingting, Peter N. Golder, and Eitan Muller (2015), "Communication on Mobile Phones versus Online Social Networks: Complements or Substitutes?" Marketing Science Conference, Johns Hopkins University.

Fan, Tingting, Peter N. Golder, and Eitan Muller (2015), "Multi-media and Multi-form Communication: A Framework and Application with Smartphones and Online Social Networks," Theory + Practice in Marketing Conference, Georgia State University.

Fan, Tingting, Peter N. Golder, and Eitan Muller (2015), "Communication on Smartphones vs. Online Social Networks: Complements or Substitutes?" Big Data Conference, Ludwig Maximilian University (LMU), Munich, Germany.

Golder, Peter N. (2014), "Exploring and Exploding(!) Myths of Innovation Success," MOT Summer School—The New Paradigm of Innovation, Seoul, Korea.

Shacham, Rachel, Tulin Erdem, and Peter N. Golder (2014), "Talking Away the Vice? Communication and Vices," Marketing Science Conference, Emory University.

Fan, Tingting, Peter N. Golder, and Cheng Zhang (2014), "Usage Adoption of New Products in an Emerging Market," Marketing and Innovation Symposium, Erasmus University, Rotterdam, Netherlands.

Golder, Peter N. (2014), "The Art and Craft of Developing Impactful Theory," AMS Review Theory Forum, Indianapolis, IN.

Golder, Peter N. and Wonjoon Kim (2014), "Order of Entry Effects with Attribute Innovations," American Marketing Association Winter Educators' Conference, Orlando, FL.

Golder, Peter N. and Wonjoon Kim (2013), "Order of Entry Effects with Attribute Innovations," invited presentation, Syracuse University.

Pang, Jun, Angela Xia Liu, and Peter N. Golder (2013), "Effects of Peer Opinions and Customer Opinions on Critic Evaluations of Cultural Products," Marketing Science Conference, Ozyegin University, Istanbul, Turkey.

Chang, Sue Ryung, Peter N. Golder, and Joel H. Steckel (2013), "Exploring Market Share Volatility around the World: The Role of Economics, Culture, Business Environment, and Market Structure," invited presentation, Peking University.

A-8

Chang, Sue Ryung, Peter N. Golder, and Joel H. Steckel (2013), "Exploring Market Share Volatility around the World: The Role of Economics, Culture, Business Environment, and Market Structure," invited presentation, Cambridge University Judge Business School.

Fan, Tingting, Eitan Muller, and Peter N. Golder (2012), "The Dynamics of New Product Feature Usage," Marketing Science Conference, Boston University.

Shacham, Rachel, Tulin Erdem, and Peter N. Golder (2012), "Are Vices Substitutes or Complements?" Marketing Science Conference, Boston University.

Golder, Peter N., Julie R. Irwin, and Debanjan Mitra (2012), "Do Economic Conditions Affect Long-Term Brand Leadership Persistence?" Theory + Practice in Marketing Conference, Harvard Business School.

Golder, Peter N. and Tingting Fan (2011), "The Dynamics of Consumers' Brand Consideration Sets," Marketing Scholar Forum, Peking University.

Shacham, Rachel, Peter N. Golder, and Tulin Erdem (2011), "The Complementarity of Vices," Marketing Science Conference, Rice University.

Fan, Tingting and Peter N. Golder (2011), "The Dynamics of Brand Preferences Along Consumers' Life Paths," Marketing Science Conference, Rice University.

Golder, Peter N. (2011), "Beyond New Products: Innovation for Growth," MSI 50th Anniversary Conference, Boston.

Golder, Peter N., Julie R. Irwin, and Debanjan Mitra (2011), "Will You Still Try Me, Will You Still Buy Me, When I'm 64? How Economic Conditions and Category Types Affect Long-Term Brand Leadership Persistence," invited presentation, Cornell University.

Golder, Peter N., Julie R. Irwin, and Debanjan Mitra (2010), "Will You Still Try Me, Will You Still Buy Me, When I'm 64? How Economic Conditions and Category Types Affect Long-Term Brand Leadership Persistence," invited presentation, Peking University.

Chang, Sue Ryung, Peter N. Golder, Joel Steckel (2010), "Global Market Share Dynamics," Marketing Science Conference, University of Cologne.

