John C. Norling – 013986
jnorling@jsslaw.com
Jeffrey D. Gardner – 021783
jgardner@jsslaw.com
Jimmie W. Pursell, Jr. – 19957
jpursell@jsslaw.com
**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
One East Washington Street, Suite 1900
Phoenix, Arizona 85004-2554
Telephone: (602) 262-5911

Michael N. Nemelka* (DC 983800)
mnemelka@kellogghansen.com
Derek T. Ho* (DC 488609)
dho@kellogghansen.com
Brendan J. Crimmins* (DC 497273)
bcrimmins@kellogghansen.com
Joshua Hafenbrack* (DC 1017128)
jhafenbrack@kellogghansen.com
Collin R. White* (DC 1031005)
cwhite@kellogghansen.com
Bethan Jones* (DC 156261)
bjones@kellogghansen.com
**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Fax:  (202) 326-7999

*Attorneys for Intervenor-Defendants*
*Arizona Automobile Dealers Association*

*Pro Hac Vice

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> Mark Brnovich, Attorney General of the State of Arizona, et al., <br><br> Defendants. | No. 2:19-cv-04849-GMS <br><br> **INTERVENOR-DEFENDANTS ARIZONA AUTOMOBILE DEALERS ASSOCIATION'S RULE 12(B)(6) MOTION TO DISMISS; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> **(Oral Argument Requested)** |

1

# TABLE OF CONTENTS

2  INTRODUCTION ..................................................................................................... 1

3  FACTUAL AND STATUTORY BACKGROUND ..................................................... 1

4  LEGAL STANDARD ............................................................................................... 6

5  ARGUMENT ............................................................................................................ 6

6     I.   FEDERAL LAW DOES NOT PREEMPT ARIZONA'S DEALER DATA
7         SECURITY LAW ............................................................................................ 6

8        A.    The CFAA Does Not Preempt Arizona's Law (Fourth Claim) ............... 7

9        B.    The DMCA Does Not Preempt Arizona's Law (First Claim) ............... 10

10        C.    The Copyright Act Does Not Preempt Arizona's Law (Second Claim) 13

11        D.    The DTSA Does Not Preempt Arizona's Law (Third Claim) ............... 15

12        E.    The GLBA Does Not Preempt Arizona's Law (Fifth Claim) ................ 16

13  CONCLUSION ....................................................................................................... 17

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6775191v1(63597.36)

**INTRODUCTION**

If Plaintiffs CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") are to be believed, the Dealer Data Security Law, codified at Arizona Revised Statute ("A.R.S.") Sections 28-4651 to 28-4655—which was passed by the Arizona Legislature by a bipartisan vote of 89 to zero, and signed into law by Governor Ducey—is preempted by five separate federal statutes and violates five separate provisions of the U.S. Constitution.  That would make it perhaps one of the most constitutionally infirm statutes in the history of state legislation.   Not surprisingly, Plaintiffs' extreme contention is wrong as a matter of law.  The statute embodies data security, consumer protection, and economic legislation—legislation that under our federalist constitutional system lies within the traditional province of the States—that ensures the security of data that belongs to automobile dealerships and brings fairness back to an industry that for too long has suffered from Plaintiffs' harmful market practices.  At its core, the statute puts safeguards around the use of dealer data and returns control of that data to the dealers themselves.  Plaintiffs are the two largest DMS (or "Dealer Management System") providers that together control 75% of the DMS market.  (Other DMS providers did not challenge the law; in fact, they support it.)  The statute forbids DMS providers like Plaintiffs from taking control of dealer data to obtain a chokehold over the retail automobile market.  Nothing in federal law or the U.S. Constitution prohibits such common-sense legislation.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Intervenor-Defendant Arizona Automobile Dealers Association ("AADA") respectfully moves this Court to dismiss with prejudice the Complaint in its entirety.

**FACTUAL AND STATUTORY BACKGROUND**

**1.**  A DMS is enterprise software that auto dealerships use to run their operations.  *See* Compl. ¶¶ 34-45.  A DMS includes a database, where dealers store the data

(about their customers, car inventory, parts, accounting, and more) that they generate in their operations.  *Id.* ¶ 42 ("some data 'belongs' to the dealers"); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 940 (N.D. Ill. 2018) (St. Eve, J.) ("Dealers 'own' their data in the DMSs.").[1]  Besides a DMS, dealers use other software applications—such as customer relationship management and inventory management—that require access to a dealer's data.  *See* Compl. ¶ 37.  CDK and Reynolds charge these third-party software applications monthly fees for access to the dealer's data.  *Id*. ¶¶ 99, 104.  CDK and Reynolds also have reporting tools that permit dealers to manually extract and transmit their data to third-party applications, *id.* ¶ 107, but, as one court observed, these methods are "'comically' insecure."  *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *9 (W.D. Wis. July 14, 2017).

