Mary O'Grady, 011434
Jeffrey B. Molinar, 018512
William D. Furnish, 028725
Emma Cone-Roddy, 034285
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona  85012-2793
(602) 640-9000
mogrady@omlaw.com
jmolinar@omlaw.com
wfurnish@omlaw.com
econe-roddy@omlaw.com

MARK BRNOVICH
ATTORNEY GENERAL
Daniel Bergin, 012057
15 South 15th Avenue
Phoenix, AZ 85007
daniel.bergin@azag.gov

MARK BRNOVICH
ATTORNEY GENERAL
Brunn (Beau) W. Roysden III, 028698
Rusty D. Crandell, 026224
2005 North Central Avenue
Phoenix, AZ 85004
(620) 542-3333
beau.roysden@azag.gov
rusty.crandell@azag.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation, | No. 2:19-cv-04849-GMS |
| Plaintiffs, | |
| vs. | **DEFENDANTS' MOTION TO DISMISS** |
| Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation, | **(Oral Argument Requested)** |
| Defendants. | |

OSBORN
MALEDON
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

Plaintiffs CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") challenge the enforceability of recently enacted Arizona legislation governing the use and exchange of data belonging to the state's automobile dealers (the "Dealer Data Security Law" or the "Law").  Producers of dealer management systems that store and manage that data, Plaintiffs seek a declaration and injunctive relief against Mark Brnovich, Attorney General of the State of Arizona, and John Halikowski, Director of the Arizona Department of Transportation (collectively, the "State Defendants"), alleging that the Dealer Data Security Law is both preempted by various federal statutes and unconstitutional.  In so doing, however, Plaintiffs mischaracterize the Law and its effects, downplay Arizona's authority to protect consumers, and misread numerous statutory regimes to conjure conflicts and ambiguities that simply do not exist.

None of Plaintiffs' allegations can support a cognizable claim.  Plaintiffs cannot establish that the Dealer Data Security Law is facially unconstitutional, because well-established law makes clear that each of Plaintiffs' scattershot constitutional arguments fails as a matter of law.  Moreover, for the reasons stated in the Arizona Automobile Dealers Association's Motion to Dismiss, in which the State Defendants join, the Dealer Data Security Law is not inconsistent with, and therefore not preempted by, any of the federal statutes governing intellectual property and trade secrets.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the State Defendants move for the dismissal of Plaintiffs' Complaint in its entirety.

# I.     FACTUAL AND STATUTORY BACKGROUND.

CDK and Reynolds are companies that produce and license computer systems for use by car dealerships.  (Compl. ¶ 8.)  Those systems, known as dealer management systems ("DMSs"), help dealerships store and manage numerous types of data generated in their operations, including information from consumers, manufacturers, financial institutions, and others involved in the sales and service of automobiles.  (*Id.*) Where dealers work with outside vendors or service providers, they often rely on third-

1  party applications that are able to access the data stored on the DMS or modify the data

2  to reflect new information.  (*Id.* ¶ 15.)

3      While CDK and Reynolds claim ownership of intellectual property and

4  proprietary data within DMS hardware and software, they concede that they do not own

5  the data that the dealers enter and store in the DMS.  (*Id.* ¶¶ 42, 46.)  CDK and

6  Reynolds nevertheless have required dealers to obtain their permission before any third

7  party may access the dealer's own data stored on the DMS.  (*Id.* ¶¶ 85, 87, 90.)  CDK

8  and Reynolds require these third parties to enter into an agreement with CDK or

9  Reynolds and pay a fee to access this dealer data.  (*Id.* ¶¶ 97-99, 105.)

10      In March 2019, the Arizona Legislature unanimously passed the Dealer Data

11  Security Law.  After Arizona Governor Doug Ducey signed it into law in April 2019, it

12  became effective on August 27, 2019.  The Law is codified at A.R.S. sections 28-4651

13  to 28-4655.

