Mary O'Grady, 011434
Jeffrey B. Molinar, 018512
William D. Furnish, 028725
Emma Cone-Roddy, 034285
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
mogrady@omlaw.com
jmolinar@omlaw.com
wfurnish@omlaw.com
econe-roddy@omlaw.com

MARK BRNOVICH
ATTORNEY GENERAL
Daniel Bergin, 012057
15 South 15th Avenue
Phoenix, AZ 85007
daniel.bergin@azag.gov

Attorneys for Defendants

MARK BRNOVICH
ATTORNEY GENERAL
Brunn (Beau) W. Roysden III, 028698
Rusty D. Crandell, 026224
2005 North Central Avenue
Phoenix, AZ 85004
(620) 542-3333
beau.roysden@azag.gov
rusty.crandell@azag.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation,<br><br>            Plaintiffs,<br><br>vs.<br><br>Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation,<br><br>            Defendants. | No. 2:19-cv-04849-GMS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Oral Argument Requested)** |

Mark Brnovich, Attorney General of the State of Arizona, and John Halikowski, Director of the Arizona Department of Transportation (collectively, the "State Defendants") hereby respond in opposition to the Motion for Preliminary Injunction filed by Plaintiffs CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds").

Plaintiffs' Motion falls far short of the standard required to enjoin enforcement of Arizona's recently enacted legislation governing the use and exchange of data belonging to the state's automobile dealers (the "Dealer Data Security Law" or the "Law"). As explained in the State Defendants' Motion to Dismiss, Plaintiffs' claims fail as a matter of law, and supporting evidence confirms that they cannot succeed on the merits of those claims. Nor can Plaintiffs establish any concrete, let alone irreparable, harm from implementation of the Law; expert testimony shows that the access and integration allowed by the Law do not increase the risk of harm to Plaintiffs' systems or disclosure of protected dealer data. Finally, any inconvenience experienced by Plaintiffs is far outweighed by the equities in permitting dealers greater access to their own data and the public's right to the consumer protections reinforced by the Law.

## I.     KEY FACTUAL AND STATUTORY BACKGROUND.

The Dealer Data Security Law governs the use of and access to data that dealers generate and gather in their operations, including information from consumers, manufacturers, financial institutions, and others involved in the sales and service of automobiles. To store and manage the vast and varied amounts of data, dealers license computer systems known as dealer management systems ("DMSs"). CDK and Reynolds produce and license DMSs and together control more than 70 percent of the DMS market based on the number of dealers using their products. *See* Declaration of Allan Stejskal ("Stejskal Dec.") ¶ 17.[1] CDK and Reynolds are being investigated by

---

[1] The State Defendants incorporate by reference the declarations supporting Intervenor-Defendant Arizona Automobile Dealers Association's concurrently filed Response to Motion for Preliminary Injunction.

several governmental authorities for anti-competitive practices.  *See* Declaration of Alan Andreu ("Andreu Dec.") ¶ 6.

While CDK and Reynolds own certain intellectual property and proprietary data within their DMS hardware and software, they do not own the data that the dealers enter and store in the DMS, as they have admitted.  *See* Compl. ¶¶ 42, 46; Stejskal Dec. ¶ 28.  CDK and Reynolds nevertheless have required dealers to obtain their permission before any third party may access the dealer's own data stored on the DMS.  *See* Compl. ¶¶ 85, 87, 90.  CDK and Reynolds also have required third parties to enter into agreements with them and pay fees to access this dealer data.  *Id.* ¶¶ 97-99, 105.

Consumer data is incredibly valuable; it has been called the "[t]he world's most valuable resource."  Stejskal Dec. ¶ 42.  In the automobile industry, consumers provide data – including demographic information, addresses, purchase history, and financing figures – to dealers in the course of the sales or service of their vehicles.  Declaration of Peter Swire ("Swire Dec.") ¶ 10.  Consumers "entrust a dealer with their business and their personal information," leaving the dealer responsible to "safeguard[] the consumer's data."  *Id.* ¶ 27.  In contrast, consumers are likely unaware that CDK and Reynolds even exist and have no knowledge regarding Plaintiffs' role or ability to access or use consumer data.  *See id.* ¶ 29.

Because dealers' core competence is selling and servicing cars, and not the various ancillary functions such as financing, marketing, or customer relations, dealers have to share the data that they collect with various third-party software vendors.  *See* Stejskal Dec. ¶¶ 24-25.  The vendors utilize the dealers' data and require efficient and reliable access to it for the software to function properly.  *See id.* ¶ 26.  As a result, dealers routinely rely on third-party "integrators," which serve as intermediaries and facilitate secure access to dealer data and transmittal of that data to dealers' chosen vendors.  *See id.* ¶ 30.  In light of this need to share highly valuable, private consumer data, Arizona (like several other states) enacted legislation to ensure appropriate access and protections.

The Federal Trade Commission ("FTC") is the central federal regulatory authority for protecting consumer data privacy.  *See* Swire Dec. ¶ 25.  The FTC recommends placing control over consumer data with "first parties" – the "companies with whom a consumer chooses to do business" – rather than "third parties" with whom consumers rarely know the data is being shared.  *Id.* ¶ 26.  And the FTC holds such first parties, rather than third parties, responsible for safeguarding the consumer's data, in line with the consumers' reasonable expectations.  *See id.* ¶ 28.  The FTC has identified five core principles that set the global standard for privacy and data security when sharing consumer data:  "(1) notice; (2) choice; (3) access; (4) security; and (5) enforcement."  *Id.* ¶¶ 39-40.  Here, the dealers are the first parties, and DMS providers such as Plaintiffs are the third parties.

In March 2019, the Arizona Legislature unanimously passed the Dealer Data Security Law, which is codified at A.R.S. sections 28-4651 to 28-4655.  The Law's sponsor identified it as a cybersecurity measure to protect consumers.  Compl. ¶ 126.  After Arizona Governor Doug Ducey signed it into law in April 2019, it became effective on August 27, 2019.

