IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation,,<br><br>          Plaintiffs,<br><br>vs.<br><br>Mark Brnovich, Attorney General of the State of Arizona, and John S. Halikowski, Director of the Arizona Department of Transportation,<br><br>          Defendants. | No. 2:19-cv-04849-GMS<br><br>**DECLARATION OF HOYT L. KESTERSON II** |

## I.    PROFESSIONAL BACKGROUND

1.    I am employed by Avertium as a Senior Security Architect.  Avertium is a privately-held company headquartered in Phoenix, Arizona that provides security consulting and managed services.  I have worked for Avertium (and its predecessor, Terra Verde) since 2000.  In my role as a Senior Security Architect, I advise on how to secure organizations and how to prepare for data security audits and performing data security audits.  Prior to working at Avertium, I consulted as a sole practitioner for nine years designing secured systems.  I have also served as an expert witness in several matters involving intellectual property and data security, including a prior art patent case on databases, a case on cryptographic time-stamping, a spoliation hearing concerning loss of escrowed encryption keys, and a trade secret lawsuit involving API access to a database.  Prior to that I was a Fellow for Bull HN Information Systems (formerly Honeywell Information Systems and Honeywell Bull), also located in Phoenix, for twenty-four years between 1976 and 2000.  A copy of my curriculum vitae is attached to this declaration as **Attachment A**.  I have also previously testified as an expert on cybersecurity and data security, and a list of the public matters in which I have testified are attached as **Attachment B**.

2.    I have over fifty years in information technology with a focus in security for the last twenty-five years. I am an internationally recognized expert in security.  I am a Certified Information Systems Security Professional (CISSP), a Certified Information Systems Auditor (CISA), and a Payment Card Industry Qualified Security Assessor (PCI QSA).  I have presented at the RSA Security Conference thirty-two times as well as at other national conferences.

3.      I am also a founder and a co-chair of the Information Security Committee in the American Bar Association Section of Science and Technology Law.  While a member of that committee I worked on the Digital Signature Guidelines and on the PKI Assessment Guidelines. I was program chair for several three-day workshops on digital evidence. I gave a talk for the *Internet Technology Basics for Judges* symposium organized by the Center on Law and Information Policy *and* the Federal Judicial Center and held at Fordham Law School. I have run the mock hearings at the RSA Security Conference each year, creating the hypothetical and selecting the participants.

4.      From 1982 to 2000, while I was employed at Bull Information Systems, I was a United States delegate and head of the United States delegation to ISO SC21 on Open System Interconnection (OSI).  I also chaired some of the technical groups within ISO SC21, including the Presentation Layer, ASN1, and the Directory, which included X.509—the standard for public-key certificates that is widely used to secure stored and transmitted data.  I was also a participant in defining the architecture for the upper layers including the Application Layer.  A significant amount of time was spent on the concept of interfaces including the application program/programming/programmatic interface (API).

## II.    Scope of Retention and Summary of Opinions

5.      I have been retained by the Defendant Mark Brnovich, the Arizona Attorney General, in the lawsuit *CDK Global LLC v. Brnovich*, Case Number CV-19-04849-PHX-GMS in the United States District Court for the District of Arizona, to apply my expertise in cybersecurity and distributed systems architecture to Plaintiffs' allegations in the Complaint and their Motion for Preliminary Injunction regarding Arizona Revised Statutes sections 28-4651 through 28-4655, which I will refer to as the "Dealer Data Security Law" or the "Law."   A list of the materials reviewed and considered in connection with this declaration is enclosed as **Attachment C**.

6.      My employer Avertium receives payment in connection with this matter at a rate of $400 per hour for my work along with $600 per hour for time during which I am testifying.  Avertium's payment, and any compensation I receive from Avertium based on my work in this matter, is not dependent in any way on reaching a particular conclusion or opinion.  Nor is my compensation or Avertium's payment dependent on the outcome of this litigation.

7.      Based on my expertise in the fields of cybersecurity and distributed systems architecture, my review of relevant literature, and my review of the Complaint, Plaintiffs' Application for Preliminary Injunction and supporting declarations and the Dealer Data Security law, the summary of my conclusions is as follows:

A. DMS providers may implement the Dealer Data Security Law in ways that maintain the integrity, confidentiality and performance of their data systems and protect their intellectual property through the implementation of an application programming interface (also known as "API");

B. DMS providers may implement the Dealer Data Security Law in ways that ensure proper and correct security safeguards by requiring compliance with the STAR Standards or more rigorous standards because the DMS providers themselves will be the sole implementors of the software that processes service requests and it is the quality of their implementation that ensures a correct, secure, and efficient service.

## III.  Summary of Plaintiffs' Concerns

8.      Based on my review of the Complaint, Preliminary Injunction and supporting declarations, Plaintiffs' cybersecurity and system architecture concerns regarding the Dealer Data Security Law fall into a few, related categories of allegations.

A. They allege the Law would require DMS providers to permit "unfettered" access to their systems, trade secrets, source code and other intellectual property, including permitting third parties to write data directly into their systems, which effectively abandons system controls.  Crutchfield ¶¶ 35-36; Hall ¶ 37; Complaint ¶¶ 1, 7, 14;

B. They allege that the Law precludes system monitoring.  Crutchfield ¶¶ 35, 37-38; Hall ¶¶ 30-34; Complaint ¶¶ 171-173; and

C. They allege the Law would undermine performance of their data systems. Crutchfield ¶¶ 35, 39; Hall ¶ 42.

## IV.  OPINION 1 – API permitted under the Dealer Data Security Law may be implemented to address Plaintiffs' concerns with the Law.

