1   John C. Norling — 013986
    jnorling@jsslaw.com
2   Jeffrey D. Gardner — 021783
    jgardner@jsslaw.com
3   Jimmie W. Pursell, Jr. — 019957
    jpursell@jsslaw.com
4   **JENNINGS, STROUSS & SALMON, P.L.C.**
    A Professional Limited Liability Company
5   One East Washington Street, Suite 1900
    Phoenix, Arizona 85004-2554
6   Telephone: (602) 262-5911

7   Michael N. Nemelka* (DC 983800)
    mnemelka@kellogghansen.com
8   Derek T. Ho* (DC 488609)
    dho@kellogghansen.com
9   Brendan J. Crimmins* (DC 497273)
    bcrimmins@kellogghansen.com
10  Joshua Hafenbrack* (DC 1017128)
    jhafenbrack@kellogghansen.com
11  Collin R. White* (DC 1031005)
    cwhite@kellogghansen.com
12  Bethan Jones* (DC 156261)
    bjones@kellogghansen.com
13  **KELLOGG, HANSEN, TODD,**
    **FIGEL & FREDERICK, P.L.L.C.**
14  1615 M Street, N.W., Suite 400
    Washington, D.C. 20036
15  Telephone:  (202) 326-7900
    Fax:  (202) 326-7999
16

17  *Attorneys for Intervenor-Defendant*
    *Arizona Automobile Dealers Association*

18  *Pro Hac Vice

19              **IN THE UNITED STATES DISTRICT COURT**

20                **FOR THE DISTRICT OF ARIZONA**

21  CDK Global, LLC, a limited liability          No. 2:19-cv-04849-GMS
    company, and The Reynolds and
22  Reynolds Company, a corporation,

23                        Plaintiffs,            **INTERVENOR-DEFENDANT**
                                                 **ARIZONA AUTOMOBILE**
24  vs.                                          **DEALERS ASSOCIATION'S**
                                                 **OPPOSITION TO PLAINTIFFS'**
25  Mark Brnovich, Attorney General of           **MOTION FOR PRELIMINARY**
    the State of Arizona, et al.,                **INJUNCTION**
26
                        Defendants.             **(Oral Argument Requested)**
27

28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD .......................................................................................... 8

ARGUMENT ...................................................................................................... 8

   I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ..... 8

     A.   The Arizona Law is Constitutional ............................................... 9

     B.   Federal Law Does Not Preempt the Arizona Law ....................... 9

     1.   The CFAA Does Not Preempt the Arizona Law ........................ 10

     2.   The Copyright Act Does Not Preempt the Arizona Law ........... 13

     3.   The DMCA Does Not Preempt the Arizona Law ...................... 16

     4.   The GLBA Does Not Preempt the Arizona Law ....................... 18

   II.     PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM ... 20

   III.    THE BALANCE OF EQUITIES WEIGHS OVERWHELMINGLY AGAINST AN INJUNCTION, AND INJUNCTIVE RELIEF WOULD NOT SERVE THE PUBLIC INTEREST .................................................... 25

   IV.   THERE IS NO JUSTIFICATION FOR ENJOINING THE ENTIRE ARIZONA LAW ........................................................................... 26

CONCLUSION ................................................................................................ 27

i

**INTRODUCTION**

Plaintiffs' request to enjoin the State of Arizona from enforcing the Dealer Data Security Law (or "Arizona Law"), codified at Arizona Revised Statute ("A.R.S.") Sections 28-4651 through 28-4655, should be seen for what it is:  a cynical effort to invoke federal law and the U.S. Constitution to shield their abusive market practices.  For years, it was settled industry practice that dealers had the right to access their data on their Dealer Management System ("DMS"), including by using third party "data integrators" that specialize in providing that data retrieval service.  But in the last five years, Plaintiffs CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") have colluded to use their joint control over the DMS market to hold dealers' data hostage, to monopolize the market for retrieving dealer data, and to charge extravagant prices many times higher than the prices charged by third-party data integrators (or any other DMS provider).  Those market practices, which are the subject of ongoing investigations by the Federal Trade Commission and state attorneys general as well as numerous civil lawsuits pending in an antitrust MDL in Chicago, have yielded hundreds of millions of dollars in unlawful profits — all at the expense of automobile dealers, software application vendors, and the car-buying public.

Without so much as mentioning the extensive law enforcement activity surrounding these new data access restrictions, Plaintiffs attempt to paint themselves as champions of the consumer interest, and the Arizona Law as undermining the security of consumers' private data.  That is nonsense.  Most of the Arizona Law consists of provisions that *enhance* data security beyond federal-law requirements, including through the creation of APIs (or application programming interfaces) that will allow dealers to securely and efficiently transfer their data from the DMS database to the dealer's chosen external source, without any of the "unfettered access" or purported security risks that Plaintiffs decry.  And Plaintiffs' suggestion that federal law charges *DMS providers* with the sole responsibility for safeguarding consumer data — to the exclusion of the State — fails the straight-face test.

What Plaintiffs are really trying to vindicate here is not the "public good" but their supposed "proprietary interests in their DMS." On Plaintiffs' telling, federal computer-hacking and copyright-protection statutes create a new *Lochner* for the digital age, providing sweeping immunity for database managers from data security and economic legislation by the States. None of the federal statutory or constitutional provisions Plaintiffs invoke say anything of the sort. Plaintiffs' claims can be dismissed as a matter of law under Rule 12(b)(6), but if they are not, they certainly do not demonstrate a sufficient likelihood of success to warrant the extraordinary remedy of enjoining democratically enacted legislation that was passed *unanimously* by both the Arizona House and Senate. This Court should deny Plaintiffs' motion.

## BACKGROUND

**1.** A DMS is specialized enterprise software that automobile dealerships use to run their day-to-day operations. *See* Decl. of Allan Stejskal ("Stejskal Decl.") ¶¶ 14-15 (attached as Exhibit 1); Compl. ¶¶ 34-45. At the heart of the dealer's DMS is an electronic database, where dealerships store virtually all of the data (including data about their customers, car inventory, parts, accounting, human resources, and more) that they create and generate in their daily operations and customer interactions. Stejskal Decl. ¶¶ 15-16 ("The data in the DMS is essential to the operation of the dealership and represents a significant asset of the dealership."). There is broad acknowledgement in the automotive industry — including through the repeated statements of Plaintiffs CDK and Reynolds — that "dealers 'own' their data in the DMSs." *In re Dealer Mmgt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 940 (N.D. Ill. 2018) ("*DMS Litigation*"); Compl. ¶ 42; Stejskal Decl. ¶¶ 27-29; Decl. of Peter Swire ("Swire Decl.") ¶¶ 31-37 (attached as Exhibit 2).

**2.** During the 2019 legislative session, the Arizona Legislature unanimously passed A.R.S. Sections 28-4651 through 28-4655 on a vote of 60-0 in the Arizona House and 29-0 in the Arizona Senate. Governor Ducey signed it into law on April 9, 2019. One aspect of the Arizona Law ensures that dealerships remain in

control of access to their own data.  Specifically, the law forbids DMS providers such as CDK and Reynolds — which dominate the DMS market — from using their control of the DMS to prevent dealerships from accessing their own data.  *See* A.R.S. § 28-4653(A)(1) ("[No] third party may . . . access, share, sell, copy, use, or transmit Protected Dealer Data without prior express written consent."); *id.* § 28-4653(A)(3)(b) (prohibiting third parties from placing any "unreasonable restriction" on dealer-authorized third parties' access to dealer data); Stejskal Decl. ¶ 55 (The law "clearly places the responsibility and control of the dealer's data on the dealer, where it belongs, and ensures that the dealer has visibility into and control over the use of the data."); *see also* Arizona Automobile Dealers Association ("AADA") Mot. to Dismiss (Dkt. 39), at 2 ("AADA MTD") (explaining that the law only applies to dealers' data).

