# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>Mark Brnovich, Attorney General of the State of Arizona, et al.,<br><br>Defendants. | No. 2:19-cv-04849-GMS<br><br>**DECLARATION OF ALLAN STEJSKAL** |

I, Allan Stejskal, have personal knowledge of the information contained herein and declare (pursuant to 28 U.S.C. § 1746) as follows:

**A.   Background, Qualifications, and Assignment:**

1. I have worked in the automotive retail industry for over two decades, in a wide variety of roles, both on the retail and technology sides of the industry.

2. From 1995 to 2000, I worked for CDK Global, LLC ("CDK") – which was then called ADP Dealer Services[1] – as a Vice President in the e-commerce division and as a General Manager for CDK's Wholesale Distribution division. During that time, I ran CDK's newly developing e-commerce business, which included CDK's business for managing and distributing dealer data that resides on the CDK DMS database.

3. From 2000 to 2003, I was a Senior Vice President at AutoNation, which was and is the largest retailer of new and used cars in the United States. I joined AutoNation in 2000 to run the e-commerce department; I was responsible for AutoNation's online sales of vehicles. In 2001, I served as Chief Information Officer ("CIO") and Senior Vice President of Operations with responsibility for store operations, training, e-commerce, and new store acquisition integration.

---

[1] ADP Dealer Services spun off and became the publicly traded company CDK Global, LLC in 2014. For simplicity, I will refer to ADP Dealer Services as CDK throughout my declaration.

1

4.     I founded and served as President of Open Secure Access ("OSA") from 2006 to 2007.  OSA was an industry coalition formed in 2006 in response to increasing concern by dealers, vendors, and DMS companies about vendors' ability to continue to access the dealer data necessary to provide their products and services.  CDK was one of the first members, and the organization eventually expanded to over 50 dealers and dealer groups, vendors, and other industry stakeholders.  While I was President of OSA, the group established principles of secure and open access to dealer data and developed data security guidelines for third-party access to dealer data.

5.     From 2007 to 2014, I was an executive at the DMS provider and vendor Dealertrack in various executive roles.  In particular, I was the General Manager for Dealertrack's DMS business from 2010 to 2012, where I had responsibility for the day-to-day operations of Dealertrack's DMS business including sales, implementation, product development, support, and administration.  While I was GM of Dealertrack's DMS business, I created the OpenTrack program, which provided secure and open access for third parties to access dealer data stored on the Dealertrack DMS.

6.     From 2014 to 2016, I returned to AutoNation as CIO.  I was brought back to AutoNation to help digitize its operations, moving more and more of the process of buying and servicing vehicles to the Internet (and away from over-reliance on pen-and-paper forms).  As CIO from 2014 to 2016, I had responsibility for AutoNation's relationship with its DMS provider, which was exclusively CDK by that time.

7.     From 2017 to 2018, I was CEO of incadea, an international DMS provider serving more than 4,000 dealers in over 100 countries outside the United States and Canada.  incadea is the primary competitor to CDK in the international market (i.e., outside the United States) for DMS services, including in Europe, Asia, and South America.  Currently, I am a senior partner at motormindz, a consulting organization focused on the use of digital retailing and the application of artificial intelligence in the automotive space; the Principal of a consulting firm called Fontana Advisors,

2

which provides consulting services to dealerships, software vendors, and other stakeholders in automotive retail technology; and a member of the Board of Directors of FusionZone Automotive, a dealer website vendor.

8. I have an undergraduate degree in engineering from the University of Michigan and an MBA from Harvard. I am currently serving as the Industry Expert for the plaintiffs in the antitrust Multi-District Litigation against CDK and The Reynolds and Reynolds Company ("Reynolds"), pending in the Northern District of Illinois.

9. I have been asked by the Defendants in the above-captioned matter to provide industry background on several relevant facets of the automotive industry, including the DMS market, third-party vendor applications, the issues surrounding access to and use of dealer data, and Arizona's Dealer Data Security Law.

