# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CDK Global, LLC, a limited liability company, and The Reynolds and Reynolds Company, a corporation, | No. 2:19-cv-04849-GMS |
| Plaintiffs, | **DECLARATION OF PETER SWIRE** |
| vs. | |
| Mark Brnovich, Attorney General of the State of Arizona, et al., | |
| Defendants. | |

I, Peter Swire, have personal knowledge of the information contained herein and declare (pursuant to 28 U.S.C. § 1746) as follows:

## I.    Background

1.    I have been asked to provide my expert opinion on whether the Dealer Data Security Law, codified at Arizona Revised Statute ("A.R.S.") Sections 28-4651 to 28-4655, affects the security and privacy of dealer data.  I note that the Arizona Law was passed unanimously by both the state House and state Senate before being signed by Governor Ducey.  The area of data privacy and security is an area of increasing importance to state governments throughout the country, and the Arizona Law is an example of the increasing role States are playing in protecting and securing consumer and business information.

2.    My qualifications as a security and privacy expert are documented in a curriculum vitae, attached to this Declaration as Appendix A.  In brief, I am the Elizabeth and Tommy Holder Chair of Law and Ethics at the Georgia Tech Scheller College of Business, with appointments in the College of Computing and the School of Public Policy.  I teach graduate and undergraduate courses in "Information Security Strategies and Policy" and "Privacy Technology, Policy, and Law."  From 1999 to 2001, I served as Chief Counsel for Privacy in the U.S. Office of Management and

Budget.  I was the first person to have U.S. government-wide policy responsibility for privacy, and was the White House coordinator for the proposed and final HIPAA Medical Privacy Rule.  In 2013, in the wake of the Snowden revelations, I was named one of five members of President Obama's Review Group on Intelligence and Communications Technology.   In 2015, the International Association of Privacy Professionals, which has over 50,000 members, awarded me its Privacy Leadership Award.  In 2019, the Future of Privacy Forum honored me for Outstanding Academic Scholarship.  I am Senior Counsel with Alston & Bird LLP.

3.       My compensation in this matter is $1,050 per hour. It is not dependent in any way upon the outcome of this litigation or upon reaching any particular opinion or conclusion.

4.       My expert opinion, based on the facts available to me and my expertise in security and privacy, is that the Dealer Data Security Law is consistent with good security and privacy principles.  It closely tracks the standard data protection provisions in security and privacy regimes, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, which governs security and privacy for medical information.

5.       In forming my opinions, I have not relied on materials that are subject to the protective order in the multi-district litigation against CDK and Reynolds for allegedly entering into an anticompetitive agreement regarding data access to their DMSs, even though such materials may buttress my opinion in this litigation.  I reserve the right to rely on those materials in any report I may submit in that multi-district litigation.

6.       Part II provides an overview of the software and data affected by the Dealer Data Security Law.  Part III discusses the Dealer Data Security Law.  In Part IV, I discuss how the Dealer Data Security Law is consistent with good security and privacy principles.  I explain that the data being regulated is controlled by the dealer

(not the Dealer Management System ("DMS") provider), and thus, the dealer has responsibility to safeguard that data.  The Dealer Data Security Law empowers dealers to exercise that responsibility.  The Dealer Data Security Law is also consistent with the widely-accepted Fair Information Principles ("FIPs") regarding data security and privacy.  Part V explains that CDK's and Reynolds's own practices confirm that the Dealer Data Security Law is consistent with good security and privacy principles.

## II.   Dealers' Use Of Third-Party Software Providers

7.   I have gained familiarity with the dealers' use of software providers through prior work in this area.  I previously submitted two expert declarations in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis. 2017), which was an antitrust suit against the two Plaintiffs in this litigation concerning their DMS data access policies.  I also testified at the preliminary injunction hearing in that case and listened to approximately two days of testimony from various industry participants (dealers, DMS providers, and other software providers) at that hearing.

8.   I have also reviewed the declaration of Allan Stejskal, which is being submitted concurrently in this case, to further familiarize myself with the software used by dealers, including DMS providers.

9.   Dealers use a variety of third-party software providers to assist them in their business operations.  One type of software used by dealers is the DMS.  The two largest DMS providers are CDK and Reynolds – the Plaintiffs in this litigation.  The DMS is software that is essential to dealership operations.  The DMS provides functionality that assists dealers with their business operations, including accounting, selling vehicles, providing financing and insurance ("F&I"), and managing their service and parts operations.

10.   The DMS includes a database that stores data that dealers generate in the course of their business operations.  That data includes:

- Customer information (*e.g.*, name, address, phone number, email address, and date of birth);
- Customer experience (*e.g.*, when a dealership contacted a customer, when the customer visited the dealership, and what cars the dealership showed him/her);
- Inventory (*e.g.*, cars and parts);
- Service information (*e.g.*, time of service appointments, cost of service to the Dealer, and profit earned on service); and
- Sales transactional information (*e.g.*, vehicle purchased, financing, insurance, and trade-in information).

11.     Dealers also use a variety of other third-party software applications, with as many as 10 to 20 different applications per dealership store being common.  Some typical categories of third-party software applications are:

- **Customer Relationship Management ("CRM")** applications track the dealership's relationships with its actual and prospective customers.
- **Service Lane** applications facilitate the scheduling and service workflow process (including checking-in customers during the appointment).
- **F&I** applications facilitate the sales process in the financing and insurance department of a dealership.
- **Inventory Management** applications provide recommendations about stocking and selling different types of cars.
- **Data Mining** applications give dealers the ability to segment and target customers for marketing campaigns.
- **Marketing** applications provide ways for dealers to market sale and service opportunities to their customers.
- **E-commerce** applications allow dealers to market their inventory online.

12.    These applications frequently need to integrate (*i.e.*, exchange data) with the DMS.  For example, applications may exchange information with the DMS about a dealership's customers, inventory, or service schedule.

13.    The use of third-party software providers that occurs in the automobile retail industry is pervasive and well-accepted in many other industries, including industries with the most sensitive consumer information like healthcare and banking.

14.    I became particularly familiar with the role of such third-party providers when I was the White House coordinator for the HIPAA Privacy Rule.  The proposed rule was issued in 1999; more than 50,000 public comments were submitted; and the final rule was issued in 2000.  I highlight two features of the HIPAA Privacy Rule to show the importance of such third-party providers.  First, the HIPAA Privacy Rule defines covered entities to include health plans, health providers, and health care clearinghouses.[1]  Health care clearinghouses are the relevant category here.  Their main function is to act as intermediaries for health care billing records.  A health care provider, such as a physician practice group, sends its records to the clearinghouse, which cleanses the data, puts the data into standard formats, and then transmits the cleansed data to the entity that will pay the bill.  In short, for sensitive health care billing information – which might, for example, state the procedures or tests a patient has undergone or the medications that a patient takes – the HIPAA Privacy Rule explicitly accepts the lawfulness and need for third-party providers (clearinghouses) to have access to that information.

15.    Second, the HIPAA Privacy Rule authorizes the use of "business associates."[2]  The Privacy Rule recognizes that many data processing and other functions are not provided by the health care provider, whose core competence is

---

[1] *See* 45 C.F.R. § 160.103.

[2] *See* 45 C.F.R. § 164.502(e)(1)(i).

health care delivery.  Instead, health care providers often rely on third parties, called "business associates," to provide data processing and other services.  These intermediaries have access to and process confidential health care information.  By authorizing the use of such business associates, the HIPAA Privacy Rule explicitly accepts the lawfulness and need for health care providers to rely on outside parties for various services.

16.     In my opinion, these HIPAA examples demonstrate that dealers using third-party software providers are following standard business practice, consistent with good privacy and data security.  Notably, the type of information that is available to third-party software providers in the automobile market – like customer names and contact information – is typically much less sensitive than health or financial information.

## III.    The Dealer Data Security Law

17.     The Dealer Data Security Law is essentially a data protection law.  It imposes certain restrictions and requirements on "Dealer Data Vendors" (*e.g.*, DMS providers)[3] and "Third Parties" (*e.g.*, DMS providers and other third-party software providers)[4] with respect to their usage of "Protected Dealer Data."

18.     "Protected Dealer Data" is defined to be "personal, financial or other data relating to a consumer that a consumer provides to a dealer or that a dealer otherwise obtains and that is stored in the Dealer's Dealer Data System," "motor vehicle diagnostic data that is stored in a dealer data system," and "other data that

---

[3] "Dealer Data Vendor" is defined to include DMS and CRM providers.  *See* A.R.S. § 28-4651(4).

[4] "Third Party" is defined as any service provider, including a DMS provider. *See* A.R.S. § 28-4651(10).  Third Parties also includes "Authorized Integrators," which are third parties "with whom a dealer enters into a contractual relationship to perform a specific function for a dealer that allows the third party to access Protected Dealer Data or to write data to a dealer data system."  *See id.* § 28-4561(1).

relates to a dealer's business operations in the Dealer's Dealer Data System."  A.R.S.
§ 28-4651(7).

19.     Among other things, the Dealer Data Security Law prohibits Third
Parties from:

- Accessing, sharing, selling, copying, using, or transmitting Protected
  Dealer Data without prior express written consent from the dealer (which
  the law allows dealers to revoke), *see id.* §§ 28-4653(A)(1), (B);

- Engaging in "Cyber Ransom," which is defined as the restricting or
  threatening to restrict access to Protected Dealer Data for monetary gain,
  *see id.* § § 28-4651(2), 28- 4653(A)(2); and

- Otherwise prohibiting or restricting a dealer's ability to protect, store,
  copy, share, or use Protected Dealer Data, including charging fees for
  such access, *see id.* § 28-4653(A)(3).

20.     The Dealer Data Security Law also imposes certain data accessibility
requirements on DMS providers.  It requires DMS providers to make available a
standard framework for exchanging information between Authorized Integrators and
the DMS using the STAR (or other compatible) standards and to provide open
Application Programming Interface ("API") access (or other similar integration
methods) to Authorized Integrators.  *See id.* § 28-4654(A).

## IV.    The Dealer Data Security Law Is Consistent With Good Privacy And Security Principles

21.     In this section, I explain that the Dealer Data Security Law is primarily
a data protection law.  It provides that Protected Dealer Data is (and should continue
to be) controlled by the dealers themselves.  I further demonstrate that the Dealer Data
Security Law is consistent with the standards for privacy and data security set forth in
the core Fair Information Principles.  Indeed, the Dealer Data Security Law shares

many similarities with the HIPAA Privacy and Security Rules that govern sensitive health records.

### A. The Dealer Data Security Law Enables Dealers To Protect Their Data

22. The Dealer Data Security Law shows, both in terminology and in its substantive provisions, the view of the Arizona Legislature that Protected Dealer Data is under the ownership and control of dealers, rather than third-party service providers like CDK or Reynolds.

23. The Dealer Data Security Law addresses "Protected Dealer Data," which is defined to include "personal, financial or other data relating to a consumer that a consumer providers to a Dealer or that a Dealer otherwise obtains and that is stored in the Dealer's Dealer Data System" and "other data that relates to a Dealer's business operations in the Dealer's Dealer Data System." A.R.S. § 28-4651(7)(a), (c). The Dealer Data Security Law thus regulates data that the dealer has collected from consumers or that the dealer has generated in the course of its business. The Dealer Data Security Law does not concern data owned or controlled by a "third party" like CDK or Reynolds.[5]

24. The Dealer Data Security Law provides protection for "Protected Dealer Data." Put another way, the Dealer Data Security Law is a "data protection" law for consumer and dealer data. Under the law, a third party "may not require a Dealer to grant . . . the third party direct or indirect access to the Dealer's Dealer Data System." A.R.S. § 28-4652. The "may not require" language indicates both that the dealer is the one in control of how Protected Dealer Data will be used and provides further

---

[5] The third category within "Protected Dealer Data" concerns motor vehicle diagnostic data. *See* A.R.S. § 28-4651(7)(b) (providing that the law "does not give a dealer any ownership or rights to share or use the motor vehicle diagnostic data beyond what is necessary to fulfill a dealer's obligation to provide warranty, repair or service work to its consumers"). I exclude discussion of this data as outside the scope of my assignment.

protection for consumer and dealer data.  The dealer gets to decide where that data goes, and a third party cannot require the dealer to give up that control.  The Dealer Data Security Law provides additional data protection by:  restricting the use of Protected Dealer Data without express consent of the dealer, *see id.* §§ 28-4653(A)(1), (B); prohibiting third parties from using Protected Dealer Data in ways that are contrary to those third parties' agreements with dealers, *see id.* § 28-4654(B); and providing dealers with rights to audit how third parties are using Protected Dealer Data, *see id.*

### 1. Providing Dealers With Control Over Their Data Is Consistent With The Federal Trade Commission's Approach

25.     The Dealer Data Security Law, in providing dealers with control over Protected Dealer Data, follows principles established by the Federal Trade Commission ("FTC").  The FTC is the leading federal agency on privacy and cybersecurity issues in the commercial sector and focuses its efforts on protecting consumers.  It works "to protect consumer privacy through law enforcement, policy initiatives, and consumer and business education."[6]  The FTC has called for companies to "incorporate substantive privacy protections into their practices, such as data security, reasonable collection limits, sound retention practices, and data accuracy."[7] The FTC's guidance has aimed "to shift the burden for protecting privacy away from consumers and to encourage companies to make strong privacy protections the default."[8]

---

[6] Preliminary FTC Staff Report, *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers* at iii (Dec. 2010), http://www.ftc.gov/os/2010/12/101201privacyreport.pdf.

[7] FTC Report, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policy Makers* at 23 (Mar. 2012), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf.

[8] *Id.* at 24.

26.     The FTC has distinguished between "first parties," the companies with whom a consumer chooses to do business with, and "third parties," the companies that receive personal information from the first party, often without the consumer knowing with whom the data is shared.  For the FTC, "whether a practice requires choice turns on the extent to which the practice is consistent with the context of the [initial] transaction or the consumer's existing relationship with the [first] business."[9]

27.     The distinction between first parties and third parties is instructive for analyzing the Dealer Data Security Law.  Consumers choose which dealer to do business with – making the dealer the "first party" for consumer data.  Consumers entrust a dealer with their business and their personal information.  The dealer, in turn, safeguards the consumer's data, and may share the data with third parties in the course of conducting the dealer's business.  The dealer's safeguarding of that data benefits the consumer, and the consumer looks to the dealer as the known and responsible party for handling the data.

28.     Under the FTC's approach, third-party service providers (including DMS providers) are "third parties" that receive a consumer's data via the "first party" (the dealer).  The FTC holds the dealer – not the DMS provider – responsible for the safeguarding of the consumer's data because consumers reasonably expect the dealers to safeguard that data.  It is unlikely a consumer even knows about a dealer's DMS provider, what enterprise software is, or how and why a dealer uses it.

29.     By contrast, it would be contrary to the FTC's approach to conclude that the data is "owned" by a third-party software company of whose existence the consumer is ignorant.

30.     The central role of the dealer as the responsible party for how the data will be handled explains why the information generated in the course of a dealer's

---

[9] *Id.* at 38-39.

business is available to the dealer's employees to read and print and for the dealer to share with other parties.  It also explains why, as dealers pursue their business goals, they can make fundamental choices about how data generated in the course of their business will be handled and safeguarded, for example by choosing which third-party service providers (including DMS providers) the dealer does business with.

### 2. Providing Dealers With Control Over Their Data Is Consistent With Historical Practice

31.     Based on public documents supplied to me and statements from industry participants, including CDK and Reynolds, the record shows that the dealers have a long and well-documented history of having ownership and control over Protected Dealer Data.  The Dealer Data Security Law thus is consistent with the industry's long-held views about ownership and control.

32.     Relevant parties have long agreed and stated over time that dealers have a legal right to look at, use, and transfer Protected Dealer Data for the dealer's business purposes.  For example, Tom Schwartz, Reynolds's chief spokesperson, publicly declared:  "The data belongs to the dealers.  We all agree on that."[10]  Reynolds's CEO is featured on a 2007 marketing sheet to dealers stating:  "You own your data and choose who you allow to access it."[11]  On its website, Reynolds has represented to dealers:  "Your Data, Your Way.  You own your data.  Reynolds recognizes you need to share that data outside your dealership."[12]  Even Reynolds's Customer Guide – which comprises part of Reynolds's contract with its dealer customers – states that

---

[10] David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011), https://www.autonews.com/article/20111121/RETAIL07/311219997/dealers-decry-reynolds-crackdown.

[11] Reynolds & Reynolds, *Brockman On The Record: You're the Boss.* (2007).

[12] Reynolds and Reynolds Company, *Fuel Ideas to Drive Performance*, https://web.archive.org/web/20130412171358/http://www.reyrey.com/dealernews/fuel/era/2010/vol1/Your-Data-Your-Way.asp.

"Reynolds acknowledges that your Business Data belongs to you," while requiring Dealers to warrant that they "have all rights and authority to the Business Data."[13]

33.     Howard Gardner, CDK's vice president over data strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."[14]

34.     Steve Anenen, CDK's former longtime CEO, publicly stated:  "I think we've stated pretty emphatically, we really believe the dealer owns the data.  I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer.  As long as they grant permission, how would you ever go against that wish?  I don't understand that."[15]  He has further stated in an April 2007 interview:  "a dealership fundamentally owns the data in its DMS, and dealers should control who access their data and how it's used."[16]  CDK's website has stated that "dealerships own their data,"[17] and CDK's Master Services Agreement with dealers stated at least until 2015 that "[a]ny Client file or other information provided by Client to CDK for use with the Services . . . shall remain the exclusive and confidential property of Client."[18]

---

[13] Reynolds and Reynolds Company, *Customer Guide* at 8, Version 8 (Jan. 1, 2009); *see also id.* at 9 (acknowledging that Business Data includes customer personal financial information).

[14] ADP Dealer Services, Inc., Press Release, *ADP Announces New Approved Vendors for ADP's Third Party Access Program* (July 12, 2013), http://www.reactornet.com/company/news/12/reactornet_adp_integration.