Shacham, Rachel, Tulin Erdem and Peter N. Golder (2010), "A Cigarettte, a Six Pack or Porn: Are Vices Substitutes or Complements?" Marketing Science Conference, University of Cologne.

Golder, Peter N. (2010), "Attribute-Level Innovation and Its Opportunities for Marketing Strategy Research," The Practice and Impact of Marketing Science, MSI/ISMS Conference, Massachusetts Institute of Technology.

Golder, Peter N. (2009), "Why Your Firm Can't Innovate," Luxury Lab Innovation Forum, Times Center, New York City, talk on youtube.

Golder, Peter N., Julie R. Irwin and Debanjan Mitra (2009), "How Do Economic Conditions Affect Long-Term Brand Leadership Persistence," New York City Marketing Modelers Meeting.

Shacham, Rachel, Peter N. Golder, and Sha Yang (2009), "On the Importance of Ignorance," Marketing Science Conference, University of Michigan.

Mitra, Debanjan, Peter N. Golder, Jinhong Xie (2009), "The Weakness of Strong Ties: Homophily, Heterophily, and the Valence of Buzz," Marketing Science Conference, University of Michigan.

Golder, Peter N., Tingting Fan, Kevin L. Keller (2009), "Branding for China: The Role of Next Generation Consumers," Innovation in India and China: How to Create Value from Emerging Markets, Cambridge University Judge Business School.

Shacham, Rachel, Peter N. Golder, and Sha Yang (2009), "Exploring the Unknown: Incorporating Awareness in New Product Adoption," Collaborative & Multidisciplinary Research Conference, Yale School of Management.

Golder, Peter N., Tingting Fan, and Kevin L. Keller (2009), "Evolving Brand Preferences of Young Chinese Consumers," China India Consumer Insights Conference, Yale School of Management.

Mitra, Debanjan and Peter N. Golder (2008), "Competing for the Future of Business Schools: Does Academic Research Help or Hurt MBA Programs?" Marketing Science Conference, University of British Columbia.

Markovitch, Dmitri and Peter N. Golder (2007), "Can the Stock Market Predict Sales Takeoff and the Long-Term Survival of Firms?" Marketing Science Conference, Singapore Management University.

Golder, Peter N. (2007), "Will and Vision: How Latecomers Grow to Dominate Markets," Wuhan University's First International Conference on Corporate Governance and Innovation.

Golder, Peter N., Rachel Shacham, and Debanjan Mitra (2006), "Innovations' Origins: When, By Whom, and How are Radical Innovations Developed?" Guanghua School of Management, Peking Univeristy.

Mitra, Debanjan and Peter N. Golder (2006), "The Buzz on Business Schools: A Longitudinal Analysis of Scholarly Research and Perceptions," Marketing Science Conference, University of Pittsburgh.

Mitra, Debanjan and Peter N. Golder (2006), "Why Today's Business School Rankings are Yesterday's News: A Long-Term Analysis of the Impact of Academic Research," University of Southern California Marketing Camp.

Golder, Peter N., Rachel Shacham, and Debanjan Mitra (2005), "The Continuity of Seemingly Discontinuous, Radical Innovations," conference on Bridging Operations and Marketing, Catholic University, Lisbon, Portugal.

Mitra, Debanjan and Peter N. Golder (2005), "Why Today's Business School Rankings are Yesterday's News: A Long-Term Analysis of the Impact of Academic Research," ERIM Conference at Erasmus University, Rotterdam, Netherlands.

Golder, Peter N. (2005), "Continuous Innovation: The Key to Market Leadership," AMA Doctoral Consortium, University of Connecticut.

Golder, Peter N., Rachel Shacham, and Debanjan Mitra (2005), "The Continuity of Seemingly Discontinuous, Radical Innovations," Marketing Science Conference, Emory University.

Golder, Peter N., Rachel Shacham and Debanjan Mitra (2004), "A Discontinuous Perspective on Seemingly Radical Innovations," Hot Thoughts on Innovation: Insights at the Intersection of Marketing and Technology," MSI-AMA Conference at AMA Summer Educators' Conference, Boston, MA.