The Arizona Legislature passed A.R.S. §§ 28-4651 to 28-4655 (the "Dealer Data Security Law" or the "Law") to safeguard the security of dealer data (which includes consumer data) and put dealers in control of access to it.  The House (March 11, 2019) and the Senate (March 27, 2019) both passed the law *unanimously* and Governor Ducey signed it on April 9, 2019.

**2.**  The Dealer Data Security Law pertains to only three categories of data: (1) "consumer" information, over which dealers have custodianship; (2) "data that relates to a dealer's business operations" (such as transactional, inventory, and accounting information); and (3) "motor vehicle diagnostic" information used to

---

[1]  The AADA does not rely on facts outside the four corners of the Complaint in support of its arguments for dismissal, and accepts all allegations within the Complaint as true.  Nevertheless, the Court can take judicial notice of the Dealer Data Security Law's legislative history and of court decisions in the antitrust cases against CDK and Reynolds.  *See, e.g.*, *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice."); *Five Points Hotel P'ship v. Pinsonneault*, 835 F. Supp. 2d 753, 757 (D. Ariz. 2011) (observing that on a motion to dismiss, a court can take judicial notice of the existence of another court's opinion, although "not for the truth of the facts recited therein").

service cars.  *See* A.R.S. § 28-4651(7) (defining "Protected Dealer Data").  The Law does *not* apply to any non-dealer data.

Dealers are subject to numerous federal regulations governing use of consumer information, including rules requiring dealers to provide notice to consumers regarding how their data will be used.  *See, e.g.*, 16 C.F.R. § 313 (FTC Financial Privacy Rule); 16 C.F.R. § 314 (FTC Safeguards Rule).  The Dealer Data Security Law provides additional safeguards to keep consumer information and other Protected Dealer Data confidential and to limit its use.  Among such provisions are those prohibiting use of the data in ways that exceed dealer and consumer consent, A.R.S. § 4654(B)(1); requiring deletion of the data after the termination of an agreement with the dealer, A.R.S. § 4654(B)(3)(b); ensuring that dealers may audit access to and use of the data held by DMS providers, A.R.S. § 4654(B)(4)-(5); and clarifying that the Law does not authorize use of consumer data in a manner inconsistent with a dealer's agreement with a consumer or the purposes for which the consumer provided it, A.R.S. § 4655(2).

The Dealer Data Security Law sets several important additional boundaries on the access and use of Protected Dealer Data.  First, the Law ensures that "[no] third party may . . . access, share, sell, copy, use, or transmit protected dealer data without prior express written consent."  A.R.S. § 28-4653(A)(1).  Second, the Law specifies that dealers and third parties must meet the Standards for Technology in Automotive Retail ("STAR Standards"), which were developed by the automotive industry to establish "best practices" for data security.[2]  A.R.S. § 28-4651(9).  Third, the Law protects dealers and consumers by prohibiting third parties from engaging in "cyber ransom," A.R.S. § 28-4653(A)(2), which is defined as any mechanism to "encrypt, restrict or prohibit . . . a dealer's or a dealer's authorized integrator's access to

---

[2] The 2019 STAR Standards have been published at https://www.starstandard.org/images/SIGINFRASTRUCTURE/2019STARDealer InfrastructureGuidelines(DIG).pdf.

6775191v1(63597.36)

protected dealer data for monetary gain," A.R.S. § 28-4651(2).  Fourth, the Law prohibits third parties—including any DMS company—from taking actions to "prohibit or limit a dealer's ability to protect, store, copy, share, or use protected dealer data," A.R.S. § 28-4653(A)(3), and from placing any "unreasonable restriction" on the ability of a dealer-authorized third party to access a dealer's data on the dealer's DMS database, *id.* § 28-4653(A)(3)(b).

Critically, DMS companies can comply with the Law by providing a secure, external interface (referred to as an application programming interface, or "API") without the need for any third party to even access the DMS database.[3]  *See* A.R.S. § 28-4654(A)(2).  Indeed, the Law requires that DMS companies "provide access to open application programming interfaces to authorized integrators," so that dealers can securely and efficiently transfer their data to their third-party business partners. *Id.*

Arizona is not alone in taking action to protect dealer and consumer data in this way.  Montana (H.B. 617 enacted on May 6, 2019, and currently in effect), Oregon (H.B. 3152 enacted on July 2, 2019, and going into effect on January 1, 2020), and North Carolina (SB 384 enacted on July 19, 2019, and going into effect on October 1, 2020)[4] have passed materially identical statutes to Arizona's law, with more states planning to follow suit in future legislative sessions.

**3.**  The Complaint fails to mention the antitrust backdrop that—along with the paramount data security issues—helped lead to the enactment of the laws in Arizona and other states.  Plaintiffs CDK and Reynolds are defendants in a federal antitrust Multi-District Litigation ("MDL") and are subject to active investigations by the

---

[3] As the FTC has explained, an "API (or Application Programming Interface) allows a website or software program to accept requests from an external source and send back responses to those requests."  *See* "FTC For Developers" *available at* https://www.ftc.gov/developer.