14      The Dealer Data Security Law governs the use of and access to "protected dealer

15  data":  (a) the "[p]ersonal, financial or other data relating to a consumer" that the

16  consumer provides to the dealer and is then stored in a DMS; (b) diagnostic data to the

17  extent "necessary to fulfill a dealer's obligation to provide warranty, repair or service

18  work to its customers"; and (c) other data the dealer inputs into a DMS that "relates to a

19  dealer's business operations."  A.R.S. § 28-4651(7).  The Law explains that protected

20  dealer data resides in a DMS, referred to in the statute as a "dealer data system," which

21  in turn is defined as a "software, hardware or firmware system that is owned, leased or

22  licensed by a dealer . . . and that stores or provides access to protected dealer data."

23  A.R.S. § 28-4651(3).

24      Dealers are subject to numerous federal regulations on how they use consumer

25  information, including rules that require them to provide sufficient notice to consumers

26  regarding the ways that their data will be used.  *See, e.g.*, 16 C.F.R. § 313 (FTC

27  Financial Privacy Rule); 16 C.F.R. § 314 (FTC Safeguards Rule).  The Dealer Data

28  Security Law supports and supplements federal law by providing additional safeguards

1    to keep consumer information confidential and to limit its use.  Among such provisions

2    are those limiting a third-party's or manufacturer's ability to "[a]ccess, share, sell, copy,

3    use or transmit protected dealer data" without dealer consent, A.R.S. §§ 28-4653(A)(1),

4    (D); prohibiting actions that limit a dealer's ability to protect that data, A.R.S. § 28-

5    4653(A)(3); using protected dealer data in ways that exceed the consent the consumer

6    provides to the dealer, A.R.S. § 28-4654(B)(1); requiring the deletion of protected

7    dealer data after the termination of an agreement with the dealer, A.R.S. § 28-

8    4654(B)(3)(b); ensuring that dealers may audit access to and use of protected dealer

9    data held by DMS providers, A.R.S. §§ 28-4654(B)(4)-(5); and clarifying that the

10   Dealer Data Security Law does not authorize use of consumer data in a manner

11   inconsistent with a dealer's agreement with a consumer or the purposes for which the

12   consumer provided the data, A.R.S. § 28-4655(2).

13         The Dealer Data Security Law restricts the actions that DMS providers and other

14   third parties may take to control dealer data.  Under the statute, third parties may not

15   engage in any act of "cyber ransom," meaning the actual, attempted, or threatened

16   encryption, restriction, or prohibition of a dealer's or integrator's "access to protected

17   dealer data for monetary gain."  A.R.S. §§ 28-4653(A)(2), 28-4651(2).  Nor may a third

18   party "prohibit or limit a dealer's ability to protect, store, copy, share or use protected

19   dealer data," including by imposing fees or restrictions on accessing or sharing

20   protected dealer data.  A.R.S. § 28-4653(A)(3).

21         The Law further addresses DMS providers' attempts to limit dealers' options for

22   third-party integration.  An integrator is "a third party with whom a dealer enters into a

23   contractual relationship to perform a specific function for a dealer that allows the third

24   party to access protected dealer data or to write data to a dealer data system, or both, to

25   carry out the specified function."  A.R.S. § 28-4651(1).  Because dealers necessarily

26   rely on outside software vendors to provide a range of services, integrators serve a

27   critical function by facilitating the extraction of data from a DMS and its transmittal in

28   a usable format to particular vendors.

Under the Dealer Data Security Law, DMS providers no longer may "[p]rohibit[] a third party that has satisfied or is compliant with the star standards" – the "current, applicable security standards published by the standards for technology in automotive retail" – "or other generally accepted standards that are at least as comprehensive as the star standards and that the dealer has identified as one of its authorized integrators from integrating into the dealer's [DMS] or plac[e] an unreasonable restriction on integration . . . ." A.R.S. §§ 28-4653(A)(3)(b), 28-4651(9). Unreasonable restrictions include unreasonable limitations on the scope of information shared with integrators, requiring unreasonable access to the accessing party's sensitive or confidential information, prohibiting a dealer's ability to store and copy its own protected dealer data, and allowing access to protected dealer data without dealer consent. *See* A.R.S. § 28-4653(A)(3)(b). The Law makes clear that it "does not prevent a dealer, manufacturer or third party from discharging its obligations . . . under federal, state or local law to protect and secure protected dealer data or . . . otherwise limit those responsibilities." A.R.S. § 28-4653(C).