The Law broadly defines the "[p]rotected dealer data" that it regulates:  (a) "[p]ersonal, financial or other data relating to a consumer that a consumer provides to a dealer or that a dealer otherwise obtains and that is stored in the dealer's [DMS]"; (b) [m]otor vehicle diagnostic data" to the extent "necessary to fulfill a dealer's obligation to provide warranty, repair or service work to its customers"; and (c) "[o]ther data that relates to a dealer's business operations in the dealer's [DMS]"  A.R.S. § 28-4651(7).  The Law defines a "[d]ealer data system" as a "software, hardware or firmware system that is owned, leased or licensed by a dealer . . . and that stores or provides access to protected dealer data."  A.R.S. § 28-4651(3).  This definition includes Plaintiffs' DMSs, but also website providers, customer relationship management providers, and other software vendors.  None of these providers or software vendors, or for that matter other DMS providers, has sued.

3

Prior to the enactment of the Dealer Data Security Law, dealers (unlike Plaintiffs) have been subject to numerous federal regulations on how they use consumer information, including rules that require them to provide sufficient notice to consumers regarding the ways that their data will be used. *See, e.g.*, 16 C.F.R. § 313 (FTC Financial Privacy Rule); 16 C.F.R. § 314 (FTC Safeguards Rule). The Dealer Data Security Law supports and supplements federal law by providing additional safeguards to keep consumer information confidential and to limit its use. Among such provisions are those limiting a third-party's or manufacturer's ability to "[a]ccess, share, sell, copy, use or transmit protected dealer data" without dealer consent, A.R.S. §§ 28-4653(A)(1), (D); prohibiting actions that limit a dealer's ability to protect that data, A.R.S. § 28-4653(A)(3); barring the use of protected dealer data in ways that exceed the consent the consumer provides to the dealer, A.R.S. § 28-4654(B)(1); requiring the deletion of protected dealer data after the termination of an agreement with the dealer, A.R.S. § 28-4654(B)(3)(b); ensuring that dealers may audit access to and use of protected dealer data held by DMS providers, A.R.S. §§ 28-4654(B)(4)-(5); and clarifying that the Dealer Data Security Law does not authorize use of consumer data in a manner inconsistent with a dealer's agreement with a consumer or the purposes for which the consumer provided the data, A.R.S. § 28-4655(2).

The Dealer Data Security Law ensures that dealers retain control over their own data, restricting the actions that DMS providers and other third parties may take to control such data. Under the statute, third parties may not engage in any act of "[c]yber ransom," meaning the actual, attempted, or threatened encryption, restriction, or prohibition of a dealer's or integrator's "access to protected dealer data for monetary gain." A.R.S. §§ 28-4653(A)(2), 28-4651(2). Nor may a third party "prohibit or limit a dealer's ability to protect, store, copy, share or use protected dealer data," including by imposing fees or restrictions on accessing or sharing protected dealer data. A.R.S. § 28-4653(A)(3).

The Law further addresses any attempts by DMS providers to limit dealers'

options for third-party integration.  It defines an "integrator" as "a third party with whom a dealer enters into a contractual relationship to perform a specific function for a dealer that allows the third party to access protected dealer data or to write data to a dealer data system, or both, to carry out the specified function."  A.R.S. § 28-4651(1). Because integrators serve a critical function by facilitating the extraction of data from a DMS and its transmittal in a usable format to particular vendors, the Law ensures that DMS providers allow third-party access as long as sufficient security standards are in place.

Under the Dealer Data Security Law, DMS providers no longer may "[p]rohibit[] a third party that has satisfied or is compliant with the [STAR] standards" – the "current, applicable security standards published by the standards for technology in automotive retail" – "or other generally accepted standards that are at least as comprehensive as the [STAR] standards and that the dealer has identified as one of its authorized integrators from integrating into the dealer's [DMS] or plac[e] an unreasonable restriction on integration . . . ."  A.R.S. §§ 28-4653(A)(3)(b), 28-4651(9). The requirement to meet or exceed the STAR standards ensures adequate data privacy and appropriately minimizes the risks of unauthorized access to a DMS system.  *See* Declaration of Hoyt Kesterson ("Kesterson Dec.")  ¶¶ 35-40.

Unreasonable restrictions include unreasonable limitations on the scope of information shared with integrators, requiring unreasonable access to the accessing party's sensitive or confidential information, prohibiting a dealer's ability to store and copy its own protected dealer data, and allowing access to protected dealer data without dealer consent.  *See* A.R.S. § 28-4653(A)(3)(b).  The Law makes clear that it "does not prevent a dealer, manufacturer or third party from discharging its obligations . . . under federal, state or local law to protect and secure protected dealer data or . . . otherwise limit those responsibilities."  A.R.S. § 28-4653(C).

The Dealer Data Security Law ensures that dealers retain control over their data, while emphasizing data security.  The statute requires DMS providers to "[a]dopt and

5

make available a standardized framework for the exchange, integration and sharing of data from [a DMS]" that is compatible with STAR standards and "[p]rovide access to open application programming interfaces to authorized integrators."  A.R.S. § 28-4654(A).  The use of application programming interfaces ("APIs") would allow DMS providers to provide access to data without allowing a third party to access, interface with, or jeopardize their intellectual property or create a risk of breach or disruption of the system.  *See* Kesterson Dec. ¶¶ 12-13.  These sorts of APIs are used by other DMS providers without providing access to their proprietary software or creating data risks.  *See* Andreu Dec. ¶¶ 12-15.

That section also makes clear that a DMS provider may only use data to the extent permitted in the DMS provider's agreement with the dealer, must permit dealer termination of such agreement, and "must work to ensure a secure transition of all protected dealer data to a successor dealer data vendor or authorized integrator" upon termination.  A.R.S. §§ 28-4654(B)(1)-(3). As expert testimony illustrates, this means that DMS providers may comply with the Dealer Data Security Law without harming the integrity, confidentiality, or performance of their DMS systems.  *See* Kesterson Dec. ¶ 7.