9.      I have been instructed by counsel for Defendant Brnovich, and have confirmed this instruction based on my review of the Dealer Data Security Law, that DMS providers may comply with the Law by providing "access to open application programming interfaces [API] to authorized integrators."[1]  This access is "the reasonable commercial or technical standard for secure data integration" or "a similar open access integration method if that method provides the same or better access to authorized

---

[1]      A.R.S. 28-4654(A)(2).

integrators as an application programming interface and uses the required standardized framework."[2]

10.      I am familiar with API through both my years of experience in system architecture and my review of relevant literature.  I understand the reference to the term "open" API in the Law to be akin to open software or open standards and available to those who have the appropriate authorization.  The term "application programming interface," also known as "API," is best explained by Mark Braunstein in his book on healthcare as follows:

> Non-technical readers may not understand what an API is.  In non-technical terms it can be understood as a "contract" that says to software developers that if you send a request from a "client" computer (*e.g.*, a phone, tablet, notebook or desktop) to a "server" (the computer where the information is stored) in the specified format you will always get a response in a specified format or initiate a defined action.  The key point is that APIs allow developers to access and even update or delete information and other resources on a remote computer without having to understand the technical details of what's going on in the system they are interacting with.[3]

11.      APIs are not a new concept.  The concept of APIs appeared as early as 1968 in a paper entitled *Data structures and techniques for remote computer graphics*, which described the use of an API to provide independence between the user of a service and the provider of it.[4]  This concept was expounded on in the paper, *On the Criteria To Be Used in Decomposing Systems into Modules*, which stated that, in an API system "[e]very module . . . is characterized by its knowledge of a design decision **which it hides from all others**. Its interface or definition was chosen to reveal as little as possible about its inner workings."[5]

12.      As these publications explain, the very nature of an API is that it shields the requestor (here, a third party including an authorized integrator) from knowing how the responder (here, the DMS provider) is processing the request.  The responder could at

---

[2]      *Id.*

[3]      Mark L. Braunstein, *Health Information on FHIR:  How HL7's New API is Transforming Healthcare*, § 1.5 (Springer 2018).

[4]      Ira W. Cotton and Frank S. Greatorex, Jr., *Data structures and techniques for remote computer graphics*, at 535 (1968) (stating that "hardware independence at the central computer means that a consistent application program interface could be maintained if that computer were replaced").

[5]      D.L. Parnas, *On the Criteria to be Used in Decomposing Systems into Modules*, at 1056 (ACM Dec. 1972) (emphasis added).

any time completely change the methods and internal data used to process the request without the requestor having any control over or access to those methods.  The API would not change; the nature of the information provided by the requestor would not change; the syntax of the response would not change.  This concealment of the method of the responder has a significant implication for the Dealer Data Security Law:  the use of an API means there is no exposure of the responders' trade secrets or copyrighted code to the requestor, nor is the responder's system directly accessed by the requestor.

13.     Additionally, the responder (here, the DMS provider) can design the API to maintain data integrity, confidentiality, correct operation, and acceptable performance by limiting the types of commands (often called arguments) that can be sent to the API.  A DMS provider could design an API so poorly that, for example, it allows for requestors to submit SQL statements that could adversely affect the responder or could provide a path for an attacker, even though unauthorized, to access and possibly, exfiltrate data to which it has no right.  But a more common and more prudent choice would be for the DMS provider's API to examine the commands (arguments) sent via the API and then to perform the appropriate action, while blocking any actions that may impair data integrity, performance, or confidentiality.  By using this approach, the responder (DMS provider) constrains the set of possible requests, guided by the privileges granted to the user issuing the request.  In short, the API, as designed by the responder/DMS provider, sets the rules for the conversation between the responder and the requestor, and it is fully within the responder's control to design and implement an API that maintains security, confidentiality, and acceptable performance.[6]

14.     Given this control and flexibility, several industries have adopted open APIs as a way of providing access to data in a secure manner without compromising the underlying database.  As one trade publication put it, "[w]e live in an API economy, a set of business models and channels based on secure access of functionality and exchange of data. APIs make it easier to integrate and connect people, places, systems, data, things and algorithms, create new user experiences, share data and information, authenticate people and things, enable transactions and algorithms, leverage third-party algorithms, and create new product/services and business models."[7]  This resource identifies Uber's use of Google Maps through an API to determine what vehicle is best placed to respond

---

[6]     Shon Harris, *CISSP Exam Guide* 6th ed., Ch. 4 (2013) ("Strict and controlled communication has to be put into place to make sure a less trusted component does not compromise a more trusted component.  This control happens through APIs.  The APIs are like bouncers at bars.  The bouncers only allow individuals who are safe into the bar environment and keep the others out.").

[7]     Christy Pettey, *Welcome to the API Economy*, Gartner (June 9, 2016), at https://www.gartner.com/smarterwithgartner/welcome-to-the-api-economy/

to a rider request without compromising Uber's data security.[8]  API is also used in banking,[9] by government entities like DHS[10] and the FBI[11] and under the European Union's Payments Service Directive.[12]

15.    As this discussion demonstrates, the Dealer Data Security Law's reference to API as a means of complying with third-party access to dealer data is a widely-adopted, well-known solution to the problems the Plaintiffs' raise.  The Law doesn't say what the API is:  this is a business and technical decision left to DMS providers that is flexible enough to evolve as providers and requestors become more familiar with the process.

16.    Because the Law doesn't say what the API is, nothing can happen under the API except what DMS providers implement.  The DMS providers are responsible for proper and efficient operations and for generating the correct response, and they can implement their API to limit any confidentiality, data integrity, or performance concerns. For purposes of illustration, I discuss developing different ways the DMS providers could implement an API.

17.    *Form 1*: The API consists of a set of commands such as "enter this record", "update this record", "read/return this record", and "read/return all records that match this criterion."  DMS providers would write code that processes those requests received through the API. That code may (and should) adhere to secure coding practices that are promulgated by companies and organizations such as OWASP and SANS. That code would need to validate the input data to ensure it does not enable some attack such as SQL injection. That code would generate the appropriate database commands to process

---

[8]     *Id.*

[9]     Alan Glickenhouse & Esther Kim, *Identifying API use cases:  Banking Industry* IBM Cloud White paper (2016), at https://www.ibm.com/downloads/cas/G4DVGRQJ

[10]    *Inventory of Agency APIs and Other Services for Public Access Collections*, Science.gov, at https://www.science.gov/servicesandtools.html

[11]    *Federal Bureau of Investigation, Crime Data Explorer*, Data.gov, https://api.data.gov/docs/fbi/

[12]    European Payments Council, *Understanding the Final Regulatory Technical Standards*, at https://www.europeanpaymentscouncil.eu/sites/default/files/infographic/2018-04/rts-infographic_April%202018.pdf; Rachel Gauci, "PSD2 – banking on a game changer in ecommerce," at https://www.theglobaltreasurer.com/2018/05/30/psd2-banking-on-a-game-changer-in-ecommerce/; Emilie Casteran, "PSD2 is helping banks adapt to a more secure, customer-centric environment," at https://www.theglobaltreasurer.com/2018/04/13/psd2-helping-banks-adapt-secure-customer-centric-environment/;

the request and return the response. That code would format and package the response to satisfy the definition of the API. The authorized integrator would write the code that takes what the user wants; converts it to the appropriate API requests; sends those requests to DMS providers over an authenticated and secure connection; and formats the response to the user.  Plaintiff code stays in the Plaintiffs' system; integrator code stays in the dealer system.  As stated above, this means there is no direct access to Plaintiffs' systems.