Working hand-in-glove with the provision placing dealers in control of access to their own data are provisions that provide additional safeguards for that data.  As Peter Swire — the former Chief Counselor for Privacy in the U.S. Office of Management and Budget, who was the first person to have government-wide policy responsibility for privacy — explains, the Arizona Law "is primarily a data protection law" that is "consistent with good privacy and security principles."  Swire Decl. ¶ 21. Dealerships already take data security seriously, given the array of federal regulations governing use of consumer information.  Stejskal Decl. ¶¶ 47-49 ("[D]ealerships take the protection of this information in written and electronic form extremely seriously and make it a point to train their staffs accordingly.").  Indeed, Plaintiffs identify no instance where dealer-authorized data access resulted in a data breach.

The Arizona Law provides yet more robust protections for dealer data.  It prohibits the use of dealer data in ways that exceed dealer and consumer consent, A.R.S. §§ 28-4653(A)(1), 28-4654(B)(1); requires deletion of the data after the termination of an agreement with the dealer, A.R.S. § 28-4654(B)(3)(b); ensures that dealers may audit access to and use of the data held by DMS providers, A.R.S. § 28-4654(B)(4)-(5); and clarifies that the Law does not authorize use of consumer data in

a manner inconsistent with a dealer's agreement with a consumer or the purposes for which the consumer provided it, A.R.S. § 28-4655(2).

The Arizona Law also specifies that dealers and third parties that handle dealer data must meet the Standards for Technology in Automotive Retail ("STAR Standards"), which were developed by the automotive industry to establish "best practices" for data security. A.R.S. § 28-4651(9); Stejskal Decl. ¶¶ 52-53 (discussing STAR Standards); Swire Decl. ¶¶ 62-66 (same).

Importantly, the Law also calls for the creation of secure, external interfaces (called an application programming interface, or "API") that will allow dealers to transfer their data to and from their third-party partners without requiring them to integrate with or dial into the DMS at all.[1]  *See* A.R.S. § 28-4654(A)(2).  "APIs are a ubiquitous technology" that "touch every facet of the internet and the economy." Swire Decl. ¶ 68.  APIs are used to securely and efficiently transmit highly sensitive data in a broad array of business and government contexts.  *Id.* ¶¶ 68-70.  As Alan Andreu, Vice President for the DMS provider Dominion Dealer Solutions LLC ("Dominion"), explained, an API "[does not] provide a third party with access" to the DMS and "an API is created to securely send and receive data, without any third-party access to the DMS at all."  Declaration of Alan Andreu ("Andreu Decl.") ¶ 15 (attached as Exhibit 3).  Accordingly, a dealer-authorized third party that sends or receives dealer data using an API "does not have access to CDK's or Reynolds's systems," Kesterson Decl. ¶¶ 21-22 (Dkt. 43-1), and the use of APIs "should not and need not affect the confidentiality, integrity, or availability of the database" stored on the DMS itself, *id.* ¶ 21.  Indeed, CDK and Reynolds themselves currently sell access to dealer data (albeit at greatly inflated rates) via APIs, which an expert for CDK and Reynolds has called a "qualitatively better" and "secure" method of access.  Swire Decl. ¶ 71.

---

[1] As the FTC has explained, an API "allows a website or software program to accept requests from an external source and send back responses to those requests." *See* "FTC For Developers," https://www.ftc.gov/developer.

4

**3.**    The Arizona Law serves the important state interests of protecting consumers and competition while enhancing data security.  Dealerships increasingly rely on third-party software vendors, separate from the DMS, to help them sell and service vehicles.  Stejskal Decl. ¶¶ 24-26; Andreu Decl. ¶¶ 3, 16-17.  A typical dealer uses between 10 and 20 software vendors to help manage everything from customer relationships to online marketing to repairs in the "service lane" (and much more).  Stejskal Decl. ¶ 24-25.  To provide those services, software vendors need automated and cost-effective access to dealer data that currently resides on the DMS.  *Id.* ¶ 26.

Dealers and their chosen vendors historically had a number of competitive options for "data integration" service providers that help retrieve dealer data and provide it in a standardized and usable format.  Stejskal Decl. ¶¶ 30-31.  Through their joint actions, CDK and Reynolds have all but eliminated those competitive options.  *See DMS Litigation*, 313 F. Supp. 3d at 940; Andreu Decl. ¶ 7.  As a result, when software vendors need access to dealer data on the CDK and Reynolds DMSs, they now must purchase that data through the CDK Third Party Access ("3PA") and Reynolds Certified Interface ("RCI") APIs.  Swire Decl. ¶ 71; Andreu Decl. ¶¶ 19-20.  With the competition largely eliminated, Plaintiffs now charge greatly inflated prices sometimes exceeding $700 a month, per dealership, for services that usually cost around $50 in a competitive marketplace.  *See Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017).  The Arizona Law addresses Plaintiffs' market abuses by restoring dealers' secure, efficient, and affordable access to their own data.[2]  Stejskal Decl. ¶ 58; Andreu Decl. ¶ 4 (Arizona Law "helps create a more fair and functional dealership software market, to the benefit of car buyers and consumers.").

---

[2] Plaintiffs' claim (Br. at 26) that the Arizona Law mandates "free" access to the DMS is not true.  The Law allows DMS companies to charge their "direct costs" associated with "providing Protected Dealer Data access to an authorized integrator or allowing an authorized integrator to write data to a dealer data system."  A.R.S. § 28-4651(5).  Moreover, dealers already pay large monthly licensing fees to CDK and Reynolds for use of the electronic DMS database.  Stejskal Decl. ¶ 19; Declaration of Bobbi Sparrow ("Sparrow Decl.") ¶¶ 7, 14 (attached as Exhibit 4).

Arizona is not alone in taking action to protect dealer and consumer data. Montana (H.B. 617 enacted on May 6, 2019, and currently in effect), Oregon (H.B. 3152 enacted on July 2, 2019, and going into effect on January 1, 2020), and North Carolina (SB 384 enacted on July 19, 2019, and going into effect on October 1, 2020) have passed materially identical statutes to Arizona's law.

4. During Arizona's legislative process, multiple DMS providers endorsed the Dealer Data Security Law. For example, Cox Automotive — which owns Dealertrack, the Nation's third-largest DMS provider — told the Arizona Legislature that it "recognizes that dealerships retain ownership over their data" and that it is not appropriate "for DMS providers to seize control over dealer data and impose unreasonable fees and anticompetitive roadblocks for access to that data." Cox Automotive Statement (attached as Exhibit 5). Cox Automotive stated that the Arizona Law is "fully consistent with the important principles of protecting the security and stability of a dealer's DMS." *Id.* Similarly, Dominion told Arizona legislators it "wholeheartedly supports" the Arizona Law, which is "completely consistent with the principles of data security, and poses no issues regarding the stability of our DMSs." Dominion Statement (attached as Exhibit 6).