10. Fontana Advisors currently bills my time on this matter at my standard rate of $400 an hour. My compensation does not depend on the outcome of this case.

11. I continue to review data and evidence and reserve the right to supplement this report if new information becomes available that affects my opinion.

### B. Automobile Dealerships:

12. There are three primary parts of a franchised automobile dealership: the sale of new vehicles, the sale of used vehicles, and the servicing of vehicles (which also includes parts sales). There is substantial competition in each part of the business.

13. Dealerships are usually counted as "rooftops" or physical locations. In 2018, there were approximately 16,800 franchised auto dealership rooftops in the United States, including 248 in Arizona.[2] Historically, automotive dealerships often have been family-owned businesses that have been passed down through multiple generations. But, in recent years, there has been an increasing trend toward consolidation. Dealers operate on very thin overall profit margins; average pre-tax net

---

[2] *See* National Automobile Dealers Association, *NADA Data 2018: Annual Financial Profile of America's Franchised New-Car Dealership* (2018), at 5, https://www.nada.org/WorkArea/DownloadAsset.aspx?id=21474857318.

3

profit margins for a car dealership is 2.2%.[3] At an automobile dealership, every dollar counts.

### C. Dealer Management System:

14. Dealerships purchase and rely on a Dealer Management System or "DMS," which is enterprise software that is essential to dealership operations. Some of the key functions performed by the DMS include accounting, vehicle sales, Finance & Insurance ("F&I"), parts management, and service management. In addition, the DMS has reporting capabilities that allow dealers to select and export data sets within the DMS for various internal and external purposes.

15. At the heart of the DMS is a database that stores dealer data, which supports all of the various functions performed at a dealership. The key categories of dealer data residing in the DMS (with an indicative list of data elements) are:

  a. Customer – name, contact information, transaction history, financial information;

  b. Vehicle – VIN, prices, cost, transaction history, specifications;

  c. Accounting – journals, transaction history, account balances, financial statements;

  d. Parts – item numbers, manufacturer, cost, prices, quantity on hand, transaction history, age; and

  e. Service – prices, labor and parts elements.

16. The data in the DMS is essential to the operation of the dealership and represents a significant asset of the dealership. In most dealerships there is substantial historical data, facilitating long-term relationships with customers. (For example, the data stored on the DMS will show the dealership's sales and service transaction with its customers over the years.) Given the high rate of employee turnover at dealerships, this historical data is particularly important because dealerships cannot reasonably expect individual employees to know the business they have done with their customers over the years.

---

[3] *Id.* at 2.

4

17.     The DMS market has been dominated by a small number of DMS suppliers since the 1980s.  Up until the mid-2000s, UCS, CDK (then ADP Dealer Services), and Reynolds were the dominant suppliers and virtually the only DMS providers that could provide integration to almost all of the Original Equipment Manufacturers ("OEMs") and that had the capabilities to handle the needs of larger dealers.  In 2006, UCS acquired Reynolds and merged the two companies, which operate today as Reynolds. At that point there were only two primary DMS competitors, CDK and Reynolds. Today, it is widely known that CDK and Reynolds have a combined market share in excess of 70% if measured by rooftop and upwards of 90% if measured by total DMS revenue.

18.     There are a number of smaller DMS providers in the marketplace, including Dealertrack, Auto/Mate, Dominion, AutoSoft, and DealerBuilt.  These DMS companies typically serve small- and mid-sized dealerships (i.e., dealerships with a single rooftop or small dealership groups with less than five rooftops).  Despite the existence of these smaller competitors, CDK and Reynolds have maintained their joint control over the market for many years.

19.     Dealers pay DMS companies like CDK and Reynolds large monthly licensing fees – thousands of dollars per month for a single store – for the use of the DMS software.  The payment of the licensing fees by dealers includes not just the enterprise software, but also the database component of the DMS.  The DMS licensing fees is one of the largest monthly expenses that a dealer has.

20.     CDK's and Reynolds's market share is protected by high barriers to entry – which has foiled even the likes of Microsoft from entering the DMS market[4] – and the substantial difficulty that dealers face in switching between DMS providers.