[15] Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007) (quoting CDK president Steve Anenen), http://www.autonews.com/article/20070219/SUB/70215040/adp-provides-dealers-3-options-on-data-access.

[16] The Dealer Magazine, *Interview with Steve Anenen and Kevin Henahan* (Apr. 17, 2007), https://www.slideshare.net/ralphpaglia/best-digital-dealer-magazine-issue-ever-printed.

[17] CDK Global, *Third Party Access Program: What Dealers Need to Know*, https://web.archive.org/web/20160505034427/http://www.cdkglobal.com/sites/default/files/Third_Party_Access_Program_Solution_Overview_%28What_Dealers_Need_to_Know%29.pdf

[18] CDK Master Services Agreement § 7.A.

35.     Until at least 2013 – shortly after which I understand CDK and Reynolds allegedly entered into an agreement that is the subject of antitrust litigation – CDK was even a member of Open Secure Access ("OSA"), whose "five key principles" were:

- Dealers should control who accesses their data and how it's used.

- Industry participants should work together to ensure dealer data is secure.

- Third parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company.

- DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database.

- Industry participants, including DMS companies, that provide essential services required to facilitate access to, and interactions with, dealer-permissioned data should be reasonably compensated.[19]

I note particularly that these key principles included the statement that "DMS companies should facilitate interaction with all data available to a DMS user . . . [such as by] a robust set of APIs."  Below, I discuss the Dealer Data Security Law's use of APIs in more detail.

36.     Other DMS providers take similar positions.  Cox Automotive – whose Dealertrack DMS is the third largest DMS provider in the country – has stated that while its DMS "stores data from [Cox Automotive's] dealership clients in a hosted database system," the dealers "retain ownership and control of their data."[20]  Further,

---

[19] Open Secure Access, *It's Your Data.  You Know Best What To Do With It*. https://web.archive.org/web/20070304105119/http://www.opensecureaccess.com/OSAOpenLetter.pdf

[20] *See* Whitworth Decl. ¶ 8, *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-cv-318, (W.D. Wis. filed June 22, 2017), Dkt. 142.

dealers "are best positioned to determine which third-party vendors and integrators they trust to have access to dealership client data stored in [the] DMS."[21]  Similarly, Auto/Mate, the fourth largest DMS provider states:  "You pay for your dealership's DMS system every single month, so it only seems logical that you would own your system and your data right?  You may be surprised to know that leading competitors charge you to access your own data.  With Auto/Mate, it truly is your data.  You own it and you have full control over it at all times."[22]

37.    Finally, I understand that the dealers themselves, industry organizations (including the National Automobile Dealers Association ("NADA")), and third-party software providers have likewise taken the same position.  In February 2007, for example, NADA and the American International Automobile Dealer Association issued a "Joint Policy Statement on Data Accessibility," which included the statement that "[d]ealers should control access to the data stored in their dealership management systems."[23]

38.    The central role of the dealer as the responsible party for how the data will be handled explains why CDK and Reynolds acknowledge that dealers can *manually* extract data from a DMS and send that data to any third party of the dealer's choosing (which is consistent with the Dealer Data Security Law).[24]  CDK and Reynolds apparently object only to the *automatic* access of data on the DMS.  This clear ability for dealers to access Dealer Data is consistent with the statute's approach that "Dealer Data" belongs to, and is under the control of, dealers.  Based on my

---

[21] *See id.* ¶ 21.

[22] *See* Auto/Mate:  Why is Auto/Mate Different, https://www.automate.com/dms/why-were-different/.

[23] *See* NADA Press Release, *NADA, AIADA Issue Joint Policy Statement on Data Accessibility* (Feb. 2, 2007), https://www.nada.org/CustomTemplates/DetailPressRelease.aspx?id=21474842320.

[24] *See* Crutchfield Decl. ¶ 15; Hall Decl. ¶ 19.

discussion below about the security protections offered by the statute, automatic access as authorized by the statute is consistent with best privacy and data security practices.

**B.      The Dealer Data Security Law Is Consistent With Fair Information Principles That Set The Standard For Privacy And Data Security**

39.      I am the lead author for the official textbook for those seeking to be certified as a U.S. information privacy professional.[25]  As I stated in the first chapter of the book, Fair Information Principles, "sometimes called fair information privacy practices or principles (FIPPS), have been a significant means for organizing the multiple individual rights and organizational responsibilities that exist with respect to personal information."[26]  FIPs provide the global standard for privacy and data security.

40.      A core list of FIPs was set forth by the FTC in a 1998 report, early in the Commission's efforts to protect consumer privacy on the Internet.[27]  This core list included five practices:   (1) notice; (2) choice; (3) access; (4) security; and (5) enforcement.[28]

41.      To provide a concrete example in the HIPAA context, these five FIPs mean:  (1) Individuals have a right to notice of a medical provider's privacy practices; (2) Individuals have a choice (must affirmatively consent) before patient records go to a third party (who is not otherwise permitted to receive the data); (3) Individuals have a right to access their medical records; (4) Security requirements apply under both the

---

[25] Peter Swire & DeBrae Kennedy-Mayo, *U.S. Private-Sector Privacy: Law and Practice for Information Privacy Professionals* (International Association of Privacy Professionals (2d ed. 2018)).  This is the official textbook for privacy in the private sector, such as data held by medical providers or car dealers; there is a different text for federal government privacy topics.

[26] *Id*. at 4.

[27] *See* Federal Trade Commission, *Privacy Online: A Report to Congress* (June 1998),    https://www.ftc.gov/sites/default/files/documents/public_events/exploring-privacy-roundtable-series/priv-23a_0.pdf.

[28] The FTC has delineated these five practices as "(1) notice/awareness; (2) choice/consent;    (3)   access/participation;   (4)   integrity/security;   and   (5) enforcement/redress."  *Id*.

HIPAA Privacy and Security Rules; and (5) There is enforcement of HIPAA violations by the Office of Civil Rights in the Department of Health and Human Services.[29]

42.    As discussed further below, the Dealer Data Security Law follows these core FIPs and others and is thus consistent with the predominant intellectual model, and implementation provisions, for data privacy and security laws globally.

43.    As an aid to understanding the Dealer Data Security Law and FIPs generally, I discuss the close similarities between the Dealer Data Security Law and the HIPAA Privacy Rule.  Where helpful, I also refer to provisions on the new California Consumer Privacy Act and other privacy and security statutes.

44.    I have chosen HIPAA as a useful comparison for a number of reasons. First, I am intimately familiar with the reasoning underlying the Privacy Rule.  I was the White House coordinator for the proposed HIPAA Privacy Rule in 1999 an oversaw the process of review of more than 50,000 public comments on that proposal, as well as the final HIPAA Privacy Rule, published in 2000.

45.    Second, I have worked extensively on medical privacy issues since that time, both as an academic expert and practitioner assisting covered entities comply with the law, so my knowledge about health privacy remains current.

46.    Third, the HIPAA Privacy Rule is among the most detailed federal privacy laws.  It is detailed enough to show best practices for handling sensitive personal information and hence shows how the Dealer Data Security Law similarly incorporates standard protections for sensitive data.

---

[29] As privacy expert Robert Gellman has explained in detail, the list of FIPs have varied, most with greater detail than the five listed by the FTC.  Robert Gellman, *Fair Information Practices: A Basic History* (Version 2.18, Apr. 10, 2017), https://bobgellman.com/rg-docs/rg-FIPshistory.pdf.  My own textbook, of 390 pages, discusses a very large number of federal and state data privacy and security laws, and FIPs are pervasively used as the standard model for understanding such laws.  The five FIPs listed by the FTC, in my experience, are included in essentially all of the other lists of basic protections.

47.     Fourth, the Privacy Rule as promulgated in 2000 remains largely intact today, which in my opinion is a sign that its approach has been widely accepted.  The U.S. Department of Health and Human Services ("HHS") made important but limited revisions to the Privacy Rule in 2002,[30] but there have been no significant regulatory changes since then.

48.     Congress has significantly amended the HIPAA privacy provisions only once, in the Health Information Technology for Economic and Clinical Health ("HITECH") Act of 2009.[31]  The provisions in the HITECH Act kept the overall structure of the 2000 HIPAA Privacy Rule, while making specific changes.  The most significant change in the HITECH Act strengthened the regulation of "business associates," a category of entities relevant to this case because similar safeguards should apply to both business associates in healthcare and third parties to auto dealers.

49.     The term "business associates" under HIPAA means entities that perform work, on behalf of a covered entity, which involves access to protected health information.[32]  HITECH brought business associates directly within the enforcement authority of HHS, as a sign of the importance of ensuring good privacy and security practices among business associates.[33]  Applied to the current case, the auto dealer is the equivalent of a "covered entity" under HIPAA, while Dealer Data Vendors such as CDK and Reynolds are the equivalent of a "business associate" under HIPAA.  The

---

[30]   U.S. Department of Health and Human Services, *Modifications to the Standards for Privacy of Individually Identifiable Health Information – Final Rule* (Aug. 9, 2002), http://wayback.archive-it.org/3926/20131029140312/http://archive. hhs.gov/news/press/2002pres/20020809.html.

[31]   The revised law is at 42 U.S.C. § 17934.

[32]   The term is defined in detail in 45 CFR § 160.103.

[33]   Prior to the HITECH Act, the hospital or other covered entity was directly subject to HIPAA enforcement, including for HIPAA violations by their business associates.

Dealer Data Security Law is similar to HIPAA in requiring good privacy and security practices from third parties who receive data from first parties.

50.     In other sectors, third parties often include computer service companies that operate on behalf of the first parties. Under HIPAA, business associates notably include information technology companies that operate on behalf of a covered entity, such as a hospital.  The hospital or other covered entity has primary responsibility for careful protection of protected health information, which is the information about individual patients.  Similarly, the Gramm-Leach-Bliley Act (GLBA) governs the non-public personal information of customers of financial services firms, including for auto lending.  Under GLBA, an auto dealer or other company that receives the customer's data has primary responsibility to provide security and privacy protections.   That company is held responsible for the actions of its "service providers," a term that has essentially the same meaning as "business associate" under HIPAA.

51.     The Dealer Data Security Law follows the same approach toward third parties as HIPAA and GLBA.   Dealers gather auto lending and other consumer information, just as hospitals gather patient information.  When dealers select a third party to have access to data, the third parties may not "take any action by contract, technical means or otherwise to prohibit or limit a Dealer's ability to protect, store, copy, share or use Protected Dealer Data."  A.R.S. § 28-4653(A)(3).  Similarly, the third parties "may not require a Dealer to grant . . . the third party direct or indirect access to the Dealer's Dealer Data System."  A.R.S. § 28-4652.  The dealers have responsibility for determining how the data is processed, just as a hospital has that responsibility under HIPAA.

### 1.     The Dealer Data Security Law Implements The "Notice" and "Choice" FIPs

52.     The Dealer Data Security Law is clear on how the FIPs of notice and choice operate.  Protected Dealer Data – which again is data under the control of the

dealer – can go to a third party, including CDK and Reynolds and any other third-party software application, only with "prior express written consent" of the dealer.  A.R.S. § 28-4653(B).  This ensures a dealer will have notice of how their data is being used because that data can only be used after consent has been provided.[34]

53.     The Dealer Data Security Law similarly complies with the FIP of choice.[35]  The requirement of "prior express written consent" in the Dealer Data Security Law uses the term "consent," which was part of the FTC's original definition of this FIP in 1998.  The Commission at that time called this information practice "choice/consent."[36]  The Dealer Data Security Law reinforces this basic provision of choice with additional safeguards:

- The Dealer can unilaterally revoke or amend consent with 30 days' notice, and third parties must make any agreement relating to the data terminable on 90 days' notice from the Dealer.  *See* A.R.S. §§ 28-4653(B)(1), 28-4654(B)(2).

- The consent must be voluntary, and "not be sought or required as a condition of or factor for consideration or eligibility for any manufacturer program, standard, or policy."  *Id.* § 28-4653(B)(2);

- A Dealer Data Vendor and Authorized Integrator "may access, use, store or share Protected Dealer Data or any other data from a Dealer Data

_____

[34] Both the Dealer Data Security Law and HIPAA make clear that business associates must comply with other legal provisions regarding data privacy and security. The Dealer Data Security Law states that the law "does not prevent a . . . third party from discharging its obligations as a service provider or otherwise under federal, state, or local law to protect and secure Protected Dealer Data or to otherwise limit those responsibilities."  A.R.S. § 28-4653(C).  The analogous exceptions for HIPAA business associates are at 45 CFR § 160.103.

[35] Federal Trade Commission, *Privacy Online: A Report to Congress* (June 1998), https://www.ftc.gov/sites/default/files/documents/public_events/exploring-privacy-roundtable-series/priv-23a_0.pdf.

[36] *Id.*

System only to the extent allowed in the written agreement with the Dealer."  A.R.S. § 28-4654(B)(1).

54.    The Dealer Data Security Law's use of "prior express written consent" is consistent with the level of consent in other prominent privacy and security regimes. Affirmative (opt-in) consent is the general requirement, for instance, under the HIPAA Privacy Rule.  *See* 45 CFR § 164.506(b).  Another example under U.S. law is the Wiretap Act, governing whether an individual has consented to interception of communications.  *See* 18 U.S.C. § 2511.  An even more detailed consent regime applies in the European Union, under the General Data Protection Regulation ("GDPR").[37]

55.    The Dealer Data Security Law's high standard for notice and consent provides strong protections for consumers' and dealers' data.

### 2.    The Dealer Data Security Law Implements The "Access" FIP

56.    The Dealer Data Security Law provides the FIP of access, in ways that are fundamentally similar to access in HIPAA.

57.    The Dealer Data Security Law prohibits a third party from taking "any action by contract, technical means or otherwise to prohibit or limit a Dealer's ability to protect, store, copy, share, or use Protected Dealer Data."  A.R.S. § 28-4653(A)(3). This statutory provision assures the Dealer right to access, to "store, copy, share, or use" the data.  The HIPAA Privacy Rule defines access as "the ability or the means necessary to read, write, modify, or communicate data/information or otherwise use any system resource." 45 CFR § 164.304.  Both definitions similarly list a variety of

---

[37] *See* General Data Protection Regulation, Definitions, https://gdpr-info.eu/art-4-gdpr/ (consent "means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her.").

activities by which the eligible person can access information. Both include the catch-all term that access includes the "use" of data.

58.     The Dealer Data Security Law provides additional requirements concerning access, to ensure that it is feasible and cost-effective in practice. The statute prohibits "imposing any fee or other restriction on the Dealer or an authorized integrator for *accessing* or sharing Protected Dealer Data." A.R.S. § 28-4653(A)(3)(a) (emphasis added). The statute also regulates and limits the charge for access: "A third party must disclose a charge to the Dealer and justify the charge by documentary evidence of the costs associated with *access* or the charge will be deemed to be a fee pursuant to this subdivision." *Id.* (emphasis added).

59.     Similar requirements apply in HIPAA, to ensure that there is effective access at a reasonable cost. HIPAA provides detailed specifications concerning "access of individuals to protected health information." 45 CFR § 164.524. For instance, a hospital or other covered entity "must provide the individual with access to the protected health information in the form and format requested by the individual, if it is readily producible in such form and format." 45 CFR § 164.524(c)(2)(i). HIPAA limits fees: the hospital or other covered entity may only impose "a reasonable, cost-based fee." 45 CFR § 164.524(c)(4). The "cost-based fee" in HIPAA closely corresponds to the "costs associated with access" in the Dealer Data Security Law.

### 3.     The Dealer Data Security Law Implements The "Security" FIP

60.     The HIPAA Privacy and Security Rules, taken together, create a detailed regime for achieving the Security FIP. The HIPAA Privacy Rule contains general security requirements: "A covered entity must have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). The HIPAA Security Rule provides additional, specific security requirements. 45 C.F.R. § 164.302 to 164.318.

- 21 -

61.     The Dealer Data Security Law has extensive security-related provisions, similar in effect to the HIPAA regime.  First, the Dealer Data Security Law uses the STAR standards, which are designed to promote best practices in automotive security and have had the active participation of CDK and Reynolds.  Second, the law requires the use of APIs or similar interfaces.  APIs have grown rapidly in recent years in large part due to their security features.

### a.     The STAR Standards

62.     The Dealer Data Security Law incorporates robust security standards for third-party access to Protected Dealer Data, in particular the Standards for Technology in Automotive Retailing ("STAR" standards).[38]

63.     The STAR standards are promulgated by a group of dealers, manufacturers, third-party software providers, and automotive-related industry organizations.[39]  CDK is an active member of STAR.[40]  CDK's membership entitles it to vote on all major issues of the organization, including new content and changes to STAR standards.  Moreover, CDK was a member of the small team that worked on the API security recommendations for the organization.[41]  Reynolds's website also

---

[38] *See* A.R.S. § 28-4653(A)(3) (prohibiting limitations on access by a third party that "has satisfied or is compliant with the STAR standards or other generally accepted standards that are at least as comprehensive as the STAR standards"); *id.* § 28-4654(A)(1) (requiring Dealer Data Vendors to "adopt and make available a standardized framework for the exchange, integration and sharing of data . . . using the STAR standards or a standard that is compatible with the STAR standards").

[39] STAR, Who We Are, https://www.starstandard.org/index.php/about-star/who-we-are.

[40] STAR, Meet Our Members, https://www.starstandard.org/index.php/about-star/membership-list.

[41] STAR Newsletter (November 2018), https://www.starstandard.org/index.php/whats-new/star-newsletter-november-2018.

boasts of the STAR 2006 DTS Implementation award the company received in for its role in leadership in implementing technology standards.[42]

64.     The STAR standards "allow different automotive entities to be able to easily exchange and utilize data critical to running all areas of business."[43]  The standards cover everything from part codes to customer service and have been the industry standard since its inception in 2001.