Golder, Peter N. (2004), "Comments on Research with Impact and Collaborating with your Advisor: Promise, Perils, and Solutions," AMA Doctoral Consortium, Texas A&M University.

Golder, Peter N. (2004), "Will and Vision: How Latecomers Grow to Dominate Markets," opening presentation at AMA Strategic Marketing Conference, Chicago, Illinois (based on book co-authored with Gerry Tellis).

Chandy, Rajesh K., Peter N. Golder, and Gerard J. Tellis (2003), "Historical Research: Method, Myths, and Applications," Cool Tools Conference for Marketing Strategy Research, AMA Summer Educators' Conference, Chicago, Illinois.

Foster, Joseph A., Peter N. Golder, and Gerard J. Tellis (2003), "Will It Ever Fly? Application of Takeoff Model at Whirlpool," ISMS Practice Prize Competition, Marketing Science Conference, University of Maryland.

Mitra, Debanjan, Peter N. Golder, and Qi Wang (2003), "Running Hard to Stand Still? Analyzing Persistence and the Duration of Market Performance," Marketing Science Conference, University of Maryland.

Golder, Peter N. (2003), "Historical Research and Innovation: How Does Looking Back Help Us Understand How to Look Ahead?" American Marketing Association Winter Educators' Conference, Orlando, FL.

Markovitch, Dmitri and Peter N. Golder (2002), "Competing Through Speed: Product Development and Alliance Speed and Their Impact on Firm Performance," Marketing Science Conference, University of Alberta.

Mitra, Debanjan and Peter N. Golder (2002), "When Do Firms Become Truly Multinational? A Study of the Dynamics of 'Near-Market' Knowledge on Entry Timing Decisions," Marketing Science Conference, University of Alberta.

Golder, Peter N. (2002), "Secondary Data," AMA Doctoral Consortium, Emory University.

Golder, Peter N. (2001), "Historical Research in Marketing," Special Session, AMA Summer Educators' Conference, Washington DC.

Mitra, Debanjan and Peter N. Golder (2001), "When Will They Ever Learn? An Econometric Analysis of the Long-Term Effects of Product Quality (or Why the Business School Ratings are always Yesterday's News?)," Marketing Science Conference, University of Mainz.

Golder, Peter N. and Julie R. Irwin (2001), "If They Could See Us Now: A Look at How Category Relationships Drive Long-Term Brand Leadership Persistence," Marketing Science Institute's Young Scholars Conference.

Golder, Peter N. and Julie R. Irwin (2000), "If They Could See Us Now: A Look at How Category Relationships Drive Long-Term Brand Leadership Persistence," New York Marketing Modelers Group.

Golder, Peter N. and Julie R. Irwin (2000), "If They Could See Us Now: A Look at How Consumers Relate to Their Products and How These Relationships Explain Why Leading Brands Succeed or Fail," special session at ACR Conference, Salt Lake City.

Bohlmann, Jonathan D. and Peter N. Golder (2000), " Deconstructing the Pioneer's Advantage: An Examination of the Relative Success and Failure of Market Pioneers," Marketing Science Conference, UCLA.

Mitra, Debanjan and Peter N. Golder (2000), "Veni, Vidi, Vici: Modern Insights for Selecting and Succeeding in New Country Markets," Marketing Science Conference, UCLA.

Golder, Peter N. (1999), "Contemporary Knowledge versus Historical Data: Other Examples of How the Past Catches Up with the Present," AMA Doctoral Consortium, University of Southern California.

Golder, Peter N. and Gerard J. Tellis (1999), "How Long Can This Keep Going On? Modeling the Growth of Radically New Products," Marketing Science Conference, Syracuse University.

Golder, Peter N. (1999), "Historical Method in Marketing Research with New Evidence on Long-Term Market Share Stability," invited presentation at University of Chicago.

Golder, Peter N. (1998), "Does Early Leadership Lock-in Long-term Leadership?" Fall INFORMS Conference, Seattle.

Golder, Peter N. and Gerard J. Tellis (1998), "Is There Life in the Product Life Cycle? New Formulation and Generalizations on a Dormant Concept," Marketing Science Conference, INSEAD.

Golder, Peter N. and Gerard J. Tellis (1998), "Great Expectations: How the Market Really Responds to Really New Products," invited presentation at University of Mainz, Germany.