[4] *See* H.R. 617, 66th Leg., Reg. Sess. (Mont. 2019); H.R. 3152, 80th Leg. Assemb., Reg. Sess. (Or. 2019); H.R. 384, Gen. Assemb. Reg. Sess. (N.C. 2019).

Federal Trade Commission and multiple state attorneys general[5] into alleged collusion to monopolize access to dealer data.  Four federal judges have found those antitrust claims to be valid in cases brought by dealers, third-party software vendors, and competitors.[6]   The harm to competition and consumers, in Arizona and elsewhere, has been immense.  CDK and Reynolds, which have long held a duopoly in the DMS market, have used their combined power to take control over data that they publicly acknowledge belongs to the dealers and then impose staggering fees for access to that data.  *In re Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 939-41, 945-46; *see also Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017) (noting that where independent integrators charge $50 per store per month for data access, Reynolds charged in one example "a whopping $893 in the aftermath of its agreements with CDK" while CDK, in another example, raised its prices multifold to $735).

**4.**  On July 29, 2019, CDK and Reynolds filed this Complaint alleging, in a kitchen-sink pleading strategy, that the Dealer Data Security Law is preempted by federal law and unconstitutional under ten different theories.  This Memorandum addresses the five preemption claims, and the AADA joins and adopts the arguments made by the State of Arizona Defendants regarding the five constitutional claims.

---

[5] *See, e.g.*, Melissa Burden, *Signs show probe of DMS giants CDK, Reynolds heating up*, Automotive News, August 26, 2019, www.autonews.com/dealers/signs-show-probe-dms-giants-cdk-reynolds-heating.

[6] *See CDK Global, LLC*, 2017 WL 3017048 (W.D. Wis. July 14, 2017) (Peterson, J. *Authenticom* opinion); *Motor Vehicle Software Corp. v. CDK Global, LLC*, 2017 WL 5643163 (C.D. Cal. Oct. 2, 2017) (Fischer, J. opinion); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931 (N.D. Ill. 2018) (St. Eve, J. *Authenticom* opinion); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018) (Dow, J. *MVSC* opinion); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477 (N.D. Ill. 2019) (Dow, J. *Vendor Class* opinion); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510 (N.D. Ill. 2019) (Dow, J. *Dealer Class* opinion).

6775191v1(63597.36)

**LEGAL STANDARD**

CDK and Reynolds must allege sufficient non-conclusory facts "to state a claim to relief that is plausible on its face." *Hamilton v. Yavapai Cmty. Coll. Dist.*, 2016 WL 5871502, at *1 (D. Ariz. Oct. 7, 2016).[7]

Plaintiffs face two significant hurdles given that they have brought a facial preemption challenge prior to enforcement. First, a statute is facially unconstitutional "only if it is unconstitutional in every conceivable application." *Klein v. San Diego Cty.*, 463 F.3d 1029, 1033 (9th Cir. 2006) (internal quotation marks omitted); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("no set of circumstances exists under which the Act would be valid"). As demonstrated below, Plaintiffs have not plausibly alleged that the DMS Law is unconstitutional in *any* of its applications, let alone *every conceivable* application.

Second, where a state law is challenged before implementation and enforcement, courts must exercise "caution in evaluating the validity of [the statute]." *Arizona v. United States*, 567 U.S. 387, 415 (2012). "There is a basic uncertainty about what the law means and how it will be enforced" and "without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume" the statute would be construed to raise constitutional concerns. *Id.*

**ARGUMENT**

**I.   FEDERAL LAW DOES NOT PREEMPT ARIZONA'S DEALER DATA SECURITY LAW**

Plaintiffs cannot clear the "high threshold" that "must be met if a state law is to be preempted for conflicting with the purposes of a federal act." *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019) (internal quotation marks omitted). To

---

[7] AADA submitted a proposed Answer in conjunction with its Motion to Intervene, *see* Dkt. 30, as required by Rule 24(c). However, it expressly reserved its right to file a motion to dismiss under Rule 12(b)(6). In the alternative, if the Court deems the proposed Answer to have been filed, AADA requests that this motion be considered a motion for judgment on the pleadings pursuant to Rule 12(c), which is assessed under the same standard as a Rule 12(b)(6) motion.

1    prevail on their theories of "implied" preemption, *see* Compl., ¶¶ 175, 184, 194, 205,

2    217, Plaintiffs must show that the Dealer Data Security Law "stands as an obstacle to

3    the accomplishment and execution of the full purposes and objectives of Congress,"

4    *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), based on "the federal statute as a whole

5    and identifying its purpose and intended effects," *Crosby v. National Foreign Trade*

6    *Council*, 530 U.S. 363, 373 (2000).