The Dealer Data Security Law ensures that dealers retain control over their data, while emphasizing data security. The statute requires DMS providers to "[a]dopt and make available a standardized framework for the exchange, integration and sharing of data from [a DMS]" that is compatible with star standards and "[p]rovide access to open application programming interfaces to authorized integrators." A.R.S. § 28-4654(A). That section also makes clear that a DMS provider may only use data to the extent permitted in the DMS provider's agreement with the dealer, must permit dealer termination of such agreement, and "must work to ensure a secure transition of all protected dealer data to a successor dealer data vendor or authorized integrator" upon termination. A.R.S. §§ 28-4654(B)(1)-(3).

## II.   ARGUMENT.

Because Plaintiffs have challenged the Dealer Data Security Law prior to enforcement, they must overcome significant hurdles to plead valid claims of

constitutional violations.  First, Plaintiffs must allege facts establishing "'that no set of circumstances exists under which [the Law] would be valid,' *i.e.*, that [the Law] is unconstitutional in all of its applications."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Second, the Law regulates commerce, consumer protection, data security, and transportation, all of which are areas states have traditionally occupied.  *See, e.g.*, *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (consumer protection); A.R.S. §§ 12-2292-94 (confidentiality and release of medical records), 18-551-52 (regulating network services and network security, including data security breaches), 23-721 (retention of records by employing units), 32-3211 (protocols for secure storage of medical records), 44-1692 (imposing limitations on the use of consumer information by credit reporting agencies).

### A.   Claims One Through Five Fail Because Compliance with the Dealer Data Security Law Does Not Conflict with Federal Copyright, Cybersecurity, and Trade Secret Laws.

All of Plaintiffs' preemption claims (Claims One through Five) allege that the Dealer Data Security Law conflicts with various federal statutes.  (Compl. ¶¶ 175, 184, 194, 205, 217.)  For the reasons stated in the Arizona Automobile Dealers Association's Motion to Dismiss, in which the State Defendants join, Plaintiffs' preemption claims fail as a matter of law.

### B.   Claims Six Through Ten Fail Because the Law Complies with the United States Constitution's Contract, Due Process, Takings, and Commerce Clauses and the First Amendment.

#### 1.   *The constitutional claims are not ripe.*

As an initial matter, Plaintiffs' constitutional claims are not ripe because they make no attempt to show, as they must, "a genuine threat of imminent prosecution under the challenged statute to establish a justiciable case or controversy."  *Wash. Mercantile Ass'n v. Williams*, 733 F.2d 687, 688 (9th Cir. 1984).  To establish a genuine threat, courts evaluate "1) 'whether the plaintiffs have articulated a 'concrete plan' to violate the law in question,' (2) 'whether the prosecuting authorities have

communicated a specific warning or threat to initiate proceedings,' and (3) 'the history of past prosecution or enforcement under the challenged statute.'" *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citation omitted). Here, Plaintiffs do not allege that they plan to take acts that violate the Dealer Data Security Law. At most, they allege that as DMS providers they are subject to the statute, but being subject to a statute is insufficient to confer standing, particularly when a statute requires a private party "to *do* something." *Carrico v. City and Cty. of San Francisco*, 656 F.3d 1002, 1007 (9th Cir. 2011). While plaintiffs allege that they do not know whether certain activities fall within the Dealer Data Security Law (Compl. ¶ 224), they do not allege that they actually plan to do any of those activities. Nor do Plaintiffs allege that any Defendant has communicated a specific warning or threat to prosecute them or that there is a history of past prosecution under the Law.

While there are some exceptions to this rule, courts do not adjudicate disputes when further factual development would "significantly advance [the Court's] ability to deal with the legal issues presented." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (citation omitted) (holding matter not ripe for judicial review); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir. 1996) (holding that "possible vague application of the law to the individual plaintiffs" is not ripe for adjudication if "there are insufficient facts to determine the vagueness of a law as applied"). Plaintiffs' complaints that they might not be adequately compensated under the statute, that disputes might arise between what dealers believe they are entitled to under the law and what they believe they are entitled to under contract, and that the law might be enforced against them present precisely such a situation. The Court need not and should not delve into hypothetical factual questions and hypothetical legal interpretations of how Arizona courts might apply the Law when there is no specific threat of enforcement alleged.