The Law thus implements the core principles set out by the FTC to best protect consumer data.  It implements notice and choice by requiring that data is under the control of the dealer and can be sent to a third party, such as Plaintiffs, only with "prior express written consent" of the dealer, consistent with other regulatory regimes.  A.R.S. § 28-4653(B); *see also* Swire Dec. ¶¶ 52-54.  It further implements the access principle by preventing Plaintiffs from restricting or overcharging dealers in the use or sharing of consumer data.  *See* Swire Dec. ¶¶ 56-59.  And it implements the enforcement principle by empowering the attorney general to prosecute anyone who violates the Law.  *See id.* ¶¶ 73-74.  But most importantly, the Dealer Data Security Law implements security protocols and ensures that consumer information is protected in a manner consistent with best practices in data security.  *See id.* ¶ 60.

1    **II.    ARGUMENT.**

2         Plaintiffs are not entitled to injunctive relief because they cannot demonstrate (a)

3    likely success on the merits, (b) irreparable harm, (c) that the balance of equities favors

4    an injunction, and (d) that the requested relief is in the public interest. *See Rodriguez v.*

5    *Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013). "The Supreme Court has emphasized

6    that preliminary injunctions are an 'extraordinary remedy never awarded as of right.'"

7    *Garcia v. Google, Inc.*, 786 F. 3d 733, 740 (9th Cir. 2015) (citation omitted). "The

8    burden of persuasion is on the movant, who must make a clear showing that each of the

9    four prongs is satisfied." *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d

10   868, 876 (D. Ariz. 2012) (citation omitted).

11        **A.    Plaintiffs Will Not Succeed on the Merits.**

12             **1.    Plaintiffs' Preemption Arguments Fail.**

13        For the reasons stated in the Opposition to Plaintiffs' Motion for Preliminary

14   Injunction filed by the Arizona Automobile Dealers Association, in which the State

15   Defendants join, Plaintiffs' preemption claims cannot succeed on the merits.

16             **2.    Plaintiffs' Constitutional Arguments Fail.**[2]

17                  *a.    Plaintiffs' claims fail because they are not ripe.*

18        The "essential goal of ripeness jurisprudence" is to "help[] federal courts avoid

19   entanglement in abstract disputes which would be better defined and more easily

20   resolved with a more complete and concrete factual record." *Guatay Christian*

21   *Fellowship v. Cty. of San Diego*, 670 F.3d 957, 977 (9th Cir. 2011). As set out in the

22   State Defendants' Motion to Dismiss, Plaintiffs' constitutional claims are not ripe

23   because they make no attempt to show, as they must, "a genuine threat of imminent

24   prosecution under the challenged statute to establish a justiciable case or controversy."

25   *Wash. Mercantile Ass'n v. Williams*, 733 F.2d 687, 688 (9th Cir. 1984).

26        To establish a genuine threat, courts evaluate "1) 'whether the plaintiffs have

27

28   _____
     [2] Plaintiffs do not move for a preliminary injunction on their Commerce Clause claim,
     and the State Defendants do not address that issue here.

articulated a 'concrete plan' to violate the law in question,' (2) 'whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings,' and (3) 'the history of past prosecution or enforcement under the challenged statute.'" *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citation omitted).  Here, Plaintiffs do not allege that they plan to take acts that violate the Dealer Data Security Law.  At most, they allege that as DMS providers they are subject to the statute, but being subject to a statute is insufficient to confer standing, particularly when a statute requires a private party "to *do* something."  *Carrico v. City and Cty. of San Francisco*, 656 F.3d 1002, 1007 (9th Cir. 2011).  While plaintiffs allege that they do not know whether certain activities fall within the Dealer Data Security Law (Compl. ¶ 224), they do not allege that they actually plan to do any of those activities.  Nor do Plaintiffs allege that any Defendant has communicated a specific warning or threat to prosecute them or that there is a history of past prosecution under the Law.

    While there are some exceptions to this rule, courts do not adjudicate disputes when further factual development would "significantly advance [the Court's] ability to deal with the legal issues presented."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (holding matter not ripe for judicial review) (citation omitted); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir. 1996) (holding that "possible vague application of the law to the individual plaintiffs" is not ripe for adjudication if "there are insufficient facts to determine the vagueness of a law as applied").  Plaintiffs' complaints that they might not be adequately compensated under the statute, that disputes might arise between what dealers believe they are entitled to under the Law and what they believe they are entitled to under contract, and that the Law might be enforced against them present precisely such a situation.  The Court need not and should not delve into hypothetical factual questions and hypothetical legal interpretations of how Arizona courts might apply the Law when there is no specific threat of enforcement alleged.  These questions can and should wait until an actual dispute over a specific contract arises.

   b.   *As set out in Defendants' Motions to Dismiss, all of Plaintiffs constitutional claims fail.*

Plaintiffs did not bring as-applied challenges to the Dealer Data Security Law. Rather, they brought facial challenges.  *See* Compl. at 59-60, ¶¶ F-J.  Facial challenges are "disfavored" because they (1) "raise the risk of premature interpretation of statutes on the basis of factually barebone records," (2) "run contrary to the fundamental principle of judicial restraint," and (3) "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (internal citations and quotation marks omitted).