18.     *Form 2*: The API allows database commands that are written by the integrator, sent to the DMS provider's systems, and applied to that system's database by DMS provider-written code.  It would be difficult, but not impossible, for the DMS providers' code to evaluate the submitted database commands for correctness.  If DMS providers chose to implement this type of API, improper database commands could lead to improper access, poor performance, or data corruption.  However, I am not aware of anything in the Law that requires the selection of this type of API.

19.     *Form 3*:  The API permits code or script written by the integrator or other third-party to be sent to a DMS provider's system for execution.  This is an unbounded universe of discourse between the requestor and the responder that gives the requestor a lot of flexibility but makes it difficult for the responder system to monitor and constrain what is being done.  This approach has been constrained by sandboxing, *i.e.* running that code in a tightly constrained, often emulated environment, that examines the appropriateness of every command.  But, based on my experience, it is difficult to detect and block inappropriate commands.  As with Form 2, I am not aware of anything in the Law that requires the selection of this type of API.

20.     An API structure that provides users with only a limited form of stored procedures code over a limited database specific to that dealer, as described in Form 1, would address all of Plaintiffs' concerns with the Law referenced in Section III.

21.     First, I note that Plaintiffs claim that compliance with the law would require them to provide "unrestricted access" to their systems, intellectual property and data.[13] These claims are based on the assumption that the type of API required under the law requires unrestricted access.  As I discussed above, however, neither the Law nor API specifies what functions will be required for the API.   The traditional API implementation approach has the service processer's, *e.g.* CKD or Reynolds, code carry out the requests that are received though the API.  That code should not and need not affect the confidentiality, integrity, or availability of the database.

---

[13]     Crutchfield ¶¶ 28-29; Hall ¶¶ 35-36; Compl. ¶¶ 14, 18, 126, 140, 204.

22.     As noted above, under that API implementation, the requestor does not have access to CDK's or Reynolds's systems.  This is because the code executing the requests received through the API will be written by the DMS provider.  That code will do the actual reading and writing to and from the DMS provider's database and can be designed to avoid any confidentiality, integrity, or performance issues.  Plaintiffs appear to assume that the API will pass actual database commands, *e.g.* SQL statements, from the integrator to be executed,[14] but that is not required by the Dealer Data Security Law. [15]

23.     Second, I note that Plaintiffs claim that compliance with the Dealer Data Security Law would require them to remove credentialing from their systems.[16]  But Plaintiffs can design their API to use credentialing so that only third-parties who have been authorized by the dealer may use the API.  For instance, CDK and Reynolds state that they will be unable to use CAPTCHA, which will result prevent them from stopping hackers.[17]  CAPTCHA, however, poses problems that can only be resolved by a human, thus preventing programmatic systems, *e.g.* robot, from logging on.  CAPTCHA does not stop hackers because an attacker's software may immediately outsource the CAPTCHA solution to low-cost labor.   An API is a programmatic interface and cannot be authenticated by a CAPTCHA.   Stronger methods, *e.g.* mutual certificate-based authentication over TLS,[18] could be used.  If desired the integrator could use CAPTCHA as an additional authentication tool of its user but there are better approaches such as a two-factor authentication for the reasons mentioned above.[19]

---

[14]     *E.g.*, Crutchfield ¶¶ 35-42.

[15]     *See, e.g.*, Shon Harris, "CISSP Exam Guide" 6th ed. (2013) ("Strict and controlled communication has to be put into place to make sure a less trusted component does not compromise a more trusted component.  This control happens through APIs.  The APIs are like bouncers at bars.  The bouncers only allow individuals who are safe into the bar environment and keep the others out.").

[16]     Crutchfield ¶ 36; Hall ¶¶ 30-34; Compl. ¶ 204.

[17]     Crutchfield ¶ 37; Hall ¶ 31-33.

[18]     Transport Layer Security, or TLS, is a protocol standardized that protects the confidentiality and integrity of messages sent across the internet and authenticates the server and (optionally) the client.  *See* IBM Corporation, "An overview of the SSL or TLS handshake," at https://www.ibm.com/support/knowledgecenter/en/SSFKSJ_7.1.0/com.ibm.mq.doc/sy10660_.htm.  For example a TLS is the protocol carrying traffic over HTTPS.

[19]     STAR Dealer Data Security Guidelines, Industry Best Practices and Recommendations for Automotive Retail Data Security §§ 2.2.4 (discussing multi-factor authentication), 3.7.1 (recommending "defense in depth" through multi-factor authentication), at https://www.starstandard.org/images/SIGINFRASTRUCTURE/2018--Data-Security-Guideline.pdf.

24.     Third, I note that Plaintiffs claim that the Dealer Data Security Law permits copyright infringement and circumvention of protections on their copyrights.[20]  This is not correct because a third party making API requests does not result in "running" or "copying" any of Plaintiffs' software, nor does it require any knowledge of the Plaintiffs' code; it only needs to know what requests are permitted and what data types can be sent or received.  The third party's view is only of the API, not Plaintiffs' underlying DMS and other software.[21]  That implementation will send the API requests to the Plaintiffs' code that is executing wherever the Plaintiffs chose to site it. The use of the API does not require that the Plaintiffs change how and where their code is executing. It will likely require the Plaintiffs to enhance that code to support the API.

25.     Fourth, I note that Plaintiffs claim that the Dealer Data Security Law creates monitoring and controlling risks.[22]  This is incorrect because an API authorized by the Law does not prevent DMS provider from monitoring or controlling how its database is accessed.  Since the DMS provider will write the code processing the requests received through the API, it can also implement code to monitor and control the requests that the API processes.  If implemented to STAR Standards (which I discuss in Section V) or other similar standards, the processing of requests received through the API should not increase the risk of data breach.  Plaintiffs can also create logging for API requests so that, in the event that a data breach occurs, the log entries will provide adequate information to forensic investigators.

26.     Although an API is an "attack surface,"[23] the API specified by the Law neither increases nor decreases the problems caused by credential sharing.  For instance, nothing in the Law prevents DMS providers from implementing API access through stronger authentication such as mutual certificate-based authentication over TLS.