Alone among all DMS providers in the United States, only CDK and Reynolds have blocked the dealers' ability to control access to dealer data. Stejskal Decl. ¶ 46. And only CDK and Reynolds have opposed the Arizona Law and claimed that dealer-controlled data access poses security risks.

5. CDK and Reynolds are defendants in an antitrust MDL and are under active investigation by the FTC and multiple state attorneys general for collusion and anti-competitive conduct with respect to the same data-access issues that animated the Arizona Law. *See* AADA MTD, at 4-5. As those private suits allege, CDK and Reynolds have long jointly controlled the DMS market and have leveraged their power to seize control over dealer data and charge astronomical fees for access to that data. *See DMS Litigation*, 313 F. Supp. 3d at 939-946.

1   Before July 2015, CDK publicly endorsed the principle of dealer-controlled
2 data access.  Stejskal Decl. ¶ 28; Swire Decl. ¶¶ 33-34.  CDK's top executives made
3 repeated public statements that, consistent with the Arizona Law, the "dealership
4 fundamentally owns the data in its DMS, and dealers should control who accesses their
5 data and how it's used."  Stejskal Decl. ¶ 41; *id.* ¶ 28 (CDK press release: "[CDK]
6 believes in a fair competitive environment and does not use its leverage through supply
7 of the dealer management system to reduce competition through the restriction of data
8 access.").  For its part, Reynolds for many years has "whitelisted," or sanctioned,
9 dealer-controlled data access (consistent with the Arizona Law) for its most important
10 clients, including its largest client, Penske Automotive Group.  *Id.* ¶ 43; *see also*
11 *Authenticom*, *Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *9 (W.D. Wis. July 14,
12 2017) ("Reynolds already allows many exceptions to its 'no hostile integration' policy.
13 There was ample evidence that Reynolds allowed (and even continues to allow to this
14 day) third parties to use dealer credentials when it suited Reynolds.").

15   Plaintiffs' claim (Br. at 1) that the Arizona Law "radically changes" the
16 contractual relationship between dealers and DMS providers is also a blatant
17 misrepresentation of the truth.  For many years, consistent with its public position
18 supporting dealer-authorized data access, CDK's standard contract with dealers
19 specifically *allowed* dealers to use "agents" to access the DMS and retrieve dealers'
20 data on dealers' behalf.  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558,
21 563-64 (N.D. Ill. 2019) (reciting relevant portion of CDK DMS contract); Stejskal
22 Decl. ¶ 28 (CDK's top executives stating dealers can authorize access to their data).  It
23 was only in late 2017, after the lawsuits that gave rise to the MDL, that CDK began
24 trying to change its DMS contracts to remove the "agent" language and purport to
25 forbid dealers from using third-party data integrators to retrieve their data.

26   In a 180-degree about-face, Plaintiffs now argue that dealer-authorized data
27 access poses an undue security risk.  Notably, CDK and Reynolds made similar
28 "security" arguments during the *Authenticom* preliminary injunction proceeding in

2017 in Wisconsin federal court, as part of the private antitrust suits against them. After a three-day evidentiary hearing, which featured 15 witnesses (including CDK's and Reynolds's top executives and experts), Chief Judge Peterson of the U.S. District Court for the Western District of Wisconsin rejected CDK's and Reynolds's cybersecurity arguments as unsupported by the evidence in a detailed point-by-point analysis. *Authenticom*, 2017 WL 3017048.[3]

## LEGAL STANDARD

"[P]reliminary injunctions are an 'extraordinary remedy never awarded as of right.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  To obtain one, Plaintiffs must demonstrate: (1) likely success on the merits; (2) irreparable harm; (3) that the balance of equities favors an injunction; and (4) that the injunction serves the public interest.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013). "The burden of persuasion is on the movant, who must make a clear showing that each of the four prongs is satisfied."  *Planned Parenthood Arizona, Inc. v. Betlach*, 899 F. Supp. 2d 868, 876 (D. Ariz. 2012).

## ARGUMENT

## I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

The first factor — likely success on the merits — "is the most important." *Garcia*, 786 F.3d at 740.  Likelihood of success is a "threshold inquiry," and if Plaintiffs cannot make this showing, then the Court must deny the preliminary injunction and "need not consider the remaining . . . elements." *Id.*

Plaintiffs face two significant hurdles given that they seek — based on a facial challenge — to preliminarily enjoin a state statute prior to enforcement.  First, a statute

---

[3] This is déjà vu all over again:  CDK and Reynolds made the same unfounded (and unsuccessful) claims before Chief Judge Peterson that dealer-authorized data access would lead to "data corruption and system instability."  *See* Defs.' Opp. to Prelim. Inj. at 2, *Authenticom v. CDK Global, LLC*, 17-cv-318 (June 17, 2017), Dkt. 114; *id.* at 53-54 (claiming dealer-controlled integration means "intolerable data and system security risks" and would "jeopardize . . . sensitive dealer and consumer data").

is facially unconstitutional "only if it is unconstitutional in every conceivable application." *Klein v. San Diego Cty.*, 463 F.3d 1029, 1033 (9th Cir. 2006) (internal quotation marks omitted); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("no set of circumstances exists under which the Act would be valid"). As demonstrated below, Plaintiffs cannot demonstrate that the Arizona Law is unconstitutional in *any* of its applications, let alone *every conceivable* application.

Second, when a court is asked to preliminarily enjoin a state statute prior to enforcement, it starts "with a presumption that the state statute is valid." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 661 (2003). Only when a plaintiff "has shouldered the burden of overcoming that presumption" can it be deemed likely to succeed on the merits. *Id.* at 645. Indeed, where a state law is challenged before implementation and enforcement, courts must exercise "caution in evaluating the validity of [the statute]." *Arizona v. United States*, 567 U.S. 387, 415 (2012).

## A.    The Arizona Law is Constitutional

For the reasons stated in the Opposition to Plaintiffs' Motion for Preliminary Injunction filed by the Arizona State Defendants, in which the AADA joins in full, Plaintiffs' constitutional claims are unlikely to succeed on the merits.

## B.    Federal Law Does Not Preempt the Arizona Law

Plaintiffs cannot clear the "high threshold" that "must be met if a state law is to be preempted for conflicting with the purposes of a federal act." *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019) (internal quotation marks omitted). To succeed on their theories of "implied" preemption, *see* Compl., ¶¶ 175, 184, 194, 205, 217, Plaintiffs must show that the Dealer Data Security Law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), based on "the federal statute as a whole and identifying its purpose and intended effects," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Furthermore, because the Dealer Data Security Law is economic and data security legislation — areas of traditional State concern, *see*, *e.g.*, *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (consumer protection); *Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 958-59 (N.D. Cal. 2004) (unfair business practices); A.R.S. §§ 12-2292 to 12-2294 (confidentiality of medical records); § 32-3211 (protocols for secure storage of medical records); § 44-1692 (limitations on use of consumer information by credit reporting agencies) — the Court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levin*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Moreover, a claim based on implied preemption "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *California*, 921 F.3d at 879 (quoting *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011)).

Plaintiffs are not likely to succeed on any of their preemption claims. In fact, for the reasons given in AADA's MTD, *see* Dkt. 39, those claims fail as a matter of law and should be dismissed with prejudice based on the complaint alone. Evidence outside the complaint's four corners only strengthens that conclusion. The Arizona Law does not conflict with any of the four statutes on which Plaintiffs rely.[4] To the contrary, the Arizona Law is *consistent* with the objectives of federal law.