---

[4] *See* David Barkholz, *Dealers Get New Management System Option*, Automotive News (Dec. 2, 2012), http://www.autonews.com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option (Microsoft executive stating, "We kind of got ahead of ourselves" in trying to enter the DMS market).

5

21. For dealerships, the cost of switching DMS providers is often prohibitive. First, both CDK and Reynolds lock dealerships into five-year contracts, and those contracts are difficult if not impossible to break. Second, there are substantial "hard" costs associated with switching DMS providers, including fees for setup, training, and data conversion from the old system, in addition to costs such as replacing physical technological equipment, printers, fax machines, and the like. These "hard" costs can equal up to a year of DMS licensing fees – fees that a dealership can avoid by staying with their existing DMS provider. Third, and most significantly, dealerships face enormous "soft" costs in converting to the new system and re-training their staffs on how to use an entirely new system. Fourth, it is incredibly expensive to switch DMS providers and often takes many months and sometimes over a year of planning and preparation.

22. Because the DMS is so integrally tied to virtually every process within the dealership, switching DMSs is hugely disruptive to a dealership's operations. I refer to the process as having to cross the "trough of despair." Others have likened the experience to a "heart transplant," suddenly having to speak in a foreign language, or learning to write with the opposite hand.[5] When a dealership attempts to switch DMS providers, every department within the dealership – from sales to accounting to parts and service – are now trying to do their jobs in a completely new way.

23. Demonstrating the difficulty in switching DMS providers, the average tenure of CDK's and Reynolds' dealer customers is twenty (20) years, so most dealership employees have only ever used one DMS brand and it is like second nature to them. The process of learning a new system – with different configurations, commands, and processes – can cause high levels of employee frustration and turnover and lead to

---

[5] Vince Bond Jr., *Survivors of DMS shifts tell their tales*, Automotive News, May 8, 2017, www.autonews.com/article/20170508/RETAIL07/305089978/survivors-of-dms-shifts-tell-their-tales.

customer dissatisfaction over deteriorated service. The negative effects of the lost productivity and sales can last for months or even years.

### D. Vendor Software Applications:

24. The core DMS application (as described above) does not fully satisfy the technology needs of a dealership. Beyond the core DMS functions, some of the other key applications required and used by dealerships include (1) Customer Relationship Management (or "CRM") software to help dealerships manage and track their customer interactions; (2) Service Lane applications to help facilitate and process transactions in the "service lane" when customers come to get their car serviced or repaired; (3) Marketing applications to help generate marketing leads and manage the dealership's website; and (4) Finance and Insurance applications to help car buyers electronically obtain financing and insurance at the point of sale. A few well-known applications include Dealer.com, DealerSocket, and AutoTrader. There are many other examples.

25. Dealerships often use 10-20 such software solutions to help them run their businesses in addition to the DMS. These additional applications are frequently used during the key touch points with customers during the online shopping, vehicle sale, financing, and on-going vehicle service experience instead of or in addition to the use of the DMS. As such, these tools and applications are essential to the effective and profitable operation of their dealerships today.

26. Each of these applications is reliant on a core set of dealer data that powers the application.[6] In other words, in order to function, software applications need efficient and reliable access to dealer data.

---

[6] Some of this data is created by the users in the application and some of the data is stored and maintained on the DMS. CRM applications, for example, rely on data that dealership sales staff enter into the CRM application itself as well as data that comes from a DMS integration.

### E. <u>Dealer Data:</u>

27. Dealerships own the data that they generate and is used in their dealerships. This data, for the most part, is stored on a database within a dealer's DMS. As listed above, the key categories of data that the dealerships own surround prospects, customers, inventory, and transactions across the entire customer-vehicle lifecycle from shopping to purchase to service to disposal and repurchase, in addition to the dealership's transactional and accounting data. This is data that is either created and maintained by the dealership or represents the products that they sell and includes dealership information such as marketing descriptions, photos, and prices.