65.     The STAR standards include Dealer Data Security Guidelines that are updated annually.   These guidelines provide "industry best practices and recommendations for automotive retail data security."[44]

66.     As an example of how they are used, in 2015 Equifax, Inc. used APIs and STAR standards in the roll out of its automotive technology platform, AutoConnect, which enables partners to deliver credit, marketing, risk and verification solutions seamlessly to their clients.[45]  Kathi Mehall, Vice President of Technology for Automotive Services for Equifax noted that the platform used "auto-specific API's (Application Programing Interfaces) based on the Standards for Technology in Automotive Retail (STAR) to help streamline partners' implementation and deployment of Equifax data and services."[46]

---

[42] Thomas Schwartz, Reynolds and Reynolds Receives STAR 2006 DTS Implementation Award (January 4, 2007), https://www.reyrey.com/company/media-center/news-releases/reynolds-and-reynolds-receives-star-2006-dts-implementation.

[43] The STAR Standards, https://www.starstandard.org/index.php/star-standards/the-standards.

[44] STAR, *Dealer Data Security Guidelines* (2018), https://www.starstandard.org/images/SIGINFRASTRUCTURE/2018--Data-Security-Guideline.pdf.

[45] *See* PR Newswire, Equifax Announced New Automotive Technology Platform at NADA Convention; AutoConnect platform from Equifax allows partners to seamlessly deliver auto-specific solutions in real-time to its customers (January 22, 2015), https://www.prnewswire.com/news-releases/equifax-announces-new-automotive-technology-platform-at-nada-convention-300024393.html.

[46] *Id*. I note that Equifax's well publicized security breach has nothing to do with AutoConnect, and thus, does not call into question the security of AutoConnect or the STAR Standards. The Equifax example does show commercial recognition, by

- 23 -

b.      **Application Programming Interfaces ("APIs")**

67.     The Dealer Data Security Law endorses APIs as the default mechanism to securely exchange data.[47] An API is a piece of software that performs functions (here, data access) for another piece of software in a programmable way.  In essence, APIs enable machine-to-machine communication.[48]  The use of APIs has grown rapidly in recent years in large part because of their security features.

68.     APIs are a ubiquitous technology.  One API indexing website has catalogued more than 20,000 API's that touch every facet of the internet and the economy.[49]  This includes APIs for industries that deal with personal and/or sensitive consumer data such as education, finance, advertising, commerce, social media, healthcare and travel.[50]  For example, the Securities Industry and Financial Markets Association recently issued principles for data aggregation APIs that affirm that consumers "may use third-parties to access their financial account data" and "such access should be safe and secure."[51]  And outside the United States, the European

a major company, of the importance of the STAR standards and APIs to security related to automobile dealer data.

[47] *See* A.R.S. § 28-4654(A)(2) (requiring Dealer Data Vendors to "provide access to open application programming interfaces to authorized integrators," unless APIs "are not the reasonable commercial or technical standard for secure data integration," in which case, "the Dealer Data Vendor may provide a similar open access integration method").

[48] *See* Red Hat, *What is an API?*, https://www.redhat.com/en/topics/api/what-are-application-programming-interfaces.

[49] Several websites have sprung up that index the world's public and private APIs.  *See* Programmable Web: API Directory, https://www.programmableweb.com/category/all/apis; Mashape: Find and Connect to Thousands of APIs, https://market.mashape.com/explore; Rapid API: Find and Connect to Thousands of APIs, https://rapidapi.com/; APIHarmony: Welcome to API Harmony!, https://apiharmony-open.mybluemix.net/public; APIs.io: APIs: Find And Be Found, http://apis.io/; APIsGuru: APIs in Collection, https://apis.guru/browse-apis/.

[50] IBM Developer Blog, API Use Cases for Every Industry (August 15, 2017), https://developer.ibm.com/apiconnect/2015/11/01/api-use-cases-for-every-industry/.

[51] *See* Securities Industry and Financial Markets Association, *SIFMA Data Aggregation Principles* (Apr. 2018), https://www.sifma.org/wp-content/uploads/2018/04/sifma-Data-Aggregation-Principles.pdf.

Union's Payment Services Directive 2 ("PSD2") requires the use of standardized APIs.[52]  Similar to the Dealer Data Security Law, PSD2 requires banks to grant licensed third-party payment service providers access to bank infrastructure and account data using a standardized API.

69.  Governments also rely extensively on APIs at both the state and federal level.  Federal government agencies "are encouraged to take a machine-readable approach to providing information by making high-value data and content available through Web APIs, supporting open standards and interoperability."[53]  Providing this information through Web APIs makes data assets freely available for use within agencies, between agencies, in the private sector, and by citizens.[54]  As of July 2018, the U.S. Federal government had APIs spanning every major department of the government including the Census Bureau, Department of Commerce, Department of

---

[52] UK Finance, *Payment Services Directive 2 and Open Banking*, https://www. ukfinance.org.uk/guidance/payment-services-directive-2-and-open-banking.

[53] Chris Noonan Sturm, *FTC launches first Web API to make Early Terminations more accessible* (June 25, 2018), https://www.ftc.gov/news-events/blogs/competition-matters/2018/06/ftc-launches-first-web-api-make-early-terminations.

[54] *See, e.g.*, HHS Proposes New Rules to Improve the Interoperability of Electronic Health Information, https://www.hhs.gov/about/news/2019/02/11/hhs-proposes-new-rules-improve-interoperability-electronic-health-information.html (The Office of the National Coordinator for Health Information Technology recently proposed a rule to "promote[] secure and more immediate access to health information for patients and their healthcare providers . . . [T]he proposed rule calls on the healthcare industry to adopt standardized application programming interfaces (APIs), which will help allow individuals to securely and easily access structured and unstructured EHI formats . . ."); Federal Student Loan Program Data, https://catalog. data.gov/dataset/federal-student-loan-program-data (Office of Federal Student Aid within the Department of Education uses APIs to "Provide[] recipient and disbursement information each quarter for the Direct Loan and Federal Family Education Loan Programs by postsecondary school."); Beneficiary Claims Data API, https://bcda.cms.gov/ (Centers for Medicare & Medicaid Services uses a "standards-based API, BCDA [to] further[] CMS' ongoing commitment to MyHealthEData, a government-wide initiative that emphasizes adopting an API-first approach to modernize how CMS exchanges data with stakeholders across the healthcare system."); Data.gov Applications, https://www.data.gov/applications; Open Data DC, https://opendata.dc.gov/.

Energy, Department of Health and Human Services, and the National Aeronautics and Space Administration, to name a few.[55]

70.     The U.S. Department of the Treasury ("Treasury") has issued a report that extols the benefits of API use in the United States financial system.[56]  One key benefit mentioned is that APIs "allow for the inclusion of robust security features, greater transparency and access controls for consumers, improved data accuracy, and more predictable and manageable information technology costs."[57]  The use of APIs to protect the sensitive information in the financial services and health care industries demonstrates that APIs are also appropriate for the security of Protected Dealer Data.

71.     Notably, Reynolds and CDK themselves offer APIs to access Protected Dealer Data on their DMS, although I understand that Reynolds and CDK make only certain Protected Dealer Data available through an API and charge high data access fees for use of the API.  The Reynolds and CDK APIs are called the Reynolds Certified Interface ("RCI") and Third-Party Access ("3PA"), respectively.  In fact, CDK's and Reynolds's own cybersecurity experts have testified that 3PA and RCI are "essentially" APIs, which are "qualitatively better" than other access methods.  *See* Hr'g Tr. 1- P- 127 (Dkt. 162), *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis. June 26, 2017); *see also id.* at 1-P-139 to 140 (same expert testifying an API is "secure"); *id.* at 1-P-151 (same expert testifying an API would not be a "tax" on CDK's and Reynolds's systems).

---

[55] APImetrics, US Government API Performance Dashboard (July 2018), https://apimetrics.io/apimetrics-free-api-tools-resources/check-api-health/us-government-api-performance-dashboard/

[56] U.S. Department of the Treasury, A Financial System That Creates Economic Opportunities:   Nonbank Financials, Fintech, and Innovation (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf).

[57] *Id*. at 26.

72.     I have also reviewed the Declaration of Hoyt Kesterson concerning APIs and other security issues.  Based on my own experience in the cybersecurity field, and as a Professor who teaches cybersecurity in the College of Computing at Georgia Tech, I concur with Mr. Kesterson's testimony, including the two overall conclusions:

- DMS providers may implement the Dealer Data Security Law in ways that maintain the integrity, confidentiality and performance of their data systems and protect their intellectual property through the implementation of an application programming interface (also known as API);

- DMS providers may implement the Dealer Data Security Law in ways that ensure proper and correct security safeguards by requiring compliance with the STAR standards or more rigorous standards because the DMS providers themselves will be the sole implementors of the software that processes service requests and it is the quality of their implementation that ensures a correct, secure, and efficient service.

### 4.     The Dealer Data Security Law Meets The "Enforcement" FIP

73.     The Dealer Data Security Law amended Title 28, Chapter 10, of the Arizona Revised Statutes.  I understand that the general enforcement provision for Title 28 apply:  "A person who violates a provision of this title or who fails or refuses to do or perform an act or thing required by this title is guilty of a class 2 misdemeanor, unless the statute defining the offense provides for a different classification."  A.R.S. § 28-121(A).[58]  The attorney general "shall prosecute and defend in the name of this state all actions necessary to carry out this title."  A.R.S. § 28-333.

---

[58] Section 28-121(C) further provides: "In addition to any other penalty assessment provided in this title, the court shall levy the surcharge as required by sections 12-116.01 and 12-116.02."

74.     HIPAA, GLBA, data breach laws, and innumerable other privacy and security laws also include enforcement.  For instance, for HIPAA, 45 C.F.R. § 160.400 to § 160.426 set forth the enforcement regime for imposition of civil monetary penalties, enforced by the Office of Civil Rights of the Department of Health and Human Services. As with the other core FIPs of notice, choice, access, and security, the Dealer Data Security Law contains the standard elements of statutes governing the control of data.

### 5.     The Dealer Data Security Law Implements the Right to Data Portability

75.     The Dealer Data Security Law also implements FIPs going beyond the five core FIPs of notice, choice, access, security, and enforcement.  Specifically, as part of a growing global trend, the Dealer Data Security Law assures dealers their right to data portability.  Mark Zuckerberg of Facebook in 2019 wrote: "regulation should guarantee the principle of data portability.  If you share data with one service, you should be able to move it to another.  This gives people choice and enables developers to innovate and compete."[59]  Erin Egan of Facebook published a report on "Data Portability and Privacy" in September 2019, stating:  "The benefits of data portability to people and markets are clear."[60]  Egan added: "There's growing agreement among policymakers around the world that data portability – the principle that you should be able to take the data you share with one service and move it to another – can help promote competition online and encourage the emergence of new services."[61]

---

[59] Mark Zuckerberg, *The Internet Needs New Rules. Let's Start in These four Areas*, Washington Post (Mar. 30, 2019), https://www.washingtonpost.com/ opinions/mark-zuckerberg-the-internet-needs-new-rules-lets-start-in-these-four-areas/2019/03/29/9e6f0504-521a-11e9-a3f7-78b7525a8d5f_story.html.

[60] Erin Egan, *Charting a Way Forward: Data Portability and Privacy*, Facebook (Sept. 2019) at 3, https://fbnewsroomus.files.wordpress.com/2019/09/data-portability-privacy-white-paper.pdf.

[61] *Id.*  As a note on my own background, in addition to my privacy and security background, I have taught semester courses in Antitrust Law as a law professor, and was the first academic to write about the intersection of privacy and antitrust, in

76.     The right to data portability has now been clearly established in jurisdictions including the European Union and California.  Article 20 of the European Union's GDPR guarantees the "right to data portability."  That right notably includes persons having the right to receive the personal data concerning them "in a structured, commonly used, and machine-readable format."[62]  Individuals also have the right to determine which other service should receive the data, with "the right to transmit those data to another controller *without hindrance* from the controller to which the personal data have been provided."[63] (emphasis added).   Similar rules apply under the California Consumer Protection Act of 2018 ("CCPA"), which goes into effect in January 2020.  Under Section 1798.100(d) of that law, where a business responds to an access request electronically, it must provide the personal information to the consumer in "a portable and, to the extent technically feasible, in a readily useable format that allows the consumer to transmit this information to another entity *without hindrance*."[64]  Both GDPR and the CCPA emphasize the importance of portability by using the same language of transfers "without hindrance."

---

testimony submitted to the FTC in 2007.  Peter Swire, *Protecting Consumers: Privacy Matters in Antitrust Analysis*, (Oct. 19, 2007), https://www.americanprogress. org/issues/economy/news/2007/10/19/3564/protecting-consumers-privacy-matters-in-antitrust-analysis/.

[62]  European Union General Data Protection Regulation, Art. 20(1), http://www.privacy-regulation.eu/en/article-20-right-to-data-portability-GDPR.htm

[63]  *Id.* Art. 4(7), http://www.privacy-regulation.eu/en/article-4-definitions-GDPR.htm ("Controller" is a term of art in E.U. data protection law, defined as "the natural or legal person, public authority, agency or other body which, alone or jointly with others, determines the purposes and means of the processing of personal data"). In the auto dealer context, for instance, where Protected Dealer Data is held by a Dealer Data Vendor such as CDK or Reynolds, a right to data portability would mean that the latter would be required to transmit those data "without hindrance" to the Dealer or an Authorized Integrator.

[64]  Cal. Civ. Code § 1798.100 (emphasis added).  For a comparison of data portability under the GDPR and the CCPA, see Yuli Takatsuki, "CCPA Blog Series, Part 2: Rethinking Access and Data Portability Rights," (Mar. 28, 2019) https://privacylawblog.fieldfisher.com/2019/ccpa-blog-series-part-2-rethinking-access-and-data-portability-rights (comparing CCPA and GDPR).

77.    Another recent example of the right to data portability comes from HHS. HHS released two proposed rules in February 2019 seeking to assure greater inter-operability for health records, consistent with privacy and security protections.  The Office of the National Coordinator for Health Information Technology in 2019 proposed a rule to "promote[] secure and more immediate access to health information for patients and their healthcare providers . . . [T]he proposed rule calls on the healthcare industry to adopt standardized application programming interfaces (APIs), which will help allow individuals to securely and easily access structured and unstructured EHI formats."[65]  To ensure portability, the proposed rule specifically includes prohibitions on "information blocking," which are practices that "unreasonably limit the availability, disclosure, and use of electronic health information undermine efforts to improve interoperability." [66]  The Center for Medicare and Medicaid Services, within HHS, proposed a similar rule for entities within its jurisdiction, "to make patient data more useful and transferable through open, secure, standardized, and machine-readable formats."[67]

78.    Similarly, the Treasury in 2018 recommended that the Consumer Financial Protection Bureau interpret Dodd-Frank to require "data portability" for consumer financial information.  Specifically, the Treasury recommended that consumer rights to access data extend to "data aggregators and consumer fintech application providers" who have been authorized by consumers "to access their

---

[65] "HHS Proposes New Rules to Improve the Interoperability of Electronic Health Information," (Feb. 11, 2019), https://www.hhs.gov/about/news/2019/02/11/hhs-proposes-new-rules-improve-interoperability-electronic-health-information.html. I note that the right to portability here applies to companies – "healthcare providers" – in addition to portability for individual patients.

[66] *Id.*

[67] "CMS Advances Interoperability and Patient Access to Health Data Through New Proposals," (Feb. 8, 2019), https://www.cms.gov/newsroom/fact-sheets/cms-advances-interoperability-patient-access-health-data-through-new-proposals.

financial account and transaction data from financial services companies."[68]   The Treasury explained that this would "advance consumer interests" by allowing consumers to benefit "from data aggregation and the innovations that flow through from fintech applications."[69]

79.     The State of Arizona through the Dealer Data Security Law followed this global trend toward the right to data portability, in at least two provisions.  One provision applies to access by Authorized Integrators that have met security standards. The statute prohibits a third party, such as a DMS provider, from "placing an unreasonable restriction on integration by an Authorized Integrator."[70]  To ensure data portability, the statute defines the term "unreasonable restriction," notably to include: (i) "An unreasonable limitation or condition on the scope or nature of the data that is shared with an Authorized Integrator;  (ii) An unreasonable limitation or condition on the ability of the Authorized Integrator to write data to a Dealer Data System; . . . [or] (v) Prohibiting or limiting a dealer's ability to store, copy, or securely share or use Protected Dealer Data outside of the Dealer Data system in any manner and for any reason."[71]

80.     A second part of the Dealer Data Security Law requires data portability when a dealer provides notice of intent to terminate an agreement with a third party, such as a Dealer Data Vendor or Authorized Integrator.  In such situations, a third party "must work to ensure a secure transition of all Protected Dealer Data to a successor

---

[68] *See A Financial System That Creates Economic Opportunities Nonbank Financials, Fintech, and Innovation, Executive Order 13772 on Core Principles for Regulating the United States Financial System* at 31 (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf).

[69] *See id.*

[70] A.R.S. § 28-4653(A)(3)(b).

[71] *Id.*

Dealer Data Vendor or Authorized Integrator."[72]  The law includes language similar to the "without hindrance" approach in California and other data portability laws – the third party must provide "access to or an electronic copy of all Protected Dealer Data and all other data stored in the Dealer Data System in a commercially reasonable time and format that a successor Dealer Data Vendor or Authorized Integrator can access and use."[73]

81.     This discussion documents the significant global trend toward the right of data portability, including acceptance across a range of settings, from Facebook to the U.S. health care system.  The provisions of the Dealer Data Security Law closely track the data portability requirements found elsewhere.

## V.     CDK's and Reynolds's Practices Demonstrate The Dealer Data Security Law Does Not Diminish Data Security

82.     CDK and Reynolds have claimed in this litigation that the Dealer Data Security Law will expose consumer and dealer data to security risks.  However, in practice, CDK and Reynolds have adopted many aspects of the Dealer Data Security Law.  This supports the conclusion that the Dealer Data Security Law is consistent with strong practices for privacy and data security.