Golder, Peter N. (1998), "Contemporary Knowledge versus Historical Data: Another Example of How the Past Catches Up with the Present," Columbia-NYU-Wharton-Yale Marketing Colloquium, New Haven, CT.

Golder, Peter N. and Gerard J. Tellis (1998), "Evaluating New Product Growth: When Will Sales Slow Down?" invited presentation at University of Houston.

Tellis, Gerard J. and Peter N. Golder (1996), "First to Market, First to Fail? Real Causes of Enduring Market Leadership," The Conference Board's 1996 Marketing Conference, New York, NY.

Golder, Peter N. and Gerard J. Tellis (1996), "Who are long-term leaders? When and how do they enter?" INFORMS Conference, Atlanta, GA.

Golder, Peter N. and Gerard J. Tellis (1996), "Evaluating New Product Growth: When Will Sales Slow Down?" Marketing Science Conference, University of Florida.

Golder, Peter N. and Gerard J. Tellis (1995), "When Will It Fly? Modeling the Takeoff of Really New Consumer Durables," New York City Marketing Modelers Group.

Golder, Peter N. and Gerard J. Tellis (1995), "When Will It Fly? Modeling the Takeoff of Really New Consumer Durables," Product Development Management Association Conference, Minneapolis, MN.

Golder, Peter N. and Gerard J. Tellis (1995), "Evaluating New Product Growth: Will Sales Ever Take Off," Marketing Science Conference, Australian Graduate School of Management.

Tellis, Gerard J. and Peter N. Golder (1994), "Forecasting Market Opportunities: Predicting the Takeoff of New Durables," Marketing Science Institute Conference, Boston, MA.

Golder, Peter N. (1994), "An Alternative Explanation for Order of Entry Effects Among Surviving Brands," Marketing Science Conference, University of Arizona.

Tellis, Gerard J. and Peter N. Golder (1993), "The Real Causes of Enduring Market Leadership," ORSA/TIMS Meeting, Phoenix, Arizona.

Golder, Peter N. (1993), "The Disadvantage of Being a Pioneer," Marketing Science Conference, Washington University.

Golder, Peter N. and Gerard J. Tellis (1993), "Pioneer Advantage: Marketing Logic or Marketing Legend?" Marketing Science Institute Conference, Atlanta, GA.

Golder, Peter N. and Gerard J. Tellis (1992), "Market Building vs. Pioneering: What Causes Long-term Leadership?" ORSA/TIMS Meeting, San Francisco, CA.

Golder, Peter N. and Gerard J. Tellis (1992), "Pioneer Advantage: Marketing Logic or Marketing Legend?" Marketing Science Conference, London Business School.

**RESEARCH INTERESTS**
Market Entry, New Products, Market Leadership, Quality, Global Marketing, Branding

**TEACHING INTERESTS**
Marketing Concepts, Global Marketing, New Products, Marketing Strategy

**PROFESSIONAL EXPERIENCE**
Northrop Corporation, 1986-1990
Conoco, 1984-1986

**GRANTS**
NYU Stern Berkley Center grant from Kauffman Foundation (2006)
NYU Stern Berkley Center grant from Kauffman Foundation (2005)
Marketing Science Institute (2000)
Richard D. Irwin Dissertation Fellowship - National Award Winner (1993)
U.S. Department of Education - Awarded through Center for International Business Education and Research at University of Southern California (1993)
Dissertation Fellowship from Center for International Business Education and Research at University of Southern California (1992)
Marketing Science Institute (1992)
Fellowship, University of Southern California (1990-1994)

**ACADEMIC SERVICE**

Editorial Review Boards: *AMS Review, International Journal of Research in Marketing, Marketing Science, Journal of Marketing*

Ad-hoc Reviewer: *Journal of Marketing Research*

Dissertation Committee Chair/Co-Chair:

Debanjan Mitra (placement: University of Florida)

Rachel Shacham (placement: University of Minnesota)

Tingting Fan (placement: Chinese University of Hong Kong)

Dissertation Committee: Jane Gu, Dmitri Markovitch, Sergio Meza

Co-Chair, Hot Thoughts on Innovation: Insights at the Intersection of Marketing and Technology, special interest conference sponsored by MSI and AMA, 2004.