7         Furthermore, because the Dealer Data Security Law regulates commerce,

8    consumer protection, and data security—areas of traditional State concern[8]—the

9    Court must "start with the assumption that the historic police powers of the States

10   were not to be superseded by the Federal Act unless that was the clear and manifest

11   purpose of Congress."  *Wyeth v. Levin*, 555 U.S. 555, 565 (2009) (quoting *Medtronic,*

12   *Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).   Moreover, a claim based on implied

13   preemption "'does not justify a freewheeling judicial inquiry into whether a state

14   statute is in tension with federal objectives; such an endeavor would undercut the

15   principle that it is Congress rather than the courts that preempts state law.'"

16   *California*, 921 F.3d at 879 (quoting *Chamber of Commerce of U.S. v. Whiting*, 563

17   U.S. 582, 607 (2011)).

18        Plaintiffs' preemption claims rest on a mistaken account of the five federal

19   statutes on which they rely.   None is fairly read to preclude Arizona's effort to

20   protect the privacy of dealer data and to restore dealers' right to control access to that

21   data.

22        **A.    The CFAA Does Not Preempt Arizona's Law (Fourth Claim)**

23        The Computer Fraud and Abuse Act ("CFAA") is principally a criminal statute

24   that "was aimed at hackers who accessed computers to steal information or to disrupt

25

26   ───────────────
     [8]  *See, e.g.*, *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (consumer
27   protection): *Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 958 (N.D. Cal.
     2004) (unfair business practices); A.R.S. §§ 12-2292 to 12-2294 (confidentiality of
28   medical records); § 32-3211 (protocols for secure storage of medical records); § 44-
     1692 (limitations on use of consumer information by credit reporting agencies).

or destroy computer functionality." *United States v. Nosal*, 844 F. 3d 1024, 1032 (9th Cir. 2016) (internal quotation marks omitted).  The CFAA's text tethers liability to whether one has "accesse[d] a computer *without authorization* or exceed[ed] *authorized* access, and thereby obtain[ed] . . . information from any protected computer."  18 U.S.C. § 1030(a)(2) (emphases added).  The conduct the CFAA prohibits has been described by the Ninth Circuit as "breaking and entering" a protected computer.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 2019 WL 4251889, at *12 (9th Cir. Sept. 9, 2019).  The CFAA does not preempt the Dealer Data Security Law.

**First**, there is no conflict between the Dealer Data Security Law and the CFAA because nothing in the state statute purports to allow anyone to break and enter into Plaintiffs' DMSs.  The Law requires DMS providers to provide data access only to users with express written authorization of the dealers.  A.R.S. § 28-4653(A)(1).  That makes the Law antithetical to "hacking."  The Law thus does not conflict with the CFAA, because while the CFAA prohibits hacking, it does not purport to federalize the law of computer access (i.e., to dictate when authorization must be granted, and when it may be denied).[9]  Indeed, courts have specifically cautioned against reading the CFAA in ways that "preempt all state and local laws that might otherwise afford a legal right of access," which would "stifle the dynamic evolution and incremental development of state and local laws addressing the delicate balance between open access to information and policy."  *hiQ Labs, Inc. v. LinkedIn Corp.* 273 F. Supp. 3d 1099, 1110-11 (N.D. Cal. 2017), *aff'd*, 2019 WL 4251889 (9th Cir. Sept. 9, 2019).  This is particularly true with respect to the state statute at issue here,

---

[9] Black-letter criminal law analogous to the CFAA proves the point:  a person cannot commit burglary if he acts within a legal entitlement to be in the relevant premises. *See* A.R.S. Ann. § 13-1501(2) (defining "Enter or remain unlawfully" under Arizona's criminal trespass and burglary statutes to mean "an act of a person who enters or remains on premises when the person's intent for so entering or remaining is not licensed, authorized or otherwise privileged . . . ."); *see also State v. Altamirano*, 166 Ariz. 432, 437 (Az. Ct. App. 1990) (reversing second-degree-burglary conviction because "the defendant had an absolute and unconditional right to enter and remain on the property where he committed the crime").

8

because Plaintiffs' reading of the CFAA would criminalize dealers granting access to their own data.  *See* A.R.S. § 28-4651(7) (defining "Protected Dealer Data"); *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012) (en banc) (cautioning against reading of CFAA that would make "every violation of a private computer use policy a federal crime"); *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, 965-66 (D. Ariz. 2008) (adopting "narrow view of the CFAA" under which the prohibited conduct "is analogous to that of 'breaking and entering' rather than using a computer . . . . Simply stated, the CFAA is a criminal statute focused on criminal conduct.  The civil component is an afterthought.").

Plaintiffs' contention that the CFAA gives them "exclusive discretion to decide who is authorized to access their computer and for what purposes," Compl. ¶ 201, is thus incorrect.  If that were so, the CFAA would have sweeping preemptive effect, displacing any state law that limited in any way a computer owner's right to deny access to a third party, even when that third party is the owner of the data.  For example, no State could pass consumer-protection laws requiring companies to provide customers access to their online data on certain terms.  Unsurprisingly, Plaintiffs cannot point to a single case holding that the CFAA supplants the States' traditional regulatory powers in that way.  Indeed, as far as the AADA is aware, no federal court has ever held the CFAA impliedly preempts any state statute in its 35-year history.