6

1

2

        2.        *Plaintiffs fail to state a claim under the Contract Clause (Claim Eight).*

3

4

5

6

7

8

9

10

11

12

13

14

15

     *Plaintiffs fail to state a facial challenge.*  Plaintiffs seek to strike down the Dealer Data Security Law as facially invalid under the Contract Clause, rather than as applied to any particular contract.  (Compl. ¶¶ 234-40.)  Setting aside whether the Contract Clause even permits a facial challenge,[1] "a contract cannot be impaired, within the meaning of [the Contract Clause] by a statute enacted prior to the making of the contract."  *Reding v. Texaco, Inc.*, 598 F.2d 513, 519 (9th Cir. 1979).  And even for an existing contract, there will generally be "some cases, *e.g.*, those where the contract is about to expire by its terms, [that] the impairment caused by the law will be slight" and thus constitutionally permissible.  *Sanitation and Recycling Indus. v. City of New York*, 107 F.3d 985, 994 (2d Cir. 1997).  While it may be possible for legislation removing the damages and specific-performance remedies for a breach of contract to constitute a facially invalid law, *see, e.g., Charles v. Baesler*, 910 F.2d 1349, 1356 (6th Cir. 1990), Plaintiffs do not allege this.

16

17

18

19

     Instead, Plaintiffs allege that the Dealer Data Security Law may impair some clauses in their presently existing contracts.  (Compl. ¶¶ 237-39.)  But they make no allegations about how it would – or even could – impair future contracts.  Their facial challenge fails as a matter of law.

20

21

22

23

     *To the extent that Plaintiffs bring an as-applied challenge, the Dealer Data Security Law does not impair the obligation of contracts.*  To the extent that their Complaint can be read as presenting an as-applied challenge of some sort, Plaintiffs fail to state a claim under the Contract Clause because they fundamentally misread the law.

24

25

26

     The Contract Clause states that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  While "the language of the Contract Clause is facially absolute," the Supreme Court has recognized that the Clause

27

28

---

[1] *See Bd. of Regents of N.M. Sch. for the Deaf v. City of Santa Fe*, CV 06-01171, 2008 WL 11451989, at *2-3 (D. N.M. Jan. 30, 2008) (noting lack of clarity).

1    "must be accommodated to the inherent police power of the State to safeguard the vital

2    interests of its people." *Energy Reserves Grp, Inc. v. Kansas Power & Light Co.*, 459

3    U.S. 400, 410 (1983) (citation omitted).  Thus, a law only creates a constitutional

4    concern if there is a "substantial impairment" of the contract and the law fails to

5    reasonably serve a "significant and legitimate public purpose." *Id.* at 411-12.  "Courts

6    generally defer to the judgment of state legislatures as to both necessity and

7    reasonableness so long as the state itself is not a contracting party." *Lazar v. Kroncke*,

8    862 F.3d 1186, 1199 (9th Cir. 2017).  Thus, when the contract is between two private

9    entities, the assessment is akin to rational basis review.

10          Courts routinely dismiss Contract Clause claims where – as here – the legislature

11   had a legitimate objective in enacting the regulation at issue.[2]  While Plaintiffs allege in

12   conclusory fashion, with no support whatsoever, that the Dealer Data Security Law was

13   enacted "for the benefit of private parties rather than for public purposes" (Compl. ¶

14   143), they also admit in their allegations that Arizona's interest in the statute related to

15   legitimate areas of concern, namely as a "cybersecurity measure to protect consumers."

16   (*Id.* ¶ 126.)  Courts rightly defer to the legislature's determination of the public interest.

17   *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22-23 (1977) (for economic and

18   social regulation, "courts properly defer to legislative judgment as to the necessity and

19   reasonableness of a particular measure").

20          Because the legislation serves a legitimate public purpose, Plaintiffs' claim

21   under the Contract Clause should be dismissed.