To succeed on a facial challenge, Plaintiffs must be able to show that "no set of circumstances exists under which the Act would be valid."  *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739. 746 (1987)).  This is a "high bar" that Plaintiffs "must overcome" before a court can strike down the Dealer Data Security Law on a facial challenge.  *Id.*

   1.   *Plaintiffs are unlikely to succeed on their Contract Clause claims.*

"The Constitution protects freedom of contract only by limiting the states' power to modify or affect contracts already formed."  *McCarthy v. Mayo*, 827 F.2d 1310, 1315 (9th Cir. 1987) (citing U.S. Const. art. 1, § 10, cl. 1.)  Because of this, "a contract cannot be impaired, within the meaning of [the Contract Clause] by a statute enacted prior to the making of the contract."  *Reding v. Texaco, Inc.*, 598 F.2d 513, 519 (9th Cir. 1979).  Thus, Plaintiffs are unlikely to succeed on their Contract Clause claim because they cannot show an impairment of future contracts, where as a matter of law there can be no impairment.[3]  Because Plaintiffs cannot meet this threshold showing

---

[3] Moreover, even for Plaintiffs' existing contracts (to which they merely site a generic version as an example), there will be "some cases, *e.g.*, those where the contract is

1    that there are no circumstances where the Law would be constitutional, the Court need

2    not address their arguments that the Contract Clause has been violated at all.

3          Even assuming that such a facial challenge under the Contract Clause is

4    permissible, Plaintiffs' arguments are without merit.  The Contract Clause states that

5    "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S.

6    Const. art. I, § 10, cl. 1.  While "the language of the Contract Clause is facially

7    absolute," the Supreme Court has recognized that the Clause "must be accommodated

8    to the inherent police power of the State to safeguard the vital interests of its people."

9    *Energy Reserves Grp, Inc. v. Kansas Power & Light Co*., 459 U.S. 400, 410 (1983)

10   (citation and internal quotation marks omitted).  Thus, a law only creates a

11   constitutional concern if there is a "substantial impairment" of the contract and the law

12   fails to reasonably serve a "significant and legitimate public purpose."  *Id*. at 411-12.

13   "Courts generally defer to the judgment of state legislatures as to both necessity and

14   reasonableness so long as the state itself is not a contracting party."  *Lazar v. Kroncke*,

15   862 F.3d 1186, 1199 (9th Cir. 2017).  Thus, when the contract is between two private

16   entities, the assessment is akin to rational basis review.

17         Plaintiffs argue (at 15) that a substantial impairment exists because their

18   contracts "expressly limit access to their DMSs and provide that a dealer must obtain

19   approval before allowing a third party to access, use, or modify the system."  They also

20   argue (at 16) that the Dealer Data Security Law impairs their "ability to comply with

21   their contractual data-security obligations," citing the FTC's Safeguards Rule.

22   Plaintiffs claim the Law thus "eviscerates" their contractual bargain.  They are incorrect

23   for several reasons.

24         **First**, Plaintiffs are simply wrong about how the Law functions.  The Law does

25   not allow third parties to "access, use, or modify" their DMSs, but rather to "protect,

26

27   about to expire by its terms, [that] the impairment caused by the law will be slight" and
     thus constitutionally permissible.  *Sanitation and Recycling Indus. v. City of New York*,
28   107 F.3d 985, 994 (2d Cir. 1997).

store, copy, share or use protected dealer data." A.R.S. § 28-4653(A)(3).  While this permission includes a dealer's right to allow an "authorized integrator" to "access[] or shar[e] protected dealer data," to "writ[e] data to a dealer data system," and to allow an authorized integrator "that has satisfied or is compliant with the [STAR] standards or other generally accepted standards" to "integrat[e] into the dealer's dealer data system," none of it requires Plaintiffs to allow third parties direct access to the DMSs themselves. A.R.S. §§ 28-4653(A)(3)(a)-(b). *See also* Andreu Dec. ¶ 12-15. Moreover, Plaintiffs ignore that integrators that are not compliant with the required security standards are not allowed access.  The Law expressly allows Plaintiffs to comply by "[p]rovid[ing] access to open application programming interfaces to authorized integrators," rather than access to the DMS itself. *Id.* § 28-4654(A)(2). Thus, far from "eviscerating" Plaintiffs' contractual right to control access to their DMSs, the Dealer Data Security Law simply requires them not to stand in the way of ensuring dealers have a "cost effective and efficient mechanism" for making their own data accessible – data the Plaintiffs concede belongs to the dealers. Stejskal Dec. ¶¶ 28, 55.

Significantly, the Law also does not require Plaintiffs to eliminate or reduce any security for their systems. *See* Kesterson Dec. ¶¶ 22, 35.  It does not allow them to "encrypt, restrict, or prohibit" a dealer's or authorized integrator's access to the *dealer's data* or threaten to do so, but this limitation does not prevent them from implementing or maintaining appropriate safeguards, as Plaintiffs argue (at 16).  A.R.S. §§ 28-4651(2), 28-4653(A)(2).  Indeed, the Law further allows a DMS provider to reject integration if the integrator does not comply with "generally accepted standards" for cybersecurity. A.R.S. § 28-4653(A)(3)(b).  These generally accepted security standards do not prevent Plaintiffs from complying with any contractual duties.

Rather, the APIs authorized by the Law are regularly used "as a way of providing access to data in a secure manner without compromising the underlying database." *See* Kesterson Dec. ¶ 14.  And the STAR standards adopted by the Law as

1   the paradigmatic, "generally accepted standard[]" for cybersecurity include, among

2   other requirements, that "all entities be authenticated and actions constrained to the data

3   they are authorized to access." *Id.* ¶ 40.  Thus, if APIs are correctly implemented, they

4   "will not increase the risk of data breach." *Id.*

5        **Second,** even if Plaintiffs were correct that the Dealer Data Security Law

6   impairs their contracts, they could not show that any impairment was substantial.  An

7   impairment is only substantial if it "deprives a private party of an important right,

8   thwarts the performance of an essential term, defeats the expectations of the parties, or

9   alters a financial term." *S. Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 890 (9th

10  Cir.2003) (internal citations omitted).  A DMS is simply a software application that

11  stores data that the dealers license from Plaintiffs for a fee, under the mutual

12  expectation that dealers will integrate the DMS with other software provided by other

13  vendors.  *See* Stejskal Dec. ¶¶ 15, 24-26 (because core DMS application "does not fully

14  satisfy the technology needs of a dealership," dealers have to use several other vendors

15  in addition to the DMS that are "reliant on a core set of dealer data" stored in the

16  DMS"); Swire Dec. ¶¶ 11-13.  A slight change in the approval process for the dealers'

17  other software partners does not affect any important rights or essential terms, defeat

18  the expectations of the parties, or alter a financial term.