27.     Fifth, I note that Plaintiffs claim that the Dealer Data Security Law creates database performance issues.[24]  Assuming that the queries through the API are relatively simple and limited to the dealer's data, (e.g., add a record, read a record, search for a record, and update a record), performance is unlikely to be impacted as described in the Crutchfield and Hall declarations.  Instead, the risk of performance issues is entirely within the DMS providers' control.  Because the code used to process the requests received through the API will be written by the DMS providers, one assumes it will be efficient and DMS providers, including Plaintiffs, have already developed API functions

---

[20]     Crutchfield ¶ 34; Hall ¶¶ 38-39; Compl. ¶¶ 174, 183.
[21]     Parnas, at 1056.
[22]     Crutchfield ¶ 35; Hall ¶¶ 29-34; Compl. ¶¶ 109-115.
[23]     Crutchfield ¶ 34; Hall ¶ 40; Compl. ¶¶ 131-133.
[24]     Crutchfield ¶ 39; Hall ¶ 42; Compl. ¶¶ 117-119.

that they could revise and repurpose for compliance with the Law.[25]  Since the API will only need to support a few operations against a few already well-known and supported data types, there is no reason to expect that the Plaintiffs' implementation efforts will be onerous.

28.    Additionally, there are established means to throttle activity from third-parties to prevent their requests from consuming a disproportionate amount of DMS provider resources through the API that would mitigate adverse effects to the DMS provider's responses to other requestors.[26]

## V.    OPINION 2 – Incorporation of the STAR Standards referenced in the Dealer Data Security Law further addresses Plaintiffs' concerns with the Law

29.    I have been informed by counsel for Defendant Brnovich and my review of the Dealer Data Security Law indicates to me the Law sets as a minimum standard of data security the STAR Standards in various places, including the "exchange, integration and sharing of data from dealer data systems with authorized integrators."[27]

30.    I have also reviewed the STAR Standards.[28]  Standards for Technology in Automotive Retail, is a non-profit organization "whose members include dealers, manufacturers, retail systems providers, and automotive-related industry organizations." It produces a new version of its standard each year with a goal of defining architecture and protocols to support communication between dealers and manufacturers.

31.    The 2019 STAR Dealer Infrastructure Guidelines provides guidance on a variety of topics including security policies, securing stored and transmitted data, and controlling access to services and data. How does a system holding such data restrict access to those entities permitted to access it?  Accepting only authorized users places a

---

[25]    CDK Global, "Third-Party Offerings", at https://www.cdkglobal.com/us/automotive/dealership-operations/operations/third-party-offerings

[26]    Red Hat, *What is an API*, at https://www.redhat.com/en/topics/api/what-are-application-programming-interfaces ("Place quotas on how often your API can be called and track its use over history.  More calls on an API may indicate that it is being abused. It could also be a programming mistake such as calling the API in an endless loop.  Make rules for throttling to protect your APIs from spikes and Denial-of-Service attacks.").

[27]    A.R.S. § 28-4654(A)(1).

[28]    STAR Dealer Data Security Guidelines, Industry Best Practices and Recommendations for Automotive Retail Data Security ("STAR Standards"), at https://www.starstandard.org/images/SIGINFRASTRUCTURE/2018--Data-Security-Guideline.pdf.

duty on the entity holding the data, the service provider, to ensure that only the owner of data and entities that owner designates can access that data.[29]

32.     To perform that duty the service provider shall assign a unique and unambiguous identity to each entity that is allowed to access that data. Requiring an unambiguous identity allows the service provider to ensure that every operation performed is attributed and recorded for future auditing.  The service provider shall be able to authenticate the identity of an entity that is asserting a right to access that data. The service provider shall be able to constrain the operations on that data to the set of operations permitted for that authenticated entity, for example, the permission to read data or the permission to modify data.

33.     These three phases are called identity, authentication, and authorization. The set of security services supporting those phases are often referred to as IAM, Identity and Access Management, and are present in some form to support every communication between a service requester and a service provider. The document, STAR Dealer Data Security Guidelines, specifies guidelines for IAM.  Entities complying with those guidelines will only allow access to authorized users and will only perform operations permitted for those users and on data permitted for those users.[30]

34.     Implementation of the STAR Standards to third party and dealer access to data systems and the API further addresses all of Plaintiffs' concerns with the Law referenced in Section III.

35.     First, I note that Plaintiffs claim that compliance with the law would require them to provide "unrestricted access" to their systems, intellectual property and data.[31] The Law does not require open access because, in compliance to STAR, authorized users including integrators shall be authenticated and shall use secure communications.[32]  Since the Plaintiffs will implement the support of the API secured as specified by the STAR standard, unauthorized access would be blocked and only requests permitted by the API would be processed.  Since requests received though the API will be received from entities that have been properly authenticated as mandated by the STAR Standards (and since the requests will be executed by DMS provider-written code) there should be no increase in cyber security incidents.

---

[29]     STAR Standard §§ 2.2.1-2.2.3 (regarding identity and access management).

[30]     *See id.* § 2.2.8 (discussing IAM standards).

[31]     Crutchfield ¶ 35; Hall ¶¶ 35-36; Compl. ¶¶ 126, 140.

[32]     STAR Standards §§ 2.2.4 (discussing multi-factor authentication), 3.7.1 (recommending "defense in depth" through multi-factor authentication).

36.     For instance, the Hall Declaration addresses performance issues related to Reynolds HUB.[33]  There is nothing in the Dealer Data Security Law that allows writeback through login credential.  The Law specifies creation of an API that follows STAR Standards.  Reynolds would write the code that processes the requests received through the API.  Only it could permit such an operation.

37.     Second, I note that Plaintiffs claim that compliance with the Law would impede their ability to comply with the Computer Fraud and Abuse Act and Gramm-Leach-Bliley Act.[34]  Authorized integrators selected by dealers still must conform to STAR or a more rigorous standard.[35]  Plaintiffs will still control the registration, authentication, and authorization of any entity accessing their services and will be the implementers of operations invoked through the API.  Accordingly, Plaintiffs will be able to comply with any security requirements imposed on them by law.  The Dealer Data Security Law also requires compliance with STAR or similar standards.  The Dealer Data Security Law requires an API be made available and that implementations comply with STAR.  The Plaintiffs are responsible for writing that code that provides the services invoked through the API.  Since that code must comply with the STAR Standards,[36] access will be controlled and all access to data will be constrained such that operations will only be performed on the data that the requestor has the right to access. A proper and correct implementation by the Plaintiffs should not create a gaping vulnerability exposing records that the requestor has no right to see.