## 1.    The CFAA Does Not Preempt the Arizona Law

Plaintiffs claim that the Computer Fraud and Abuse Act ("CFAA") preempts the Arizona Law because it "grants computer owners" the "'*exclusive* discretion'" — immune from state legislation — "to determine who is authorized to access their

---

[4] Plaintiffs have abandoned any effort to secure a preliminary injunction based on the Defend Trade Secrets Act (Third Claim). That claim lacks merit, as well, for the reasons AADA explained in its motion to dismiss. *See* Dkt. 39, at 16-17.

1    computer and for what purposes." Br. at 8. Plaintiffs' premise mischaracterizes the

2    CFAA. As AADA explained in its MTD (at 7-10), the CFAA prohibits computer

3    hacking; it does not confer on a computer owner a federal right to exclude anyone it

4    wants to from its computer systems. *See United States v. Nosal*, 844 F.3d 1024, 1032

5    (9th Cir. 2016) (CFAA "aimed at hackers who accessed computers to steal information

6    or to disrupt or destroy computer functionality"); *hiQ Labs, Inc. v. LinkedIn*

7    *Corporation*, 2019 WL 4251889, at *12 (9th Cir. Sept. 9, 2019) (CFAA prohibits

8    "breaking and entering" a protected computer). Put differently, the CFAA prohibits

9    overriding *lawful* restrictions of access to a protected computer, but it nowhere

10   prevents States from enacting laws that make certain access restrictions *unlawful*.

11       That conclusion is evident from the text of the statute. The CFAA imposes

12   liability on a person who has "accesse[d] a computer *without authorization* or

13   exceed[ed] *authorized* access." 18 U.S.C. § 1030(a)(2). But it does not specify when

14   authorization exists — or whether authorization can be required by law. The statute is

15   thus wholly consistent with state law that requires computer owners to provide such

16   authorization for sound reasons of public policy. Had Congress meant to enact a statute

17   that immunized computer owners from all such state legislation, it certainly could have

18   included a provision expressly preempting state laws that attempted to override the

19   computer owner's refusal to provide such authorization. But Congress did not do so,

20   and the unadorned reference to "authorization" does not provide the clear indication of

21   legislative intent necessary to override the strong presumption against preemption.[5]

22       Plaintiffs' reading of the CFAA, moreover, would lead to untenable results, as

23   this case illustrates. Automobile dealers are not software companies; their business is

24

25       [5] The CFAA's legislative history confirms that Congress did not intend that
     result. When the original CFAA was enacted in 1984, Congress's stated goal was to
26   stop hacking — but it did not want to interfere with "any type or form of computer
     access that is for a legitimate business purpose." *See* H.R. Rep. No. 98-894, at 20,
27   *reprinted in* 1984 U.S.C.C.A.N. at 3706-07. It does not conflict with the CFAA's
     intent for States to identify such a "legitimate business purpose" and require that third
28   parties be granted access to protected computers to further that purpose.

selling cars. Stejskal Decl. ¶ 36. Dealers have relied on third parties (known as "data integrators") to help them retrieve their own data from the DMS and transmit it to software vendors, so those vendors can create applications that are critical to the operation of their dealerships. *Id.* ¶¶ 30-36. For years, CDK and Reynolds had policies of permitting dealer-authorized access. *Id.* ¶ 37. Now, Plaintiffs want to hold that data hostage and to force dealers to pay *them* exorbitant prices to get their own data off the DMS, even though dealers already pay Plaintiffs large fees for hosting the data. *See id.* ¶ 19; Sparrow Decl. ¶¶ 7, 14. Nothing in the CFAA prevents States like Arizona from preventing that anti-competitive result. *See United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012) (en banc) (cautioning against reading of CFAA that would make "every violation of a private computer use policy a federal crime"); *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, 965-66 (D. Ariz. 2008) (adopting "narrow view of the CFAA" under which the prohibited conduct "is analogous to that of 'breaking and entering' rather than using a computer . . . . Simply stated, the CFAA is a criminal statute focused on criminal conduct. The civil component is an afterthought."). This is particularly true with respect to the state statute at issue here, because Plaintiffs' reading of the CFAA would criminalize dealers granting access to their own data. *See* A.R.S. § 28-4651(7) (defining "Protected Dealer Data").

Plaintiffs cite no case supporting their radical position that the CFAA "grants computer owners," irrespective of other legal obligations, the "'exclusive discretion' to determine who is authorized to access their computer and for what purposes." Br. at 8. The "exclusive discretion" phrase that Plaintiffs quote from *Nosal* (a criminal case, not a preemption case) is not a legal proposition; it appears in the case's description of the particular database at issue. *See* 844 F.3d at 1036.

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), has no relevance to the preemption issue here because there was no state statute requiring Facebook to grant the defendant access to any data stored on Facebook's computers. Moreover, the data the defendant accessed (employing a user-supplied password)

included "*Facebook's* data" — not just the user's data, unlike here where the Arizona Law expressly pertains only the dealer's own data.  *Id.* at 1068 ("Power continued to access Facebook's data and computers without Facebook's permission"); *see also Facebook, Inc. v. Power Ventures, Inc.*, 2013 WL 5372341, at *1 (N.D. Cal. Sept. 25, 2013) ("Facebook complains that Defendants employ Facebook's proprietary data without its permission by inducing Facebook users to provide their login information and then using that information to 'scrape' Facebook's proprietary material.").[6]

None of the cases Plaintiffs cite holds that state laws of the type here are preempted.  As far as the AADA is aware, no federal court has ever held that the CFAA impliedly preempts any state statute in its 35-year history, and Plaintiffs have cited to none.  Instead, courts have specifically cautioned against reading the CFAA in ways that "preempt all state and local laws that might otherwise afford a legal right of access," which would "stifle the dynamic evolution and incremental development of state and local laws addressing the delicate balance between open access to information and privacy."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1110-11 (N.D. Cal. 2017), *aff'd*, 2019 WL 4251889 (9th Cir. Sept. 9, 2019).  Because Plaintiffs' position would disrupt that balance, the Court should reject it.

## 2.    The Copyright Act Does Not Preempt the Arizona Law

Plaintiffs' Copyright Act preemption argument is not likely to succeed.  Plaintiffs' theory (Br. at 11) is that "the Law purports to give dealers and integrators a state-law right to copy and distribute copies of Plaintiffs' copyrighted works" — namely, the DMS operating software — because, on their telling, when third parties run a DMS report-generator function in order to access dealer data, they necessarily

---

[6] Plaintiffs also point to (Br. at 8) *In re Dealer Management Systems Antitrust Litigation* from the private antitrust MDL against CDK and Reynolds.  *See* 362 F. Supp. 3d 558, 570 (N.D. Ill. 2019).  But that decision also had nothing to do with preemption, and certainly did not hold that a computer owner may rely on the CFAA to preclude enforcement of state laws requiring computer owners to authorize third parties to access the data of authorized users.

13

create copies of the DMS software in random access memory (or "RAM"). That argument is not likely to succeed, for several reasons.