28. CDK and Reynolds have long recognized that dealerships not only own the data that they store on their DMSs, but should also control access to that data. To cite just a few examples, CDK's vice president over data strategy has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."[7] CDK's senior vice president of marketing has stated: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path."[8] Steve Anenen, CDK's longtime former CEO, publicly stated: "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant

---

[7] ADP Dealer Services, Inc. Press Release, *[CDK] Announces New Approved Vendors for [CDK]'s Third Party Access Program* (July 12, 2013), http://www.reactornet.com/company/news/12/reactornet_adp_integration.

[8] Ralph Kisiel, *Dealer Security Stirs Insecurity: Vendors Wary of Reynolds Plan for Computer Systems*, Automotive News (Dec. 4, 2006), http://www.autonews.com/article/20061204000100/SUB/61201031/dealer-security-stirs-insecurity.

8

permission, how would you ever go against that wish?"[9]  As one CDK press release put it:  CDK "believe[d] in a fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access."[10]

29.  As for Reynolds, the company's chief spokesperson has publicly stated: "The data belongs to the dealers.  We all agree on that."[11]  On its website, Reynolds has represented to dealers: "Your Data, Your Way.  You own your data.  Reynolds recognizes you need to share that data outside your dealership."[12]  And Reynolds's CEO is featured on marketing sheets to dealers stating:  "You own your data and choose who you allow to access it."[13]

30.  Historically, "data integration" providers have helped dealers and dealers' chosen vendors obtain secure and efficient access to dealer data.  A data integration provider – acting on the dealer's behalf – extracts dealer data that is stored on the DMS and provides it to the dealer's chosen software vendors, typically in a standardized and useable format.

31.  There used to be a robust and competitive market for these "data integration" services, with numerous third-party providers offering innovative data services at competitive rates.  Competitors included Authenticom, Inc. and Superior Integrated Solutions (or "SIS").  CDK itself acquired two different third-party providers – Digital

---

[9] Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007), http://www.autonews.com/article/20070219/SUB/70215040/adp-provides-dealers-3-options-on-data-access.

[10] *See* CDK Press Release: *ADP Announces Its Third-Party Access Program*, *Authenticom v. CDK Global, LLC*, No. 17-cv-318 (filed June 23, 2017), Dkt. 151-3.

[11] David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011), http://www.autonews.com/article/20111121000100/RETAIL07/311219997/dealers-decry-reynolds-crackdown.

[12] Reynolds and Reynolds, *Drive for ERA Customers*, http://www.reyrey.com/company/drive/PDFs/ERA_Vol1_2010_US.pdf.

[13] Reynolds & Reynolds, *Brockman On The Record: You're the Boss.* (2007).

Motorworks in 2002 and IntegraLink in 2010 – in order to compete in this formerly growing market across all DMS providers.

32. In competition with these third-party providers, the DMS companies themselves also offer in-house data integration services with respect to dealer data, such as with Reynolds' RCI ("Reynolds Certified Interface") program and CDK's 3PA ("Third Party Access") program. Almost all DMS suppliers now have sets of tools (or certified programs) that facilitate data integration to and from the DMS. I started one such program – the OpenTrack program – when I was the GM for the Dealertrack DMS business.

33. Over the years, there have been a number of ways to connect and integrate into the DMS in order to access dealer data:

   a. Application Programming Interfaces ("APIs"): DMS vendors over the last 10 years (including CDK and Reynolds) have built tools that allow an external party to securely and programmatically request, create, update, or delete information from the DMS. Each API is usually very granular and performs a specific function such as "add a customer."

   b. User emulation: In this method, the dealer provides a User ID and password with the appropriate security privileges to a third-party data integrator or application provider. The data integrator can then execute functions that might run a report or create or update particular data in the DMS. The screen images or reports are captured and parsed in order to collect the data required or to confirm that the requested transaction completed successfully.

   c. Automated data extraction: Some of the DMSs have tools that allow the dealer to schedule data extractions in pre-defined formats to execute on a pre-defined schedule and have the output of the extractions electronically delivered to a pre-defined recipient.