83.     First, as explained above, CDK and Reynolds already use APIs as the principal method for the exchange of data between a dealer's DMS database and a third-party.  CDK's and Reynolds's own existing practices for exchanging Protected Dealer Data through APIs therefore demonstrates that Arizona's Law, which prescribes APIs for the exchange of data where requested by a dealer, is consistent with strong practices for privacy and data security.

84.     Second, also as explained above, CDK and Reynolds have historically recognized that dealers own and control Protected Dealer Data and should be able to

---

[72] A.R.S. § 28-4654(B)(3).

[73] A.R.S. § 28-4654(B)(3)(a).

decide which third parties may access that data (which is a right that the Dealer Data Security Law gives to dealers). The text of the Dealer Data Security Law is consistent with this approach, including by clearly labeling the relevant data as "Dealer Data" and describing companies such as CDK and Reynolds as "Dealer Data Vendors."

85.     Third, CDK and Reynolds agree that dealers have the ability to manually extract data from the DMS and to send that data to third-party software providers of the dealer's choice.[74] CDK and Reynolds only dispute whether dealers may authorize third parties to *automatically* access Protected Dealer Data on a DMS. This clear ability for dealers to access Dealer Data is consistent with the statute's approach that "Dealer Data" belongs to, and is under the control of, dealers. Based on my discussion above about the security protections offered by the statute, notably including its use of the Star standards and APIs, automatic access as authorized by the statute is consistent with strong privacy and data security practices.

86.     Fourth, CDK owns two "Authorized Integrators" – DMI and IntegraLink – that integrate with non-CDK DMSs, as contemplated by the Dealer Data Security Law.[75] That CDK itself operates two such companies demonstrates that access by Authorized Integrators, pursuant to the Dealer Data Security Law, is consistent with strong privacy and data security practices.

---

[74] *See* Crutchfield Decl. ¶ 15 ("Dealers have the ability to extract and transmit data that is housed on the DMS, including to certain third-party software application providers, for no cost. They may do so through utilizing 'manual reporting.' Under that process, a dealership employee runs a report and exports the resulting data into a file, such as a plain-text file or an Excel spreadsheet, which the dealer may then send to a vendor."); Hall Decl. ¶ 19 ("Reynolds also provides its dealership licensees with secure reporting tools built into the DMS such as Dynamic Reporting that allow dealership employees to build, schedule, and export reports of a dealer's operational or business data, either or the dealer's internal use or for transmittal to any third party.")

[75] *See* A.R.S. § 28-4654 (requiring "a standardized framework" and "open application programming interfaces" (or a similar open access integration method) be made available to Authorized Integrators); *see* Hr'g Tr. 2-P-191, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis. June 27, 2017), Dkt. 163.

87.    Fifth, CDK and Reynolds have contracted with Authorized Integrators to access to Protected Dealer Data for use by CDK's and Reynolds's own third-party software applications that need access to such data.[76]   That CDK and Reynolds have used Authorized Integrators in their capacity as third-party software providers indicates that the Dealer Data Security Law is consistent with strong privacy and data security practices.

88.    Sixth, CDK and Reynolds have "whitelisted" Authorized Integrators in a large number of instances, thereby allowing those Authorized Integrators (separate and apart from existing APIs) to access Protected Dealer Data on CDK's and Reynolds's own DMSs.   As one federal judge described it, "Reynolds allows significant exceptions by 'whitelisting' certain third parties that it allows to access its system, most notably DMI, CDK's third-party integrator." *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *7 (W.D. Wisc. July 14, 2017); *see id.* ("There was ample evidence that Reynolds allowed (and even continues to allow to this day) third parties to use dealer credentials when it suited Reynolds.").   CDK and Reynolds presumably would not allow such access if they had legitimate privacy and data security concerns.[77]

## VI.   Conclusion

89.    In closing, I emphasize two themes from this testimony.   First, the Dealer Data Security Law ratifies the long-held understanding of who owns and controls the data generated in the course of the dealer's business.   The statute defines this as

---

[76] *See* Hr'g Tr. 1-A-97, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis. June 26, 2017), Dkt. 164 (discussing Reynolds's Naked Lime); *id.* at 1- A-120 to 125 (testimony of Authorized Integrator Authenticom that both CDK and Reynolds have "themselves use[d] Authenticom for data integration services" despite "using data security and system integrity as a reason to block Authenticom").

[77] *See* Hr'g Tr. 1-A-125 to 133 & PHX-93, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318 (W.D. Wis. June 26, 2017), Dkt. 164; *see also id.* at 2-P-37 to 38, 2-P-86 to 89 (Reynolds witness confirming "whitelisting" practice).

"Protected Dealer Data."  Consistent with the FTC's approach, the dealers are the "first parties" who have responsibility to handle the data carefully, notably for the consumers who selected that dealer. [78]  Other entities who receive the data are "third parties" generally unknown to consumers, including Dealer Data Vendors such as CDK and Reynolds.  Dealer Data Vendors do not call the shots about consumer data; the Dealer Data Security Law reaffirms that the dealers selected by consumers are the ones responsible for decisions about the data.

90.    The second theme of my testimony is that the Dealer Data Security Law closely tracks the Fair Information Principles found in innumerable security and data privacy laws, in the United States and globally.  The statute assures the core FIPs of notice, choice, access, security, and enforcement.  It also assures the right to data portability, as part of a global trend to prevent third parties from unreasonably restricting access to data.  Put another way, the Dealer Data Security Law has widely accepted and widely adopted FIPs provisions, many of which closely track HIPAA and other legal regimes that govern protection of data.

91.    In conclusion, the Dealer Data Security Law ratifies the long-held understanding about who owns and controls the data – the dealer.  Then, it uses the standard FIPs to govern how to implement that ownership and control.  My expert opinion, based on the facts available to me and my expertise in security and privacy, is that the Dealer Data Security Law is consistent with the FIPs and good security and privacy principles.

---

[78] As discussed during the discussion of data portability, above, the E.U. term for what the FTC calls the "first party" is "controller" – the entity that has control over how the data is protected.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on this 28thth day of September 2019.

By: _____

Peter P. Swire

**Appendix A**
**Curriculum Vitae**

# PETER P. SWIRE, J.D.

Scheller College of Business
Georgia Institute of Technology
800 West Peachtree NE
Atlanta GA 30308

Phone: (240) 994-4142

peter@peterswire.net
peter.swire@scheller.gatech.edu

http://www.peterswire.net
http://scheller.gatech.edu/directory/faculty/swire/index.html

---

## *Education*

**YALE UNIVERSITY**                                              **School of Law**
*Juris Doctor*                                                                      *1985*
*ABD,* Program of Doctor of Civil Laws (Law and Political Theory).
Senior Editor, Yale Law Journal (1983 – 1985)

**UNIVERSITÉ LIBRE DE BRUXELLES**
1980 – 1981      Student, in French, at the Institute of European Studies and in Economics      Belgium

**PRINCETON UNIVERSITY      Woodrow Wilson School of Public and International Affairs**
*Bachelor of Arts* (Summa Cum Laude, Phi Beta Kappa)                                          *1980*
Concentration: Economics
Thesis Title: "The Onslaught of Complexity: Information Technologies and Their Effects on Legal and Economic Thought"

---

## *Experience*

**GEORGIA INSTITUTE OF TECHNOLOGY**                    **Scheller College of Business**
*Elizabeth and Tommy Holder Chair of Law and Ethics*                            Atlanta, GA

Aug. 2013 – present      Law and Ethics Program.  Appointments by courtesy to the College of Computing and the School of Public Policy.  Associate Director for Policy, Georgia Tech Institute for Information Security and Privacy.  2013-2017, Nancy J. & Lawrence P. Huang Professor of Law and Ethics.

## ALSTON & BIRD, LLP
*Senior Counsel*                                                                                           Atlanta, GA

Jan. 2015 – present          Under University rules governing outside consulting, assist clients in global law firm on
                             privacy, cybersecurity, and other matters.


## PRESIDENT'S REVIEW GROUP ON INTELLIGENCE AND COMMUNICATIONS TECHNOLOGY
*Member*

2013-2014                    One of five members appointed by President Obama to recommend policy changes for the
                             U.S. intelligence community.  Report issued in December, 2013. Along with other
                             recommendations that have been adopted, the major provisions of the USA-FREEDOM Act
                             were based on the Report.


## WORLD WIDE WEB CONSORTIUM
*Co-Chairman, Tracking Protection Working Group*

2012-2013                    Led global process to develop a Do Not Track standard for users surfing the Internet.
                             Responsible for leading "compliance specification" for web sites that receive a user's Do Not
                             Track signal.

## OHIO STATE UNIVERSITY                                                              **Moritz College of Law**
*C. William O'Neill Professor in Law and Judicial Administration*                    Columbus, OH
1996 – 2013

2006                         Named C. William O'Neill Professor in Law and Judicial Administration
2002 – 2013                  Director, Washington DC Summer Program (except when in government)
1997                         Promoted to Full Professor
1996-97                      Associate Professor


## NATIONAL ECONOMIC COUNCIL                                                          **The White House**
*Special Assistant to the President for Economic Policy*                             Washington, DC
2009 – 2010                  Principal responsibility for administration's inter-agency coordination on housing and housing
                             finance issues. In addition, extensive work on technology issues, including broadband,
                             spectrum, patents, net neutrality, and privacy/surveillance. Reported to Lawrence Summers.


## OBAMA-BIDEN PRESIDENTIAL TRANSITION TEAM
*Member*                                                                             Washington, DC

2008 – 2009                  Activities included: Counsel to New Media Team; member of transition team for Federal
                             Communications Commission and Federal Trade Commission.


## MORRISON & FOERSTER, LLP
*Part-time Consultant*                                                               Washington, DC

2001 – 2008                  Responsibilities for legal work with global privacy and cybersecurity practice.


## GEORGE WASHINGTON UNIVERSITY                                                       **Law School**
2001 – 2002  *Visiting Professor*                                                    Washington, DC
2002 – 2009  *Adjunct Professor*

**EXECUTIVE OFFICE OF THE PRESIDENT OF THE UNITED STATES**   **The White House**
*Chief Counselor for Privacy, Office of Management & Budget*                 Washington, DC
1999 –2001          Policy official with government-wide responsibility for privacy issues. White House
                    Coordinator for HIPAA medical privacy regulation; Coordinator, White House Working
                    Group on legislative proposal to update wiretap and electronic surveillance laws; substantial
                    work on computer security, encryption, international data flows, financial privacy, and other
                    topics.

**UNIVERSITY OF VIRGINIA**                                           **School of Law**
1990 –1996    *Associate Professor*                                  Charlottesville, VA

**POWELL, GOLDSTEIN, FRAZER & MURPHY**
*Associate*                                                          Washington, DC
1986 – 1990          Advocacy practice before Congress and agencies, on banking, environmental,
                     high-technology and other issues.

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
1985 – 1986    *Judicial Clerk to the Honorable Ralph K. Winter, Jr.*  New Haven, CT & NY, NY

---

### Honors and Awards

Outstanding Academic Scholarship Award, Future of Privacy Forum 10th Anniversary (2019)
Named Andrew Carnegie Fellow for project on "Protecting Human Rights and National Security in the New Era of Data
         Nationalism" (one of 31 Fellows chosen in national competition)
Member, National Academy of Sciences Forum on Cyber-Resiliency (2015-present)
Privacy Leadership Award of the International Association of Privacy Professionals (2015) (annual award of the IAPP, a
         group with over 50,000 members)
Selected, Notable Paper for "Privacy Papers for Policy Makers 2015" by the Future of Privacy Forum, for "Going Dark:
         Encryption, Technology, and the Balance Between Public Safety and Privacy (2015)
American Library Association 2014 James Madison Award, to the Review Group on Intelligence and Communications
         Technology, for "the public's right to know at the national level" (2014).
Selected, "Privacy Papers for Policy Makers 2012" by the Future of Privacy Forum, for "Going Dark vs. the Golden Age
         of Surveillance" (2012)
First Runner-Up, Privacy Law Scholars Conference vote on best proposal for USvJones.com (2012)
Distinguished Paper Award, *19th IEEE International Conference on Requirements Engineering* (2011)
Senior Fellow, Future of Privacy Forum in Washington DC (2010 – present)
Senior Fellow, Center for American Progress in Washington, DC (2005 – 2014, except for leave)
Policy Fellow, Center for Democracy and Technology in Washington DC (2005 – 2015, except for leave)
Cyber Fellow, New America Foundation in Washington DC (2015-present)
Named John Glenn Scholar in Public Policy Research by the John Glenn Institute for Public Policy & Public Service, for
         "What Should Still be Secret? Lessons on Anti-terrorism, Cybersecurity, and Privacy" (2003)
Distinguished Privacy Leadership Award, presented by Privacy & American Business, 2000
Named Ameritech Faculty Fellow for 1997-99, in competition within Ohio State University, for project on "The Role of
         Law in Assuring Financial Privacy."
Rotary International Fellowship (1980 – 1981)
Phi Beta Kappa (1980)
Departmental thesis prize for undergraduate thesis at Princeton University (1980)

---

## Selected Funding

### Research on Cross-Border Government Access to Data

Over $850,000 from the Hewlett Foundation, Carnegie Corporation, companies, and others for project to analyze and reform global system for cooperation in trans-border sharing of electronic evidence for law enforcement. 2015-present.

### Computing Community Consortium/Computing Research Association

Catalyst grant for four workshops on "Privacy by Design." Swire was on organizing committee for developing a research program in the field. 2015-2016.

### U.S. Department of Commerce, National Strategy for Trusted Identity in Cyberspace

Swire a member of Georgia Tech Research Institute team awarded $1.7 million for identity trustmarks project. November 2013-November 2015.

### National Science Foundation – Computing and Communication Foundations, Software and Hardware Foundations

"Towards Regulatory Compliance Software Engineering with UCON$_{LEGAL}$". PIs: Annie I. Antón (Georgia Tech), John Doyle (NC State University).  Swire was Senior Personnel for this grant. Proposal was approved for $400,000. August 2012 - August 2014.

### Future of Privacy Forum, Washington, D.C.

Over $500,000 from Apple, Google, Intel, Microsoft, Yahoo! and others to fund research on encryption, government access to data, de-identification, and related topics.  2011-2017.

### John Glenn Institute for Public Policy & Public Service, Ohio State University

Award for "What Should Still be Secret? Lessons on Anti-terrorism, Cybersecurity, and Privacy." Research funding $25,000.  2003.

---

## Publications — Books

Peter Swire & DeBrae Kennedy-Mayo, U.S. Private Sector Privacy: Law and Practice for Information Privacy Professionals, 3d edition (International Association of Privacy Professionals, 2018).

Richard Clarke, Michael Morrell, Geoffrey Stone, Cass Sunstein & Peter Swire, Liberty and Security in a Changing World: Report and Recommendations of the President's Review Group on Intelligence and Communications Technologies (first published 2013, Princeton University Press 2014).

Peter Swire & Kenesa Ahmad, Foundations of Information Privacy and Data Protection: A Survey of Global Concepts, Laws, and Practices (International Association of Privacy Professionals 2012).

Peter Swire & Kenesa Ahmad, U.S. Private Sector Privacy: Law and Practice for Information Privacy Professionals (International Association of Privacy Professionals 2012).

Peter P. Swire & Sol Bermann, Information Privacy: Official Reference for the Certified Information Privacy Professional (International Association of Privacy Professionals, 2007).

Peter P. Swire & Robert E. Litan, None of Your Business: World Data Flows, Electronic Commerce, and the European Privacy Directive (Brookings Institution Press, 1998).

## Publications — Academic

"Frequently Asked Questions About the U.S. Cloud Act," Cross-Border Data Forum (Apr. 16, 2019) (with Jennifer Daskal).

"The Important, Justifiable, and Constrained Role of Nationality in Foreign Intelligence Surveillance," Hoover Institute (January 2019). Peter Swire, Deven Desai & Jesse Woo.

"India-US Cooperation for Law Enforcement Sharing: Blueprints for Reform," Georgia Tech Project on Cross-Border Access to Data & Observer Research Foundation (January 2019).  Madhulika Srikumar, Sreenidhi Srinivasan, DeBrae Kennedy-Mayo, Peter Swire.

"A Pedagogic Cybersecurity Framework: A Proposal for Teaching the Organizational, Legal, and International Aspects of Cybersecurity," 61 *Communications of the ACM*, No. 10, October 2018.

"Privacy and Cybersecurity Lessons at the Intersection of the Internet of Things and Police Body-Worn Cameras," 96 *North Carolina Law Review* 101 (2018). Peter Swire & Jesse Woo.

"Why Both the EU and the US are Stricter than Each Other for the Privacy of Government Requests for Information," 66 *Emory Law Journal* 101 (2017). Peter Swire & Debrae Kennedy-Mayo.

"A Mutual Legal Assistance Case Study: The United States and France," 34 *Wisconsin International Law Review* 323 (2017).  Peter Swire, Justin Hemmings & Suzanne Vergnolle.

"Mutual Legal Assistance in an Era of Globalized Communications: The Analogy to the Visa Waiver Program," 71 *NYU Annual Survey of American Law* 687 (2017).  Peter Swire & Justin Hemmings.

"Stakeholders in Reform of the Global System of Mutual Legal Assistance," in "Bulk Collection: Systematic Government Access to Private-Sector Data," (Fred H. Cate & James X. Dempsey, eds.) (Oxford 2017). Peter Swire & Justin Hemmings.

"New Export Requirements on the Horizon for Cybersecurity Products and Technologies," *Int. Prop. And Tech. L. J.,* Vol 27, No. 9, Sep., 2015 (with Kim Peretti, Jason Waite, & Jason Wool).

"The Declining Half-Life of Secrets and the Future of Signals Intelligence," New America Cybersecurity Initiative, Jul. 23, 2015.

"The USA Freedom Act: A Partial Response to European Concerns about NSA Surveillance," Working Paper, Jean Monnet Centre of Excellence, 2015.