Chair, Strategy Track, Winter AMA 2005, San Antonio, Texas

**ASSOCIATIONS**

American Marketing Association

Institute for Operations Research and Management Science (INFORMS)

*Revised May 1, 2019*

# APPENDIX B
# TESTIMONY IN THE LAST FOUR YEARS

## Peter N. Golder

### Testimony in the Last Four Years

United States District Court, Northern District of California, *The American Beverage Association et al., v. City of San Francisco*, 3:15-cv-03415, reports filed, no deposition.

United States International Trade Commission, *In The Matter of: Certain Footwear Product*, Investigation No. 337-TA-936, deposed May 20, 2015, testified at trial August 6-7, 2015.

United States District Court, District of Oregon, Portland Division, *adidas America, Inc. and adidas AG v. Skechers USA, Inc.*, 3:16-cv-01400-AC, deposed September 28, 2016, testified at hearing November 1, 2016.

United States District Court, Western District of Texas, Austin Division, *YETI Coolers, LLC, v. RTIC Coolers, LLC; John Jacobsen; and James Jacobsen*, Civil Action No. 1:15-cv-00597-RP, deposed December 9, 2016.

United States District Court, Eastern District of Wisconsin, *Glenn Burton, Jr., Minor, by his guardian ad litem, Susan M. Gramling, v. American Cyanamid Co.*, 2:07-cv-0303, deposed May 17, 2017.

United States District Court, Eastern District of Wisconsin, *Ravon Owens, Minor, by his guardian ad litem Susan M. Gramling, v. American Cyanamid Co.*, 2:07-cv-0441, deposed May 17, 2017.

United States District Court, Eastern District of Wisconsin, *Cesar Sifuentes, Minor, by his guardian ad litem Susan M. Gramling v. American Cyanamid Co.*, 2:10-cv-0075, deposed May 17, 2017.

United States District Court, District of Minnesota, *HealthPartners, Inc. v. Wal-Mart Stores, Inc. and Sam's West Inc.*, 16-cv-02970, deposed August 17, 2017.

United States District Court, Central District of California, Western Division, *Forever 21, Inc. v. Gucci America, Inc.*, 2:17-cv-4706, deposed June 27, 2018.

United States District Court, Western District of Missouri, Western Division, *In Re: Dollar General Corp. Motor Oil Marketing and Sales Practice Litigation*, Master Case No. 16-02709-MD-W-GAF, deposed July 9, 2018.

*Ballet Beauty, LLC, V. Lions Gate Films Inc.*, JAMS Arbitration Reference No. 1210034307, deposed January 26, 2019.

United States District Court of New Jersey, *Merck & Co., Inc., and Merck Sharp & Dohme Corp. v. Merck KGAA*, 2:16-cv-00266-ES-MAH, deposed March 3, 2019.

United States District Court for the District of Delaware, *LiQWD, Inc. and Olaplex LLC v. L'Oréal USA, Inc. et al.*, Civil Action No. 17-14 (JFB) (SRF), deposed March 10, 2019.

United States District Court, Southern District of New York, *Sprint Spectrum L.P., Sprintcom, Inc., and Sprint/United Management Company v. AT&T Mobility LLC*, Case No. 1:19-CV-01215-VSB, deposed April 3, 2019.

In the Court of Chancery of the State of Delaware, *Outlaw Beverage, Inc. v. Lance Collins and A Shoc Beverage, LLC*, C.A. No. 2019-0342-AGB, report filed, no deposition.

**APPENDIX C**
**MATERIALS RELIED UPON**

**Case Documents**

Complaint, *CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation v. Mark Brnovich, Attorney General of the State of Arizona and John S. Halikowski, Director of the Arizona Department of Transportation*, Case No. 2:19-cv-04849-GMS, July 29, 2019.

Declaration of Kelly Hall, *CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation v. Mark Brnovich, Attorney General of the State of Arizona and John S. Halikowski, Director of the Arizona Department of Transportation*, Case No. 2:19-cv-04849-GMS, August 22, 2019.

**Bates-Stamped Documents**

Defs. Ex. 28, Preliminary Injunction Hrg., *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-CV-318-JDP (W.D. Wisc. June 26-28, 2017) (*"Authenticom* P.I. Hrg.), CDK-0001009.