The CFAA's legislative history confirms that Congress did not intend such a radical result.  When the original CFAA was enacted in 1984, Congress's stated goal was to stop hacking—but it did not want to interfere with "any type or form of computer access that is for a legitimate business purpose."  *See* H.R. Rep. No. 98-894, at 21, *reprinted in* 1984 U.S.C.C.A.N. 3689, 3706-07 (CFAA's predecessor statute).  Clearly, Congress did not intend to give computer owners *carte blanche* to preclude access even for "legitimate business purpose[s]."  The CFAA leaves States

free to determine when and under what circumstances third parties may access data on protected computers for such legitimate reasons.  That is what Arizona's law does.

**Second**, instead of being in conflict, the federal CFAA and state Dealer Data Security Law work in tandem to ensure that computer systems and data are properly protected and remain free from any damage or loss.  As noted above, the Dealer Data Security Law does not allow third parties to access a DMS and write harmful information into it directly.   Instead, the statute precludes only "unreasonable restriction[s]" on access by third parties that have met STAR Standards for data security, A.R.S. § 28-4653(A)(3)(b); provides an alternative to "access to the [DMS]" by permitting pushing data through "any widely acceptable electronic file format" that, again, meets the STAR Standards, *id.* § 28-4652; does not prevent Plaintiffs from complying with their obligations under federal law, *id.* § 28-4653(C); and requires only a "standardized framework" for the exchange and integration of Protected Dealer Data consistent with a "reasonable commercial or technical standard for secure data integration," *id.* § 28-4654(A)(1)-(2).

Indeed, Plaintiffs can comply with the Law—as the statute itself enumerates, *see id.* § 28-4654—by creating an API between the dealer's DMS database and a database outside the DMS, requiring no third-party access to the DMS at all.  This provision alone is fatal to Plaintiffs' facial challenge under the CFAA.  *Klein*, 463 F.3d at 1033 (statute facially unconstitutional "only if it is unconstitutional in every conceivable application") (internal quotation marks omitted).

In short, rather than Plaintiffs' strained reading of these provisions as giving direct, unfettered access to criminal hackers, the Law ensures that any data access is secure, controlled, and within authorized bounds.   Accordingly, the Dealer Data Security Law is wholly consistent with the CFAA.

**B.     The DMCA Does Not Preempt Arizona's Law (First Claim)**

Plaintiffs' Digital Millennium Copyright Act ("DMCA") preemption claim fails for similar reasons.  To protect copyright owners against Internet piracy, Congress

10

made it unlawful to "circumvent a technological measure that effectively controls access to" a copyrighted work.  17 U.S.C. § 1201(a)(1)(A).  Circumvention "means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure . . . ."  17 U.S.C. § 1201(a)(3)(A).  The Dealer Data Security Law does not conflict with the DMCA.

**First**, the Dealer Data Security Law does not authorize any circumvention of technological barriers by unauthorized parties.  Rather, it requires DMS providers to permit data access by persons who have the dealers' written authorization to access the dealers' data.  Indeed, it is clear that the DMCA prohibits anti-circumvention only by parties who lack permission to access the computer system at issue.  "The legislative record reveals a clear congressional intent for the DMCA to promote an electronic marketplace free from *unauthorized* electronic dissemination of copyrighted works."  *ITC Textile, Ltd. v. Wal-Mart Stores, Inc.*, 2009 WL 10671458, at *5 (C.D. Cal. Mar. 31, 2009); *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018) ("legitimate users" that complete a CAPTCHA screen "do not violate the DMCA"); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 691 (D. Md. 2011) (DMCA requires plaintiffs to "prove that the defendant's access was unauthorized").  As with the CFAA, the DMCA protects anti-circumvention measures to block unauthorized access, not to define (as the Dealer Data Security Law does for dealer-authorized third parties) what access is authorized in the first place.

Moreover, the Dealer Data Security Law does not enable copyright piracy, and poses no threat to the DMCA's core anti-piracy objective.  Rather, the Law reflects the Arizona Legislature's judgment that Plaintiffs' use of technological blocking to prevent dealers from allowing third parties to access *their own data* has other undesirable effects — principally, enabling Plaintiffs to hold dealer data hostage in exchange for a "cyber ransom."  A.R.S. § 28-4651(2).  Nothing in the DMCA

6775191v1(63597.36)

prohibits States from prohibiting the *abuse* of anti-circumvention measures.  *Cf. MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 951 (9th Cir. 2010) (recognizing possibility that a party may use the "DMCA anti-circumvention right in a manner that violates antitrust law").  As with the CFAA, Plaintiffs' unprecedented approach would leave States powerless to use common tools—not least, state antitrust enforcement—to regulate anticompetitive practices by software companies and their control of data.