22                  3.      *Plaintiffs fail to state a claim under the Takings Clause (Claim*
23                          *Seven).*

24          Plaintiffs allege both "physical and regulatory taking of Plaintiffs' property" by

25   "requiring CDK and Reynolds to allow third parties to access their proprietary DMSs

26   and to remove data and write data to that system." (Compl. ¶¶ 229, 232.)  Those

27

28   [2] *See, e.g.*, *Golden Rule Ins. Co. v. Stephens*, 912 F. Supp. 261, 268 (E.D. Ky. 1995);
     *Easthampton Sav. Bank v. City of Springfield*, 874 F. Supp. 2d 25, 32 (D. Mass. 2012).

allegations fail to state a claim for several reasons.

**First**, Plaintiffs misread the Dealer Data Security Law in that it does not require CDK or Reynolds to allow any third parties to "access" their proprietary DMSs.  As explained above, this legal conclusion is simply false.  *See* A.R.S. § 28-4653(A).

**Second**, Plaintiffs do not have any propriety rights in the Protected Dealer Data that is "removed" as a matter of law.  That data belongs to the dealers.

**Third**, Plaintiffs' physical takings claim fails as a matter of law.  A physical taking is a type of per se taking that is a "relatively narrow" category.  *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 531 (9th Cir. 2019) (citation omitted).  Generally, the physical takings category is limited to the context of real property.  *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 881 (9th Cir. 2001).  And even when real property is at issue, a mere access regulation is insufficient to create a physical taking; in particular, a limitation on the "right to exclude" will not effect a physical taking.  *Cedar Point Nursery*, 923 F.3d at 533.  As a result, Plaintiffs have failed to plead a legally cognizable physical taking.

**Fourth**, Plaintiffs' regulatory takings claim fails because the Dealer Data Security Law is "much more an adjustment of the benefits and burdens of economic life to promote the common good than a physical invasion of property."  *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015) (internal citation and quotation marks omitted).  For a regulatory taking to occur, the action must be "functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner."  *MHC Financing Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (citation omitted).  The Law does not – and is not alleged to – do any such thing; rather, it regulates how Plaintiffs must interact with their business partners and what they are allowed to charge.  This type of activity is not a regulatory taking.  *See Rancho de Calistoga*, 800 F.3d at 1091-92 (rent control ordinance is not regulatory taking).  While Plaintiffs allege that the value of their DMS systems will decrease, a "diminution in the value of property, however

serious, is insufficient to demonstrate a taking." *Id.* at 1090 (collecting cases where no regulatory taking occurred with diminution of value from 75% to 92.5%).

**Finally**, although Plaintiffs allege that the Law "provides no compensation," (Compl. ¶ 232), this is a misreading of the law. While Plaintiffs may not "impos[e] any fee," A.R.S. § 28-4653(A)(3)(a), the term "fee" is expressly defined to exclude "any direct costs incurred by the [DMS provider] in providing protected dealer data access to an authorized integrator or allowing an authorized integrator to write data to a dealer data system." A.R.S. § 28-4651(5). Just compensation under the takings clause "is to be measured by 'the market value of the property at the time of the taking.'" *Horne v. Dep't of Agric.*, 135 S.Ct. 2419, 2432 (2015) (citation omitted). Thus, "evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are not to be considered." *United States v. 87.30 Acres of Land, More or Less, in Whitman and Garfield Ctys., State of Wash.*, 430 F.2d 1130, 1132 (9th Cir. 1970). Just compensation is not "equivalent to 'full compensation.'" *In re City of Stockton, Cal.*, 909 F.3d 1256, 1268 (9th Cir. 2018) (citation omitted). Plaintiffs have not alleged any facts (and none exists) to suggest this compensation is less than just, and Plaintiffs fail to state a valid claim under the Takings Clause.

> 4.   *Plaintiffs fail to state a claim under the First Amendment (Claim Ten).*

Plaintiffs allege that the Dealer Data Security Law violates the First Amendment by (1) "compelling Plaintiffs to engage in an exchange of information with third parties" and (2) "compelling Plaintiffs to draft computer code to allow third parties to circumvent the security measures that currently control access to Plaintiffs' DMSs and otherwise rewrite the functionality of the DMSs to allow and enable such access." (Compl. ¶¶ 251-52.)