19       Yet even if Plaintiffs could show a substantial impairment, their Contract Clause

20  claim would still fail because the Dealer Data Security Law serves a legitimate and

21  significant public interest in the statute related to legitimate areas of local concern –

22  namely as a "cybersecurity measure to protect consumers." *See* Compl. ¶ 126.

23  Plaintiffs suggest (at 17), without support from any affidavit or other evidence, that the

24  Law will not serve this purpose and instead "simply confers valuable benefits on

25  dealers and their designees."  This Court, however, should "defer[s] to the judgment of

26  state legislatures as to both necessity and reasonableness so long as the state itself is not

27  a contracting party." *Lazar*, 862 F.3d at 1199.  Unlike DMS providers such as

28  Plaintiffs, dealers comprise a heavily regulated industry that must, and does, take great

care to protect the consumer data that it collects.  *See* Stejskal Dec. ¶ 49.  Plaintiffs, in contrast, have been using their dominant market position to seize control of and monetize consumer data.  *See id*. ¶¶ 42-46.

By placing control of consumer data in the hands of the dealers (whom the consumers actually choose to do business with and trust) rather than the DMS providers (about whom the consumers likely do not know), the Dealer Data Security Law aligns with best practices in protecting consumer privacy.  *See* Swire. Dec. ¶ 25-30.  Arizona's legislature has a clear public purpose in pushing these generally accepted consumer data privacy standards onto the car dealer industry, and placing limits on Plaintiffs' ability to abuse their market position to monetize the private data of unwitting consumers.  Courts routinely dismiss Contract Clause claims where, as here, the legislature had a legitimate objective in enacting the regulation at issue.[4]

Finally, Plaintiffs (at 17 n.9) insinuate that the Dealer Data Security Law was part of some corrupt bargain because the Intervenor-Defendant is the top donor to the law's sponsor, contributing $5,500.  The Court should disregard this untoward, baseless, and unsupported accusation regarding the Law, which passed the Arizona legislature unanimously.

> ### 2.    *Plaintiffs are unlikely to succeed on their due process claims.*

Plaintiffs next argue (at 18-21) that the Law is unconstitutionally vague under the Due Process Clause.  This claim fails as a matter of law.  Statutes need not spell out their terms to "mathematical certainty" to be constitutionally permissible.  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (lawmakers are "[c]ondemned to the use of words").  Rather, due process merely requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply them."  *Id.* at 108-09.

---

[4] *See, e.g.*, *Golden Rule Ins. Co. v. Stephens*, 912 F. Supp. 261, 268 (E.D. Ky. 1995); *Easthampton Sav. Bank v. City of Springfield*, 874 F. Supp. 2d 25, 32 (D. Mass. 2012).

Plaintiffs cannot facially challenge the Dealer Data Security Law as constitutionally vague and a violation of due process.  Rather, as the Ninth Circuit has explained, "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."  *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).[5]  And here, because the Dealer Data Security Law has yet to be enforced, there has been no "application" of the Law at all and an as-applied challenge is impossible.  *See Hoye v. City of Oakland*, 653 F.3d 835, 859 (9th Cir. 2011) (declining to rule on as-applied challenge "that would require us to speculate as to prospective facts").

Plaintiffs object to terms that have specific definitions and give clear notice of their meanings, such as "[f]ee" (defined at A.R.S. § 28-4651(5)) and "dealer data" (defined at *id.* § 28-4651(7)).  They also object (at 9) to the statute's use of the term "unreasonable restrictions," although courts have routinely made clear that the terms "unreasonable" and "reasonable" are not vague as a matter of law.  *See, e.g., Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 28 (D.C. Cir. 2015) (interpretation of mine safety regulation to cover material that "reasonably" might ignite not unconstitutionally vague); *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 734-739 (D.C. Cir. 2016) (regulation prohibiting conduct that "unreasonably interfere[s] with or unreasonably disadvantage[s]" consumer internet access not unconstitutionally vague) (citation omitted).

Similarly, Plaintiffs' contentions that it is unclear whether "hosting encrypted data for a fee" is prohibited "cyber-ransom" and whether they are required to "facilitate or prevent one dealer from accessing another dealer's data" are insufficient to state a constitutional violation.  A reasonably intelligent person would not read the statute in those ways.  The cyber ransom definition is directed at encrypting a "dealer's . . . access

---

[5] While Plaintiffs do bring a First Amendment compelled-speech challenge, it is separate and distinct from their vagueness challenge.  They do not argue that they are unclear about what "speech" is compelled.

1    to protected dealer data for monetary gain," not encrypting data at a dealer's request.

2    A.R.S. § 28-4651(2).  Moreover, the "[p]rotected dealer data" the statute references is

3    not some other dealer's data, but "data relating to a consumer that a consumer provides

4    to a dealer or that a dealer otherwise obtains and that is stored in the dealer's [DMS],"

5    along with "[o]ther data that relates to a dealer's business operations."  A.R.S. § 28-

6    4651(7).  No reasonable reading would suggest that the statute creates a right to access

7    other dealers' data, stored in other dealers' DMS systems.

8            Critically, "if this general class of offenses can be made constitutionally definite

9    by a reasonable construction of the statute, this Court is under a duty to give the statute

10   that construction."  *United States v. Harriss*, 347 U.S. 612, 618 (1954).  Even if

11   Plaintiffs could raise a colorable argument that terms such as "fee," "direct" costs, and

12   "cyber ransom" are vague (and they do not), these terms can be further clarified, once

13   the Law takes effect, through reasonable interpretations by the responsible Arizona

14   agencies and state courts.  *See Colten v. Kentucky*, 407 U.S. 104, 110 (1972)

15   (vagueness doctrine is "not a principle designed to convert into a constitutional

16   dilemma the practical difficulties in drawing criminal statutes").