38.     Third, I note that Plaintiffs claim that compliance with the Law would hinder their ability to monitor their data systems and prevent data breaches.[37]  If implemented to STAR Standard requirements the processing of requests received through the API should not increase the risk of data breach.  Additionally, if a data breach occurs, the log entries that should have been written when that code processes a request received through the API would provide adequate information to forensic investigators.  Practically every security framework or standard requires that as actions are done, log entries shall be recorded showing the action done, for example, reading record x in the database, the identity of the entity on whose behalf the action was carried out, and the date and time the action was executed.[38]

---

[33]     Hall ¶¶ 45-46.

[34]     Crutchfield ¶ 41; Hall ¶ 47; Compl. ¶¶ 196-217.

[35]     A.R.S. § 28-4653(A)(1)(3)(b).

[36]     Id.

[37]     Crutchfield ¶ 38; Hall ¶ 41; Compl. ¶¶ 138-142.

[38]     STAR Standard §§ 2.1.9, 2.2.3, 2.2.5; NIST Cybersecurity Framework Versions 1.1, Framework Core Protective Technology, NIST SP 800-92 Guide to Computer Security Log Management, *at* https://www.nist.gov/cyberframework/framework.

39.　　Fourth, I note that Plaintiffs claim that compliance with the Law creates performance issues for their systems.[39]   The Dealer Data Security Law mandates compliance to STAR Standards, whose guidance prohibits the practices Plaintiffs describe as impeding system performance.[40]   A DMS providers' implementation of the API can adopt data minimalism and should prevent access to data not authorized for the requestor. Sharing authentication credentials does make attribution difficult.  However, there is nothing in the Law to cause the increase or decrease of sharing authentication credentials.

40.　　Finally, I note that Plaintiffs discuss the potential reputational harm from a cybersecurity incident.[41]   The Dealer Data Security Law requires compliance to STAR Standards or stronger standard.   The STAR Standard requires that all entities be authenticated and actions constrained to the data that they are authorized to access.[42]   The API will support a limited set of commands and the DMS providers will implement the software to process those commands.   If that software is correctly implemented, the support of the API will not increase the risk of data breach.

## VI.　CONCLUSION

41.　　It is my opinion, based on my review of relevant literature, the pleadings in the case and my fifty years of experience in cybersecurity and distributed systems architecture, that the Dealer Data Security Law provisions related to API and the STAR Systems address Plaintiffs' concerns regarding their ability to protect their intellectual property, data systems and confidential information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 30th day of September, 2019

Signature

Hoyt L. Kesterson II

---

[39]　　Crutchfield ¶ 39; Hall ¶ 42; Compl. ¶¶ 117-119.
[40]　　STAR Standard § 2.2.3 ("Passwords need to be secured in both transit and storage.").
[41]　　Hall ¶¶ 45-46.
[42]　　STAR Standard § 2.2 (regarding identity and access management).

**HOYT L. KESTERSON II DECLARATION - ATTACHMENT A**

# HOYT L KESTERSON II
## SENIOR SECURITY ARCHITECT
### AVERTIUM

20601 NORTH 19TH AVENUE, SUITE 150                                      (602) 316-1985
PHOENIX, ARIZONA  85027                                hoyt.kesterson@AVERTIUM.COM

## SUMMARY

I am well versed in distributed applications including major components — operating systems, communication protocols, messaging, EDI, distributed transaction processing & database architectures, and security. I am a CISSP, a CISA, and a PCI QSA. I have designed security protocols, specified security policies, and have performed security audits. I chaired the international committee responsible for defining the X.500 Directory standard, including X.509 for digital signature. I am a co-chair of the American Bar Association's Information Security Committee. I have been a testifying expert in a dispute on trade secret, a Markman hearing for patent infringement, and two hearings on spoliation of digital evidence, including one due to loss of the escrowed encryption key. Although I have been programming computers since 1961, my professional focus in the last thirty years has been the various aspects of security, including cryptography, and their influence on legal activities such as IP, privacy, business transactions including signing contracts, discovery, and evidence in a digital world.

## AREAS OF EXPERTISE

- Certified as a PCI Qualified Security Assessor (QSA). Performed an FTC-ordered security and a PCI DSS audit on a large identity theft prevention company. Performed PCI DSS audits on a company that determines the sharing of earned fees on merchant credit card transaction, on a service provider of system administration for a call services provider, on an insurance company, and PCI readiness reviews on a number of companies in differing sectors, e.g. municipal parking garage, casino

- Chaired the International committee responsible for defining the OSI Directory standard, X.500, and its associated Authentication Framework, X.509 from 1986 to 2007. X.509 is the digital signature certificate standard used in many areas, e.g. SSL for web browsers and the IETF Public Key Infrastructure (PKIX).

- A member of the American Bar Association's Information Security Committee (ISC) since its inception in the early 90's and a significant contributor to its Digital Signature and PKI Assessment Guidelines. Currently co-chair of the ISC. Co-chair and founding member of the Information Security Committee and the Electronic Discovery and Digital Evidence Committee (now subsumed within the ISC).

- Program chair and faculty for the American Bar Association's E-Discovery and Information Governance National Institute 2013 and 2014.

- Lecturer, *ESI in the Cloud—the legal implications arising from the technical possibilities*, for the symposium *Internet Technology Basics for Judges* held at Fordham Law School in May 2012 and organized by the Center on Law and Information Policy *and* the Federal Judicial Center.

- A lecturer on data breach at the ABA Annual meeting and on electronic discovery and evidence at the Florida Bar Association's annual and mid-year meetings. A faculty member of a live audio webcasts—on spoliation of digital evidence, on retention and preservation, and bench decisions concerning disputes on commercially reasonable security—offered by the American Law Institute and the American Bar Association. Presented in twenty-two sessions in the legal tracks of fourteen RSA conferences. Attendees at each of the events earned Continuing Legal Education (CLE) credits. Attributed contributor to a book on digital discovery, a book on digital data and the rules of evidence, and a book on data breach and encryption, all published by the American Bar Association.

- Nationally recognized speaker at conferences, universities, and companies on technology and its use. The conferences have not only been technical but also on the potential legal impacts and uses, e.g. its use to meet regulatory requirements such as HIPPA and Sarbanes-Oxley.

- Invited participant to the first National Science Foundation / Association of Community Colleges conference on cyber-security education (2002).

- Performed security audits and gap analyses for a variety of sectors, e.g. education, financial, business, technology (e.g., a web-hosting company, a electronics R&D company). Evaluated data breach prevention implementations, including database encryption. Designed key management and data encryptions services for several businesses.

- Performed several Sarbanes-Oxley, Visa CISP, and PCI audits. Each of the CISP audits and gap analysis covered a different segment of the industry—a large merchant, a merchant services company, and a card-issuer services organization. Also performed several financial controls technical audits of a bank and a large ISP.