**First**, nothing in the Law mandates that dealers be given access to *Plaintiffs'* copyrighted material. The Law requires DMS providers to preserve dealer-authorized access to *dealers' own data*. *See* A.R.S. § 28-4651(7) (defining "Protected Dealer Data"); AADA MTD at 2-3 (explaining that the law does not apply to non-dealer data). Plaintiffs have not shown — as they must on a facial challenge — that there is no way to achieve the Law's goal of restoring dealer control over dealer data without giving dealers the right copy Plaintiffs' copyrighted software. Indeed, the provision that Plaintiffs focus on — A.R.S. § 28-4653(A)(3)(b) — prohibits "*unreasonable* restriction[s]" on access by dealer-authorized third parties that have met the STAR Standards for data security.[7] That provision has not been implemented — and Plaintiffs certainly have not shown that it will be (or can only be) implemented in a way that requires copying of Plaintiffs' DMS software. *See Arizona v. United States*, 567 U.S. at 415 ("without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume" the statute would be construed to raise constitutional concerns).

Indeed, Plaintiffs' argument ignores the separate provision of the Law (A.R.S. § 28-4654) requiring DMS companies to set up APIs to allow for the transfer of dealer data — a process that would not require access to the DMS (or copying of Plaintiffs' DMS software) by any third party at all. Plaintiffs do not allege that dealer-initiated data transfers and those done through separate APIs require the use and copying of their DMS software. APIs do not so require, as other DMS companies and technology experts have averred. *See* Andreu Decl. ¶ 15 ("An API does not copy software from Dominion's DMS at all."); Kesterson Decl. ¶¶ 12, 17, 21-22 (Dkt. 43-1).

---

[7] Plaintiffs also cite A.R.S. § 28-4653(A)(3), but that provision does not involve any third party access at all; rather, it prohibits access restrictions on the "*dealer's* ability" to access and use "Protected Dealer Data."

14

**Second**, even assuming that the Law could not be implemented without requiring copying of Plaintiffs' DMS software, the law at most would authorize nothing more than fair use and therefore would not conflict with the Copyright Act. Plaintiffs must show that the Arizona Law conflicts with the entire copyright scheme, which includes fair use. *See* 17 U.S.C. § 107 (fair use "is not an infringement of copyright"); *Ass'n of Am. Med. Colleges v. Cuomo*, 928 F.2d 519, 523 (2d Cir. 1991) (if a state statute authorizes fair use, it does not conflict with the Copyright Act); *Lindberg v. Cty. of Kitsap*, 133 Wash. 2d 729, 745 (1997) (rejecting conflict-preemption claim on fair-use grounds).

In *Sony Computer Entertainment, Inc. v. Connectix*, 203 F.3d 596 (9th Cir. 2000), the Ninth Circuit explained that the fair-use defense permitted a company to reproduce copyrighted software underlying Sony's PlayStation in order to create a program that let consumers run PlayStation games on personal computers — a new gaming platform that did not itself contain infringing material. *See id.* at 608. The Court acknowledged that Sony "understandably seeks control over the market for devices that play games Sony produces or licenses. The copyright law, however, does not confer such a monopoly." *Id.* at 607. Similarly, the Seventh Circuit has explained that the rule applied in *Connectix* would permit copying a copyrighted database program for the purpose of extracting the underlying data. *See Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 645 (7th Cir. 2003) (Posner, J.); *see also Phantomalert, Inc. v. Google Inc.*, 2016 WL 879758, at *6 (N.D. Cal. Mar. 8, 2016) ("copying of a database by a defendant who used it only to extract the raw data was a fair use that did not give rise to a claim for copyright infringement").

The same logic makes clear that the Law authorizes only the fair use of Plaintiffs' copyrighted material. Creating incidental and temporary RAM copies of the DMS's report generator program for the limited purpose of extracting dealer data has no conceivable effect on the value of the copyrighted elements of the DMS

software.  It instead is a necessary step to free data that Plaintiffs want to hold hostage — data over which they do not have any intellectual property right.

**Third**, and in a similar vein, the Arizona Law is consistent with the Copyright Act because it shares the Act's objective of preventing CDK and Reynolds from misusing any copyright in their DMS software to secure "an exclusive right or limited monopoly not granted by the Copyright Office."  *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520-21 (9th Cir. 1997); *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 699-700 (9th Cir. 2015) (Wardlaw, J., concurring) (copyright misuse prevents copyright owner from "abus[ing] the limited monopoly his copyright provides by restricting competition in a market that is beyond the scope of his copyright.").[8]   As explained, the Arizona Law stops CDK and Reynolds from extracting a "cyber ransom" (*see* A.R.S. § 28-4651(2)) for access to data that they do not own.  Stejskal Decl. ¶¶ 44-45; Sparrow Decl. ¶ 18.  Plaintiffs cannot claim an implied conflict with copyright law when they are using any applicable copyrights in their software "to control competition in an area outside the copyright."  *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990); *see also WIREdata*, 350 F.3d at 642, 646-47 (attempt by the database owner to prevent data owners from "from revealing *their own* data . . . might constitute copyright misuse" and "would be appalling" if allowed to succeed).

### 3.        The DMCA Does Not Preempt the Arizona Law

Plaintiffs do not appear to dispute that the Digital Millennium Copyright Act ("DMCA") makes it unlawful to "circumvent a technological measure" only insofar as that measure "effectively controls access to" a copyrighted work.    17 U.S.C. § 1201(a)(1)(A).  The DMCA's objective is to help protect copyrighted works against

---

[8] Here, there is a well-documented case — with private lawsuits and government investigations well underway — showing that CDK and Reynolds are violating the antitrust laws through their joint efforts to lock down and monopolize access to dealer data.  *See supra* p. 6.  Even so, to prove copyright misuse, it is not necessary to prove an antitrust violation.  *Practice Mgmt.*, 121 F.3d at 521.

computer theft.  But, as noted above, nothing in the Law mandates that dealers be given access to *Plaintiffs'* copyrighted material.  The Law requires DMS providers to preserve dealer control over access to *dealers' own data.  See* A.R.S. § 28-4651(7) (defining "Protected Dealer Data"); AADA MTD at 2-3 (explaining that the law does not apply to non-dealer data).  The DMCA does not prevent States from requiring DMS providers to give access to material as to which they hold no copyright.  Indeed, the case law recognizes that the DMCA does *not* entitle copyright holders to *abuse* technological blocking measures by extending them beyond the legitimate scope of their copyright interest.  *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 951 (9th Cir. 2010) (recognizing possibility that a party may use the "DMCA anti-circumvention right in a manner that violates antitrust law").  That type of abuse is exactly what the Law targets:  the Law reflects the Arizona Legislature's judgment that Plaintiffs' use of technological blocking to prevent dealers from allowing third parties to access *their own data* has other undesirable effects — principally, enabling Plaintiffs to hold dealer data hostage in exchange for a "cyber ransom."  A.R.S. § 28-4651(2).

In any event, even to the extent that Plaintiffs' copyrighted software had to be run in order to restore dealers' control over access to their own data, that would not frustrate the DMCA's purposes, because it would at most permit fair use of that software.  *See* AADA MTD at 14.  As in *Connectix*, 203 F.3d 596 (9th Cir. 2000), any limited use or copying of the DMS software would be wholly incidental to the retrieval of the *dealers' own* data stored on the DMS.  Indeed, using a technological measure as a pretext to exercise control over dealers' own data — over which Plaintiffs have no valid copyright claim — would constitute copyright *misuse* under federal law.  *See WIREdata, Inc.*, 350 F.3d at 645; *Practice Mgmt.*, 121 F.3d at 520-21 (extending copyright to materials as to which Copyright Office has not granted any monopoly constitutes copyright misuse); AADA MTD at 14-15.  The Law is thus fully consistent with the DMCA by preventing Plaintiffs' abuse of their copyright.