34. In my experience, dealers and their vendors will use APIs to transfer dealer data, if given that option. APIs offer a secure and standard automated method of transferring a dealer's data to any third parties who need that data.

35. The companies providing data integration services develop important economies of scale that greatly benefit dealerships. For a data integrator that works with the same dealer on multiple integrations, they are able to leverage their knowledge

10

of the DMS type and setup to ease the integration, normalization, and cleansing process.

36. Automated data providers save dealerships from having to spend time and money performing laborious manual data extraction, which is outside dealership's expertise and core competency. Dealerships typically do not have the know-how, surplus staffing, or the financial resources to manually recreate automated data services. Also, for vendors that need "real time" access to dealer data, or to "write back" data to the DMS, the manual method does not work. As one longtime dealership executive Wayne Fitkin testified in federal court: "Here is the thing about manual: Manual doesn't work. Take the case of the [O]pen [R]ecall[s] vendor that was here yesterday. It's 50 stores. He's got to find 50 people, one in each store, to manually run a report, grab the data, and then transmit it . . . . These people can't have a day off. They can't make a mistake, can't have a vacation. It doesn't work unless you can automate the process. You have to be able to automate the process."[14]

### F. Open Secure Access:

37. Historically, neither CDK nor Reynolds prevented dealers from accessing their own data, including by working with the dealers' chosen data integration provider or providers.

38. In 2005-2006, Reynolds announced its intention to block dealers from using the primary method of data access at that time (which was through a modem). This raised a high level of concern with the companies whose products and services were dependent upon dealer data. The fears were that individual companies would be restricted from getting the data because they had competitive offerings with Reynolds or that Reynolds would charge excessive fees for access to dealer data, making it

---

[14] Exhibit A (Prelim. Inj. Hr'g Tr. 9:22-10:20 (June 27, 2017 a.m.) (Fitkin Testimony).

11

unprofitable for the companies needing integration to continue to offer their products or services.

39. A group of companies in this situation came together in 2006 and requested my help to form a coalition to promote the principles of open and secure access to the dealer data. By mid-2006, I formed Open Secure Access ("OSA") to do just that. Over the course of the next year and a half, as President of OSA, we created a set of operating principles, met with many of the industry players to discuss the issue and promote the principles, built a draft set of data security guidelines for the companies accessing dealer data to follow, and grew the membership to over 50 members strong, which included dealership, software, and service organizations.

40. The principles of OSA were:

    a. Dealers should control who accesses their data and how it is used.

    b. Industry participants should work together to ensure dealer data is secure.

    c. Third parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company.

    d. DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database.

    e. Industry participants, including DMS companies, that provide essential services required to facilitate access to, and interactions with, dealer-permissioned data should be reasonably compensated.

41. CDK was a member of OSA and joined OSA's open letter to the industry, which was published in *Automotive News* in early 2007. In 2007, CDK CEO Steve Anenen gave an interview to *Dealer Magazine* in which he said: "[CDK] joined OSA for a couple of reasons. First and foremost, the principles that it has endorsed are exactly the same principles that we hold near and dear to our own business philosophy: that a

12

dealership fundamentally owns the data in its DMS, and dealers should control who accesses their data and how it's used."[15]

### G. CDK and Reynolds Seized Control Over Dealer Data:

42. In the digital age, it is no surprise that dealer data has become more and more valuable, as "[t]he world's most valuable resource is no longer oil, but data."[16] CDK and Reynolds – but not other DMS companies – have taken a series of actions in recent years to seize control and monetize dealer data. I believe these actions have greatly harmed dealerships and consumers.