"Lessons from Fair Lending Law for Fair Marketing and Big Data," Future of Privacy Forum, and presented before Federal Trade Commission Workshop on "Big Data: A Tool for Inclusion or Exclusion?" (2014).

"Identifying and classifying ambiguity for regulatory requirements," *22nd IEEE International Requirements Engineering Conference (RE14),* Aaron K. Massey, Richard L.Rutledge, Annie I. Antón and Peter Swire, pp. 83-92, Karlskrona, Sweden, 25-29 August 2014.

"Peter Hustinx and Three Clichés About E.U.-U.S. Data Privacy," in *Data Protection Anno 2014: How to Restore Trust?* (Hielke Hijmans & Herke Kranenborg ed.) (Intersentia 2014).

"Why the Right to Data Portability Likely Reduces Consumer Welfare: Antitrust and Privacy Critique,"
72 *Maryland Law Review* 335 (2013).

"The Second Wave of Global Privacy Protection: Symposium Introduction," 74 *Ohio St. L. J.* 841 (2013).

"Automated Text Mining for Requirements Analysis of Policy Documents," Aaron K. Massey, Jacob Eisenstein, Annie I. Antón and Peter Swire. *21st IEEE International Requirements Engineering Conference (RE'13)*   Rio de Janeiro Brazil, pp. 4-13, 15-19 July 2013.

"From Real-Time Intercepts to Stored Records: Why Encryption Drives the Government to Seek Access to the Cloud," *International Data Privacy* Law (2012), doi: 10.1093/idpl/ips025.

"Managing Changing Compliance Requirements by Predicting Regulatory Evolution: An Adaptability Framework," Jeremy C. Maxwell, Annie I. Antón, Peter Swire.  20th *IEEE International Requirements Engineering Conference* (2012), Chicago, Sept. 2012.

"Encryption and Globalization," 13 *Colum. Sci. & Tech. L. Rev.* 416 (2012). Peter Swire & Kenesa Ahmad.

 "A Legal Cross-References Taxonomy for Reasoning about Compliance Requirements," Jeremy Maxwell, Annie I. Antón, Peter Swire, Maria Riaz & Christopher McCraw, *Requirements Engineering Journal,* Springer-Verlag, 2012.

 "Social Networks, Privacy, and Freedom of Association: Data Protection vs. Data Empowerment," 90 *North Carolina Law Review* 1371 (2012).

"A Reasonableness Approach to Searches after the Jones GPS Tracking Case," 64 *Stanford L. Rev. Online* 57 (2012).

"Why the U.S. Government Should Have a Privacy Office," 10 *J. Telecomm. & High Technology L.* 41 (2012).

"A Legal Cross-References Taxonomy for Identifying Conflicting Software Requirements," *IEEE International Requirements Engineering Conference*, (2011) (awarded "Distinguished Paper" for the conference), Jeremy Maxwell, Annie I. Antón, & Peter Swire.

 "Peeping," 24 *Berkeley Journal of Law & Technology* 1164 (2009).

"The Consumer as Producer: The Personal Mainframe and the Law of Computing," 42 *Law/Technology*, 1st Quarter 2009, at 5.

"When Should 'Consumers-as-Producers' Have to Comply With Consumer Protection Laws?" 31 *J. Consumer Pol'y* 473 (2009).

"Book Review: Proportionality for High-Tech Searches," 6 *Ohio St. J. Crim. L.* 751 (2009) (reviewing Christopher Slobogin, Privacy at Risk: The New Government Surveillance and the Fourth Amendment).

"Introductory Essay for 'Privacy Law: Year in Review, 2008" 4 *I/S: A Journal of Law and Policy for the Information Society* (2009).

"No Cop on the Beat: Underenforcement in E-Commerce and Cybercrime," 7 *J. Telecomm. & High Technology L.* 107 (2009).

"The ID Divide: Addressing the Challenges of Identification and Authentication in American Society*," Center for American Progress* (2008) (with Cassandra Q. Butts).

"Introductory Essay for 'Privacy Law: Year in Review, 2007," 3 *I/S: A Journal of Law and Policy for the Information Society* 373 (2008).

"Introductory Essay for 'Privacy Law: Year in Review, 2005-2006," 2 *I/S: A Journal of Law and Policy for the Information Society* 475 (2006).

"Privacy and Information Sharing in the War on Terrorism," 51 *Villanova L. Rev.* 260 (2006).

"A Theory of Disclosure for Security and Competitive Reasons: Open Source, Proprietary Software, and Government Systems," 42 *Houston Law Review* 1333 (2006).

"Introductory Essay for 'Privacy Law: The Year in Review, 2004'," *I/S: A Journal of Law and Policy for the Information Society* (2005).

"Elephants and Mice Revisited: Law and Choice of Law on the Internet," 153 *U. Penn. L. Rev.* 1975 (2005).

"Through the Privacy Lens," 4 *J. Marshall Rev. Intell. Prop. L.*, Issue 2 (with Julie Cohen & David Sorkin) (2005).

"*Katz* is Dead, Long Live *Katz*," 102 *Mich. L. Rev.* 904 (2004).

"The System of Foreign Intelligence Surveillance Law," 72 *Geo. Wash. L. Rev.* 1306 (2004).

"A Model for When Disclosure Helps Security: What Is Different About Computer and Network Security?" 3 *J. Telecomm. & High Technology L.* 163 (2004); republished in Knowledge Policy for the 21st Century (Mark Perry & Brian Fitzgerald, eds.) (2009).

"Efficient Confidentiality for Privacy, Security, and Confidential Business Information," *Brookings-Wharton Papers on Financial Services* (Brookings, 2003).

"Trustwrap: The Importance of Legal Rules for E-Commerce and Internet Privacy", 54 *Hastings L.J.* 847 (2003).

"State Wiretaps and Electronic Surveillance After September 11", 54 *Hastings L.J.* 971 (2003) (with Charles Kennedy).

"The Surprising Virtues of the New Financial Privacy Law," 86 *Minn. L. Rev.* 1263 (2002).

"Security and Privacy After September 11: The Health Care Example," 86 *Minn. L. Rev.* 1515 (2002) (with Lauren Steinfeld).

"The Ethical and Legal Implications of *Jaffee v. Redmond* and the HIPAA Medical Privacy Rule for Psychotherapy and General Psychiatry," 25 *Psychiatric Clinics of North America* 575 (2002). Peter Swire & Paul Mosher.

"Financial Privacy and the Theory of High-Tech Government Surveillance," 77 *Washington U. L.Q.* 461 (1999) & Brookings-Wharton Papers on Financial Services (1999).

"Of Elephants, Mice, and Privacy: International Choice of Law and the Internet," 32 *The International Lawyer* 991 (1998).

"The Uses and Limits of Financial Cryptography: A Law Professor's Perspective," chapter in the *proceedings of Financial Cryptography* '97 (Springer-Verlag, 1997).

"Markets, Self-Regulation, and Legal Enforcement in the Protection of Personal Information," U.S. Department of Commerce, Privacy and Self-Regulation in the Information Age (1997).

"The Race to Laxity and the Race to Undesirability: Explaining Failures in Competition Among Jurisdictions in Environmental Law," *Yale Law & Policy Rev./Yale J. on Regulation,* Symposium: Constructing a New Federalism 67 (1996).

"Equality of Opportunity and Investment in Creditworthiness," 143 *U. Pa. L. Rev.* 1533 (1995).

"The Persistent Problem of Lending Discrimination: A Law and Economics Analysis," 73 *Tex. L. Rev.* 787 (1995).

"Safe Harbors and a Proposal to Improve the Community Reinvestment Act," 79 *Va. L. Rev.* 349 (1993).

"Bank Insolvency Law Now That It Matters Again," 42 *Duke L.J. 469* (1992).

"The U.S. Liability System: Background and Trends," in *Liability: Perspectives and Policies* (Brookings, 1988). Robert Litan, Peter Swire & Cliff Winston.

Note, The Incorporation of Independent Agencies Into the Executive Branch, 94 *Yale L.J.* 1766 (1985).

Book Review, 1 *Yale J. L & Pol'y* 417 (1983) (reviewing Jerry L. Mashaw, Bureaucratic Justice: Managing Social Security Disability Claims).

## Testimony and Other Public Comments

Testimony before the European Political Strategy Centre of the European Commission, on "Building a European Data Economy," March, 2017.

Testimony before the Irish High Court, as independent expert witness selected by Facebook for the "Schrems 2" case, March, 2017.

Testimony before the Senate Commerce Committee on "How Will the FCC's Proposed Privacy Regulations Affect Consumers and Competition?" July 2016.

Comments submitted to the Federal Communications Commission on "Supplementing the Record About Limits on ISP Comprehensive and Unique Visibility," June, 2016 (with Justin Hemmings).

Comments submitted to the Federal Communications Commission on "Online Privacy and ISPs," May, 2016 (with Justin Hemmings and Alana Kirkland).

Testimony submitted to the Belgian Privacy Authority on "US Surveillance Law, Safe Harbor, and Reforms Since 2013," December, 2015.

Testimony before the Senate Judiciary Committee on "Going Dark: Encryption, Technology, and the Balance Between Public Safety and Privacy," July, 2015.

"Comments to the FCC on Broadband Consumer Privacy," presented before the Federal Communications Commission Workshop on Broadband Consumer Privacy, April, 2015.

"Lessons from Fair Lending Law for Fair Marketing and Big Data," presented before Federal Trade Commission Workshop on "Big Data: A Tool for Inclusion or Exclusion?" September, 2014.

Testimony before the House Judiciary Committee, "Examining Recommendations to Reform FISA Authorities," February, 2014.

Testimony before the Senate Judiciary Committee, "Hearing on the Report of the President's Review Group on Intelligence and Communications Technologies," January, 2014.

Testimony before the Senate Intelligence Committee on the Report of the President's Review Group on Intelligence and Communications Technology, (closed session) January, 2014.

Testimony before the Senate Commerce Committee on "A Status Update on the Development of Voluntary Do-Not-Track Standards," April, 2013.

Testimony before the Senate Homeland Security Committee on "State of Federal Privacy and Data Security Law: Lagging Behind the Times?" July, 2012.

Testimony before the Senate Commerce Committee on "The Need for Privacy Protections: Is Industry Self-Regulation Adequate?" June, 2012.

"De-Identification and the Privacy Multistakeholder Process."  Comments submitted to the U.S. Department of Commerce, April, 2012.

Testimony before the House Energy & Commerce Committee on "Internet Privacy: The Impact and Burden of EU Regulation," September, 2011.

Testimony before the Senate Banking Committee on "National Mortgage Servicing Standards," August, 2011.

"Delivering ERISA Disclosure for Defined Contribution Plans: Why the Time Has Come to Prefer Electronic Delivery." Comments submitted to the U.S. Department of Labor, June, 2011.

"Social Networks, Privacy, and Freedom of Association." Comments submitted to the Federal Trade Commission, January, 2011.

"Why the Federal Government Should Have a Privacy Policy Office." Comments submitted to the U.S. Department of Commerce, January 28, 2011.

Comments submitted to the U.S. Department of Health and Human Services on Health Data Breach Guidelines, May 22, 2009.

"The FTC @ 100 and the Future of Consumer Protection," Testimony submitted to the Federal Trade Commission for the FTC at 100 Project, October 30, 2008.

Testimony before the Senate Judiciary Committee on "Laptop Searches and Other Violations of Privacy Faced by Americans Returning from Overseas Travel," June 25, 2008.

Testimony before the Senate Homeland Security and Governmental Affairs Committee, on "Protecting Personal Information: Is the Federal Government Doing Enough?" June 18, 2008.

Comments submitted to the Federal Trade Commission on Proposed Principles for Online Behavioral Advertising, April 10, 2008 (with Annie I. Antón).

"Protecting Consumers: Privacy Matters in Antitrust Analysis," Testimony submitted to the Federal Trade Commission on Privacy and Antitrust, October 19, 2007.

Testimony before the House Oversight and Government Reform Subcommittee on Information Policy, Census, and National Archives, on electronic medical records and privacy, June 19, 2007.

Testimony before the Senate Judiciary Committee, on National Security Letters, April 11, 2007.

Testimony before the House Energy and Commerce Committee, on "Privacy in the Commercial World II," June 20, 2006.

Testimony before the House Judiciary Committee, on "Personal Information Acquired From Information Resellers: Is There Need for Improvement?" April, 2006.

Testimony before the White House Privacy and Civil Liberties Board, Dec. 5, 2006.

Testimony before the House Judiciary Committee, on Section 218 of the Patriot Act, April, 2005.

Testimony before the House Judiciary Committee, on Sections 209 & 217 of the Patriot Act, April, 2005.

Comments submitted to federal financial regulatory agencies on short privacy notices, Mar. 29, 2004.

Testimony before the House Financial Services Committee on "Reauthorization of the Fair Credit Reporting Act," May, 2003.

Testimony before the House Judiciary Committee on "Privacy and the Homeland Security Department," July, 2002.

Comments submitted to the U.S. Department of Health and Human Services on medical privacy regulation, March, 2002.

Comments submitted to the U.S. Department of Health and Human Services on medical privacy regulation, April, 2001.

Comments submitted to the U.S. Department of Commerce on the proposed safe harbor for transborder data flows, December, 1998.

Testimony before the U.S. Senate Banking Committee, concerning proposed reform of bank insolvency laws, June, 1995.

## Other Writings

"The US, China, and Case 311/18 on Standard Contractual Clauses," *European Law Blog*, July 15, 2019.

"Interdire le transfert de données seulement vers les Etats-Unis serait une aberration," *Le Monde*, July 11, 2019.

"Two Ways that Smaller Countries Could Participate in Emerging Global Systems of Transfer of Electronic Evidence," *Cross-Border Data Forum*, May 30, 2019 (with DeBrae Kennedy-Mayo).

"EU and U.S. Negotiations on Cross-Border Data, Within and Outside of the Cloud Act Framework," Cross-Border Data Forum (Apr. 13, 2019).

"The Important, Justifiable, and Constrained Role of Nationality in Foreign Intelligence Surveillance," *Lawfare*, Jan. 11, 2019 (with Jesse Woo, Deven Desai).

"U.S. Federal Privacy Preemption Part 1: History of Federal Preemption of Stricter State Laws," IAPP Privacy Tracker, Jan. 9, 2019.

"U.S. Federal Privacy Preemption Part 2: Examining Preemption Proposals," IAPP Privacy Tracker, Jan. 10, 2019.

"How Stricter Procedures in Existing Law May Provide a Useful Path for Cloud Act Executive Agreements," Cross-Border Data Forum, Nov. 16, 2018 (with Justin Hemmings, Sreenidhi Srinivasan).

"The Globalization of Criminal Evidence," IAPP, Oct. 18, 2018. (with Théodore Christakis, Jennifer Daskal).

"Announcing the New Cross-Border Data Forum," IAPP, Oct. 18, 2018.  (with Théodore Christakis, Jennifer Daskal).

"Recommendations for the Potential U.S.-U.K. Executive Agreement Under the Cloud Act," *Lawfare*, Sept. 14, 2018. (with Justin Hemmings).

"Insight: A Canary in the Ad Tech Coal Mine? German DPAs Announce Opt-In Regime for Online Advertising," *Bloomberg Law: Privacy & Data Security*, June 29, 2018 (with Dan Felz).

"A Possible EU-US Agreement on Law Enforcement Access to Data?", *Lawfare*, May 21, 2018 (with Jennifer Daskal).

"The Importance of Accurate Retrieval of Data Subjects' Personal Data in Complying with GDPR Individual Rights Requirements," Alston & Bird, *Privacy and Data Security Blog*, May 16, 2018 (with Jan Dhont and DeBrae Kennedy-Mayo).

"2018 Update to Delivering ERISA Disclosure for Defined Contribution Plans: Why the Time Has Come to Prefer Electronic Delivery," May, 2018 (with DeBrae Kennedy-Mayo).

"Suggestions for Implementing the Cloud Act," *Lawfare*, Apr. 30, 2018, (with Jennifer Daskal).

"What the CLOUD Act Means for Privacy Pros," International Association of Privacy Professionals, *Privacy Tracker*, Mar. 26, 2018 (with Jennifer Daskal).

"The Cloud Act and its Impact on Cross-border Access to the Contents of Communications," Alston & Bird, *Privacy & Data Security Blog*, Mar. 25, 2018 (with Justin Hemmings).

"Privacy and Civil Liberties Under the CLOUD Act: A Response," *Lawfare*, Mar. 21, 2018 (with Jennifer Daskal).

"Why the CLOUD Act is Good for Privacy and Human Rights," *Lawfare*, Mar. 14, 2018 (with Jennifer Daskal).

"The CLOUD Act: A Welcome Legislative Fix for Cross-Border Data Problems," *Lawfare*, Feb. 6, 2018 (with Andrew Keane Woods).

"Reform Section 702 to Maintain Fourth Amendment Principles," *Lawfare*, Oct. 19, 2017 (with Richard Clarke).

"EU Judges US Surveillance Law," *Lawfare*, Sep. 11, 2017.

"Should the Leading Online Tech Companies Be Regulated as Public Utilities?" *Lawfare*, Aug. 2, 2017.

"WannaCry About Backdoors," *Future of Privacy Forum*, June 2, 2017.

"Why Cross-Border Government Requests for Data Will Keep Becoming More Important," *Lawfare*, May 23, 2017.

"Why CISOs Should Care About Developments in the EU," *National Technology Security Coalition Blog*, Apr. 18, 2017.

"A Qualified SPOC Approach for India and Mutual Legal Assistance," *Lawfare* (with Deven Desai), Mar. 2, 2017.

"Reforming Mutual Legal Assistance Needs Engagement Beyond the U.S.," *Lawfare* (with Ian Brown and Vivek Krishnamurthy), Mar. 2, 2016.

"Explaining U.S. Surveillance Law Protections for an EU Audience," *Lawfare*, Dec. 22, 2015.