Defs. Ex. 38, *Authenticom* P.I. Hrg., CDK-0001113.

Defs. Ex. 39, *Authenticom* P.I. Hrg., CDK-0001115.

Defs. Ex. 40, *Authenticom* P.I. Hrg., CDK-0001117.

"CDK-0032184.pdf", CDK-0032184.

"CDK-0111950.pdf," CDK-0111950.

"CDK-0214705.pdf," CDK-0214705.

"CDK-0887504.pdf," CDK-0887504.

"CDK-1176494.pdf," CDK-1176494.

"CDK-1176497.pdf," CDK-1176497.

"CDK-2670251.pdf," CDK-2670251.

**Academic Literature and Publications**

Fombrun, Charles J. and Naomi Gardberg, "Who's Tops in Corporate Reputation?" *Corporate Reputation Review*, Vol. 3, No. 1, January 2000.

Goel, Sanjay, Christopher Brown, and Hany Shawky, "Measuring the Impact of Security Breaches on Stock Valuations of Firms," *In Proceedings of the 6th Annual Security Conference*, April 2007, available at https://pdfs.semanticscholar.org/cf4b/00606775d37ec4766fc2a89fd176eac8bdcb.pdf.

Keller, Kevin Lane, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, 4th Edition, Pearson, 2013.

Kotler, Philip and Kevin Lane Keller, *Marketing Management*, 15th Edition, Pearson, 2016.

Mizik, Natalie, "Value of Marketing," *Marketing Accountability Standards Board — Board Meeting*, March 2010, available at https://themasb.org/wp-content/uploads/2010/03/J.-Methods-of-Marketing.Stock-Price-MizikF-3.10.pdf.

Mizik, Natalie and Robert Jacobson, "Valuing Branded Businesses," *Journal of Marketing*, Vol. 73, No. 6, November 2009.

Payne, John W., James R. Bettman, and Eric J. Johnson, *The Adaptive Decision Maker*, Cambridge University Press, 1993.

Sinanaj, Griselda, Jan Muntermann, "Assessing Corporate Reputational Damage of Data Breaches: An Empirical Analysis," *Association for Information Systems - BLED Proceedings,* 2013.

Slovic, Paul, Baruch Fischhoff, and Sarah Lichtenstein, "Rating the Risks," *Environment*, Vol. 21, No. 3, April 1979.

Tversky, Amos and Daniel Kahneman, "Availability: A Heuristic for Judging Frequency and Probability," *Cognitive Psychology*, Vol. 5, 1973.


**Publicly Available**

"10 Steps Dealers Need to Take to Protect 'Dealer Data,'" *National Automobile Dealers Association*, 2014, available at https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474839172.

"ADP Completes Spinoff of CDK Global," *ADP*, October 1, 2014, available at http://mediacenter.adp.com/news-releases/news-release-details/adp-completes-spinoff-cdk-global.

Bond Jr., Vince, "Dealers Vulnerable to Hackers, Survey Warns," *Automotive News*, June 20, 2016, available at https://www.autonews.com/article/20160620/OEM06/306209973/dealers-vulnerable-to-hackers-survey-warns.

"CDK Global Launches Security-Focused Program for Automotive Retail," *MarketWatch,* available at https://www.marketwatch.com/press-release/cdk-global-launches-security-focused-program-for-automotive-retail-2015-06-22.

"CDK Security First," *CDK Global*, available at https://www.cdkglobal.com/en-ca/cdk-security-first.

"Certified Dealer's Process Reynolds Certified Interface Testimonial," *Reynolds & Reynolds*, available at https://www.reyrey.com/media/certified-dealers-process-reynolds-certified-interface-testimonial.

"Cyberthreats and Solutions for Small and Midsize Businesses," *Vistage*, 2018, available at https://www.vistage.com/wp-content/uploads/2018/04/Cybersecurity-Research-Note.pdf.

"Data Management," *CDK Global*, available at https://www.cdkglobal.com/us/automotive/dealership-operations/data-management.

"Data Security," *Reynolds & Reynolds*, available at https://www.reyrey.com/company/reynolds-data-management/data-security.