**Second**, Plaintiffs can comply with the Law by creating an API between a dealer's DMS database and an external location, *see* A.R.S. § 28-4654; *supra* p. 4, which does not implicate Plaintiffs' alleged anti-circumvention measures, such as CAPTCHA.  With an API, no third party is accessing the DMS, and thus there is no "circumvention" of any technological roadblock.  Again, as with the CFAA, this fact is fatal to Plaintiffs' facial challenge to the Law in its entirety.  *See Arce v. Douglas*, 793 F.3d 968, 989 (9th Cir. 2015) (under Arizona principles on severability, where law is not facially invalid, the remaining provisions are to be enforced).

In any event, as noted, the Law precludes only "unreasonable restriction[s]" on access by dealer-authorized third parties that have met STAR Standards for data security, A.R.S. § 28-4653(A)(3)(b).  That provision—by its very nature—does not prohibit anti-circumvention measures in "every conceivable application."  *Klein*, 463 F.3d at 1033.  Rather, a DMS provider that imposes reasonable restrictions on access—such as CAPTCHA for *unauthorized* third parties—could comply with the statute and will not be forced, as Plaintiffs allege, to "abandon" those restrictions. Compl. ¶ 174; *see Puente Arizona v. Arpaio*, 821 F. 3d 1098, 1104, 1107-08 (9th Cir. 2016) (holding that a facial challenge on preemption grounds, even in an area exclusively within the federal domain, will not succeed "[j]ust because some applications of those laws implicate federal immigration priorities" and "does not mean that the statute as a whole should be struck down").

12

## C.   The Copyright Act Does Not Preempt Arizona's Law (Second Claim)

CDK and Reynolds do not and could not allege that they have a copyright over Protected Dealer Data stored on the DMS.[10]   Rather, Plaintiffs argue that the Dealer Data Security Law allows third parties to "access and use Plaintiff's copyrighted DMS software," which results in the creation of "random access memory" (or "RAM") copies, Compl. ¶ 183, when those third parties run a DMS report-generator function in order to access dealer data.  Those allegations do not plausibly establish that Arizona's statute conflicts with the Copyright Act.

**First**, as with their claims under the CFAA and DMCA, Plaintiffs' facial challenge fails because they can comply with the Dealer Data Security Law without any of the "access and use" of the DMS software that they allege: through the creation of an API to and from the dealer's database.  *See supra* p. 4.   Indeed, although the Law prohibits Plaintiffs from preventing dealers from using authorized third parties to access the dealers' data, the Law does not authorize — much less mandate — access in a way that permits the copying of Plaintiffs' copyrighted software.  Instead, Section 28-4654 requires DMS companies to set up APIs to allow for the transfer of dealer data — a process that would not require access to the DMS by any third party.  Although Plaintiffs allege that it is "impossible for a user *to access or use the Reynolds DMS* without running (and thereby copying) Reynolds's copyrighted DMS software programs," Compl. ¶ 49 (emphasis added), Plaintiffs make no allegations that dealer-initiated data transfers and those done through separate APIs require use and copying of their DMS software.  There is thus no basis to conclude the law is "unconstitutional in every conceivable application."  *Klein*, 463 F.3d at 1033.

---

[10] The dealer data held in the DMS is raw information – such as customer, inventory, and transactional information – and these "facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (finding no copyright protection over information in White Pages because "raw data does not satisfy the originality requirement" for copyright protection).

13

**Second**, even if Plaintiffs could not comply with the Dealer Data Security Law without letting dealers run Plaintiffs' copyrighted software, the Law at most authorizes fair use.  It is Plaintiffs' burden in a preemption case to show that the state statute conflicts with the entire copyright scheme, which encompasses fair use.  *See* 17 U.S.C. § 107 (fair use "is not an infringement of copyright"); *Ass'n of Am. Med. Colleges v. Cuomo*, 928 F.2d 519, 523 (2d Cir. 1991) (if a state statute authorizes fair use, it does not conflict with the Copyright Act); *Lindberg v. Cty. of Kitsap,* 133 Wash. 2d 729, 745-746 (1997) (rejecting conflict preemption claim on fair use grounds).  Here, any incidental copying necessary for dealers to gain access to their own data is fair use as a matter of law.  *See Sony Comput. Entm't, Inc. v. Connectix*, 203 F.3d 596, 606-608 (9th Cir. 2000) (fair use for company to reproduce copyrighted software underlying Sony's PlayStation to create a program that let consumers run PlayStation games on personal computers); *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 645 (7th Cir. 2003) (Posner, J.) (*Connectix* permits copying a copyrighted database program for the purpose of extracting the underlying data); *Phantomalert, Inc. v. Google Inc.*, 2016 WL 879758, at *6 (N.D. Cal. Mar. 8, 2016) ("copying of a database by a defendant who used it only to extract the raw data was a fair use that did not give rise to a claim for copyright infringement").  To the extent dealers (and their authorized agents) use the DMS report-generator function to extract the dealer's own data, resulting in incidental and temporary RAM copies, that is textbook fair use.