The first allegation rests on the false proposition that the Law compels Plaintiffs to share any information with third parties. It does not. The statute requires Plaintiffs to allow dealers to share the dealers' own data with third parties of the dealer's

1  choosing.  Plaintiffs' sole involvement is in a transmittal role – the dealers store their

2  data in the software they license from Plaintiffs, and Plaintiffs must facilitate the

3  dealers' transfer of this data to third parties.  This sort of "transmittal role" is not

4  "speech" within the meaning of the First Amendment.  *See European Connections &*

5  *Tours, Inc. v. Gonzales*, 480 F. Supp. 2d 1355, 1370 (N.D. Ga. 2007); *Rest. Law Ctr. v.*

6  *City of New York*, 360 F. Supp. 3d 192, 212 (S.D.N.Y. 2019) (holding that "the

7  employers' mere act of sending a check to an employee's designated non-profit

8  recipient is not speech" because "they have no discretion as to the recipient of their

9  employees' donation – they merely follow their employees' instructions").

10  Nor is Plaintiffs' allegation that they will have to design code to comply with the

11  Dealer Data Security Law sufficient to create a compelled speech issue under the First

12  Amendment.  Indeed, this claim "trivializes the freedom" protected by the First

13  Amendment.  *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62

14  (2006).  Plaintiffs are for-profit enterprises that, at most, are being asked to modify

15  commercial software that will only be seen by them.  *See* A.R.S. §§ 28-4654(A)(1)-(2).

16  There is reason to doubt that functional programming of this sort is even entitled to

17  traditional speech protections.  *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273

18  F.3d 429, 454 (2d Cir. 2001) (source code's "functional capability is not speech within

19  the meaning of the First Amendment").  "[T]hat this [programming] occurs at some

20  level through expression does not elevate all such conduct to the highest levels of First

21  Amendment protection.  Doing so would turn centuries of our law and legal tradition on

22  its head, eviscerating the carefully crafted balance between protecting free speech and

23  permissible government regulation."  *United States v. Elcom Ltd.*, 203 F. Supp. 2d

24  1111, 1128-29 (N.D. Cal. 2002).

25  If any code at issue here has expressive elements that fall within the First

26  Amendment's protection, Plaintiffs may draft that code however they want.  The Law

27  would only require the code to have certain functionality, but its "broad requirements"

28  do "not dictate a specific message."  *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832,

11

849-51 (9th Cir. 2003).  And even if there are some expressive elements to the functionality, the Law does not require Plaintiffs to share any code with anyone; the "speech" would not be public and thus not implicate the Constitution.  *Cf. Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108-09 (D.C. Cir. 2011) ("constitutional concerns" with compelled public speech are not triggered when government commission is "only audience"); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (lesser concern where compelled speech lacks public dissemination).

The Dealer Data Security Law regulates conduct.  That does not amount to a First Amendment violation for the reasons explained by the Supreme Court in *Rumsfeld*, which rejected a First Amendment challenge to the requirement that law schools host and promote military recruitment even if the schools objected to military policy.  Like in *Rumsfeld*, "[t]he compelled speech . . . is plainly incidental to [the Law's] regulation of conduct."  547 U.S. at 62.  The statute simply requires that a market product (Plaintiffs' DMS) has certain functionality (the ability to allow dealers to access and share their own data).  That is conduct, not speech.  *Id.*  ("Congress, for example, can prohibit employers from discriminating in hiring on the basis of race.  The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.").

The public "can appreciate the difference between speech [Plaintiffs] sponsor[]" and code Plaintiffs develop "because [they are] legally required to do so."  *Id.* at 65.  It is thus extremely unlikely that anyone could understand Plaintiffs to be expressing any message whatsoever "given both the nature of [their] activity and the factual context and environment in which it was undertaken."  *Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419, 438 (9th Cir. 2008) (internal quotation marks and citation omitted).  For these reasons, the Law plainly regulates only conduct and Plaintiffs fail to state a claim under the First Amendment.