17           Because none of the challenged provisions is vague, and because this court

18   cannot properly reach the question, the Court need not consider whether the "vague"

19   provisions are severable.  Under Arizona law, however, they are, and "if part of an act

20   is unconstitutional and by eliminating the unconstitutional portion the balance of the act

21   is workable, only that part which is objectionable will be eliminated and the balance left

22   intact."  *State v. Watson*, 120 Ariz. 441, 453 (1978).

23           None of the purportedly vague provisions meets this standard, and Plaintiffs

24   barely manage such an argument, asserting instead in conclusory fashion (at 21) that the

25   "ambiguities [] are central to the statute as a whole."  The structure of the statute makes

26   clear that this is not the case.  For example, the term "cyber ransom" (other than its

27   definition) is used once in a stand-alone prohibition.  *See* A.R.S. § 28-4653(A)(2).

28   Even if the definition of cyber ransom was vague, the ban on cyber ransom could be

1     struck and the rest of the Dealer Data Security Law would remain workable because

2     nothing else depends on it.  Similarly, the term "unreasonable" is used in a single

3     prohibition at A.R.S. section 28-4653(A)(3)(b).  If that term was somehow found to be

4     unconstitutionally vague, the prohibition could be struck without affecting the rest of

5     the statute.

6             *3.     Plaintiffs' Takings Clause claim is unlikely to succeed.*

7             Plaintiffs argue (at 21-22) that they are likely to succeed is establishing either a

8     per se or a regulatory taking in violation of the Constitution.  Plaintiffs are wrong.

9             Plaintiffs takings argument simply misreads the Dealer Data Security Law,

10    which does not require CDK or Reynolds to allow any third parties to "access" their

11    proprietary DMSs.  *See* A.R.S. § 28-4653(A); Kesterson Dec. ¶ 22 (discussing API

12    functions).  Nor do Plaintiffs have any propriety rights in the protected dealer data that

13    is removed or shared.  That data belongs to the dealers.  *See* Stejskal Dec. ¶ 28.

14            Plaintiffs' physical takings claim fails as a matter of law.  A physical taking is a

15    "relatively narrow" category.  *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 531 (9th

16    Cir. 2019) (citation omitted).  Generally, physical takings are limited to the context of

17    real property.  *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 854 (9th

18    Cir. 2001).  And even when real property is at issue, a mere access regulation is

19    insufficient to create a physical taking; in particular, a limitation on the "right to

20    exclude" will not effect a physical taking.  *Cedar Point Nursery*, 923 F.3d at 533.

21    Moreover, a DMS's entire purpose is to hold data for dealers; that dealers can demand

22    that Plaintiffs allow the dealers' software vendors to access data from or write data to

23    the system through an API is hardly akin to a physical taking of real property.

24            Plaintiffs' regulatory takings claim also fails because the Dealer Data Security

25    Law is "much more an adjustment of the benefits and burdens of economic life to

26    promote the common good than a physical invasion of property."  *Rancho de Calistoga*

27    *v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015) (internal citation and

28    quotation marks omitted).  For a regulatory taking to occur, the action must be

"functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner." *MHC Financing Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (citation omitted). The Law does not – and is not alleged to – do any such thing; rather, it regulates how Plaintiffs must interact with their business partners and what they are allowed to charge. This type of activity is not a regulatory taking. *See Rancho de Calistoga*, 800 F.3d at 1091-92 (rent control ordinance is not regulatory taking). While Plaintiffs allege that the value of their DMS systems will decrease, a "diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Id.* at 1090 (collecting cases where no regulatory taking occurred with diminution of value from 75 to 92.5 percent).

Additionally, Plaintiffs improperly rely on case law regarding a per se taking in arguing their regulatory takings claim, in direct contradiction of Supreme Court and Ninth Circuit precedent. *See, e.g., Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323-34 (2002) ("[W]e do not apply our precedent from the physical takings context to regulatory takings claims."); *Rancho de Calistoga*, 800 F.3d at 1092 (same). This Court cannot rely on *Kelo v. City of New London*, 545 U.S. 649, 477 (2005), regarding the benefit that dealers may receive under the Dealer Data Security Law, as Plaintiffs attempt to do (at 22); there is no "public use" analysis in the regulatory takings context. *Rancho de Calistoga*, 800 F.3d at 1092 (specifically rejecting the application of language Plaintiffs cite from *Kelo* to regulatory takings). Rather, this Court's analysis is properly limited under *Penn Central Transportation Company v. New York City*, 438 U.S. 104, 127 (1978), to whether it has a "substantial public purpose."

Additionally, although Plaintiffs allege that the Law "provides no compensation," this is a misreading of the Law. See Compl. ¶ 232. While Plaintiffs may not "[i]mpos[e] any fee," A.R.S. § 28-4653(A)(3)(a), the term "[f]ee" is expressly defined to exclude "any direct costs incurred by the [DMS provider] in providing protected dealer data access to an authorized integrator or allowing an authorized

17

1    integrator to write data to a dealer data system."  A.R.S. § 28-4651(5).  Just

2    compensation under the Takings Clause "is to be measured by 'the market value of the

3    property at the time of the taking.'"  *Horne v. Dep't of Agric.*, 135 S.Ct. 2419, 2432

4    (2015) (citation omitted).  Thus, "evidence of loss of profits, damage to good will, the

5    expense of relocation and other such consequential losses are not to be considered."

6    *United States v. 87.30 Acres of Land, More or Less, in Whitman and Garfield Ctys.,*

7    *State of Wash.*, 430 F.2d 1130, 1132 (9th Cir. 1970).  Just compensation is not

8    "equivalent to 'full compensation.'"  *In re City of Stockton, Cal.*, 909 F.3d 1256, 1268

9    (9th Cir. 2018) (citation omitted).  Plaintiffs are unlikely to succeed in establishing a

10   violation of the Takings Clause.