- Researched prior art, submitted expert's reports, advised counsel on technical aspects, and testified as an expert witness in litigations on patent infringement, on trade secret issues, and twice on spoliation of digital evidence. Submitted expert's report on patent infringement and on insider EFT fraud.

- Created a risk assessment tool for a large technology company.

- Assessed the security plans for, among others, a very large county school system, a European country's large Social Services organization, two state agencies, and several US financial institutions.

- Participated in "customer teaming" defining key customers' enterprise IT strategies, and focusing on networking, distributed applications (e.g. workflow and data warehouse), and security. Brought a large software company's development process to SEI and ISO 9000 guidelines, including code inspection.

- Advised companies on technical product strategy and security. Wrote an extensive evaluation of company's security products and capabilities and made recommendations for a marketing and product strategy for security.

- Advised a company on what companies it should acquire to broaden its portfolio of eDiscovery services and products.

- Developed technical strategies for interconnecting multi-vendor products, from enterprise to desktop.

- Designed components for electronic commerce - security, messaging, EDI, and distributed TP and database architectures.

- Worked on in a variety of systems designing and writing code that responds at the interrupt level of the operating system to handle events in a real-time fashion. These systems have included fast parallel-processing scientific computers, large-scale data processing computers, communication front-ends, and vector-graphic workstations.

- Reversed-engineered communication protocols for which documentation was not available.

- Developed and taught courses on Security, Directory, and ASN.1 for open seminars, as well as internal classes for various companies, government agencies, and organizations.

- Designed Distributed Application Architecture for intercommunication aspects including models, communication protocols, TP/DB paradigms, security, and naming and addressing.

- Encouraged and shepherded patent applications as member of company patent committee.

- Significant contribution to the specification of US name registration procedures (which served as the base for other countries' procedures), to the definition of the OSI Application Layer and CC&R (the TP commitment protocol) architectures (head of US delegation), and to various security standards.

- Lectured on security at Arizona State University in 2001, 2002, and 2003.

## PROFESSIONAL EXPERIENCE

**Avertium née Terra Verde**, 20601 North 19th Avenue, Suite 150, Phoenix, Arizona 85027  2010 –

**Consultant**, 7625 West Villa Rita Drive, Glendale, Arizona 85308                                    2000 – 2009

**Honeywell / Bull HN Information Systems Inc.**, Phoenix, Arizona                          1976 – 2000
    <u>Fellow — Systems Engineer and Architect</u>
    Responsible for the major components of electronic commerce, i.e. Security, Messaging, EDI, and
    distributed Transaction Processing and Database Architectures.
    Manager/developer for communication front-end to a large transactional database system

## AFFILIATIONS

Led the International Standards group responsible for defining the OSI Directory Standard, X.500 including X.509, from 1985 thru 2006. Other activities were the ISO and national committees that defined the standards for Naming and Addressing and for Registration Authorities, participated in the definition of the Commitment, Concurrency, and Recovery protocols to support transaction processing, chaired the ISO effort on the OSI presentation layer standards and on ASN.1, head of US delegation to the work on the OSI Upper Layers.

Associate member, American Bar Association  - Helped produce the ABA's *Digital Signature Guidelines with Model Legislation* document. Contributor to the *PKI* (public key infrastructure) *Assessment Guidelines*. Co-authored an article on digital signatures and EDI for the ABA's Spring 1998 issue of *Jurimetrics: Journal of Lay, Science, and Technology*. Contributed attributed content to the book *The Discovery Revolution: E-Discovery Amendments to the Federal rules of Civil Procedure* by George Paul and Bruce Nearon (ABA Publishing, 2005). Worked extensively with George Paul in the development of his book, *Foundations of Digital Evidence* (ABA Publishing, 2008).

Faculty member for CLE seminars conducted by the American Law Institute CLE and by the American Bar Association:

— Live audio webcast of a seminar titled *Spoliation of Digital Evidence: The Aftermath of Qualcomm v. Broadcom,* 2008
— Live video webcast of a seminar titled *Digital Evidence: Generation, Admissibility and Weight Considerations: An Advanced Course for Sophisticated Litigators,* 2008
— Live video webcast of a seminar titled *Spoliation of Digital Evidence: Ethics & Case Law Update—New Forensics & Emerging Standards for Discovery & Abuse,* 2009
— Live audio webcast of a seminar titled *Ethics in E-Discovery,* 2009
— First Annual American Bar Association Electronic Discovery and Digital Evidence Practitioners' Workshop, 2010
— Second American Bar Association Electronic Discovery and Digital Evidence Practitioners Workshop, 2011
— Live video webcast of a seminar titled *Litigation Holds! The Increasing Scope of Preservation Burdens,* 2011
— Live video webcast of a seminar titled *Whose Fault Is It That I Didn't Know It Wasn't You— How to Represent Your Client in a Cyber Authentication Case,* 2011
— Third American Bar Association Electronic Discovery and Digital Evidence Practitioners Workshop, 2011
— Live video webcast of a seminar titled *ESI Retention vs. Preservation, Privacy and the Cloud,* 2012
— American Bar Association The 2013 E-Discovery and Information Governance National Institute


Participated in Open Systems Foundation's development of the DCE (Distributed Computing Environment) architecture and protocols, including Kerberos. Participated in development of the CBEMA (the US computer industry lobby organization now called ITI) response to the US government's Clipper initiative and the US government's encryption policy. Acted as representative to Key Recovery Alliance.

**AWARDS, PATENTS, and CERTIFICATIONS**

Honeywell H. W. Sweatt Engineer–Scientist Award, 1984

Patent 6,067,579 Method for reducing message translation and traffic through intermediate applications and systems in an Internet application

PCI Qualified Security Assessor (QSA)

Certified Information Systems Security Professional (CISSP)

Certified Information Systems Auditor (CISA)


**CONFERENCE PRESENTATIONS**

2019 Rocky Mountain Information Security Conference, *Those Old Rules for Passwords—Gone*, June 2019

2019 RSA Data Security Conference, *Blockchain Anchored Swap Meet—a mock trial,* and *Cryptocurrency Hacking and the Legal Climate for Blockchain Technology*, March 2019

Smart Cities Conference, *Data Privacy and Cybersecurity in Smart Cities,* sponsored by ABA Section of Science and Technology and by ASU Sandra Day O'Connor College of Law, February 2019

2018 RSA Data Security Conference, *Internet of Wild Things—a mock trial,* April 2018

2017 RSA Data Security Conference, *Honesty Is the Best Policy—A Mock Trial on What You Say Versus What You Do,* February 2017