17

1    Nothing Plaintiffs cite (Br. at 11-12) remotely suggests that the DMCA

2  preempts the Law.  *Microsoft Corp. v. AT&T Corp.* addressed an issue of patent law,

3  and merely mentioned the DMCA in passing.  550 U.S. 437, 458-59 (2007).  And

4  *Universal City Studios, Inc. v. Corley* rejected First Amendment and Copyright Clause

5  challenges to the anti-trafficking provisions of the DMCA, in a paradigm DMCA case

6  concerning efforts to decrypt DVDs.  273 F.3d 429, 435 (2d Cir. 2001).  As with the

7  CFAA, Plaintiffs' approach to the DMCA would leave States powerless to use

8  common tools — not least, state antitrust enforcement — to regulate anticompetitive

9  practices by software companies and their control of data.  Plaintiffs cite no case

10  suggesting that the DMCA sweeps so broadly.

11           **4.       The GLBA Does Not Preempt the Arizona Law**

12    The Gramm-Leach-Bliley Act ("GLBA") prohibits financial institutions from

13  disclosing nonpublic personal information of consumers, and requires certain agencies

14  to create regulations to ensure the security and confidentiality of that information.  *See*

15  15 U.S.C. §§ 6801-6802.  The FTC has, in turn, promulgated a rule that generally

16  requires financial institutions to create an information security program sufficient to

17  control for "reasonably foreseeable" security risks "to the security, confidentiality, and

18  integrity of customer information."  *See generally* 16 C.F.R. § 314.3-314.4.  By its

19  terms, the GLBA "shall not be construed as superseding, altering, or affecting"

20  consistent state laws, 15 U.S.C. § 6807(a)-(b).

21    The Dealer Data Security Law does not conflict with the GLBA.  To start, the

22  Law cannot conflict with Plaintiffs' ability to "comply with their obligations under

23  federal law" (Br. 14 n.7) unless Plaintiffs are actually subject to regulation under the

24  GLBA.  But the Complaint alleges that only dealers — not DMS providers — are

25  subject to the GLBA.  And although Plaintiffs assert (Br. at 13-14 & n.7) that the FTC

26  has "alleged" that one DMS provider was a "financial institution" subject to the GLBA,

27  they expressly refuse to endorse that FTC position.  Plaintiffs' argument that federal

28

1   and state law impose conflicting obligations on them fails because they do not argue
2   that federal law imposes *any* obligations on them.

3          Nor does the Arizona Law pose any obstacle to dealers' compliance with their
4   GLBA obligations.  The Arizona Law requires that Protected Dealer Data only be used
5   subject to a dealer's express written consent, A.R.S. §§ 28-4653(A)(3)(b)(vi), 28-
6   4654(B)(1), which is fully consistent with the GLBA's financial privacy rule, *see* 16
7   C.F.R. § 313 (setting conditions on use of customers' data).  And the STAR
8   Standards — which the Law incorporates as minimum security standards for all
9   interactions with dealer data, *see* A.R.S. § 28-4652 — incorporate the GLBA.  *See*
10  STAR Standards § 2.6.e (requiring each dealer to "[e]nsure the dealer complies with
11  all federal . . . regulations for financial and retail institutions such as the [GLBA]").  If
12  anything, the Law enhances security and confidentiality.  *See* Swire Decl., ¶¶ 39-81
13  (explaining the law is consistent with the FTC's core Fair Information Principles).

14         Moreover, Plaintiffs' view that dealers categorically cannot be trusted with
15  consumer data is unsupported by the record.  Tellingly, Plaintiffs' data security
16  anecdote involved an isolated case in which a *DMS provider*, not a dealer, allegedly
17  mishandled consumer data.[9]   And dealers — who concededly are subject to the
18  GLBA — take their obligations to protect sensitive consumer data seriously, with no
19  reported data breach ever having been caused by an Arizona dealer.  Stejskal Decl. ¶¶
20
21
22

---

23   [9] In that instance, the FTC alleged that an employee of DealerBuilt (a DMS
     provider) attached a storage device to DealerBuilt's backup network that exposed the
24   backup network to outside hackers.  *See* Compl. ¶¶ 9-15, *In Re Lightyear Dealer
     Technologies*, FTC, https://tinyurl.com/yx8nky6b.   That incident did not involve
25   dealer-authorized access to the DMS, and nothing in the Arizona Law prevents CDK
     and Reynolds from implementing appropriate training and safeguards for their own
26   employees.  Plaintiffs' suggestion (Br. at 24) that the Arizona Law will prevent them
     from complying with the FTC's guidance in the DealerBuilt case is false.  Again, the
27   Law as written strengthens data privacy and security; only prohibits *unreasonable*
     restrictions on STAR-compliant third parties; requires the creation of secure APIs; and
28   specifically provides that Plaintiffs are not precluded from "discharging" any federal
     legal duties "to protect and secure Protected Dealer Data," A.R.S. § 28-4653(c).

47-49; Sparrow Decl. ¶¶ 15-16. Plaintiffs' contrary suggestion is therefore wholly speculative.

Finally, if, in a particular instance, DMS providers had to restrict dealer access to their own data to protect consumer information — such as a temporary cyberattack — the Law specifically provides that Plaintiffs are not precluded from "discharging" any federal duties "to protect and secure" that data. A.R.S. § 28-4653(c).

## II.  PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM

To establish irreparable harm, CDK and Reynolds must prove that, in the absence of an injunction, they will suffer harm that cannot be redressed through monetary damages. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). Plaintiffs "must do more than merely *allege* imminent harm" but rather must "*demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991) (emphases added); *see Garcia*, 786 F.3d at 746 (showing of irreparable harm must be "clear"). "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). For multiple reasons, Plaintiffs have failed to make that showing here.

**1.**  CDK's and Reynolds's delay in seeking a preliminary injunction undercuts their claim of irreparable harm. Governor Ducey signed the Dealer Data Security Law on April 9, 2019, and yet Plaintiffs waited nearly four months to file suit (on July 29, 2019) and then delayed almost another month before seeking a preliminary injunction (on August 23, 2019, just four days before the law was scheduled to take effect). Plaintiffs' feet-dragging "implies a lack of urgency and irreparable harm." *Garcia*, 786 F.3d at 746. Their delay is especially notable because Montana enacted a materially identical law that has been in full force and effect since May 3, 2019, which

20

1  Plaintiffs never challenged.  *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d

2  Cir. 1985) (ten-week delay can imply lack of irreparable harm).

3     **2.**     Plaintiffs claim (Br. at 24-25) two related categories of purportedly

4  irreparable harm related to the Arizona Law:  (1) allowing a "dealer-designated third

5  party to 'write back' data into the DMS" would result in the corruption of data stored

6  on the DMS; and (2) CDK and Reynolds would suffer reputational harm and loss of

7  goodwill in the event of a data breach resulting from dealer-authorized data access.

8  Neither contention is persuasive, for at least three reasons.

9     **First**, Plaintiffs' data-security arguments rest on a misreading of the Arizona

10  Law.  Plaintiffs claim that the law "threatens Plaintiffs' reputations as providers of

11  secure and reliable DMSs" (Br. at 24) and that, once the Law is in force, "none" of

12  their "security and performance features . . . would be available to guard against invalid

13  data entry."  Hall Decl. ¶ 45 (Dkt. 20-1).  But the Law does not prohibit measures

14  combatting "invalid data entry."  Rather, the Law prohibits imposing "an *unreasonable*

15  restriction" on DMS access by dealer-authorized and STAR-compliant third parties.