43. **Reynolds**: As noted, Reynolds announced blocking efforts as early as 2006. However, because the demand for access to dealer data was so high, Reynolds was forced to grant many exemptions (often called "whitelisting") to these blocking practices. The practice of "whitelisting" is where Reynolds permits a dealer to use independent integrators to access the dealer's data through the User Emulation method described above. It is well known in the industry that Reynolds's practice of "whitelisting" has been extensive and deployed widely, including for its largest dealer customers (like Penske Automotive Group). As one federal court found, there is "ample evidence that Reynolds allowed (and even continues to allow to this day) third parties to use dealer credentials when it suited Reynolds." *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *9 (July 14, 2017 W.D. Wis. 2017). "[T]he bottom line is that Reynolds allows many exceptions," the court concluded. *Id*.

44. Nevertheless, over time, Reynolds has largely taken away a dealer's control of access to the dealer's data. The result is that – today – any dealer-authorized vendor that needs access to dealer data functionally basically has one choice: the Reynolds

---

[15] Exhibit B (Digital Dealer Interview, *Steve Anenen and Kevin Henahan: ADP Dealer Services*, Digital Dealer (Apr. 17, 2007)), https://www.slideshare.net/ralphpaglia/best-digital-dealer-magazine-issue-ever-printed.

[16] *The world's most valuable resource is no longer oil, but data*, The Economist, May 6, 2017, www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

RCI program (which uses APIs).  Reynolds now charges astronomical fees for access to dealer data.  Whereas independent data integration providers (and other DMS companies) have consistently charged roughly $50 to $75 per month per dealership, Reynolds charges much higher rates for the same services.   *Id.* at *4; *see also Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017).

45. **CDK**:  Up until 2015 – as demonstrated by the public statements made by CDK's leaders quoted above – CDK permitted and publicly endorsed dealer-controlled and dealer-authorized access to dealer data.  I understand that CDK changed its position in 2015 and 2016 and joined Reynolds in using technological methods to block dealer-authorized and dealer-controlled access to dealer data.  Like Reynolds, CDK has also dramatically increased the prices it charges for access to dealer data.

46. Other DMS providers also offer in-house, "certified" data integration services, just like the Reynolds RCI and CDK 3PA programs.  However, none of those DMS providers has blocked the ability of dealers to control and authorize access to their own data and to work with third-party data service providers if they choose.  For example, the Dealertrack DMS (which is the country's third largest DMS provider) gives dealers the choice of using the APIs through its Opentrack program or using an independent data integrator to access their data.  Moreover, the other DMS companies charge a fraction of what CDK and Reynolds do for access to dealer data, usually in the range of $50 per month per dealership for real-time data access.

### H. Data Security and the Arizona Law:

47. Data security is a topic that is well known in the automotive retail community.  Over the last 20 years, with the rise of the Internet, the growth of legislation around the protection of consumer financial and personally identifiable information ("PII"), and the general increasing level of awareness of computer security, dealers have had to take responsibility for and improve the overall quality of the security of their dealerships.  Larger dealer groups, including AutoNation, have dedicated staff that

14

focus on security. At smaller dealerships, the security tasks are often assigned to an individual, typically with responsibility for overseeing the technology in the dealership, or are outsourced to a knowledgeable IT vendor.

48. Data security is a frequent topic at industry conferences, and there are many experts and consulting organizations available to support the dealers' security needs.

49. Many of the systems that dealers use contain data that needs to be appropriately secured, and dealers are very cognizant of these requirements. Most of the systems contain PII, and many contain parts of the consumer financial information necessary to finance the purchase of a vehicle. In addition to the systems themselves, there is also a substantial amount of printed material in a dealership that contains similar material and must also be secured. In my experience, dealerships take the protection of this information in written and electronic form extremely seriously and make it a point to train their staffs accordingly.

50. I understand that in 2019, the Arizona Legislature passed, and Governor Ducey signed into law, the Dealer Data Security Law – Arizona Revised Statute Sections 28-4651 to 28-4655.

51. The Dealer Data Security Law contains many important provisions and safeguards that I believe protects the security and privacy of dealer data while also ensuring that dealers have control over and access to their own data. This will benefit Arizona dealerships and Arizona consumers by not only protecting their data but also by fostering competition and preventing CDK and Reynolds from engaging in the harmful conduct described above.