"Why U.S. Surveillance Law Protections Are Better Than Europe Thinks," *IAPP Privacy Perspectives*, Dec. 18, 2015.

"Solving the Unsolvable on Safe Harbor—The Role of Independent DPAs," *IAPP Privacy Perspectives*, Oct. 13, 2015.

"Don't Strike Down the Safe Harbor Based on Inaccurate Views About U.S. Intelligence Law," *IAPP Privacy Perspectives*, Oct. 5, 2015.

"What the FBI Director Could Learn from the Rolling Stones," *Huffington Post*, Sep. 30, 2015 (with Richard A. Clarke).

"The Declining Half-Life of Secrets," *Just Security*, Jul. 23, 2015. (One of 15 most-read JS articles of the year.)

"The Golden Age of Surveillance," *Slate*, Jul. 15, 2015.

"The USA Freedom Act, the President's Review Group, and the Biggest Intelligence Reform in 40 Years," *IAPP Privacy Tracker*, Jun. 3, 2015.

"A Historical Primer for This Week's Judicial and Congressional Actions on Section 215 Bulk Collection," *IAPP Privacy Tracker*, May 14, 2015.

"Preparing to Debate NSA Surveillance and Online Commercial Tracking," *IAPP Privacy Perspectives*, Feb. 18, 2015.

"Protecting Health Data Critical," *Atlanta Journal Constitution*, Jan. 23, 2015 (with Annie Antón).

"The FBI Doesn't Need More Access: We're Already in the Golden Age of Surveillance," *Just Security*, Nov. 17, 2014.

"Amend the Privacy Act to Provide Further Privacy Protections to European and Other Non-U.S. Persons," *Future of Privacy Forum Blog*, Nov. 12, 2014.

"The Chinese Hacking Indictments and Why Economic Espionage is Different," *IAPP Privacy Perspectives*, May 21, 2014.

"The NSA Shouldn't Stockpile Web Glitches," *The Daily Beast*, Apr. 18, 2014 (with Richard Clarke).

"Why Tech Companies and the NSA Diverge on Snowden," *Washington Post*, Jan. 31, 2014.

"Engineers and Lawyers in Privacy Protection: Can We All Just Get Along," *IAPP Privacy Perspectives*, Jan. 13, 2014 (with Annie Antón).

"Protecting Citizens, and Their Privacy," *New York Times*, Dec. 10, 2013 (with other members of the Review Group).

"Why the New Senator Markey May Be the Most Influential Privacy Congressman in History," *IAPP Privacy Perspectives*, June 26, 2013.

"Telephone Records and PRISM – the First Job for the Privacy and Civil Liberties Oversight Board," *IAPP Privacy Perspectives*, June 7, 2013.

"Going Dark vs. Going Secure – New CDT Experts Report on CALEA II," *IAPP Privacy Perspectives*, May 16, 2013.

"How to Prevent the 'Do Not Track' Arms Race," *Wired*, Apr. 24, 2013.

"Alan Westin's Legacy of Privacy and Freedom," *IAPP Privacy Perspectives*, March 7, 2013.

"Moving Too Fast on Cybersecurity," *thehill.com*, Apr. 20, 2012.

"'Going Dark' vs. 'A Golden Age for Surveillance,'" *Center for Democracy and Technology*, Nov. 28, 2011 (with Kenesa Ahmad).

"The Need for Consumer Protection Laws for Homeowners," *Center for American Progress*, Aug. 8, 2011.

"Avoiding Voicemail Hacking in the U.S.," *thehill.com,* Jul. 26, 2011 (with Christopher Soghoian).

"Why Privacy Legislation is Hot Now," *thehill.com*, Jun. 23, 2011.

"What the Fair Credit Reporting Act Should Teach Us About Mortgage Servicing," *Center for American Progress*, Feb. 28, 2011.

"Getting Online Privacy Policy Right," *Center for American Progress*, Jan. 28, 2011.

"Homeowners are Consumers, Too," *Center for American Progress*, Dec. 23, 2010.

"Stopping Foreclosures Amid Mortgage Modifications," *Center for American Progress*, Nov. 19, 2010.

"Bankers Should Take Personal Responsibility for the Mortgage Mess," *Center for American Progress*, Oct. 11, 2010.

"Smart Grid, Smart Broadband, Smart Infrastructure," *Center for American Progress*, Apr. 8, 2009.

"It's Not the Campaign Any More: How the White House is Using Web 2.0 Technology So Far," *Center for American Progress*, June, 2009.

"How to Buy Free Software: Procuring Web 2.0 Technology for the Federal Government," *Center for American Progress*, June, 2009.

"Six New Media Challenges: Legal and Policy Considerations for Federal Use of Web 2.0 Technology," *Center for American Progress*, June, 2009.

"Transparency Can Alleviate Systemic Risk," *American Banker*, Apr. 17, 2009.

"Phone Tracking Should Require a Warrant," *American Constitution Society*, Apr. 17, 2009.

"Smart Grid, Smart Broadband, Smart Infrastructure," *Center for American Progress*, April, 2009.

"Tech Policy and the Financial Crisis," Talking Points Memo, Oct. 21, 2008.

"The ID Divide: Addressing the Issues of Authentication and Identification in American Society," in American Constitution Society, "A Fresh Start for a New Administration: Reforming Law and Justice Policies," October, 2008.

"Bush's Budget Repeats Cybersecurity Mistakes," *Center for American Progress*, Feb. 4, 2008.

"Privacy Key to Yahoo Merger; Microsoft Bid Must Ensure Safeguards," *Center for American Progress*, Feb. 1, 2008.

"Google and Privacy: Merger with DoubleClick Prompts New Privacy Guidelines," *Center for American Progress*, Dec. 20, 2007.

"We Are the Web," *Center for American Progress*, Dec. 18, 2007.

"Transparency in Jeopardy," (Review of Alisdair McIntyre, Blacked Out: Government Secrecy in the Information Age), *Issues in Science & Technology*, Winter, 2007.

"Funding the FTC," *Center for American Progress*, Feb. 26, 2007.

"Why There Are No Privacy Problems Raised by the Ohio Fair Minimum Wage Amendment," Oct., 2006.

"A Question of Impartiality," *Detroit Free Press*, Aug. 31, 2006.

"The Internet and the Future of Consumer Protection," *Center for American Progress*, July 24, 2006.

"Is Data Retention Secure?", *Federal Computer Week*, June 12, 2006.

"Disclosing Records Clearly Illegal," *Cincinnati Enquirer*, May 21, 2006.

"Research Report: Application of IBM Anonymous Resolution to the Health Care Sector," Apr., 2006.

"Auditing Access to and Use of a Health Information Exchange," *Markle Connecting for Health Common Framework*, April, 2006.

"A Call for Action: Report from the National Consumers League Anti-Phishing Retreat" (served as "reporter" for this project), March, 2006.

"Legal FAQs on NSA Wiretaps," *Center for American Progress*, Jan. 30, 2006.

"Making Privacy a Priority," *Federal Computer Week*, Jan. 23, 2006.

"Creating a Trusted Information Sharing Environment: Using Immutable Audit Logs to Increase Security, Accountability, and Transparency" (with Jeff Jonas), *Markle Foundation Task Force on National Security in the Information Age*, January 2006.

"Councilman Reversal Protects Email Privacy," *Privacy & Information L. Rept.*, Oct. 2005, at 1.

"Justice Department Opinion Undermines Protection of Medical Privacy," Center for American Progress, June, 2005.

"Section 215 of the Patriot Act," *www.patriotdebates.com*, Apr., 2005.

"The New Federal Privacy Officials," *Privacy & Information L. Rept.,* Mar. 2005, at 8.

"The Wrong Civil Liberties Board," *Center for American Progress guest editorial*, Sept. 2004.

"Has Technology Outstripped Telephone Legal Protections?", *Privacy Journal*, June, 2004, at 3.

"Don't Delete Internet Privacy", *Detroit Free Press*, Aug. 26, 2003.

"Protecting Privacy from the 'New Spam'", *Boston Globe*, July 27, 2003, at E11.

"Enforcement of the HIPAA Privacy Rule: The Past Is Our Guide", *Privacy & Information Law Reporter,* June, 2003, at 1 (with Brian Busey).

"The Online/Offline Question", in "Considering Consumer Privacy: A Resource for Policymakers and Practitioners" (Center for Democracy and Technology 2003).

Eisenach & Swire, "Ensuring Privacy's Post-Attack Survival," *www.zdnet.com*, Sept.11, 2002.

"New Procedures Under HIPAA for Disclosure of Protected Health Information in Judicial and Administrative Proceedings," *Privacy & Information Law Reporter*, Sept., 2002, at 1 (with  Brian Busey and Sean Ruff).

"Speaking Out About Wiretaps," *Wash. Post*, Aug. 30, 2002, at A23 (with John Podesta).

"Privacy and the Future of Justice Statistics," Proceedings of a National Conference on Privacy, Technology, and Criminal Justice Information , *SEARCH -- The National Consortium for Justice Information and Statistics* (2001).

"If Surveillance Expands, Safeguard Civil Liberties," *Atlanta Journal Constitution*, Oct. 21, 2001.

"Administration Wiretap Proposal Hits the Right Issues But Goes Too Far," *Brookings Terrorism Project Website*, Oct. 3, 2001.

"Cato Privacy Paper Not Persuasive," available at Swire web site, Aug. 10, 2001 (critiquing Tom Bell, "Internet Privacy and Self-Regulation: Lessons from the Porn Wars").

"New Study Substantially Overstates Costs of Internet Privacy Protections," available at Swire web site, May 9, 2001 (critiquing Robert Hahn, "As Assessment of the Costs of Online Privacy Protection").

"Peter Swire on Privacy, Pay Phones, and Strong Crypto," *Electronic Banking Law and Commerce Report,* Apr., 2001, p. 1 (interview on financial privacy).

"Privacy is Peter Swire's Domain: Behind the Scenes He's President's Go-to Guy," by Elizabeth Weise, *USA Today*, June 7, 2000, Life Section, p. 1 (press profile).

"The Great Firewall of Europe," CIO Magazine, Feb. 15, 1998, at 26.

"Invasion of the Space Alien Movies," *Ohio State Hearsay*, Sept. 1997.

"The Consumer Credit Reporting Reform Act and the Future of Electronic Commerce Law," Electronic Banking Law & Commerce Rep., Nov./Dec. 1996.

"Bank on Streamlined Regulation," Wall St. J., Nov. 21, 1994, at A16.

"Jonah, the Bible, and Environmental Values," Va. L. Weekly, Sept. 23, 1994, at 1.

"Lifting CRA's Threat to Mergers," American Banker, Jan. 5, 1993, at 4.

"Good Old Days Disappear in Banking Regulation," *Va. L. Rept.*, Summer, 1991, at 21.

Eizenstat & Swire, "Try Efforts That Are Neutral of Race, Too," *Los Angeles Times*, Feb. 14, 1989.

"Tropical Chic", *The New Republic*, Jan. 30, 1989.

Lazarus & Swire, "Reactionary Activism", *The New Republic*, Feb. 22, 1988.

## Selected Professional Activities

**Research Director, Cross-Border Data Forum** (2018-present).

**Adviser, American Law Institute/European Law Institute**, Project on Principles for a Data Economy (2018 – present).

**Member, Forum on Cyber Resilience**, The National Academies of Sciences-Engineering-Medicine (2015 – present).

**Senior Fellow and Member of the Advisory Committee, Future of Privacy Forum** (2010-present). *The Future of Privacy Forum "is a Washington, DC based think tank that seeks to advance responsible data practices."*

**Policy Fellow and pro bono advisor, Center for Democracy and Technology** (2005-2014), except when in government). *The Center for Democracy and Technology "is a non-profit public interest organization working to keep the Internet open, innovative, and free." Projects on topics including Internet privacy, authentication, surveillance practices, and spyware.*

**Cyber Fellow, New American Foundation/Open Technology Institute** (2015-present). *New America "is dedicated to the renewal of American politics, prosperity, and purpose in the digital age."*

**Senior Fellow, Center for American Progress** (2005-2014, except when in government). *The Center for American Progress is a think tank in Washington, D.C., whose mission is as a "nonpartisan research and educational institute dedicated to promoting a strong, just, and free America that ensures opportunity for all."*

**"Volunteer Group" to update the Organization for Economic Cooperation and Development Privacy Guidelines** (2011 to 2013). *The OECD Privacy Guidelines on the Protection of Privacy and Transborder Flows are the most widely-cited international consensus guidelines for privacy protection. In late 2011 I was named as the sole U.S. academic for the working group considering revision of these Guidelines, with workshops in Brussels, Paris, and elsewhere.*

**Guest blogger, Lawfare** (2015-present), **International Association of Privacy Professionals** (2013-present); **ConcurringOpinions.com** (2012-2013).

**Markle Foundation.** "*Markle works to realize the full potential of information and information technology to address critical public needs, particularly in the areas of health and national security." In 2005-2006, I served as an Associate to the Task Force on National Security in the Information Age. In 2004-2006, I served on the Connecting for Health Task Force.*

**Reporter, Committee on Technology and Privacy, The Constitution Project: The Liberty and Security Initiative**, 2002-2004. *This project focused on privacy and security in the wake of the attacks of September 11, 2001.*

**Consulting Expert, Organization for Economic Cooperation and Development**, on project for assessing fair information practices for genetic information, 2001-2002.

**Consulting expert, U.S. Department of Commerce**, to lead federal inter-agency delegation to six European countries for research concerning the safe harbor principles for transfers of data between the European Union and the United States, 1998-1999

**Consulting expert, Center for Legal and Social Research** (headed by Dr. Alan Westin), on Model Contracts Project for Transborder Data Flows, 1998-1999.

**Associate Director of Studies, The American Agenda** (assisted on domestic and economic policy issues in preparation of bipartisan report to President-elect), June-November 1988.

## Professional Service – Editorial Boards

Editor, Cyberspace Law Abstracts of the Social Science Research Network. *One of two editors, originally with Larry Lessig and now with Jonathan Zittrain.* (1998 – present) (on leave while in government).

Faculty Editor, *I/S: A Journal of Law and Society for the Information Age* (2004 – 2013) (on leave while in government).

Editorial Board, *Journal of National Security Law and Policy* (2004 – present) (on leave while in government).

Advisory Board, *BNA Electronic Commerce Report* (2003 – present).

Advisory Board, *Privacy & Information Law Reporter* (2002 – 2008).

Editorial Advisory Board, *Electronic Banking Law & Commerce Report* (1997-1999).

Selected Program Committees: Requirements Engineering Law '13, '14, '15; Telerise '15.

## Professional Service – Selected Industry Advisory Boards

Member, Intel Privacy and Security Advisory Board, 2005-2015 (on leave while in government).

Member, Trustworthy Computing Academic Advisory Board, Microsoft, 2003-08, 2012-2014.

Advisory Board, Sensity, 2013-2016.

Advisory Board, Strevus, 2013-2015.

Advisory Board, Enlocked, 2013-2015.

Advisory Board, Sentrigo, 2006-2009.

Academic advisor, Google Health Care Board, 2006-07.

Member, IBM Privacy and Security Advisory Board, 2001-02.

## University Service

**Georgia Institute of Technology, Scheller College of Business,** 2013-present. *Associate Director for Policy, Institute for Information Security and Privacy; Scheller College Representative, Institute for Data Engineering and Science; Scheller College Promotion & Tenure Review Committee; Scheller College Strategic Planning Committee; Member, Institute-wide Data Science Faculty Council; Member, Scheller College Committee on Possible Reforms to Promotion & Tenure.*

**Director, Washington, D.C. Summer Law Program of the Moritz College of Law,** 2002-2013. *Each summer approximately 20 Moritz law students worked in internships, approximately half in federal agencies and half in non-profits. I worked closely with each student to secure a good internship, and taught two courses to them in the summer.*

**Faculty Editor, "*Privacy Year in Review*," for I/S: A Journal of Law and Policy for the Information Society,** 2004-

2013. *This issue for several years was distributed to all members of the International Association of Privacy Professionals, and I at that time supervised 10-14 student note publications for this issue.*

**Committee memberships:** *I served on a range of committees at Ohio State, including appointments, long-range planning, promotion & tenure, and as an advisor to the Dean on press relations.*

---

## Teaching

**Georgia Institute of Technology, Scheller College of Business**, Professor (2013-present).
- Privacy, Technology, Policy, and Law
- Information Security Strategies and Policy
- Introduction to Business Law
- Executive education programs on cybersecurity and privacy

**Ohio State University, Moritz College of Law,** Associate Professor (1996-1998), Professor (1998 – 2013) (except for leave):
- Antitrust
- Business Associations
- Environmental Law
- Environmental Law Topics (seminar)
- Ethics of Washington Lawyering
- Financial Crisis (seminar)
- Introduction to U.S. Law
- Law of Cybersecurity
- Law of Cyberspace
- Privacy and Cyberspace (seminar)
- Privacy Law
- Torts
- Washington, D.C. summer program externship seminar

**George Washington University Law School**, Visiting Professor (2001 – 2002), Adjunct Professor (2002 – 09):
- Business Associations
- Ethics of Washington Lawyering (cross-listed in summers with Ohio State)
- Law of Cyberspace
- Torts

**University of Virginia School of Law**, Associate Professor (1990 – 1996):
- Banking Regulation
- Environmental Law
- Legislation
- Regulation in the Information Age (seminar)
- Regulation of Toxics
- Torts

**Georgetown University Law School**, Adjunct Professor (1990)
- Alternative Dispute Resolution

## Presentations (2013 to September, 2019)

*Full list of presentations, with links to materials, available at www.peterswire.net*

Keynote, "The Pedagogic Cybersecurity Framework and the Non-Code Aspects of Cybersecurity," Workshop on the Economics of Cybersecurity, Cambridge MA, June, 2019.

"Expanding the OSI Stack to Describe Categories of Privacy Tasks: The Privacy Institutions Risk Management Framework," Drafting the NIST Privacy Framework, Workshop #2, Atlanta, May, 2019.