"Dealer Data Guidance – Sample Service Provider Contract Language," *National Automobile Dealers Association*, August 28, 2013, available at https://d3dkdvqff0zqx.cloudfront.net/groups/ilada/attachments/dealerdataguidance.pdf.

"ERA Data Management Milestones," *Reynolds & Reynolds*, 2016.

"Fallout: The Reputational Impact of IT Risk," *Forbes Insights*, 2014, available at https://images.forbes.com/forbesinsights/StudyPDFs/IBM_Reputational_IT_Risk_REPORT.pdf.

Fombrun, Charles J. and Jonathan Low, "The Real Value of Reputation," *Communication World*, November–December 2011, available at https://www.iabc.com/wp-content/uploads/2014/10/The-Real-Value-of-Reputation.pdf.

House Bill 2418, 54th Legislature, 1st Reg. Sess. (Ariz. 2019).

Kilgore, Tomi, "Marriott's Stock Sinks After Disclosing Data Breach Affecting Up to 500 Million Guests," *MarketWatch,* November 30, 2018, available at https://www.marketwatch.com/story/marriotts-stock-sinks-after-disclosing-data-breach-affecting-up-to-500-million-guests-2018-11-30.

Kitzman, Sharon, "How to Find the Right DMS," *Auto Dealer Today*, May 5, 2014, available at https://www.autodealertodaymagazine.com/310463/how-to-find-the-right-dms.

Lieberman, Matthew, "Mind the Trust Gap: How Companies Can Retain Customers After a Security Breach," *Forbes*, December 8, 2017, available at https://www.forbes.com/sites/forbestechcouncil/2017/12/08/mind-the-trust-gap-how-companies-can-retain-customers-after-a-security-breach/#7b5b7d2f6c95.

Nusca, Andrew, "Equifax Stock Has Plunged 18.4% Since It Revealed Massive Breach," *Fortune*, September 11, 2017, available at https://fortune.com/2017/09/11/equifax-stock-cybersecurity-breach/.

Prahalad, Deepa, "Why Trust Matters More Than Ever for Brands," *Harvard Business Review*, December 8, 2011, available at https://hbr.org/2011/12/why-trust-matters-more-than-ev.

"Reputation Impact of a Data Breach," *Ponemon Institute*, November 2011, available at https://www.experian.com/assets/data-breach/white-papers/reputation-study.pdf.

"Reynolds - 10 Principles of Reynolds Data Management," *Reynolds & Reynolds*, 2014.

"Reynolds Data Management," *Reynolds & Reynolds*, available at https://www.reyrey.com/company/reynolds-data-management.

"Reynolds Sells a Revolution," *Automotive News*, November 14, 2016, available at https://www.autonews.com/article/20161114/RETAIL/311149988/reynolds-sells-a-revolution.

"Service Provider Dealer Data Access Addendum," National Automobile Dealers Association, available at https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474839174.

Shadbolt, Peter, "How Can a Company Repair a Damaged Reputation?" *BBC*, October 13, 2016, available at https://www.bbc.com/news/business-37630983.

Smith-Bingham, Richard, "Reputation Risk," *Oliver Wyman*, available at https://www.oliverwyman.com/content/dam/oliver-wyman/global/en/2014/may/ReputationRisk_Final_web.pdf.

"The Aftermath of a Data Breach: Consumer Sentiment," *Ponemon Institute*, April 2014, available at https://www.ponemon.org/local/upload/file/Consumer%20Study%20on%20Aftermath%20of%20a%20Breach%20FINAL%202.pdf.

"The Impact of Data Breaches on Reputation & Share Value," *Ponemon Institute,* May 2017, available at https://www.centrify.com/media/4737054/ponemon_data_breach_impact_study.pdf.

"The Most Reputable US Consumer Companies," Reputation Institute, October 2018, available at https://ri.reputationinstitute.com/hubfs/_PDF/Research/Consumer%20Report_v2%20(003).pdf.

"The Power of a Strong DMS," *CDK Global*, available at https://www.cdkglobal.com/us/automotive/dms.

"What is Reputational Damage Coverage?" *Insurance Technologies Corporation*, available at https://www.getitc.com/syndicate/2017/12/28/what-is-reputation-damage-coverage.