**Third**, and in a similar vein, the Dealer Data Security Law is consistent with the Copyright Act because it shares the Act's objective of preventing DMS providers from misusing any copyright in their DMS software to secure "an exclusive right or limited monopoly not granted by the Copyright Office."  *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520-521 (9th Cir. 1997); *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 699-700 (9th Cir. 2015) (Wardlaw, J., concurring) (copyright misuse prevents copyright owner from "abus[ing] the limited monopoly

14

his copyright provides by restricting competition in a market that is beyond the scope of his copyright.").  As explained, the Law stops third parties from extracting a "cyber ransom," *see* A.R.S. § 28-4651(2), for access to Protected Dealer Data (which they do not own).  Plaintiffs, in short, cannot claim an implied conflict with copyright law when they are using any applicable copyrights in their software "to control competition in an area outside the copyright."  *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990); *see also WIREdata*, 350 F.3d at 642, 646-647 (database owner's attempt to prevent data owner from "from revealing *their own* data . . . might constitute copyright misuse" and "would be appalling" if allowed to succeed).

### D. The DTSA Does Not Preempt Arizona's Law (Third Claim)

CDK and Reynolds allege that the Defend Trade Secrets Act ("DTSA") gives them a "federally guaranteed right to exclude others from their trade secrets," Compl. ¶ 73, which they claim the Dealer Data Security Law undermines by preventing them from blocking dealer-authorized access to dealer data.  That is wrong for two reasons.

**First**, by its terms, the DTSA concerns only the acquisition, disclosure, or use of a trade secret pursuant to "improper means" or in violation of a duty to maintain confidentiality.  18 U.S.C. § 1839(5).  Importantly, the statute provides that "the term 'improper means' . . . does not include . . . any  . . . *lawful means of acquisition*."  *Id.* § 1839(6) (emphasis added); *see also Sapienza v. Trahan*, 2019 WL 348820, at *12 (W.D. La. Jan. 28, 2019) (information lawfully received not misappropriated under DTSA).  The Dealer Data Security Law therefore poses no conflict with the DTSA: it simply specifies a "lawful means" through which dealer-authorized third parties may access dealer data.

**Second**, CDK and Reynolds have not plausibly alleged that any trade secrets will be stolen if the Dealer Data Security Law is enforced.  CDK and Reynolds claim that the Law requires access to their trade secret "forms, accounting rules, tax tables, and

proprietary tools and data compilations," Compl. ¶¶ 191-92, but the statute only allows access to Protected Dealer Data as specifically defined in the statute, not any of these alleged trade secrets. Indeed, Protected Dealer Data falls outside the DTSA because it is data the dealers or third parties themselves have developed and derived independently. *See* 18 U.S.C. § 1839(6)(B). Here again, in the context of a facial challenge, there is no basis to conclude that dealer-authorized third parties will exploit access to Protected Dealer Data as a means to steal Plaintiffs' trade secrets. And, the Complaint is bereft of examples of dealer-authorized third parties accessing (let alone stealing) a DMS provider's trade secrets.

### E.     The GLBA Does Not Preempt Arizona's Law (Fifth Claim)

The Gramm-Leach-Bliley Act ("GLBA") prohibits financial institutions from disclosing nonpublic personal information of consumers and requires certain agencies to create regulations to ensure the security and confidentiality of that information. *See* 15 U.S.C. §§ 6801-6802. The FTC has, in turn, promulgated a rule that requires financial institutions to create an information security program sufficient to control for "reasonably foreseeable" security risks. *See generally* 16 C.F.R. § 314.3-314.4. By its terms, the GLBA "shall not be construed as superseding, altering, or affecting" consistent state laws, 15 U.S.C. § 6807(a)-(b), and nothing in the Dealer Data Security Law remotely conflicts with the GLBA or the FTC's regulations. To the contrary, the Law operates to allow dealers to meet their obligations under the GLBA.

To start, Plaintiffs do not allege that the GLBA applies to CDK and Reynolds—only that *dealers* are "financial institutions" subject to the GLBA's regulations. *See* Compl. ¶ 211. That alone is fatal to their claim: the Dealer Data Security Law does not impose any duties or obligations on DMS providers that are contrary to what the GLBA requires of them.

Since the Complaint does not allege that Plaintiffs are actually subject to the GLBA, their contention appears to be that restricting DMS providers' right to exert

16

total control over dealer data will undermine the GLBA because dealers will fail to comply with their own GLBA obligations if they regain control of their data. *See* Compl. ¶¶ 214-16. That is a circuitous—and novel—theory indeed. There is no case finding preemption in remotely similar circumstances.