1               5.      *Plaintiffs fail to state a claim under the Due Process Clause (Claim*
2                      *Six).*

3           Plaintiffs' allegations (at Compl. ¶¶ 218-25) that the Dealer Data Security Law is

4    unconstitutionally vague under the Fourteenth Amendment's Due Process Clause

5    likewise fail as a matter of law.  Statutes need not spell out their terms to "mathematical

6    certainty" to be constitutionally permissible.  *Grayned v. City of Rockford*, 408 U.S.

7    104, 110 (1972) (lawmakers are "[c]ondemned to the use of words").  Rather, due

8    process merely requires that laws "give the person of ordinary intelligence a reasonable

9    opportunity to know what is prohibited," and "provide explicit standards for those who

10    apply them."  *Id.* at 108-09.

11           Plaintiffs cannot facially challenge the Dealer Data Security Law as

12    constitutionally vague and a violation of due process.  Rather, as the Ninth Circuit has

13    explained, "[v]agueness challenges to statutes not threatening First Amendment

14    interests are examined in light of the facts of the case at hand; the statute is judged on

15    an as-applied basis."  *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  And here,

16    because the Dealer Data Security Law has yet to be enforced, there has been no

17    "application" of the law at all and an as-applied challenge is impossible.  *Hoye v. City*

18    *of Oakland*, 653 F.3d 835, 859 (9th Cir. 2011) (declining to rule on an as-applied

19    challenge "that would require us to speculate as to prospective facts").

20           Plaintiffs object to terms that have specific definitions and give clear notice

21    regarding their meanings, such as "fee" (defined at A.R.S. § 28-4651(5)) and "dealer

22    data" (defined at *id.* § 28-4651(7)).  They also object to the statute's use of the term

23    "unreasonable restrictions," although courts have repeatedly made clear that the terms

24    "unreasonable" and "reasonable" are not vague as a matter of law.  *See, e.g., Am. Coal*

25    *Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 28 (D.C. Cir. 2015)

26    (interpretation of mine safety regulation to cover material that "reasonably" might

27    ignite not unconstitutionally vague); *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*,

28    825 F.3d 674, 734-739 (D.C. Cir. 2016) (regulation prohibiting conduct that

1    "unreasonably interfere[s] with or unreasonably disadvantage[s]" consumer internet

2    access not unconstitutionally vague) (citation omitted).

3         Similarly, Plaintiffs' claims that it is unclear whether "hosting encrypted data for

4    a fee" is prohibited "cyber-ransom" and whether they are required to "facilitate or

5    prevent one dealer from accessing another dealer's data" are insufficient to state a

6    constitutional violation.  (Compl. ¶ 224.)  A reasonably intelligent person would not

7    read the statute in those ways.  The cyber ransom definition is directed at encrypting a

8    "dealer's . . . access to protected dealer data for monetary gain," not encrypting data at a

9    dealer's request.  A.R.S. § 28-4651(2).  Moreover, the "[p]rotected dealer data" the

10   statute references is not some other dealer's data, but "data relating to a consumer that a

11   consumer provides to a dealer or that a dealer otherwise obtains and that is stored in the

12   dealer's dealer data system," along with other data in the "dealer's data system."

13   A.R.S. § 28-4651(7).  No reasonable reading would suggest that the statute creates a

14   right to access other dealers' data, stored in other dealers' DMS systems.

15        Critically, "[i]f this general class of offenses can be made constitutionally

16   definite by a reasonable construction of the statute, this Court is under a duty to give the

17   statute that construction."  *United States v. Harris*, 347 U.S. 612, 618 (1954).  Even if

18   Plaintiffs could raise a colorable argument that terms such as "fee," "direct" costs, and

19   "cyber ransom" are vague (and they do not), these terms can be further clarified, once

20   the Law takes effect, through reasonable interpretations by the responsible Arizona

21   agencies and Arizona state courts.  *See Colten v. Kentucky*, 407 U.S. 104, 110 (1972)

22   (vagueness doctrine is "not a principle designed to convert into a constitutional

23   dilemma the practical difficulties in drawing criminal statutes").