11           4.       *Plaintiffs are unlikely to succeed on their First Amendment claim.*

12           Finally, Plaintiffs argue (at 22) that the Dealer Data Security Law violates the

13   First Amendment by "compel[ling]" them to "share information" and "writ[e] computer

14   code."

15           The first argument rests on the false proposition that the Law compels Plaintiffs

16   to share any information with third parties.  It does not.  The statute requires Plaintiffs

17   to allow dealers to share the dealers' own data with third parties of the dealers'

18   choosing.  Plaintiffs' sole involvement is in a transmittal role; the dealers store their

19   data in the software they license from Plaintiffs, and Plaintiffs must facilitate the

20   dealers' transfer of this data to third parties.  This sort of "transmittal role" is not

21   "speech" within the meaning of the First Amendment.  *See European Connections &*

22   *Tours, Inc. v. Gonzales*, 480 F. Supp. 2d 1355, 1370 (N.D. Ga. 2007); *Rest. Law Ctr. v.*

23   *City of New York*, 360 F. Supp. 3d 192, 212 (S.D.N.Y. 2019) (holding that "the

24   employers' mere act of sending a check to an employee's designated non-profit

25   recipient is not speech" because "they have no discretion as to the recipient of their

26   employees' donation – they merely follow their employees' instructions").  Moreover,

27   the requirement that data shared with one business partner be portable to other business

28   partners is a key part of regulatory regimes across industries.  *See* Swire Dec. ¶¶ 75-81.

1    Nor is Plaintiffs' argument that they will have to design code to comply with the

2  Dealer Data Security Law sufficient to create a compelled-speech issue under the First

3  Amendment.  Indeed, this claim "trivializes the freedom" protected by the First

4  Amendment.  *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62

5  (2006).  Plaintiffs are for-profit enterprises that, at most, are being asked to modify

6  commercial software that will only be seen by them.  *See* A.R.S. §§ 28-4654(A)(1)-(2).

7  There is reason to doubt that functional programming of this sort is even entitled to

8  traditional speech protections.  *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273

9  F.3d 429, 454 (2d Cir. 2001) (source code's "functional capability is not speech within

10  the meaning of the First Amendment").  "[T]hat this [programming] occurs at some

11  level through expression does not elevate all such conduct to the highest levels of First

12  Amendment protection.  Doing so would turn centuries of our law and legal tradition on

13  its head, eviscerating the carefully crafted balance between protecting free speech and

14  permissible government regulation."  *United States v. Elcom Ltd.*, 203 F. Supp. 2d

15  1111, 1128-29 (N.D. Cal. 2002).

16    If any code at issue here has expressive elements that fall within the First

17  Amendment's protection, Plaintiffs may draft that code however they want.  *See*

18  Kesterson Dec. ¶ 16.  The Law would only require the code to have certain

19  functionality, but its "broad requirements" do "not dictate a specific message."  *Envtl.*

20  *Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 849-51 (9th Cir. 2003).  And even if there are

21  some expressive elements to the functionality, the Law does not require Plaintiffs to

22  share any code with anyone; the "speech" would not be public and thus not implicate

23  the Constitution.  *Cf. Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108-09 (D.C.

24  Cir. 2011) ("constitutional concerns" with compelled public speech are not triggered

25  when government commission is "only audience"); *United States v. Sindel*, 53 F.3d

26  874, 878 (8th Cir. 1995) (lesser concern where compelled speech lacks public

27  dissemination).

28    The Dealer Data Security Law regulates conduct.  That does not amount to a

19

1    First Amendment violation for the reasons explained by the Supreme Court in

2    *Rumsfeld*, which rejected a First Amendment challenge to the requirement that law

3    schools host and promote military recruitment even if the schools objected to military

4    policy.  Like in *Rumsfeld*, "[t]he compelled speech . . . is plainly incidental to [the

5    Law's] regulation of conduct."  547 U.S. at 62.  The statute simply requires that a

6    market product (Plaintiffs' DMS) has certain functionality (the ability to allow dealers

7    to access and share their own data).  That is conduct, not speech.  *Id.* ("Congress, for

8    example, can prohibit employers from discriminating in hiring on the basis of race.  The

9    fact that this will require an employer to take down a sign reading 'White Applicants

10   Only' hardly means that the law should be analyzed as one regulating the employer's

11   speech rather than conduct.").

12        The public "can appreciate the difference between speech [Plaintiffs] sponsor[]"

13   and code Plaintiffs develop "because [they are] legally required to do so."  *Id.* at 65.  It

14   is thus extremely unlikely that anyone could understand Plaintiffs to be expressing any

15   message whatsoever "given both the nature of [their] activity and the factual context

16   and environment in which it was undertaken."  *Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d

17   419, 438 (9th Cir. 2008) (citation and internal quotation marks omitted).  For these

18   reasons, the Law plainly regulates only conduct.

19        Because Plaintiffs mischaracterize the Law as a speech regulation, rather than a

20   conduct regulation, they argue incorrectly that it must survive strict scrutiny.  As a

21   conduct regulation that does not burden protected expression, the Law need only

22   "promote[] a substantial government interest that would be achieved less effectively

23   absent the regulation."  *Edge v. City of Everett*, 929 F.3d 657, 670 (9th Cir. 2019)

24   (quoting *Rumsfeld*, 547 U.S. at 67).  Here, the Dealer Data Security Law will promote

25   Arizona's interest in consumer protection.  *See* Swire Dec.  ¶¶ 25-30; Stejskal Dec. ¶¶

26   47-51.