Phoenix Security & Audit Conference, *Honesty Is the Best Policy*, September 2016

2016 RSA Data Security Conference, *Flaming Toaster to Crashing Cars—The Internet of Things and Mass Liability,* February/March 2016

2015 PCI Security Standards Council North American Community Meeting, *Passwords and Equivalent Strength—the loophole in the DSS*, September/October 2015

Phoenix Security & Audit Conference, *Passwords and Equivalent Strength—the loophole in the DSS*, September 2015

ISACA Phoenix Chapter, *The Cloud—inexpensive, rapid deployment... and a governance issue?* May 2015

2015 RSA Data Security Conference, *I was attacked by my power supply—a mock trial* and a follow-on panel, *I was attacked by my power supply— a deep dive into the issues raised,* April 2015

ATIC Ninth Annual Cybersecurity Public Meeting, *Everything We're Doing With Passwords Is Wrong,* November 2014

ISACA Phoenix Chapter, *Frontline Information Protection*, October 2014

Arizona Cloud Security Alliance Chapter, *The Cloud—inexpensive, rapid deployment…and a governance issue?* August 2014

2014 RSA Data Security Conference, *Protection In Part Means Fully Exposed—a mock trial* and a follow-on panel, *A Tale of Two Mocks,* February 2014

Vanguard Security & Compliance 2013 conference, a full day seminar *PCI—A Different Point of View*, a presentation *Everything We're Doing with Passwords is Wrong*, and a presentation *Whose Fault Is It That I Didn't Know It Wasn't You—commercially reasonable security, a court rules what it is not,* June 2013

2013 RSA Data Security Conference, *Your Honor, It Was Self Defense—a Mock Hearing* and a follow-on panel; a presentation *Everything We're Doing With Passwords Is Wrong,* February 2013

2013 eFraud Global Forum, a panel *Whose Fault Is It That I Didn't Know It Wasn't You—commercially reasonable security, a court rules what it is not, February 2013.*

Vanguard Security & Compliance 2012 conference, *ESI in the Cloud—the legal implications arising from the technical possibilities* and *Whose fault is it that I didn't know it wasn't you? a discussion of commercially reasonable security* June 2012

2012 Rocky Mountain Security Conference, *Whose Fault Is It That I Didn't Know It Wasn't You—a discussion of commercial security,* May 2012

Internet Technology Basics for Judges, *ESI in the Cloud—the legal implications arising from the technical possibilities*, organized by the CLIP, Center on Law and Information Policy *and* the Federal Judicial Center, Fordham Law School, 3–4 May 2012

2012 RSA Data Security Conference, *Just Because They're Authenticated Doesn't Mean You Should Trust Them—a Mock Hearing* and a panel, *Whose Fault Is It That I Didn't Know It Wasn't You—an Update,* February 2012

Contact Center Conference Fall 2011, *Your Employee from Home—Managing Security for a Virtual Call Center*, October 2011

Presentation to the Arizona Bankers Association Fraud and Security Seminar, *Whose Fault Is It That I Didn't Know It Wasn't You,* September 2011

Presentation to the ISACA Phoenix Chapter, *PCI—A Different Point of View,* September 2011

Third American Bar Association Electronic Discovery and Digital Evidence Practitioners' Workshop, *Emerging Technologies—Real Technology Addressing Real Problems* and *Mock 26(f) Meeting and 16(b) Hearing* New York, August 2011

Vanguard Security & Compliance 2011 conference, *Cloud Control—Assurance in a Massively Scalable World* and *ESI in the Cloud—the legal implications arising from the technical possibilities,* June 2011

2011 Cornerstones of Trust Conference, *Being an Expert Witness—Preparing for Trial, Depositions, and Testifying at Trial,* June 2011

ISSA Web Conference, *InfoSec Meets Legal—Business Records to ESI to Digital Evidence,* February 2011

Second American Bar Association Electronic Discovery and Digital Evidence Practitioners' Workshop, *Emerging Technologies—Real Technology Addressing Real Problems* and *Mock 26(f) Meeting and 16(b) Hearing* San Francisco, February 2011

2011 RSA Data Security Conference, *Whose Fault Is It That I Didn't Know It Wasn't You—a Mock Hearing* and a panel, *More on Judicial Response to Authentication Methods,* February 2011

Presentation on key management to Phoenix and Denver Chapters of the ISSA—*To Protect the Kingdom, One Must Protect the Key,* January and February 2011

Presentation to Phoenix Chapter of the ISSA— *Business Records to ESI to Digital Evidence.* July 2010

2010 Annual Florida Bar Convention, *Electronic Everything 2010: Litigating Computer Forensics Evidence Issues*

First Annual American Bar Association Electronic Discovery and Digital Evidence Practitioners' Workshop, *Emerging Technologies—Real Technology Addressing Real Problems, Plenary I—Mock 26(f) Meeting,* and *Plenary II—Mock Spoliation and Discovery Abuse Hearing,* Chicago, May 2010

2010 RSA Data Security Conference, *Technology Experts Go to Court –The Federal Rule 26f eDiscovery Conference, Technology Experts Go to Court II – Rule 16(b) eDiscovery Mock Hearing, Digital Evidence Life Cycle Management – Generating Robust Evidence Early,* and *Digital Forensics vs. Security & Encryption*

2009 Annual Florida Bar Convention, *Electronic Everything 2009: Technology's accelerating influence on today's practice of law and what lawyers need to know*

2009 MER (Managing Electronic Records) Conference, *Authentication and Admissibility of Digital Evidence: The "Shotgun Marriage" of Law and Technology* and a keynote address*, The Legal/Regulatory Revolution Goes Digital: Identifying and Addressing Needed Operational Changes in Your ERM System*

2009 RSA Data Security Conference, *Mock Trial — Authentication and Admissibility of Digital Evidence*

Information Security Compliance & Risk Management 2008 Conference, *Authentication and Admissibility of Digital Evidence*

American Bar Association's 2008 Annual Meeting, *Protection of Sensitive Information Is Every Lawyer's Business—Practical Solutions to Avoid Data Breaches*

2008 RSA Data Security Conference, *Mock Trial — Authentication and Admissibility of Digital Evidence* and *Which "Which" Is Which? Sources of digital content & its authenticity*

Florida Bar Association's 2008 annual and mid-year meetings, *Electronic Everything: Technology's accelerating influence on today's practice of law and what lawyers need to know*