16  A.R.S. § 28-4653(A)(3)(b) (emphasis added).  CDK and Reynolds will remain free to

17  block *unauthorized* third parties as they see fit, including through CAPTCHA.

18     Moreover, Plaintiffs once again ignore that the Arizona Law allows for the

19  creation of APIs to securely transfer the dealers' data to and from third parties.  After

20  those APIs are in place, there will be no need for dealer-authorized third parties to

21  integrate with the DMS at all, which negates any hypothetical risk that a dealer-caused

22  data incident will impair DMS functionality.  Andreu Decl. ¶¶ 13-15, Kesterson Decl.

23  ¶¶ 21-22 (Dkt. 43-1).  Notably, Plaintiffs do not argue that APIs create security risks.

24  Nor could they:  both the CDK 3PA and Reynolds RCI data programs transfer dealer

25  data via APIs (albeit for grossly inflated fees).  Swire Decl. ¶ 71.

26     **Second**, Plaintiffs' data-security and data-corruption arguments are also based

27  on pure speculation.  Plaintiffs argue (Br. at 24) that "[h]istory shows that writeback

28  by unauthorized third parties can cause serious data integrity issues," but they tellingly

1   fail to provide even a single detail about that purported "history."   The Hall

2   Declaration, Plaintiffs' only citation for their data-corruption theory, provides no facts

3   to demonstrate that dealer-controlled data access creates a substantial and immediate

4   risk of data corruption.  *See* Hall Decl. ¶ 45 (Dkt. 20-1) (opining that, where data entry

5   errors occur, they "*can* disrupt all dealer operations" — without offering any facts to

6   show that dealers have caused or will cause such errors (emphasis added)).  Similarly,

7   there has **never** been even a single documented data breach caused by a dealer-

8   authorized third party accessing the DMS.  Here too, the Hall and Golder declarations

9   on which Plaintiffs rely provide no evidence to support the assertion that enforcement

10   of the Arizona Law will, in fact, result in data breaches.[10]  Plaintiffs' sole example (Br.

11   at 24), again, is the wholly inapposite case of a *DMS provider* whose own employee

12   allegedly exposed a backup server to outside hackers.  *See supra* n.9.

13        This glaring absence of factual support is fatal.  "Speculative injury does not

14   constitute irreparable injury."  *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*,

15   739 F.2d 466, 472 (9th Cir. 1984); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,

16   750 F.2d 1470, 1473 (9th Cir. 1985) (affidavits that "are conclusory and without

17   sufficient support in facts" cannot support finding of irreparable harm); *accord*

18   *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary

19   injunctive relief cannot rest on mere hypotheticals.").   Indeed, the evidence is

20   overwhelmingly to the contrary — dealers are responsible stewards of their data and

21   have every incentive to ensure their data is handled with the appropriate care.

22        **Third**, Plaintiffs' own practices, as well as those of competing DMS

23   companies, belie any suggestion that dealer-controlled access poses a cybersecurity

24

25        [10] The cited paragraph in the Hall Declaration merely argues that "[a]ny data
     breach that results from hostile access to the Revnolds DMS" will harm Revnolds's
26   reputation — it does not provide anv facts to show that dealer-controlled data access
     would result in such breaches in the first place. Hall Decl. ¶ 47 (Dkt. 20-1). Similarly,
27   the Golder Declaration provides general commentary on how data breaches can affect
     a company's reputation; it does not purport to demonstrate that dealer-controlled data
28   access in fact would produce such breaches.  *See* Golder Decl. ¶¶ 19-21 (Dkt. 20-1).

risk.  *See* Swire Decl. ¶¶ 82-88.  For years, up until July 2015, CDK not only permitted but publicly championed dealer-controlled data access, consistent with the Arizona Law's core principle.  *See supra* p. 7.  And, Reynolds has long "whitelisted" dealer-controlled data access for its most important clients, when doing so benefitted its bottom line.  *Id.*  The Arizona Law does nothing more than give all Arizona dealerships the same control over their data that Reynolds has selectively granted to its largest dealer clients.

Tellingly, aside from CDK and Reynolds, every other DMS provider in the United States honors the ability of dealers to control their own data.  Stejskal Decl. ¶ 46.  Indeed, in sharp contrast to Plaintiffs, other DMS companies *support* the Arizona Law; none has suggested it will inhibit their ability to provide a secure and reliable service, much less irreparably harm their businesses.  *See supra* p. 6; Andreu Decl. ¶ 4 ("Dominion, which placed the security of system and the security of the data on its system as its top priority, supports the law and will have no problem complying with it.").  The two outliers are CDK and Reynolds, and their motivation could scarcely be any clearer:  they are the only DMS providers that have seized control over and monopolized access to dealer data.  And they are the only DMS providers to conjure up alarmist cybersecurity arguments in a bid to strike down the Arizona Law that will put a stop to their market abuse (which are strikingly similar to Plaintiffs' "security" arguments that Chief Judge Peterson rejected in the private antitrust litigation, after hearing voluminous evidence and testimony, *see supra* p. 8).[11]

---

[11] Plaintiffs mention (Br. at 24) — without any support — that complying with the Law will require "system modification."  Plaintiffs have waived any irreparable harm argument based on system modification by failing to develop or explain it.  *Korff v. City of Phoenix*, 2016 WL 1242523, at *4 (D. Ariz. Mar. 29, 2016) (arguments raised "in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").  Plaintiffs make no attempt to quantify the cost of the purported system modifications, but even if there are some de minimis costs, that is a garden-variety cost of doing business and not sufficient to justify a preliminary injunction.  Andreu Decl. ¶ 13 (creating APIs is a "minimal expense and is a straightforward technological process"); *Associated Gen. Contractors*, 950 F.2d at 1410-11 ("[I]f any irreparable injury were suffered, it would not be so great as to require issuance of a

23

**3.**     Plaintiffs lastly argue (Br. at 24-25) that constitutional infringements, if proven, are "often" considered irreparable.  But no presumption of irreparable harm applies here.  The Ninth Circuit repeatedly has held that "[h]arm must be proved, not presumed."  *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 999-1000 (9th Cir. 2011); *accord Garcia*, 786 F.3d at 740.  Plaintiffs rely on *Goldie's*, but that case proves the point:  there, the Ninth Circuit *rejected* a finding of irreparable harm, in a First Amendment case, because the alleged harm was "not based on any factual allegations" and "appear[ed] to be speculative."  739 F.2d at 472.  True here, too.

With respect to Plaintiffs' First Amendment argument (Br. at 24-25), *Goldie's* held it is only the "purposeful unconstitutional suppression of speech" that "constitutes irreparable harm for preliminary injunction purposes."  *Id.* (citing and discussing *Elrod v. Burns*, 427 U.S. 347 (1976)).  Relying on *Goldie's*, courts have noted "[t]he *only* areas of constitutional jurisprudence" where a presumption of irreparable injury arises "involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether."  *Siegel*, 234 F.3d at 1178 (emphasis added); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) (citing *Goldie's* and holding:  "Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.").  Here, Plaintiffs' First Amendment claim is that the Arizona Law compels the creation of computer code, not that the law chills or suppresses speech.  The presumption of irreparable harm when free speech is suppressed is therefore inapplicable.[12]

---

preliminary injunction."); *Wash. Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1197 (N.D. Cal. 1969) (irreparable injury must be "certain and great").