52. The Dealer Data Security Law codifies the Standards for Technology in Automotive Retail (STAR), which is a widely recognized industry organization that creates standards to efficiently meet the information technology needs of the automotive retail ecosystem. The STAR organization represents a wide spectrum of industry participants including dealers, manufacturers, and retail system providers

15

(including CDK). The 2019 STAR Standards have been published at https://www.starstandard.org/images/SIGINFRASTRUCTURE/2019STARDealerInfrastructureGuidelines(DIG).pdf.

53. As noted above, dealers have a legal and commercial obligation to protect the data and systems under their control both from a physical and technology perspective. The STAR Dealer Infrastructure Guidelines provide a comprehensive set of policies and approaches for meeting those obligations. The guidelines specifically address identity and access management, security awareness training, network security and application security, as well as a number of other security topics. The dealer data that resides in the DMS is just one set of data that needs to be protected in an overall scheme of data security that a dealer must implement to be legally compliant and meet commercial standards. Dealers who implement the STAR standards for data security will have taken adequate precautions to protect the data that they are stewards of.

54. Section 28-4652 ensures that dealers remain in control of the flow of data to manufacturers or third parties by specifying that manufacturers or third parties may not require the dealer to provide them with direct or indirect access to the dealer's systems. The dealer is allowed to determine the best approach for providing any required data to the manufacturer or third party in a secure method of the dealer's choice. This allows dealers to control their costs (by not being required to use high cost integrations provided by CDK or Reynolds), maintain security (by following STAR standards) and still meet the business requirements of the agreements with manufacturers or third parties.

55. Section 28-4653(A)(1) provides that the dealer must give express written consent for a third party to use or share dealer data. This section clearly places the responsibility and control of the dealer's data on the dealer, where it belongs, and ensures that the dealer has visibility into and control over the use of the data.

56. Section 28-4653(A)(2) provides that no third party can engage in any act of "cyber ransom," which is defined in Section 28-4651(2) as any mechanism to "encrypt, restrict or prohibit or threaten or attempt to encrypt, restrict or prohibit a dealer's or a dealer's authorized integrator's access to protected dealer data for monetary gain." This provision is an important and necessary consumer protection, because CDK and Reynolds have charged enormous fees for access to dealer data (through their certification integration programs) that vastly exceed their costs in providing those services.[17] And as noted above, dealers already pay CDK and Reynolds very large monthly fees for the software and database components of their DMSs.

57. Section 28-4653(A)(3) prohibits dealer vendors from profiting off dealer data and from and placing "an unreasonable restriction" on the ability of a dealer-authorized third party to integrate with the DMS. These provisions would prevent exactly the kind of behavior exhibited by CDK with AutoNation. Reynolds has followed a similar pattern of behavior, preventing dealers from choosing integration partners and then charging extortionist fees to the third party for access to dealer data.

58. Section 28-4654 imposes requirements on "dealer data vendors," including requiring such vendors to "[p]rovide access to open application programming interfaces to authorized integrators." Section 28-4654 makes the dealer data vendors (including DMS companies) responsible for making the data accessible through a cost effective and efficient mechanism and to ensure that dealers have the flexibility to change software providers as desired. This section will have the effect of promoting

---

[17] When I was the CIO of AutoNation between 2014 and 2016, AutoNation used software systems from a number of third parties that needed access to the data stored in our CDK DMS. CDK dramatically raised the costs of the integrations to these third parties, which the third parties then passed on to AutoNation. The third parties had no alternative to using the CDK integration and paying the charges. Had they been unwilling to pay the charges they would have no longer had access to the AutoNation data as AutoNation required, as CDK had taken steps to block other forms of access to the DMS data. I asked CDK for the details pertaining to these costs. CDK was unwilling to provide the details. But, recognizing that these fees could not be justified they offered AutoNation a rebate amounting to approximately 50% of the amount of the integration fees.

competition, thus lowering dealer costs and promoting innovation and quality of service.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this 30th day of September 2019 at Walworth, Wisconsin.

_____
Allan Stejskal