"Is Privacy Dead? Reports of Its Death (May) Have Been Greatly Exaggerated," Princeton Mini-Reunion, Atlanta, March, 2019.

Report release, "India-US Data Sharing for Law Enforcement: Blueprints for Reform," Observer Research Foundation, New Delhi, January, 2019.

Panelist, "Walls or Bridges: The Future of the Networked World," Asian Forum on Global Governance, New Delhi, January, 2019.

Panelist, "Substantive Issues in Privacy and Defamation Law in the Internet Age: Possibilities of Civil Recovery?" American Associate of Law Schools Conference, Section of Privacy and Defamation Law, New Orleans, January, 2019.

Panelist, "Policy Issues," Georgia Tech Blockchain Roundtable, Atlanta, December, 2018.

"The European Union as Global Information Regulator," Engage CISO Roundtable with the Georgia Tech Institute of Information Security and Privacy, Atlanta, December, 2018.

Panelist, "Developments in 2017-2018 on oversight and exchange mechanism in the world," United Nations Conference on "Latest Challenges to Intelligence Oversight in a Democracy," Malta, November, 2018.

Panelist, "Training of Oversight Bodies from Inspection to Judicial Review: the UK experience,"  United Nations Conference on "Latest Challenges to Intelligence Oversight in a Democracy," Malta, November, 2018.

Moderator, "The Future of Data in Europe," Alston & Bird, Brussels, November, 2018.

Webinar, "Binding Corporate Rules: The Process and the Potential Benefits," Alston & Bird, October, 2018.

Guest Speaker, "Key Legal and Policy Issues in EU/US Data Flows," Vrije Universiteit Brussel, Brussels, October, 2018.

"Roundtable on US/EU Data Privacy Issues," Beltug Privacy Council, Brussels, October, 2018.

"Roundtable on US/EU Data Privacy Issues," German Marshall Fund, Brussels, October, 2018.

Panelist,  "Intellectual Property Rights, States and Digital Borders Around Data," Global Congress on Intellectual Property and Public Interest, American University Washington College of Law, D.C., October, 2018.

Conference Chair Introduction and Overview, Georgia Tech Cybersecurity Summit featuring the Sam Nunn Bank of American Policy Forum, Atlanta, October, 2018.

Webinar, "Navigating the California Consumer Privacy Act of 2018," Alston & Bird, September, 2018.

Panelist, "The Legislative Evolution of Cross-Border Evidence Gathering," Fair Trials Conference on Judicial Cooperation in Criminal Matters and Electronic IT Data in the EU," Brussels, Belgium, July 2018.

"The Important, Justifiable, and Restrained Role of Nationality in Foreign Intelligence Surveillance," Privacy Law Scholars 2018, Washington, D.C., June 2018.

Moderator, "Privacy and Competition – Big Issues for Big Data," IAPP Privacy Summit, Washington, D.C., April 2018.

Panelist, "Clashing Visions for Control over the Internet," Yale Law School Information Society Conference on Extraterritorial Enforcement: Developing Norms for the Information Society, New Haven, March 2018.

"Modern Surveillance and Privacy," Arena Forum: Civil Dialogues, Arena Stage, Washington, D.C., March 2018.

"The Clash of the EU and U.S. on Privacy & National Security," Atlanta Council on International Relations, Atlanta, March 2018.

"The Economics of Cybersecurity: Breach & Liability Rules," March Atlanta Economics Club Luncheon, Federal Reserve Bank of Atlanta, March 2018.

"The Big Picture on GDPR and the Rising Importance of Privacy Compliance," ISACA GDPR Summit, Atlanta March 2018.

"Lectio Magistralis: Should the EU Decide to Separate from the US Based on Data Protection Law?" European Data Protection Supervisor, Brussels, Belgium, January 2018.

"Regulating Big Tech in a Post-Truth World," Asian Forum on Global Governance conference on Managing Disruptive Transitions, New Delhi, January 2018.

"The Non-Code Layers of the Cyberstack – Lessons for Cybersecurity," Scheller College of Business Faculty Workshop, Georgia Tech, Atlanta, December 2017.

"Privacy, Cybersecurity and Data Analytics," Bowles Symposium 2017 on "Predictive Analytics and Risk Analytics," Georgia State University, Atlanta , November, 2017.

"Privacy and Cybersecurity Lessons at the Intersection of the Internet of Things and Policy Body Worn Cameras," at University of North Carolina Law Review Symposium on "Badge Cams as Data and Deterrent: law Enforcement, the Public, and the Press in the Age of the Digital Video," Chapel Hill NC, November, 2017.

**Keynote:** "The Big Picture on Privacy and Cybersecurity for Technology Lawyers," Georgia Bar Association, Atlanta, October, 2017.

Workshop, "The Ethical Reuse of Data in a Machine Learning Age," Georgetown University Law School, Washington, D.C., October, 2017.

Workshop, "Cyber Policy and Security in Higher Education," Stanford University, Palo Alto, October, 2017.

"The Non-Code Layers of the Cyber Stack & the Globalization of Criminal Evidence," Institute for Information Security and Privacy, Georgia Tech, Atlanta, October, 2017.

Panelist, "GDPR—DPOs, PIAs & Data Mapping," National CISO Policy Conference, National Technology Security Coalition, Atlanta, October, 2017.

Moderator: "Education and Cybersecurity," National CISO Policy Conference, National Technology Security Coalition, Atlanta, October, 2017.

"Understanding Why Citizenship Matters for Surveillance Rules," Center for Applied Cybersecurity Research,

Indiana Law School, Bloomington, September, 2017.

"The Non-Code Lawyers of the Cyber Stack," Program on Cybersecurity & Internet Governance, Indiana University, Bloomington, September, 2017.

"The Globalization of Criminal Evidence and the Importance of Attribution," Cyber Security Summit, Georgia Tech Institute for Information Security and Privacy, Atlanta, September, 2017.

"Surveillance Oversight, Intelligence Sharing, and the Rule of Law," @lantic Series Policy Conference, University of Maastricht, September, 2017.

"Layers of the Cyberstack: Lessons for Cybersecurity," Academy of Legal Studies of Business, Savannah, August, 2017.

"Service Providers as Adjudicators of Nationality: When Should Citizenship Matter to Surveillance Rules?" Conference on Technology Giants, Sovereign Power, And Surveillance, Hoover Institute, Washington, D.C., July, 2017.

Commenter, "Reconciling Trade and Privacy Concerns in the EU-US Context," 2017 Privacy Law Scholars Conference, Berkeley, June, 2017.

Panelist, "Cyber MayDay: A Bipartisan Approach to Cyber," (with U.S. Reps. Tom Graves and Krysten Sinema) Georgia Tech, Atlanta, May, 2017.

**Keynote**, "Key Policy and Legal Issues for CISOs," Information Systems Security Association CISO Executive Forum on Information Security, Privacy and Legal Collaboration, Washington, D.C., April, 2017.

Panelist, "Schrems, the Sequel," International Association of Privacy Professionals Global Summit, Washington, D.C., April, 2017.

"Introduction to Surveillance, Privacy, & Data Across Borders: Transatlantic Perspectives," Georgia Tech Conference on Surveillance, Privacy, & Data Across Borders, Atlanta, April, 2017.

**Keynote**, "Cybersecurity: View from the Boardroom, the White House, and the Hacker," Adhesives and Sealant Council Spring Convention, Atlanta, April, 2017.

Panelist, "European Union and Other Key Policy Issues," National Technology Security Council Regional CISO Roundtable, Dallas, April, 2017.

Panelist, "Data Protection: Global Convergence or Roads Diverged?" ABA Spring Antitrust Meeting, Washington D.C., March, 2017.

Panelist, "Developments in the European Union and Data Breach Policy" National Technology Security Council Regional CISO Roundtable, Atlanta, February, 2017.

Plenary Panel, "The Caspar Bowden Panel on Privacy Shield and Mass Surveillance," Computers, Privacy, and Data Protection '17, Brussels, January, 2017.

Moderator, "Privacy and Cross-Border Requests for Data," Computers, Privacy, and Data Protection '17, Brussels, January, 2017.

Moderator, Workstream on Data and Jurisdiction, Global Internet and Jurisdiction Conference, Paris, November, 2016.

Panelist, "Three Years Post-Snowden: Surveillance and the State of Transatlantic Data Flows," International

Association of Privacy Professionals Europe Data Protection Congress, Brussels, November, 2016.

"Privacy, Cybersecurity, the Internet, and the Stakes in This Year's Election," University of Michigan Dissonance Series, Ann Arbor, October 2016.

Panelist, "Privacy and Big Data," University of Michigan Center on Finance, Law, and Policy Conference on Finance and Big Data, Ann Arbor, October 2016.

**Keynote**, "Current Issues in Privacy and Cybersecurity," Net Diligence Cyber-Liability Conference, Los Angeles, October 2016

Panelist, "A Chain-Link Fence for Intelligence Surveillance," Constitution Project, Washington, D.C., October, 2016.

"EU Data Flows to US: Are Protections against NSA Surveillance 'Adequate'?" France/Atlanta Conference on Cybersecurity: TransAtlantic Innovation & Strategies, Atlanta, October, 2016.

Panelist, "The Cybersecurity Landscape at Home and Abroad," Georgia Tech Cybersecurity Summit, Atlanta, September, 2016.

Testimony before the Senate Commerce Committee on "How Will the FCC's Proposed Privacy Regulations Affect Consumers and Competition?" July, 2016.

Panelist, "Cybersecurity and Privacy," Atlanta Chief Financial Officers Roundtable, Atlanta, June, 2016.

"Why Cross-Context Tracking is Often More Important than Cross-Device Tracking," 2016 Privacy Law Scholars Conference, Washington, DC, June, 2016.

Panelist, "Governance Looking Out: Trade, Finance, and Territorialization," Georgia Tech School of Public Policy Conference on Political Space/Cyberspace, Atlanta, May, 2016.

"Privacy Déjà Vu: Crypto, Government Surveillance and Safe Harbor, 2000 and 2016," IAPP Global Privacy Summit, Washington, D.C., April, 2016.

Panelist, "The Smartest Cities are Smart on Privacy," IAPP Global Privacy Summit, Washington, D.C., April, 2016.

Panelist, "Privacy: Law Firm Ethical and Legal Obligations," ABA Antitrust Section's 2016 Spring Meeting, Washington, D.C., April, 2016.

Webinar for the National Governors Assocation on Encryption and Privacy, March, 2016.

**Keynote**, "Encryption, Apple, and the FBI," Sayers Technology Summit, Atlanta, March, 2016.

"Debate on Encryption," Cybersecurity for a New America Conference, New America Foundation, Washington, D.C., March, 2016.

"How Technology is Prompting US/EU Tension on Mutual Legal Assistance," Emory Law Journal Thrower Symposium, Atlanta, February, 2016.

"Mutual Legal Assistance," Computers, Privacy, and Data Protection '16, Brussels, January, 2016.

"Making Sense of the Right to Data Portability," Computers, Privacy, and Data Protection '16, Brussels January, 2016.

"Debate with Max Schrems on US/EU Data Protection," Belgian Permanent Representative to the European Union, Brussels, January, 2016.

**Keynote**, "Online Advertising and Privacy," State of the Net '16, Washington, D.C., January, 2016.

"Going Dark: Encryption, Technology, and the Balance Between Public Safety and Privacy," Future of Privacy Forum, "Privacy Papers for Policy Makers," Washington, D.C., January, 2016.

"Regulatory Design and Privacy by Design," Computing Community Consortium/Computing Research Assocation Workshop on Privacy by Design, Washington, D.C., January, 2016.

Panelist, "Law in the EU and the US: Impossible Coexistence?" in "Forum on the Consequences of the Judgment in the Schrems Case," Belgian Privacy Authority (presented remotely), December, 2015.

"Privacy and Cybersecurity: What Does Georgia Tech Think" (with Annie Antón), Georgia Tech Foundation Board of Trustees, Atlanta, December, 2015.

Panelist, "National Security, Digital Trade Policy, and Market Access: International Developments," BSA General Counsel Forum, Napa, November, 2015.

Panelist, "Current Issues in Cybersecurity," Georgia Tech Cyber Security Summit 2015, Atlanta, October, 2015.

"Interviewer for Data and Goliath: A Conversation with Bruce Schneier on Surveillance," Privacy & Security Forum, Washington, D.C., October, 2015.

"Lawyers and Engineers in Privacy Protection," Privacy & Security Forum, Washington, D.C., October, 2015.

"The Storm Over Safe Harbor: The E.U. Strikes Down Its Privacy Agreement with the U.S." Georgia Tech Center for European and Trans-Atlantic Studies, Atlanta, October, 2015.

**Keynote**, "The Second Wave of Global Privacy Protection," PrivacyXChange, Phoenix, October, 2015.

Debate with Ben Wittes on "Going Dark and the Intersection of Law Enforcement and Privacy Interests," Federalist Society Teleforum, October, 2015.

"Where Did HIPAA Come From?" Panel on Medical Privacy for IAPP Privacy Academy, Las Vegas, September, 2015.

**Keynote**, "Identity and the ID Divide," Global Identity Summit, Tampa, September, 2015.

"Re-Engineering the Mutual Legal Assistance Treaty Process," Harvard Berkman Center Conference on Mutual Legal Assistance, Cambridge, July, 2015.

Panelist, "The Essential Role of Organizational Controls," Future of Privacy Forum/Ernst & Young Conference on Practical De-Identification, Washington, D.C., July, 2015.

"The Declining Half-Life of Secrets and the Future of Signals Intelligence," New America Foundation, Washington, D.C., June, 2015.

"General Session Presentation: Security and Privacy After Snowden: Lesson's from the President's NSA Review Group," Gartner Security & Risk Management Summit, National Harbor, MD, June, 2015.

"Re-Engineering the Mutual Legal Assistance Treaty Process," Security & Human Behavior '15, Washington, D.C., June, 2015.

"Re-Engineering the Mutual Legal Assistance Treaty Process," Privacy Law Scholars Conference '15, Berkeley, June, 2015.

**Keynote**, "The Second Wave of Global Privacy Protection," Facebook Privacy@Scale Conference, Menlo Park, June, 2015.

"Why Economists Often Under-Value Privacy," Federal Trade Commission Staff Brown Bag, Washington, D.C., May, 2015.

Panelist, "Extraterritorial Application of U.S. Law to the Cloud," NYU School of Law Symposium on Government Access to Data in the Cloud," New York, May, 2015.

Conference Co-Chair and moderator, Computing Community Consortium/Computing Research Assocation Workshop on Privacy by Design, Atlanta, May, 2015.

Panelist, "Thinking Outside the Cookie Jar: New Tools, Opportunities and Risks of Mobile Behavioral Tracking and Text Messaging Campaigns," IAPP KnowledgeNet Conference, Los Angeles, April, 2015.

Panelist, "The Application of Section 222 of the Communications Act to Broadband Internet Access Services," Federal Communications Commission Workshop on Broadband Consumer Privacy, Washington, D.C., April, 2015.

"A Law Professor's Comments on the Role of Computer Scientists in Public Policy," Computing Research Association 2015 Leadership in Science Policy Workshop, Washington, D.C., April, 2015.

"Why Economists Often Under-Value Privacy," University of Pennsylvania Law School Conference on Taking Responsibility for One's Own Data Privacy and Security, Philadelphia, April 2015.

"MLATs 2.0," Future of Privacy Forum Annual Retreat, Middleburgh, VA, April 2015.

"Some Thoughts on Cyber-Resiliency, Time, and Surveillance," National Academy of Sciences/National Research Council Forum on Cyber-Resiliency, Washington, D.C., April 2015.

Moderator, "Privacy and Security Issues in Big Data," Scheller 2015 Business Analytics and Big Data Conference, Atlanta, March, 2015.

"The Second Wave of Global Privacy Protection: Why This Year is Different," CLE Seminar on "Unto the Breach: Privacy and Data Security Today," Atlanta, March, 2015.

Moderator, "Can US Warrants Reach Cloud Email Stored Abroad?" Webinar of the American Bar Association Section of Antitrust and Consumer Protection Law, March, 2015.

"Debate on NSA Surveillance and Online Commercial Tracking" (with Jonathan Mayer of Stanford), International Association of Privacy Professionals Summit, Washington, D.C., March, 2015.

"The Increasing and Essential Role of Computer Scientists in Policy Debates," Yale University Department of Computer Science, New Haven, February, 2015.

"Privacy by Design: More than Compliance with the Law," Computing Community Consortium/Computing Research Assocation Workshop on Privacy by Design, Berkeley, February, 2015.

Panelist, "Health Privacy in a Fully Connected World," Data Privacy Day Atlanta: Health Privacy in a Fully Connected World, Atlanta, January, 2015. (Conference Co-Chair)

"Location Information in Government Data Acquisition and Surveillance," NYU Law School Roundtable on Government Access to Cloud Data, New York, December, 2014.

"The Case of Surveillance," Syracuse University Workshop on Sovereignty, National Security and Internet Governance, New York, December, 2014.

Moderator, "Plenary Session on Exploring Surveillance, Privacy, and Big Data," Global Cyberspace Cooperation Summit V, (and also Co-Chair, Breakthrough Group on Surveillance, Privacy, and Big Data), Berlin, December, 2014.

"Debate on Law Enforcement vs. Smartphone Encryption" (with Andrew Weissman, former FBI General Counsel), New America Foundation, Washington, D.C., November, 2014.

"Panel: Looking Ahead," The Privacy Act @ 40 Conference of the Center on Privacy & Technology of the Georgetown Law Center, Washington, D.C., October, 2014.

"Plenary Panel on Cybersecurity," Georgia Tech Cyber Security Summit, Atlanta, October, 2014.

"Surveillance and the Future of the Internet," MIT Information Policy Project, Cambridge, October, 2014.

"Plenary Panel on Cybersecurity," Venture Atlanta '14 Conference, Atlanta, October, 2014.

Conway-Walker Lecture, "Information Technology Implications of the President's NSA Review Group," Cornell Department of Computer Science, Ithaca, October, 2014.