Moreover, the suggestion that Arizona's automobile dealers are categorically incapable of complying with their own GLBA obligations is entirely speculative and implausible. The Complaint cites no instances of dealers causing data breaches. Tellingly, Plaintiffs' data security anecdote involved an isolated case in which a *DMS provider*, not a dealer, allegedly mishandled consumer data. *See* Compl. ¶¶ 135-37. In fact, the Dealer Data Security Law helps dealers comply with their obligations under the GLBA. For instance, it requires that Protected Dealer Data only be used subject to a dealer's express written consent, A.R.S. §§ 28-4653(A)(3)(b)(vi), 28-4654(B)(1), which is consistent with the GLBA's financial privacy rule, *see* 16 C.F.R. § 313 (setting conditions on use of consumer data). And the STAR Standards—which the Law incorporates as a minimum set of security standards for all interactions with Protected Dealer Data, *see* A.R.S. § 28-4652—incorporate the GLBA. *See* STAR Standards § 2.6.e (requiring dealers to "[e]nsure the dealer complies with all federal . . . regulations for financial and retail institutions such as the [GLBA]").

Finally, if on a wholly different set of facts it truly became the case that DMS providers had to restrict dealer access to the dealers' own data to protect consumer information—such as a temporary cyberattack—the Law specifically provides that Plaintiffs are not precluded from "discharging" any federal legal duties "to protect and secure protected dealer data." *See* A.R.S. § 28-4653(C).

## CONCLUSION

For the foregoing reasons, AADA respectfully requests that the Court dismiss Plaintiffs' Complaint in its entirety with prejudice.

17

1       RESPECFULLY SUBMITTED this 18th day of September, 2019.

2

3                       By    */s/ Jeffrey D. Gardner*

John C. Norling

4                         Jeffrey D. Gardner
Jimmie W. Pursell, Jr.

5                         **JENNINGS, STROUSS &**
**SALMON, P.L.C.**

6                         One East Washington Street, Suite 1900
Phoenix, Arizona  85004-2554

7                         Michael N. Nemelka*
Derek T. Ho*

8                         Brendan J. Crimmins*
Joshua Hafenbrack*

9                         Collin R. White*
Bethan Jones*

10                       **KELLOGG, HANSEN, TODD,**
**FIGEL & FREDERICK, P.L.L.C.**

11                       1615 M Street, N.W., Suite 400
Washington, D.C. 20036

12

13                       *Attorneys for Intervenor Defendants Arizona*
*Automobile Dealers Association*

14                       *\*Pro Hac Vice*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

1

**CERTIFICATE OF SERVICE**

2   ☒

I hereby certify that on September 18, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- Mary Ruth O'Grady: mogrady@omlaw.com, pnieto@omlaw.com
- Daniel Hunt Bergin: Daniel.Bergin@azag.gov, Transportation@azag.gov
- Jeffrey Bryan Molinar: jmolinar@omlaw.com, ddybdahl@omlaw.com
- Lauren Elliott Stine: lstine@quarles.com, docketaz@quarles.com, mmarotta@quarles.com
- Brian Alexander Howie: brian.howie@quarles.com, docketaz@quarles.com, maria.marotta@quarles.com
- Rusty Duane Crandell: Rusty.Crandell@azag.gov, ACL@azag.gov
- Brunn Wall Roysden, III: beau.roysden@azag.gov, ACL@azag.gov
- William Dewitt Furnish: wfurnish@omlaw.com, ddybdahl@omlaw.com
- Emma Jane Cone-Roddy: econe-roddy@omlaw.com, rsanhadja@omlaw.com
- Thomas J. Dillickrath: tdillickrath@sheppardmullin.com
- Denise L. Drake: ddrake@gibbsbruns.com, kstehling@gibbsbruns.com
- Amar Shrinivas Naik: anaik@sheppardmullin.com
- Molly C. Lorenzi: MLorenzi@sheppardmullin.com
- Britt M. Miller: bmiller@mayerbrown.com
- Michael Anthony Scodro: mscodro@mayerbrown.com
- Brett E. Legner: blegner@mayerbrown.com, courtnotification@mayerbrown.com
- Aundrea K. Gulley: agulley@gibbsbruns.com, kstehling@gibbsbruns.com
- Brendan J. Crimmins: bcrimmins@kellogghansen.com, agilbert@kellogghansen.com
- Bethan R. Jones: bjones@kellogghansen.com, wwiener@kellogghansen.com
- Collin R. White: cwhite@kellogghansen.com, ccook@kellogghansen.com
- Derek T. Ho: dho@kellogghansen.com, ccook@kellogghansen.com
- Michael N. Nemelka: mnemelka@kellogghansen.com, aoak@kellogghansen.com, jdavis@kellogghansen.com
- Joshua Hafenbrack: jhafenbrack@kellogghansen.com, jcenzer@kellogghansen.com

☐   I hereby certify that on September 18, 2019, I electronically transmitted a PDF version of the attached document and sent via U.S. Mail to the following:

☐   I further certify that on September 18, 2019, I put in the U.S. Mail a paper courtesy copy of the foregoing document and the Notice of Electronic Filing to the assigned Judge.

By    */s/ Estela G. Blackmountain*

19