24              6.    *Plaintiffs fail to state a claim under the Commerce Clause (Claim*
25                    *Nine).*

26        The Commerce Clause of the United States Constitution provides to Congress

27   the power to "regulate Commerce with foreign Nations, and among the several States,

28   and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  A state statute can violate the

so-called Dormant Commerce Clause in two ways.  If a state statute "directly regulates or discriminates against interstate commerce, or its effect is to favor in-state economic interests over out-of-state interests," it is "struck down . . . without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579 (1986). If a statute has only indirect effects on interstate commerce and is non-discriminatory, it violates the Commerce Clause only if "the burdens of the statute so outweigh the putative benefits as to make the statute unreasonable or irrational." *UFO Chuting of Haw., Inc. v. Smith,* 508 F.3d 1189, 1196 (9th Cir.2007) (alteration omitted).

Plaintiffs do not – and cannot – allege that the DMS Law discriminates against interstate commerce.  It provides no different regulations for transactions wholly within Arizona and for transactions between Arizona and non-Arizona parties.  *See e.g., Or. Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S.93, 99 (1994) (defining discrimination under Commerce Clause as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter").  Nor does the regulation of transactions between Arizona car dealers and DMS providers who may not be located in Arizona, such as Plaintiffs, bring the statute within the first category of Commerce Clause violations; a state is free to "regulate commercial relationships 'in which at least one party is located in [the state].'"  *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015) (quoting *Gravquick A/S v. Trimble Navigation, Int'l Ltd.,* 323 F.3d 1219, 1224 (9th Cir. 2003)).

Thus, Plaintiffs could only theoretically state a claim under the Commerce Clause only by alleging facts that demonstrate that "the burdens of the [Law] so outweigh the putative benefits as to make the statute unreasonable or irrational." *See UFO Chuting of Haw., Inc.*, 508 F.3d at 1196 (alteration and citation omitted). Plaintiffs' sole allegation on this front is that there is an "undue and substantial burden on interstate commerce because it creates special rules for the relationship between DMS providers and dealers.  DMSs are sold nationwide, and indeed some dealers have operations in more than one State, but Plaintiffs must change their products specifically

1  for the Arizona market as a result of the DMS Law." (Compl. ¶ 245.)  This is far from

2  sufficient.  Given the national system of federalism, it is a rare case where a dormant

3  Commerce Clause violation exists simply because of different regulatory schemes

4  between states.  *See, e.g., Chinatown Neighborhood Ass'n*, 794 F.3d at 1146-47

5  (identifying transportation and professional sports leagues as such categories).  Nor

6  could Plaintiffs make such allegations:  there is no national system of regulation

7  governing control over access to dealer data, the subject of the Dealer Data Security

8  Law.

9       While Plaintiffs have made a "[t]hreadbare recitals of the elements of [this]

10  cause of action," namely that there is a "substantial burden" on interstate commerce,

11  they support this only with conclusory statements, which are insufficient to survive a

12  motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009).

13  **II.     CONCLUSION.**

14       For the foregoing reasons, Plaintiffs' claims fail as a matter of law and the Court

15  should dismiss their Complaint with prejudice.

16       DATED this 18th day of September, 2019.

17                                 OSBORN MALEDON, P.A.

18

19                                 By      s/ Emma Cone-Roddy
                                        Mary O'Grady
20                                      Jeffrey B. Molinar
                                        William D. Furnish
21                                      Emma Cone-Roddy
                                        2929 North Central Avenue
22                                      21st Floor
                                        Phoenix, Arizona  85012-2793
23
                                   MARK BRNOVICH,
24                                 ATTORNEY GENERAL

25                                      Daniel Bergin
                                        15 South 15th Avenue
26                                      Phoenix, AZ 85007

27                                 *Attorneys for Defendant John S. Halikowski,*
                                   *Director of the Arizona Department of*
28                                 *Transportation*

1

MARK BRNOVICH,
ATTORNEY GENERAL

2

3

By      s/ Brunn (Beau) W. Roysden III

4

Brunn (Beau) W. Roysden III

5

Rusty D. Crandell
2005 North Central Avenue
Phoenix, AZ 85004

6

7

*Attorneys for Defendant Arizona Attorney
General Mark Brnovich*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28