27        Plaintiffs also argue that the Dealer Data Security Law is underinclusive because

28   it does not cover other entities that similarly provide database systems to market

20

participants that collect dealer data.  Plaintiffs cite to *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013), for this point, but the opinion notes that state laws are not "automatically underinclusive simply because they . . . fail to regulate all forms of [a communication]."  *Id.*  at 824.  Nothing in *Valle Del Sol* suggests that Arizona cannot regulate one industry without regulating all industries.  Moreover, Plaintiffs provide no evidence that other database systems in other industries are not already subject to complex regulatory schemes to protect consumer data.  *See, e.g.,* Health Info. Tech. for Econ. and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226-27 (2009) (codified in scattered sections of 42 U.S.C.) (regulating databases with electronic health records used in the medical industry).  Indeed, the provisions of the Dealer Data Security Law are strikingly similar to the regulatory regime for consumer health data and financial services firms under federal law.  *See* Swire Dec. ¶¶ 39-51.

Thus, far from being underinclusive, the Dealer Data Security Law simply brings DMS providers and protected dealer data into line with cross-industry best practices throughout the country and, indeed, the world.  *See id*. ¶ 90.  If Plaintiffs have a First Amendment right to avoid application of standard, cross-industry best practices for protecting consumer data, it would deal a crippling blow to data privacy protections.

Plaintiffs are unlikely to succeed in proving a violation of the First Amendment.

**B.      Plaintiffs Will Not Experience Irreparable Harm.**

Plaintiffs' alleged harm is entirely speculative.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  Plaintiffs assert (at 24), in the abstract, that unauthorized third-party access "can" cause data issues and that they "might" not be able to fix such problems.  But Plaintiffs have not even attempted to show that the limited access permitted under the Law to STAR-qualified vendors presents a likelihood of concrete injury, let alone irreparable injury.  Indeed, such a showing is

1    impossible because the Law will not increase the likelihood of security breaches. *See*

2    Kesterson Dec. ¶¶ 7, 37.

3        Likewise, Plaintiffs' argument that STAR-qualified vendors might steal data is

4    unsupported and ignores that vendor access under the Law is limited to the *dealer's*

5    data, not DMS provider data.  Plaintiffs' assertion that the Law prevents providers from

6    implementing critical security measures is a clear misreading of the Law.  *See* A.R.S. §

7    28-4653(C).  The declaration of Allan Stejskal, who has experiences in high-level

8    executive positions with several DMS providers, completely undercuts Plaintiffs'

9    argument that the DMS Law cannot be implemented without causing irreparable harm.

10    *See* Stejskal Dec. ¶¶ 3-7, 47-58.  Similarly, Hoyt Kesterson, who has over fifty years'

11    experience in information technology, concluded that the Dealer Data Security Law

12    "addresses Plaintiffs' concerns regarding their ability to protect their intellectual

13    property, data systems, and confidential information."  Kesterson Dec. ¶¶ 2, 41.

14        Lacking evidence of actual harm, Plaintiffs attempt to bootstrap the requisite

15    irreparable harm through their First Amendment claim.  But even if Plaintiffs had pled

16    such a claim (and they have not), raising a serious First Amendment claim is not

17    enough, by itself, "to tip the hardship scales."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109,

18    1138 (9th Cir. 2009) (citation omitted).  This same reasoning applies equally to

19    Plaintiffs' Contract Clause claim.  To hold otherwise would collapse the other

20    preliminary injunction elements into a finding on the merits.

21       **C.**     **The Balance of the Equities and Public Interest Do Not Favor**

22            **Plaintiffs.**

23        The balance of equities favors the State.  In contrast to Plaintiff's speculative

24    harm, the State is certain to suffer irreparable harm.  "[A]ny time a State is enjoined by

25    a court from effectuating statutes enacted by representatives of its people, it suffers a

26    form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in

27    chambers) (citation omitted); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th

28    Cir. 1997) ("[A] state suffers irreparable injury whenever an enactment of its people or

1    their representatives is enjoined.").  This is particularly so here given the consumer

2    privacy and antitrust concerns that brought about the DMS Law.

3          The public interest also counsels against granting preliminary relief.  Although

4    Plaintiffs never voiced a concern about the Law when it was debated in the Arizona

5    Legislature, in their motion, they now argue that the Law is bad policy.  But the

6    Arizona Legislature has definitively spoken on the public interest by passing the Law

7    unanimously.  Allowing the Law to stay in effect during the short time of trial is thus in

8    the public interest.  *See, e.g.*, *Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to

9    specific constitutional limitations, when the legislature has spoken, the public interest

10   has been declared in terms well-nigh conclusive."); *Virginian Ry. Co. v. Sys. Fed'n No.*

11   *40*, 300 U.S. 515, 552 (1937) (holding that legislation "is in itself a declaration of the

12   public interest.").

13   **III.    CONCLUSION.**

14         For the foregoing reasons, the State Defendants request that the Court deny

15   Plaintiffs' Motion for Preliminary Injunction.

16         DATED this 30th day of September, 2019.

17                                                OSBORN MALEDON, P.A.

18

19                                                By    s/ Jeffrey B. Molinar
                                                        Mary O'Grady
20                                                      Jeffrey B. Molinar
                                                        William D. Furnish
21                                                      Emma Cone-Roddy
                                                        2929 North Central Avenue
22                                                      21st Floor
                                                        Phoenix, Arizona  85012-2793

23                                                MARK BRNOVICH,
                                                  ATTORNEY GENERAL
24

25                                                      Daniel Bergin
                                                        15 South 15th Avenue
26                                                      Phoenix, AZ 85007

27                                                *Attorneys for Defendant John S. Halikowski,*
                                                  *Director of the Arizona Department of*
28                                                *Transportation*

                                                23

1

2

MARK BRNOVICH,
ATTORNEY GENERAL

3

By      s/ Brunn (Beau) W. Roysden III
        Brunn (Beau) W. Roysden III

4

        Rusty D. Crandell
        2005 North Central Avenue

5

        Phoenix, AZ 85004

6

*Attorneys for Defendant Arizona Attorney*

7

*General Mark Brnovich*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28