2007 RSA Data Security Conference, *Mock trial: Handling Testimony of InfoSec Expert Witnesses* and *Metadata Mining: An Ethical Minefield for Attorneys*

2006 RSA Data Security Conference, *Mock trial: Challenging a Digitally Signed Legal Documents in Court*, *X.509—the new and improved 5th edition*, and *The sky isn't falling—legal effects of the failure of the hash algorithm*

2005 RSA Data Security Conference, *Forensics / Digital Evidence* (a panel in the legal Policy Track)

2004 RSA Data Security Conference, *Time and Content Authentication To Enhance Authentication* (a panel in the Privacy, Law, and Policy Track on the requirements of Sarbanes-Oxley and others)

2003 RSA Data Security Conference, *The 5th edition of X.509* and *Can protocol convey a legal constraint?* (a panel organized by me for the Law and Policy Track)

Lockheed Martin Information Technology Trends Conference, 2002, *I support standards—but my problem is different*

2002 RSA Data Security Conference, *The American Bar Association's New PKI Assessment Guidelines*

2001 RSA Data Security Conference, *Legal intent to digitally sign* (a panel in the legal track organized by me) and *Update on X.509*

2000 RSA Data Security Conference, *Attribute Certificates*

COMDEX 99, Panel Chair, *Directory Services and PKI*

NETSEC 99 Conference, *X.509 Attribute Certificate, June 1999*

Stanford University, Stanford Computer Industry Project, *Building Trust on the Internet*, 1999

DISA EC/EDI Seminar Series, *Digital Signatures and Enterprise Internet EDI*

Network Security Framework Forum, *Access Control*

SmartCard Forum, *PKI and SmartCards*

IEEE Aerospace Conferences  - 1997, Organized and chaired 1998 Security Session

IEEE International Performance, Computing, and Communications Conference, 1999, full day tutorial *Digital Signatures—Whom do you trust?*

National Information Systems Security Conference, 1995 & 1997

Worldwide Electronic Commerce Law, Policy, Security and Controls Conferences, 1992 & 1995

Networld Conference, Panel on Directory, 1990

### HOYT L. KESTERSON II DECLARATION - ATTACHMENT B
### PRIOR TESTIMONY

1.  *Novetrix Corp., et al. v. Tri Pole Corp., et al.*, Case No. 02CC00182 (Cal. Super. Ct.): On August 3, 2011, provided expert testimony regarding Novell key escrow system used to store keys for encryption of documents produced in discovery.

2.  *Naked Rhino Media, LLC v. Too Much Media, LLC, et al.*, Case No. 06-cv-03988-JAP-JJR (D. N.J.):  On June 2, 2008, provided expert testimony regarding allegations of spoliation in connection with responses to production requests.

3.  *Timecertain, LLC v. Authentidate Holding Corp. et al.*, Case No. 8:05-CV-1559-T-23EAJ (M.D. Fla.):  On November 26, 2006, provided expert testimony in *Markman* hearing before federal district court regarding patent on time-stamping of digital signatures.

4.  *Modular Mining Systems, Inc. v. Jigsaw Technologies, Inc., et al.*, Case No. C20046306 (Pima County Sup. Ct.):  On April 12, 2005, provided expert testimony in defense of trade secret claims in connection with API database access.

## HOYT L. KESTERSON II DECLARATION - ATTACHMENT C
## MATERIALS CONSIDERED, REVIEWED AND/OR RELIED UPON

1.      Arizona Revised Statutes §§ 28-4651 through 4655.

2.      Complaint (Doc. 1), Motion for Preliminary Injunction and Exhibits (Doc. 20), *CDK Global, LLC v. Brnovich, et al.*, Case No. 2:19-cv-04849-GMS (D. Ariz.).

3.      Braunstein, Mark L., *Health Information on FHIR:  How HL7's New API is Transforming Healthcare* (Springer 2018).

4.      Casteran, Emilie, "PSD2 is helping banks adapt to a more secure, customer-centric environment," at https://www.theglobaltreasurer.com/2018/04/13/psd2-helping-banks-adapt-secure-customer-centric-environment/.

5.      CDK Global, "Third-Party Offerings", at https://www.cdkglobal.com/us/automotive/dealership-operations/operations/third-party-offerings.

6.      Cotton, Ira W. and Greatorex, Jr., Frank S., *Data structures and techniques for remote computer graphics* (1968).

7.      Data.gov, "Federal Bureau of Investigation, Crime Data Explorer," at https://api.data.gov/docs/fbi/.

8.      Gauci, Rachel, "PSD2 – banking on a game changer in ecommerce," at https://www.theglobaltreasurer.com/2018/05/30/psd2-banking-on-a-game-changer-in-ecommerce/.

9.      Gauci, Rachel, European Payments Council, "Understanding the Final Regulatory Technical Standards," at https://www.europeanpaymentscouncil.eu/sites/default/files/infographic/2018-04/rts-infographic_April%202018.pdf.

10.     Glickenhouse, Alan & Kim, Esther, "Identifying API use cases:  Banking Industry" IBM Cloud White paper (2016), at https://www.ibm.com/downloads/cas/G4DVGRQJ.

11.     Harris, Shon, "CISSP Exam Guide" 6th ed. (2013).

12.     IBM Corporation, "An overview of the SSL or TLS handshake," at https://www.ibm.com/support/knowledgecenter/en/SSFKSJ_7.1.0/com.ibm.mq.doc/sy10660_.htm.

13.     NIST Cybersecurity Framework Versions 1.1, Framework Core Protective Technology, NIST SP 800-92 Guide to Computer Security Log Management, at https://www.nist.gov/cyberframework/framework.

**HOYT L. KESTERSON II DECLARATION - ATTACHMENT C**
**MATERIALS CONSIDERED, REVIEWED AND/OR RELIED UPON**

14.     Parnas, D.L, *On the Criteria to be Used in Decomposing Systems into Modules* (ACM Dec. 1972).

15.     Pettey, Christy, "Welcome to the API Economy," Gartner (June 9, 2016), at https://www.gartner.com/smarterwithgartner/welcome-to-the-api-economy/.

16.     Red Hat, *What is an API*, at https://www.redhat.com/en/topics/api/what-are-application-programming-interfaces.

17.     Science.gov, "Inventory of Agency APIs and Other Services for Public Access Collections," at https://www.science.gov/servicesandtools.html.

18.     STAR Dealer Data Security Guidelines, Industry Best Practices and Recommendations for Automotive Retail Data Security, at https://www.starstandard.org/images/SIGINFRASTRUCTURE/2018--Data-Security-Guideline.pdf.