[12] Plaintiffs cite (Br. at 25) a case from the Virgin Islands to suggest that a Contracts Clause violation always results in irreparable harm, but that is not so.  *See, e.g.*, *Elementary v. Orleans Parish Sch. Bd.*, 2016 WL 5390393, at *4 (E.D. La. Sept. 27, 2016) (no presumption of irreparable harm in Contracts Clause case); *see also Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 62-64 (2d Cir. 2011) (no preliminary injunction based on Takings Clause claim because "Appellants had not made a sufficient showing of irreparable injury").

24

**III.    THE BALANCE OF EQUITIES WEIGHS OVERWHELMINGLY AGAINST AN INJUNCTION, AND INJUNCTIVE RELIEF WOULD NOT SERVE THE PUBLIC INTEREST**

To warrant preliminary injunctive relief, Plaintiffs must clearly demonstrate that the "balance of equities weighs in its favor" and that the injunction serves the public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "When the government is a party," as here, "these last two factors merge." *Id.* Here, an injunction is neither equitable nor in the public interest.

An injunction would prevent enforcement of a law unanimously passed by the Arizona Legislature, and signed by Governor Ducey, based on their considered judgment that the law protects data privacy and benefits consumers. The Legislature's determination of the public interest deserves deference. *See Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) (holding "[t]he public interest may be declared in the form of a statute" and noting "[w]e are not sure on what basis a court could conclude that the public interest is not served" by a local ordinance unanimously passed and signed into law); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 317-18 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy."); *Wash. State Grange*, 552 U.S. at 451 ("[A] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.") (internal quotation marks omitted).

The law serves manifestly important public purposes, including strengthening data-privacy protections and protecting consumers and consumer information. *See supra* pp. 3-4. Arizona's law also brings fairness back to an industry that has suffered greatly from Plaintiffs' abusive market practices. Stejskal Decl. ¶¶ 42-45; Andreu Decl. ¶ 4; Sparrow Decl. ¶ 14. By stopping CDK and Reynolds from imposing astronomically high fees on access to dealer data, the law will promote competition, spur innovation, and lower prices at Arizona's automobile dealerships. *See, e.g.*, *hiQ Labs*, 273 F. Supp. 3d at 1120 (public interest favors the "'vigilant enforcement of the

25

antitrust laws'" and stopping "anticompetitive conduct" (quoting *Am. Express Co. v. Italian Colors Rest.*, 133 U.S. 2304 (2013))).

Plaintiffs offer no sufficient justification to block enforcement of the Arizona Law.   They argue (Br. at 25-26) that the Law, once enforced, will result in data breaches and "jeopardize the security of millions of consumer records," but as detailed above, those breathless claims misread the statute and lack any factual support. Plaintiffs' suggestion (Br. at 25) that dealers can manually download and export their data to each of their third-party business partners is both a "comically insecure" solution, *see Authenticom*, 2017 WL 3017048, at *9, and practically infeasible, *see* Stejskal Decl. ¶ 36.

## IV.    THERE IS NO JUSTIFICATION FOR ENJOINING THE ENTIRE ARIZONA LAW

As described earlier, Plaintiffs cannot come close to establishing a likelihood of success as to any of their preemption or constitutional claims.   The Court should therefore dismiss the Complaint and deny the Motion for Preliminary Injunction without reaching any severability analysis.   But even if this Court were to credit any of Plaintiffs' arguments, the Court should not preliminarily enjoin the entire Arizona Law, because the sub-section that is the overwhelming focus of Plaintiffs' legal arguments — A.R.S. § 28-4653(A)(3)(b) — is severable from the rest of the statute.

It is well-settled that "[a]n entire statute need not be declared unconstitutional if constitutional portions can be separated." *State Comp. Fund v. Symington*, 174 Ariz. 188, 195 (1993).   "Where the valid portions of a statute can be severed from those that are unconstitutional without compromising its operability or frustrating legislative purpose, severance is preferred." *State v. Angulo-Chavez*, 2019 WL 3423323, at *3 (Ariz. App. July 30, 2019).   In Arizona, a statute will be declared invalid in its entirety only if the invalid provisions are "so intimately connected" with the remainder of the statute "as to raise the presumption the legislature would not have enacted one without the other, and the invalid portion was not the inducement of the act." *Kobar ex rel*

26

1    *Kobar v. Novartis Corp.*, 378 F. Supp. 2d 1166, 1176 (D. Ariz. 2005) (quoting

2    *Selective Life Ins. Co. v. Equitable Life Assur. Soc'y*, 101 Ariz. 594, 599 (1967)).

3         All of Plaintiffs' preemption arguments (*see* Br. at 9, 10, 12, 14) are predicated

4    on the narrow provision of the Arizona Law that prohibits vendors from unreasonably

5    restricting the ability of dealer-authorized (and STAR-compliant) third parties from

6    integrating with the DMS.  A.R.S. § 28-4653(A)(3)(b).  Although AADA strongly

7    believes that sub-section is entirely lawful, to the extent it is found that Plaintiffs have

8    any likelihood of success in attacking that provision, it is severable from the rest of the

9    statute.  Even without A.R.S. § 28-4653(A)(3)(b), the law would still succeed in

10   achieving many of the Arizona Legislature's important data-protection and consumer-

11   protection goals, including *inter alia* ensuring dealers control access to their own data,

12   *id.* § 28-4652; implementing the STAR Standards for data security; preventing third

13   parties from profiting off dealer data or holding dealer data hostage subject to a "cyber

14   ransom," *id.* §§ 28-4653(A)(2), 28-4653(A)(3)(a); and requiring the creation of APIs

15   that will allow dealers to securely and efficiently transfer data to and from their third-

16   party business partners, *id.* § 28-4654.  Sparrow Decl. ¶ 18; *Benjamin v. Ariz. Dep't of*

17   *Rev.*, 163 Ariz. 182, 183 (App. 1989) (assessing severability in light of the "the context

18   of the [statute's] provisions[,] . . . the historical background[,] . . . and the spirit and

19   purpose of the law"); *Vivid Entm't, LLC v. Fielding*, 965 F. Supp. 2d 1113, 1138 (C.D.

20   Cal. 2013), *aff'd*, 774 F.3d 566 (9th Cir. 2014) (finding severance appropriate under

21   California's analogous standard because "it seems eminently reasonable to suppose

22   that those who favored the proposition would be happy to achieve at least some

23   substantial portion of their purpose").

24                                   **CONCLUSION**

25         For the foregoing reasons, the Court should deny Plaintiffs' Motion for a

26   Preliminary Injunction.

27

28

RESPECFULLY SUBMITTED this 30th day of September, 2019.

By    */s/ Derek T. Ho*
Michael N. Nemelka*
Derek T. Ho*
Brendan J. Crimmins*
Joshua Hafenbrack*
Collin R. White*
Bethan Jones*
**KELLOGG, HANSEN, TODD,**
**  FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

John C. Norling
Jeffrey D. Gardner
Jimmie W. Pursell, Jr.
**JENNINGS, STROUSS &**
**SALMON, P.L.C.**
One East Washington Street, Suite 1900
Phoenix, Arizona  85004-2554

*Attorneys for Intervenor Defendant*
*Arizona Automobile Dealers Association*

**Pro Hac Vice*

28