"Protecting Privacy and Civil Liberties in a Digital Age," French-American Foundation & Interpol: International Working Group on Cyber Security and the Law, Washington, D.C., October, 2014.

"The President's NSA Review Group: The Technology Issues," GVU Brown Bag Presentation, Georgia Tech, Atlanta, September, 2014.

"Cyber-security and Banking," Briefing to the Board of Directors of State Bank and Trust Company, Stone Mountain GA, September, 2014.

Panelist, "Surveying the Legal Landscape," Federal Trade Commission Workshop on "Big Data: A Tool for Inclusion or Exclusion," Washington, D.C., September, 2014.

**Keynote Presentation**, "A Policy Wonk's Plea for Better Policy Research and Engagement from Computer Scientists," Computing Research Association Snowbird Conference, Snowbird Utah, July 2014.

Plenary Panel, "Shedding Light on the PRISM of Government," American Constitution Society Annual Convention, Washington D.C., June 2014.

"The Declining Half Life of Secrets and the Future of Signals Intelligence," Security and Human Behavior Conference, Cambridge England, June 2014.

"The Declining Half Life of Secrets," Privacy Law Scholars Conference, Washington D.C., June 2014. (Selected for encore presentation.)

"Defining the Internet of Devices: Privacy and Security Implications," Privacy Law Scholars Conference, Washington D.C., June 2014. (Selected for encore presentation.)

"Privacy, Cybersecurity, and Meeting Business Goals in a Post-Snowden World," British American Business Conference, Atlanta, May 2014.

**Keynote**, "Privacy and Cybersecurity Compliance in the Post-Snowden World," Compliance Week 2014 Annual Conference, Washington D.C., May 2014.

"Information Technology Implications of the President's Review Group," Georgia Tech Research Institute, Atlanta, May 2014.

"Public Policy Implications of the President's Review Group," Georgia Tech School of Public Policy, Atlanta, April 2014.

2014 Thomas E. Noonan Distinguished Lecture, "The Information Technology Implications of the President's Intelligence Review Panel," Georgia Tech College of Computing, Atlanta, April 2014.

"The Ethical and Legal Implications of the President's Review Group on Intelligence and Communications Technology," Scheller Cecil B. Day Program in Business Ethics, Atlanta, March 2014.

"Cybersecurity and Law Enforcement Data Gathering," Conference on Strategies for Addressing Risks in Data and Technology Transactions, Atlanta, March 2014.

"Business Analytics Keynote Panel," Scheller Big Data Industry Forum, Atlanta, March 2014.

"Privacy, Innovation and Big Data: What Does the Future Hold?" American Constitution Society/Technology Law Section of the Georgia State Bar, Atlanta, March 2014.

"Business Implications of the President's Review Group Report on Intelligence and Communications Technology," Faculty Workshop Scheller College of Business, Atlanta, March 2014.

"A Talk with Peter Swire," IAPP Privacy Summit, Washington, D.C., March 2014.

Panelist, "The Future of NSA Surveillance," National Constitution Center, Philadelphia, February 2014.

Webinar, "Dissecting the NSA Review Group Report: Liberty and Security in a Changing World," American Constitution Society, January 2014.

Panelist, "Democracy, Surveillance, and Intelligence Agencies," Computers, Privacy, and Data Protection '14, Brussels, January 2014.

Panelist, "Privacy Developments," Georgia Association of Corporate Counsel CLE Jamboree, Atlanta, September 2013.

Panelist, "Bridging the Atlantic – the U.S./E.U. Privacy Divide," Privacy Law Salon, Washington, D.C., September 2013.

Moderator, "The Next Leap Forward: Modernizing America's Infrastructure through the IP Transition," Center for American Progress, Washington, D.C., July 2013.

Panelist, "Do Not Track," Consumer Action Conference at National Press Club, Washington, D.C., June 2013.

Panelist, "New Media and Privacy," DARPA Expert Workshop on Cybersecurity and Privacy, Arlington, June 2013.

Panelist, "The Search for Privacy and Security in the Internet's Modern Age," American Constitution Society National Convention, Washington, D.C., June 2013.

Panelist, "Is Data Mining Political Speech?", Conference on Data-Crunched Democracy sponsored by the University of Pennsylvania and University of North Carolina, Philadelphia, May 2013.

Panelist, "A Big Discussion about Big Data," Early Warning Summit, Phoenix, April 2013.

"Observations, Considerations, and Concerns," Conference on "Government/Information/Networks/Technology" of the Albany Law Journal of Science and Technology, Albany NY, April 2013.

"Pretty Good De-Identification," Internet Law Works in Progress Conference, Santa Clara Law School, Santa Clara CA, April 2013.

"Engineers and Lawyers in Privacy Protection," IAPP Summit, Panel: "Re-engineering Privacy Law", March 8, 2013.

Panelist, "US and TransAtlantic Debates: A New Direction for US Online Consumer Rights," Computers, Privacy, and Data Protection '13, Brussels, January 2013.

"Concluding Remarks," The Technology of Privacy Conference of the Silicon Flatirons of the University of Colorado, Boulder, January 2013.

Panelist, "The Globalization of European Privacy Law," American Association of Law Schools Conference, New Orleans, January 2013.

Panelist, "Politics and Media: New and Old," American Association of Law Schools Conference, New Orleans, January 2013.

Panelist, "How Can Legal Scholarship Be More Policy Relevant?", American Association of Law Schools Conference, New Orleans, January 2013.

## Other

**Press:**
Very extensive interviews for the press, including in all major U.S. papers, on national television, and in the international media. For details, see www.peterswire.net/pspress.htm.

**Languages:**
French (excellent), Spanish (fair to good).

**Personal:**
Lifelong science fiction fan; improving at golf (from a low base); two adult sons, Nathan and Jesse.  Married 2013 to Annie Antón, Professor in the School of Interactive Computing at Georgia Tech.

**Appendix B**
**Previous Testimony**

1.     Expert witness in *Pierce v. Universal Underwriters Life Insurance Co.*, Georgia Civil Action No. SU-03CV377 (2006).  In this case, plaintiff Pierce claimed that a nationwide class action should be certified based on information contained in credit histories provided by Equifax.  Swire testified that the information contained in the credit histories did not form an accurate factual basis for determining which individuals may have been affected by the alleged wrongful practices of UULIC.  After Swire provided written testimony, the case was dropped.

2.     Expert witness in *In re* Moore, No. 06-11736 (Bankr. E.D. Tenn. 2015).  In this case, the Debtor claimed injury due to alleged privacy and security failures by National Data Center, which operates a national database of debtor information used in bankruptcy litigation.  Swire was retained by a law firm to testify on behalf of National Data Center, and concluded:  "In light of its comprehensive technical and administrative safeguards of debtor privacy, and its overall enablement of efficient access to information for trustees, debtors, and creditors, NDC's actions are consistent with the overarching goals of the efficient administration of bankruptcy and do not present a material risk of harm to debtor's privacy."   After Swire provided written testimony, the case was dropped.

3.     Expert witness in *Data Protection Commissioner and Facebook Ireland Ltd. and Maximillian Schrems*, the High Court Commercial, 2016 No. 4809P (Ireland 2017).  In this case, the Irish Data Protection Commissioner found below that there was a well-founded basis for believing that standard contract clauses used by Facebook were not adequate under European Union data protection law.  Swire was retained by a law firm that represented Facebook, to testify in the Irish High Court.  Under Irish law, Swire was an independent

expert sworn to provide independent testimony to the Court.  Swire testified about U.S. surveillance law, including how U.S. law was more protective of privacy than similar E.U. law.

4.   Expert witness in *Authenticom Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis. 2017).  In this case, Authenticom alleged, among other things, that CDK and Reynolds had engaged in an anticompetitive conspiracy to block independent data integrators from accessing data stored on the DMS, causing data access prices to increase dramatically.  Swire was retained by Authenticom to provide an expert opinion on the privacy and data security implications of allowing independent data integrators to access data stored on the DMS.  After Swire testified at a preliminary injunction hearing, the district court enjoined CDK and Reynolds from continuing their blocking activities, although that particular remedy was reversed by the Seventh Circuit.

**Appendix C**
**Materials Considered, Reviewed, or Relied Upon**

Preliminary FTC Staff Report, Protecting Consumer Privacy in an Era of Rapid Change, A Proposed Framework for Businesses and Policymakers (Dec. 2010), http://www.ftc.gov/os/2010/12/101201privacyreport.pdf.

FTC Report, Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policy Makers at 23 (Mar. 2012), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf.

David Barkholz, Dealers Decry Reynolds Crackdown, Automotive News (Nov. 21, 2011), https://www.autonews.com/article/20111121/RETAIL07/311219997/dealers-decry-reynolds-crackdown

Reynolds & Reynolds, *Brockman On The Record*: *You're the Boss*. (2007).

Reynolds and Reynolds Company, Fuel Ideas to Drive Performance, http://www.reyrey.com/dealernews/fuel/era/2010/vol1/Your-Data-Your-Way.asp.

Reynolds and Reynolds Company, Customer Guide, Version 8 (Jan. 1, 2009)

ADP Dealer Services, Inc., Press Release, ADP Announces New Approved Vendors for ADP's Third Party Access Program (July 12, 2013), http://www.reactornet.com/company/news/12/reactornet_adp_integration.

Ralph Kisiel, ADP Provides Dealers 3 Options on Data Access, Automotive News (Feb. 19, 2007), http://www.autonews.com/article/20070219/SUB/70215040/adp-provides-dealers-3-options-on-data-access.

The Dealer Magazine, Interview with Steve Anenen and Kevin Henahan (Apr. 17, 2007), https://www.slideshare.net/ralphpaglia/best-digital-dealer-magazine-issue-ever-printed

CDK Global, Third Party Access Program: What Dealers Need to Know, https://web.archive.org/web/20160505034427/http://www.cdkglobal.com/sites/default/files/Third_Party_Access_Program_Solution_Overview_%28What_Dealers_Need_to_Know%29.pdf

CDK Master Services Agreement

Open Secure Access, *It's Your Data.  You Know Best What To Do With It.* https://web.archive.org/web/20070304105119/http://www.opensecureaccess.com/OSAOpenLetter.pdf

Auto/Mate:  Why is Auto/Mate Different, https://www.automate.com/dms/why-were-different/

NADA Press Release, NADA, AIADA Issue Joint Policy Statement on Data Accessibility (Feb. 2, 2007), https://www.nada.org/CustomTemplates/DetailPressRelease.aspx?id=21474842320.

Peter Swire & DeBrae Kennedy-Mayo, U.S. Private-Sector Privacy: Law and Practice for Information Privacy Professionals (International Association of Privacy Professionals (2d ed. 2018)

Federal Trade Commission, Privacy Online: A Report to Congress (June 1998), https://www.ftc.gov/sites/default/files/documents/public_events/exploring-privacy-roundtable-series/priv-23a_0.pdf.

Robert Gellman, Fair Information Practices: A Basic History (Version 2.18, Apr. 10, 2017), https://bobgellman.com/rg-docs/rg-FIPshistory.pdf.

U.S. Department of Health and Human Services, Modification to the Standards for Privacy of Individually Identifiable Health Information – Final Rule (Aug. 9, 2002), http://wayback.archive-it.org/3926/20131029140312/http://archive.hhs.gov/news/press/2002pres/20020809.html.

General Data Protection Regulation, Definitions, https://gdpr-info.eu/art-4-gdpr/

STAR, Who We Are, https://www.starstandard.org/index.php/about-star/who-we-are.

STAR, Meet Our Members, https://www.starstandard.org/index.php/about-star/membership-list.

STAR Newsletter (November 2018), https://www.starstandard.org/index.php/whats-new/star-newsletter-november-2018.

Thomas Schwartz, Reynolds and Reynolds Receives STAR 2006 DTS Implementation Award (January 4, 2007), https://www.reyrey.com/company/media-center/news-releases/reynolds-and-reynolds-receives-star-2006-dts-implementation.

The STAR Standards, https://www.starstandard.org/index.php/star-standards/the-standards.

STAR, Dealer Data Security Guidelines (2018), https://www.starstandard.org/images/SIGINFRASTRUCTURE/2018--Data-Security-Guideline.pdf

PR Newswire, Equifax Announced New Automotive Technology Platform at NADA Convention; AutoConnect platform from Equifax allows partners to seamlessly deliver auto-specific solutions in real-time to its customers (January 22, 2015), https://www.prnewswire.com/news-releases/equifax-announces-new-automotive-technology-platform-at-nada-convention-300024393.html.

Red Hat, What is an API?, https://www.redhat.com/en/topics/api/what-are-application-programming-interfaces

Programmable Web, API Directory, https://www.programmableweb.com/category/all/apis

Mashape: Find and Connect to Thousands of APIs,
https://market.mashape.com/explore

Rapid API: Find and Connect to Thousands of APIs, https://rapidapi.com/

APIHarmony, Welcome to API Harmony!,
https://apiharmony-open.mybluemix.net/public

APIs.io, APIs: Find And Be Found, http://apis.io/

APIsGuru, APIs in Collection, https://apis.guru/browse-apis/

IBM Developer Blog, API Use Cases for Every (?) Industry (August 15, 2017),
https://developer.ibm.com/apiconnect/2015/11/01/api-use-cases-for-every-industry/.

Securities Industry and Financial Markets Association, SIFMA Data Aggregation
Principles (Apr. 2018), https://www.sifma.org/wp-content/uploads/2018/04/sifma-
Data-Aggregation-Principles.pdf.

UK Finance, Payment Services Directive 2 and Open Banking,
https://www.ukfinance.org.uk/guidance/payment-services-directive-2-and-open-
banking

Chris Noonan Sturm, FTC launches first Web API to make Early Terminations more
accessible (June 25, 2018), https://www.ftc.gov/news-events/blogs/competition-
matters/2018/06/ftc-launches-first-web-api-make-early-terminations.

HHS Proposes New Rules to Improve the Interoperability of Electronic Health
Information, https://www.hhs.gov/about/news/2019/02/11/hhs-proposes-new-rules-
improve-interoperability-electronic-health-information.html

Federal Student Loan Program Data,
https://catalog.data.gov/dataset/federal-student-loan-program-data

Beneficiary Claims Data API, https://bcda.cms.gov/

Data.gov Applications, https://www.data.gov/applications

Open Data DC, https://opendata.dc.gov/

APImetrics, US Government API Performance Dashboard (July 2018),
https://apimetrics.io/apimetrics-free-api-tools-resources/check-api-health/us-
government-api-performance-dashboard/

U.S. Department of the Treasury, A Financial System That Creates Economic
Opportunities: Nonbank Financials, Fintech, and Innovation, (July 2018),
https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-
Creates-Economic-Opportunities---Nonbank-Financi....pdf).

Mark Zuckerberg, The Internet Needs New Rules: Let's Start in These four Areas,
Washington Post (Mar. 30, 2019), https://www.washingtonpost.com/opinions/mark-
zuckerberg-the-internet-needs-new-rules-lets-start-in-these-four-
areas/2019/03/29/9e6f0504-521a-11e9-a3f7-78b7525a8d5f_story.html.

Erin Egan, Charting a Way Forward: Data Portability and Privacy, Facebook (Sept. 2019), https://fbnewsroomus.files.wordpress.com/2019/09/data-portability-privacy-white-paper.pdf.

Peter Swire, Protecting Consumers: Privacy Matters in Antitrust Analysis, (Oct. 19, 2007), https://www.americanprogress.org/issues/economy/news/2007/10/19/3564/protecting-consumers-privacy-matters-in-antitrust-analysis/.

European Union General Data Protection Regulation, Art. 20(1), http://www.privacy-regulation.eu/en/article-20-right-to-data-portability-GDPR.htm

European Union General Data Protection Regulation, Art. 4(7), http://www.privacy-regulation.eu/en/article-4-definitions-GDPR.htm

Yuli Takatsuki, "CCPA Blog Series Part 2: Rethinking Access and Data Portability Rights," (Mar. 28, 2019) https://privacylawblog.fieldfisher.com/2019/ccpa-blog-series-part-2-rethinking-access-and-data-portability-rights

"HHS Proposes New Rules to Improve the Interoperability of Electronic Health Information," (Feb. 11, 2019), https://www.hhs.gov/about/news/2019/02/11/hhs-proposes-new-rules-improve-interoperability-electronic-health-information.html.

"CMS Advances Interoperability and Patient Access to Health Data Through New Proposals," (Feb. 8, 2019), https://www.cms.gov/newsroom/fact-sheets/cms-advances-interoperability-patient-access-health-data-through-new-proposals

A Financial System That Creates Economic Opportunities Nonbank Financials, Fintech, and Innovation, Executive Order 13772 on Core Principles for Regulating the United States Financial System (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf).

Declaration of Dean Crutchfield, *CDK Global, LLC et al. v. Brnovich* et al., No. 2:19-cv-04849-GMS, (filed August 22, 2019), Dkt. 20-1.

Declaration of Kelly Hall, *CDK Global, LLC et al. v. Brnovich et al.*, No. 2:19-cv-04849-GMS, (filed August 22, 2019), Dkt. 20-1.

Declaration of Hoyt Kesterson, *CDK Global, LLC et al. v. Brnovich* et al., No. 2:19-cv-04849-GMS, (filed September 30, 2019)

Declaration of Paul Whitworth, *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-cv-318, (W.D. Wis. filed June 22, 2017), Dkt. 142

Preliminary Injunction Hearing Transcript (Day 1 morning), *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-318 (W.D. Wis. June 26, 2017), Dkt. 164

Preliminary Injunction Hearing Transcript (Day 1 afternoon), *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-318 (W.D. Wis. June 26, 2017), Dkt. 162

Preliminary Injunction Hearing Transcript (Day 2 afternoon), *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-318 (W.D. Wis. June 27, 2017), Dkt. 163

PHX-93, Preliminary Injunction Hearing, *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 17-318 (W.D. Wis. June 26, 2017)